N O T I C E
- - - - - -


To:  Cary Ichter, Esq.
     Meadows Ichter & Bowers
     14 Piedmont Center, Suite 1100
     3535 Piedmont Road, NE
     Atlanta, GA  30305


January 10, 2003


                UNITED STATES DISTRICT COURT
                        for the
                NORTHERN DISTRICT OF GEORGIA
                     ATLANTA DIVISION

Marcial Davis,

                plaintiff                    CIVIL ACTION

          v.                                 NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          --------------------------------------------

     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was



served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

> Luther D. Thomas, Clerk
> United States District Court
> Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To: Kelly Jean Beard, Esq.
    Meadows Ichter & Bowers
    14 Piedmont Center, Suite 1100
    3535 Piedmont Road, NE
    Atlanta, GA  30305



January 10, 2003



                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Marcial Davis,

                plaintiff                    CIVIL ACTION

          v.                                 NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            ---------------------------------------------


     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Merrick D. Bernstein, Esq.
     Meadows Ichter & Bowers
     14 Piedmont Center, Suite 1100
     3535 Piedmont Road, NE
     Atlanta, GA  30305



     .


January 10, 2003



                 UNITED STATES DISTRICT COURT
                          for the
                 NORTHERN DISTRICT OF GEORGIA
                       ATLANTA DIVISION

Marcial Davis,

                 plaintiff                    CIVIL ACTION

          v.                                  NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                 defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            -------------------------------------------

     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - ~ - - -

To:  Michelle Rothenberg, Esq.
     Meadows Ichter & Bowers
     14 Piedmont Center, Suite 1100
     3535 Piedmont Road, NE
     Atlanta, GA  30305

January 10, 2003

UNITED STATES DISTRICT COURT
for the
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Marcial Davis,

             plaintiff                       CIVIL ACTION

          v.                              NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

             defendant

NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
--------------------------------------------

     On 1/8/03, World Championship Wrestling, Inc., et al,
filed a motion for  summary judgment in this Court, case document
number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-
sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:  John J. Dalton, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 10, 2003


                   UNITED STATES DISTRICT COURT
                              for the
                   NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION

Marcial Davis,

              plaintiff                    CIVIL ACTION

         v.                                NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

              defendant


           NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
           --------------------------------------------

     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  James Andrew Lamberth, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 10, 2003


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION


Marcial Davis,

                 plaintiff                    CIVIL ACTION

           v.                                 NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                 defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          ---------------------------------------------


     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Evan H. Pontz, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 10, 2003


                    UNITED STATES DISTRICT COURT
                            for the
                    NORTHERN DISTRICT OF GEORGIA
                         ATLANTA DIVISION

Marcial Davis,

                  plaintiff              CIVIL ACTION

          v.                             NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                  defendant


          NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
          ---------------------------------------------

     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -


To:  Eric Allen Richardson, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 10, 2003


                UNITED STATES DISTRICT COURT
                         for the
                NORTHERN DISTRICT OF GEORGIA
                      ATLANTA DIVISION


Marcial Davis,

                 plaintiff                    CIVIL ACTION

           v.                                 NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                 defendant


           NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
           ---------------------------------------------


     On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

     Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

                                        Luther D. Thomas, Clerk
                                        United States District Court
                                        Northern District of Georgia

Copies to counsel of record

N O T I C E
- - - - - -

To:  Bridget Bobick, Esq.
     Troutman Sanders
     Bank of America Plaza
     Suite 5200
     600 Peachtree Street, N.E.
     Atlanta, GA  30308-2216


January 10, 2003


                    UNITED STATES DISTRICT COURT
                              for the
                    NORTHERN DISTRICT OF GEORGIA
                          ATLANTA DIVISION

Marcial Davis,

                    plaintiff              CIVIL ACTION

            v.                             NO. 1:0-cv-1716-CC

World Championship Wrestling, Inc., et al,

                    defendant


            NOTICE TO RESPOND TO SUMMARY JUDGMENT MOTION
            ---------------------------------------------

        On 1/8/03, World Championship Wrestling, Inc., et al,

filed a motion for  summary judgment in this Court, case document

number 100.

        Pursuant to this Court's order dated April 14, 1987, opposing coun-

sel is hereby notified that within 20 days from the date said motion was

served, filing of all materials, including any affidavits, depositions, answers to interrogatories, admissions on file and any other relevant materials to be considered in opposition to the motion for summary judgment, is required. Federal Rules of Civil Procedure, Rule 56(c); Moore v. State of Florida, 703 F.2d 516, 519 (11th Cir. 1983).

Unless otherwise stated by the trial court, the Court will take said motion for summary judgment under advisement immediately upon the close of the aforesaid 20 day period. Id. at 519. See also Donaldson v. Clark, 786 F.2d 1570, 1575 (11th Cir. 1986); Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985).

The entry of a summary judgment by the trial court is a final judgment on the claim or claims decided. Finn v. Gunter, 722 F.2d 711, 713 (11th Cir. 1984). Whenever the non-moving party bears the burden of proof at trial on a dispositive issue and the party moving for summary judgment has demonstrated the absence of any genuine issue of fact, the nonmoving party must go beyond the pleadings and must designate, by affidavit or other materials, "... specific facts showing that there is a genuine issue for trial." Federal Rules of Civil Procedure, Rule 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324; 106 S.Ct. 2548, 2552-53; 91 L.Ed.2d 265, 272-3.

Luther D. Thomas, Clerk
United States District Court
Northern District of Georgia

Copies to counsel of record

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                    )
                                  )
           Plaintiff,             )
                                  )        CIVIL ACTION FILE
v.                                )
                                  )        NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC. and TURNER    )
BROADCASTING SYSTEM, INC.,        )
                                  )
           Defendants.            )

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure
and the Local Rules of this Court, Defendants Universal
Wrestling Corporation (f/k/a World Championship Wrestling,
Inc.), Turner Sports, Inc. and Turner Broadcasting System, Inc.,
(collectively, "Defendants") hereby move this Court for an order
granting summary judgment in their favor because, as a matter of
law, no genuine issue of material fact exists to be tried in
this case.

Defendants base this Motion on the following documents and
record evidence filed contemporaneously herewith:

1.   Defendants' Memorandum of Law in Support of
Defendants' Motion for Summary Judgment;

2.   Deposition testimony of Marcial Roberto Davis
Archbold;

3.    Deposition testimony of Eric A. Bischoff;

4.    Deposition testimony of Joseph N. Hamilton;

5.    Deposition testimony of James A. Morrison (p/k/a "JJ Dillon");

6.    Deposition testimony of Paul Orndorff;

7.    Deposition testimony of Dewayne E. Bruce;

8.    Affidavit of Diana L. Myers;

9.    Affidavit of Joseph Hamilton;

11.    Affidavit of James A. Morrison (p/k/a "JJ Dillon");

12.    Affidavit of Paul Orndorff; and

13.    Defendants' Statement of Undisputed Material Facts.

This 8th day of January, 2003.

TROUTMAN SANDERS LLP

_Evan H. Pontz_

JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants
Universal Wrestling Corporation
(f/k/a World Championship
Wrestling, Inc.), Turner Sports,
Inc. and Turner Broadcasting
System, Inc.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                      )
                                    )
              Plaintiff,            )
                                    )        CIVIL ACTION FILE
v.                                  )
                                    )        NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER     )
BROADCASTING SYSTEM, INC.,          )
                                    )
              Defendants.           )

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** upon the interested parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA  30305

This 8th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404)885-3000

# ORIGINAL



FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 08 2003

LUTHER D. Thomas, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,               )
                             )
                Plaintiff,   )
                             )        CIVIL ACTION FILE
v.                           )
                             )        NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and     )
TURNER BROADCASTING SYSTEM, INC., )
                             )
                Defendants.  )

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW"), Turner Sports, Inc. ("TSI") and Turner Broadcasting System, Inc. ("TBS") (collectively "Defendants") submit this memorandum in support of their Motion for Summary Judgment on all claims brought by Plaintiff Marcial Davis ("Davis").

### INTRODUCTION

Davis first filed this action on July 10, 2000, alleging claims of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and under the Civil Rights Act of 1866, 42 U.S.C. § 1981; alleging failure to pay overtime and minimum wage, as required by the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.; and alleging a state law claim of intentional infliction of emotional distress.  With respect to

Davis's race discrimination claims, he alleges that WCW (i) discriminated against him because of his race (African-American) with regard to wrestling opportunities, (ii) retaliated against him for complaining about alleged racial discrimination and (iii) subjected him to a racially hostile work environment. Davis also alleges that by engaging in such discriminatory conduct, WCW intentionally caused him emotional distress. With respect to Davis's FLSA claims, he alleges that he provided translation, clean-up and video shoot services to WCW for which he was not paid minimum wage and/or overtime. Based solely upon principles of agency and vicarious liability, Davis seeks not only to hold WCW liable for these alleged acts, but to hold TSI and TBS liable as well.

Davis's claims are baseless. Davis has not presented even a scintilla of evidence showing that he was treated differently because of his race. To the contrary, the undisputed evidence establishes that he was provided with the same opportunities as other similarly-situated white wrestlers and/or trainees at WCW. In addition, the uncontroverted evidence of record shows that Davis was not subjected to a racially hostile work environment, was not retaliated against for alleged complaints of race discrimination, and did not provide services to WCW for which compensation was required but not paid.

Because WCW's decisions and actions taken with regard to Davis were based on legitimate, non-discriminatory business reasons that had nothing to do with Davis's race, and because Davis is not entitled to recover overtime or any other type of compensation under the FLSA for services allegedly provided to WCW, summary judgment should be granted in WCW's favor on all of Davis's claims. Moreover, because Davis's claims against TSI and TBS derive solely from Davis's claims against WCW and are based on principles of agency and vicarious liability, summary judgment also should be granted in favor of TSI and TBS on all of Davis's claims.

**STATEMENT OF FACTS**

**WCW's Business**

WCW created, produced, and marketed professional wrestling events during the 1990s and through March 2001. (Affidavit of Diana Myers (hereinafter "Myers Aff.") ¶ 3 (a copy of this affidavit is attached hereto as Exhibit A)). WCW's wrestling events were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems. (Id.) The wrestlers and other on-screen talent who appeared in WCW's wrestling events provided their services to WCW as independent contractors, either through formal written contracts or without written agreements. (Id. at ¶ 4). A creative team of

writers and producers at WCW created WCW's wrestling events, both
live and taped, with the goal of entertaining wrestling fans and
general audiences nationwide.  (Id.)

After enjoying commercial and financial success in the mid-
to-late 1990s, WCW's business suffered a sharp downturn during
1999.  (Myers Aff. ¶ 6).  During this time period, WCW lost
significant sums of money and, thus, only added new talent who it
perceived was likely to generate substantial revenue.  (Id.)  WCW
also began reducing the compensation of existing talent where
possible, began producing fewer and fewer wrestling events to
reduce costs, and terminated the contracts of some its lesser
performers.  (Id. at ¶¶ 6-7).  Despite these efforts, WCW's
business downturn continued, and in March 2001, WCW sold certain
of its assets and ceased its operations.  (Id. at ¶ 8).

**Davis's Background And Relationship With WCW**

Davis's relationship with WCW began in February 1998 when he
was accepted into the professional wrestling training program held
at WCW's "Power Plant" facility.  (Deposition of Marcial Roberto
Davis Archbold (hereinafter "Davis Dep.") at 23, Ex. 1).[1]  Davis
did not have any prior wrestling experience and had never received
any wrestling instruction before he commenced WCW's training

---

[1] Excerpts of deposition testimony and copies of deposition
exhibits referenced herein are included in the Appendix, filed
simultaneously herewith.

program.  (Davis Dep. at 17-18).  The purpose behind the Power

Plant training program was to help Davis develop the mental and

physical wrestling skills and the charisma necessary to compete in

WCW's professional wrestling matches with minimal instruction.

(Affidavit of Joseph N. Hamilton (hereinafter "Hamilton Aff.") ¶ 5

(a copy of this affidavit is attached hereto as Exhibit B)).

Davis initially paid a fee for wrestling training and instruction

at the WCW Tryout/Workout Camp, and after completing this initial

training period, he continued to train at the Power Plant on an

ongoing basis and paid WCW periodically for his training and

instruction.  (Davis Dep. at 21-22; Hamilton Aff. ¶ 6).

Eventually, WCW allowed Davis to continue receiving wrestling

instruction and training without the obligation to pay the

associated fees.  (Davis Dep. at 21-22; Hamilton Aff. ¶ 6).

Davis needed additional training because he appeared awkward in

the wrestling ring, was unconvincing in executing his wrestling

matches and needed to substantially improve his wrestling skills.

(Hamilton Aff. ¶ 7; Deposition of Paul Orndorff (hereinafter

"Orndorff Dep.") at 58-59); Deposition of Joseph N. Hamilton

(hereinafter "Hamilton Dep.") at 64-65; Deposition of James A.

Morrison (p/k/a "J.J. Dillon") (hereinafter "Dillon Dep.) at 122-

23).  In fact, despite training, Davis was still unnatural on

stage, his wrestling movements still appeared too mechanical and

choreographed, and he still lacked the excitement and charisma necessary to generate crowd interest. (Hamilton Aff. ¶ 7; Hamilton Dep. at 64-65; Orndorff Dep. at 58-59; Deposition of Dewayne E. Bruce (hereinafter "Bruce Dep.) at 59-61). Davis also lacked the ability to convincingly and logically achieve the predetermined result of his wrestling matches. (Hamilton Aff. ¶ 7; Affidavit of James A. Morrison (p/k/a "J.J. Dillon") (hereinafter "Dillon Aff.") ¶ 5 (a copy of this affidavit is attached hereto as Exhibit C); Bruce Dep. at 59-61). Nevertheless, WCW offered Davis the opportunity to continue training at the Power Plant because Joseph Hamilton, the Director of the Power Plant, believed that, with hard work and determination, Davis had the potential to substantially improve his wrestling skills. (Hamilton Aff. ¶ 7). Despite WCW's efforts to develop his skills, Davis often missed training sessions and failed to capitalize upon all available opportunities to improve his wrestling skills. (Bruce Dep. at 59-61). As a result, he never developed his potential and was unable to master basic wrestling maneuvers. (Id.; Hamilton Aff. ¶ 8).

In an effort to allow Davis to demonstrate and improve upon his wrestling skills during training sessions at the Power Plant, WCW frequently allowed him to wrestle against other more successful wrestlers. (Davis Dep. at 112-113; Affidavit of Paul

Orndorff (hereinafter "Orndorff Aff.") ¶ 7 (a copy of this affidavit is attached hereto as Exhibit D)).   Nonetheless, Davis remained slow in the wrestling ring, and his wrestling movements continued to be awkward and uncoordinated.   (Hamilton Aff. ¶¶ 7-8; Orndorff Aff. ¶ 10; Dillon Aff. ¶ 7).

In addition to frequently giving Davis the opportunity to wrestle against and learn from big-name wrestlers during training, WCW also gave Davis other opportunities to promote himself within WCW, such as by making commercials for the organization.   (Davis Dep. at 67).   In fact, while training, Davis appeared in a promotional video with Ric Flair, who was, at that time, a popular and successful wrestler for WCW.   (Id.)   WCW also afforded Davis several opportunities to provide services as a translator for its Spanish-speaking wrestlers, because Davis was bilingual.   (Dillon Dep. at 235-36; Dillon Aff. ¶ 5).

## WCW Relocates And Restructures Its Training Program

At the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location to a new location on Log Cabin Drive, in Smyrna, Georgia.   (Orndorff Aff. ¶ 6).   WCW established this new facility to serve as its training facility for a smaller group of wrestler trainees than the group that had previously been training at the former Power Plant location. (Id.)   WCW intended to enter into written independent contractor

agreements with all of the wrestlers selected to train at this new facility.  (Id.)

**WCW Selects Davis To Receive An Independent Contractor Agreement**

To select the individuals who would be signed to these agreements, WCW training personnel devoted roughly six to eight weeks evaluating the skills and talents of the approximately forty individuals who were then training at the Power Plant.  (Orndorff Aff. ¶ 7).  At the end of this period, WCW conducted "tryout" sessions and matches among all of the trainees.  (Id.)  At the conclusion of these try-outs, Davis was among those trainees selected to be signed to an agreement and to continue training at the new Power Plant location.  (Id.)  Although Davis had not developed his skills to the degree expected of WCW's professional wrestlers, Davis was chosen because he was big in size, had a good "look," and was still, despite his lack of development, perceived to have potential that could be developed.  (Id.)

After the try-out process, Davis formally entered into a trainee Agreement with WCW, as an independent contractor, on April 19, 1999.  (Davis Dep. at 70; Independent Contractor Agreement, dated April 19, 1999 ("Agreement"), Defendants' Exhibit 7 to Davis Dep.).  The Agreement had a term of one year, and established that Davis would be paid $2,600 per month.  (Davis Dep. at Ex. 7).  The

Agreement also expressly provided that WCW could terminate it for any reason with fourteen (14) days advance notice.  (Id.)

## Davis Fails To Improve And WCW Terminates His Independent Contractor Agreement

After signing the Agreement, Davis continued to train in the new Power Plant location.  (Orndorff Aff. ¶ 7).  At the new Power Plant, WCW separated the wrestler trainees into training groups based upon their skill level.  (Id. at ¶ 8).

In an attempt to help some of the lesser skilled wrestlers develop their wrestling skills, WCW trainers conducted practice wrestling matches between trainees.  (Id.)  Davis often participated in these matches and competed against the more advanced wrestler trainees.  (Id.)  In facilitating these matches, WCW gave Davis the opportunity to learn from the more advanced wrestlers and to demonstrate any progress that he had made.  (Id.) Although Davis was permitted to wrestle in practice matches during training, he was not given the same live and televised wrestling opportunities as other wrestlers and trainees who were more experienced, polished and/or talented, because Davis did not have the requisite skills to appear on WCW's live and/or televised programming.  (Dillon Aff. ¶ 6).

In September of 1999, the Director of the Power Plant, Paul Orndorff, evaluated all of the trainees at the Power Plant, a process in which he periodically engaged, to assess their overall

progress and development.  (Orndorff Aff. ¶ 9).  In evaluating
Davis, Mr. Orndorff determined that Davis's wrestling skills had
not only failed to improve, but that they had in fact diminished
since he began training at the new Power Plant.  (Orndorff Aff. ¶
10).  Mr. Orndorff also noted that Davis did not stand out as a
potential star wrestler among the trainees and was not likely to
develop his skills to the point necessary to be a successful
wrestler with WCW or to advance beyond the trainee level.  (Id.)
During this same time, WCW was suffering from financial
difficulties and had embarked on a major cost reduction effort.
(Dillon Aff. ¶ 7).  As part of this effort, WCW terminated the
contracts of some of its lesser skilled trainees and wrestlers.
(Id.)  Because Davis had failed to improve his wrestling skills to
the point necessary to appear on WCW's live and/or televised
events, after giving Davis the required advance notice, WCW
terminated his Agreement in October of 1999.  (Davis Dep. at 86-
87, Ex. 10; Dillon Aff. ¶¶ 7-8; Orndorff Aff. ¶ 11).

**ARGUMENT AND CITATION OF AUTHORITY**

**I.   THE SUMMARY JUDGMENT STANDARD.**

Summary judgment is appropriate if the evidence before the
Court shows that there is no genuine issue as to any material fact
and that the moving party is entitled to judgment as a matter of
law.  Fed. R. Civ. P. 56(c); Vason v. City of Montgomery, 240 F.3d

905, 907 (11th Cir. 2001).  To survive summary judgment, the

nonmoving party must present concrete evidence in the form of

"*specific facts* showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis added).

The summary judgment rule applies with equal force in

discrimination cases.  The Eleventh Circuit recently held:

> While acknowledging that questions of fact in job
> discrimination cases are "both sensitive and difficult"
> and "[t]here will seldom be 'eyewitness' testimony as
> to the employer's mental processes," the [U.S.] Supreme
> Court has told us that "none of this means that trial
> courts or reviewing courts should treat discrimination
> differently from other ultimate questions of fact."
> St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524
> (1993).... And quite recently, the [U.S. Supreme]
> Court rejected a rule which would have made it easier
> for job discrimination plaintiffs to get their case to
> a jury, explaining that "[t]o hold otherwise would be
> effectively to insulate an entire category of
> employment discrimination cases from [appropriate]
> review..., and we have reiterated that trial courts
> should not treat discrimination differently from other
> ultimate questions of fact."  Reeves, 120 S. Ct. at
> 2109.  ...The long and short of it is that the summary
> judgment rule applies in job discrimination cases just
> as in other cases.  No thumb is to be placed on either
> side of the scale.

Chapman v. Al Transport, 229 F.3d 1012, 1026 (11th Cir. 2000).  As

demonstrated herein, Davis cannot present evidence *sufficient* to

create a genuine issue of material fact on any of his claims.

Accordingly, Defendants are entitled to summary judgment on all of Davis's claims.[2]

## II.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO DAVIS'S § 1981 CLAIMS BECAUSE DAVIS CANNOT ESTABLISH THAT WCW DISCRIMINATED AGAINST HIM ON THE BASIS OF HIS RACE.

To establish a disparate treatment claim, Davis must prove "intentional discrimination."  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  Because Davis cannot present direct evidence of discrimination, the proof scheme articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies to his claim of disparate treatment.  See Burdine, 450 U.S at 254.    Under the McDonnell Douglas proof scheme, Davis must present circumstantial evidence sufficient to establish a prima facie case of discrimination.  Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999).  However, the mere presentation of circumstantial evidence is not sufficient to defeat a motion for

---

[2] Davis's claims against TSI and TBS are based solely on theories of derivative liability.  (Third Amended Complaint ¶¶ 35-47).  Davis does not claim that either TSI or TBS took any improper actions against Davis or violated any law as to Davis.  Rather, Davis claims that WCW took such actions, and that TSI and TBS should be held accountable because of their purported relationship with WCW.  (Id.)  Because Davis's claims against WCW fail as a matter of law, Davis's derivative claims against TSI and TBS also fail.

summary judgment.  Even if a plaintiff can establish a prima facie case of race discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions regarding the plaintiff.  Reeves, 530 U.S. at 142. The defendant is not required to prove absence of discriminatory motive, but merely to articulate some legitimate reason for its actions.  Moreover, the defendant's burden is one of production and not persuasion.  See id.; Burdine, 450 U.S. at 253.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).  The plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination."  Texas Dep't of Community Affairs, 450 U.S. at 253; see Reeves, 530 U.S. at 143.  The plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff." St. Mary's

Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

As demonstrated herein, Davis cannot establish that WCW

intentionally discriminated against him because of his race by

purportedly failing to provide him with additional or more

prestigious wrestling opportunities.  Moreover, Davis's hostile

work environment claim lacks legal and factual support.

Accordingly, Defendants are entitled to summary judgment on

Davis's § 1981 claims.

### A.   Davis Cannot Establish That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Davis's allegations boil down to a "failure-to-

promote" or "failure-to-advance" type claim.  Davis alleges that

WCW failed to provide him with opportunities to wrestle on

televised events and/or in other wrestling matches because of his

race.  (Third Amended Complaint ¶ 51).  Davis, however, cannot

produce any evidence that WCW actually and intentionally refused

to give him wrestling opportunities "because of" his race.  Oncale

v. Sundowner Offshore Services, Inc. 523 U.S. 75, 78, 118 S. Ct.

998, 140 L. Ed. 2d 201 (1998)(quoting 42 U.S.C. § 2000e-2(a)(1))

(emphasis added).

To establish a prima facie case of failure to promote on

account of his race under the McDonnell-Douglas framework, Davis

must show:  (1) that he was a member of a protected class; (2)

that he sought or applied for one or more positions; (3) that he was otherwise qualified for the positions sought; and (4) that, after his rejection, the positions remained open or were filled by a person outside his protected class. See Schoenfield v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999). Davis cannot establish a prima facie "failure-to-promote" case because the record is devoid of any evidence establishing that Davis was qualified for the wrestling positions or opportunities about which he complains.

Because wrestling matches are a form of entertainment and are scripted, charisma, crowd appeal, uniqueness, wrestling skill, physical capabilities, persona and acting ability are essential prerequisites for a wrestler to receive consistent wrestling opportunities on WCW's live and televised events. (Dillon Aff. ¶ 4; Orndorff Aff. ¶ 4). The uncontroverted evidence of record establishes that Davis did not have the talent necessary to wrestle on WCW's events. (Orndorff Aff. ¶¶ 5, 7, 10; Dillon Aff. ¶¶ 5, 7, 8; Hamilton Aff. ¶ 8; Orndorff Dep. at 58-59; Bruce Dep. at 59-61; Dillon Dep. at 122-23; Hamilton Dep. at 64-65). Despite WCW's efforts to train and instruct Davis, Davis appeared awkward and inexperienced in the ring, was unable to execute even basic wrestling moves, lacked stage presence and charisma, and lacked the ability to entertain. (Hamilton Aff. ¶ 7; Orndorff Aff. ¶¶ 5, 10; Dillon Aff. ¶ 5; Dillon Dep. at 122-23). Moreover, Davis's

wrestling skills and ability to lay out and execute a wrestling match appeared to decline after he began training at the new Power Plant location. (Orndorff Aff. ¶ 10). For all of the foregoing reasons, and not because of Davis's race, Davis never advanced to a higher wrestling status within WCW. (Dillon Aff. ¶ 8; Orndorff Aff. ¶¶ 10-11). Because Davis cannot establish that he was qualified for the opportunities he claims he was denied, his failure to promote claim fails.

Davis also has failed to make out a prima facie case of disparate treatment with respect to advancement opportunities, because he cannot point to any **similarly situated** white wrestler with WCW who was given more and better wrestling opportunities than Davis was given.

To succeed on a disparate treatment claim for failure to promote, Davis must establish "that similarly situated or less qualified [individuals] were promoted or transferred" to the position about which he complains. Pashoian v. GTE Directories, 208 F. Supp. 2d, 1293, 1308 (M.D. Fla. 2002). Davis claims that Mark Jindrak, Chuck Palumbo, Mike Sanders, Lash LaRue, "The Wall," "Shark Boy," and Allen Funk were similarly situated to or less qualified than him. (Davis Dep. at 100). In making this assertion, however, Davis relies on nothing more than his own subjective opinion. Davis's subjective opinion that he was

similarly situated to or better qualified than other wrestlers who received opportunities to wrestle on WCW's more popular events is insufficient.  See Lee v. GTE Florida, Inc., 226 F.3d 1249, 1254 (11th Cir. 2000) (explaining that "an employee's own opinions about his . . . qualifications do not give rise to a material factual dispute") (quoting Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Svcs., 165 F.3d 1321, 1329-30 (10th Cir. 1999), cert. denied, 528 U.S. 815, 120 S. Ct. 53 (1999)); see also Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983) (instructing that an employee's subjective belief does not establish a jury issue).

In any event, to sustain a claim of discrimination, Davis must do more than show that he was better qualified than another individual who received the position that he wanted.  Denney v. City of Albany, 247 F.3d 1172, 1187 (11th Cir. 2001) (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253-54 (11th Cir. 2000 (quotations omitted).  "Disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless these disparities are so apparent as virtually to jump off the page and slap you in the face."  Id.; see also Miller v. Bed, Bath & Beyond, Inc., 185 F. Supp. 2d 1253, 1271 (N.D. Ala. 2002). Here, Davis cannot even establish that the wrestlers to whom he points were similarly situated to him with respect to experience,

17

wrestling skill, the ability to successfully carry out a
predetermined wrestling result, and acting ability.  Because he is
unable to meet this lesser burden as to these other wrestlers, he
most certainly cannot establish that he was *more qualified* than
they were.  Accordingly, Davis cannot establish a prima facie case
of discrimination in denial of opportunities, and this claim
fails.

**B.   WCW Has Articulated Legitimate, Nondiscriminatory
      Reasons For Not Providing Davis With Additional
      Wrestling Opportunities.**

Davis's failure to promote/advance claim also fails because
WCW has established that it had legitimate, nondiscriminatory
*reasons which explain* why Davis was not provided with additional
wrestling opportunities.  The undisputed evidence of *record*
establishes that Davis was not offered televised or live-audience
wrestling opportunities with WCW because he lacked the basic
talent and *skills necessary* to appear in and wrestle during these
events, despite extensive training and numerous opportunities to
improve his wrestling skills.  The record also shows that in 1999,
WCW was experiencing and responding to a business downturn,
reduced the number of *wrestling* events produced, had less need for
mediocre wrestling talent, and terminated the contracts of many
non-essential wrestlers and trainees as a cost-cutting measure.
(Myers Aff. ¶ 5).  Accordingly, WCW decided not to provide

additional opportunities to lesser performers such as Davis.
Because Davis cannot and does not dispute that such a downturn
occurred, that there was less need for mediocre wrestling talent
and that WCW properly considered Davis to be a lesser performer,
he is unable to establish that the nondiscriminatory reasons
offered by WCW are a pretext for discrimination.  Accordingly,
Davis's claim fails.  See Burdine, 450 U.S. at 256 (to survive
summary judgment, a plaintiff must directly persuade the court
that a "discriminatory reason more likely motivated [WCW] or
indirectly [prove discrimination] by showing that [WCW]'s
proffered explanation is [pretextual and] unworthy of credence").

### C. Davis Cannot Establish That He Was Subjected To A Racially Hostile Work Environment.

Davis also alleges that while with WCW he was subjected to a
racially hostile environment.  (Third Amended Complaint ¶ 52).  In
support of this claim, Davis contends that racial slurs were
allegedly made while he was training, he was "required" to assist
in cleaning the Power Plant facility, and that the white wrestlers
trained separately from the black wrestlers during practices.
(Davis Dep. at 103-21).[3]  Even assuming the truth of Davis's

---

[3] With respect to the alleged statements about which Davis
complains, Davis claims (1) that some of the trainees allegedly
used the words "nigger," "monkey" or "chimp" in reference to other
black wrestlers and/or trainees; (2) that other trainees requested
that he stop speaking that Spanish "crap in here"; (3) that
Dewayne Bruce called him a "black motherfucker" and said he would

allegations, as a whole, they are insufficient to establish that he was subjected to a racially hostile work environment.

To succeed on his hostile work environment claim, Davis must demonstrate that the alleged actions of WCW "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). "For example, the racial slurs allegedly spoken . . . had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" Id. (quotations omitted). Factors that must be considered in assessing the merits of a hostile environment claim include the frequency and severity of the alleged discriminatory conduct, whether the conduct was threatening or humiliating, and whether it unreasonably interfered with Davis's work performance with WCW. Id. at 1521-22. In light of this standard, Davis's claim fails, because, even assuming the truth of every incident that Davis describes in support of his claim, these incidents are insufficient as a matter of law to create a racially hostile work environment.

---

"never get anywhere in the company;" (4) that some of the trainees made racial jokes; (5) that certain trainees would ask if he was "a Mexican;" and (6) that Paul Orndorff stated that he had to "kiss his ass to get anywhere in [the] company." (Davis Dep. at 95-96; 102-03, 118-120).

The uncontroverted evidence of record establishes that many of the alleged statements were not directed towards Davis or made to Davis.  (Davis Dep. at 120).  Davis may not rely on hearsay statements or statements that were not directed at him to defeat summary judgment.  See Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1135 (11th Cir. 1996) (instructing that inadmissible hearsay cannot be offered to defeat a summary judgment motion when it is not reducible to admissible form at trial); see also Edwards, 49 F.3d at 1520-21 (concluding that hostile work environment claim was without merit because many of the alleged statements were either speculation or hearsay, and because there was insufficient information as to when the alleged statements were made).

Davis's claim also fails because it is undisputed that the few alleged statements about which Davis complains were made at random over an approximately two-year time period.  (Davis Dep. at 95-121).  Such sporadic comments are insufficient to establish that the environment at WCW was permeated with racial hostility. See Hudson v. Norfolk Southern Railway Co., 209 F. Supp. 2d 1301, 1314 (11th Cir. 2001) (explaining that instances of racial slurs must be more than sporadic to be sufficient to support a hostile work environment claim); see also Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) (explaining that the "mere utterance of an ethnic or racial epithet which engenders offensive

feelings in an employee does not rise to a Title VII [or Section 1981] violation" and that isolated incidents of harassment are not actionable).  Because the alleged discriminatory conduct about which Davis complains was far from "commonplace," was not harsh or severe, and was not physically threatening, this claim fails.  See Edwards, 49 F.3d at 1521 (explaining that racial slurs must be so "commonplace, overt and denigrating that they create an atmosphere charged with racial hostility").

Davis's hostile work environment claim also fails because he cannot support his allegation with "any specific examples of how [the alleged] discriminatory conduct . . . had a deleterious effect on his [work] performance."  See Mitchell v. Carrier Corp., 954 F. Supp. 1568, 1578 (M.D. Ga. 1995), aff'd, 108 F.3d 343 (11th Cir. 1997); see also Evans v. Pemco Aeroplex, 1998 WL 1048470, No. CIVACV96-S-2801-S (N.D. Ala. Feb. 23, 1998) (explaining in case in which five incidents of racist conduct occurred, including the use of nooses and the letters "KKK," that without evidence that the incidents affected [the plaintiff's] work performance, the court could not conclude that the alleged harassment was sufficiently severe and pervasive to alter a term or condition of employment). In this case, not only has Davis failed to establish that his performance declined because of any alleged acts of discrimination, he has, to the contrary, claimed that his

performance at WCW was so exemplary as to warrant advancement. (Davis Dep. at 101-07).  Davis can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. at 21.

Davis's assertions that he was required to help clean up the Power Plant and to help assemble and take down the wrestling ring do nothing to salvage his claim.  (Davis Dep. at 26, 77, 123).  As Davis has admitted, WCW also asked white wrestler trainees at the Power Plant to help clean up the Power Plant and to help assemble and take down the wrestling ring as part of the training program. (Davis Dep. at 31).  Because cleaning up the Power Plant and assembling the wrestling ring were race-neutral incidents of training at the Power Plant, Davis cannot rely on that evidence in support of his hostile work environment claim, and his claim fails.  Smith v. Mount Sinai Medical Ctr. of Greater Miami, Inc., 36 F. Supp. 2d 1341, 1346 (S.D. Fla. 1998).

Likewise, Davis's assertion that black wrestlers and white wrestlers were separated during training cannot support a hostile work environment claim.  The record establishes that trainers at the Power Plant separated the trainees into practice groups based upon their level of wrestling skill and talent.  (Orndorff Aff. ¶

8).  Davis has admitted that each wrestling group was composed of both black and white wrestlers.  (Davis Dep. at 109-13).  Because the trainees were separated into groups based upon race-neutral criteria, Davis's hostile environment claim based on his allegations regarding separate training fails.

### D. Davis Cannot Establish That WCW Retaliated Against Him Because Of Any Alleged Complaints About Race Discrimination.

Davis apparently also claims that, as a result of his alleged complaints of discrimination to Pezevan Whatley, who was then a trainer at the Power Plant, WCW retaliated against him by terminating his trainee contract and by refusing to provide him with additional, more prestigious wrestling opportunities.  (Third Amended Complaint ¶ 57).  Despite these bald assertions, Davis cannot demonstrate that WCW took any adverse action against him in retaliation for his purported complaints.

A prima facie claim of retaliation requires proof of three elements:  (i) that plaintiff engaged in statutorily protected conduct; (ii) that plaintiff suffered an adverse employment action; and (iii) that the adverse action was causally related to the protected conduct.  Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).  In this case, Davis cannot provide any evidence that a causal connection existed between his alleged complaints and the adverse employment action.

To establish the causal connection prong of his *prima facie* case, Davis must establish that the person who made the decisions relating to the termination of his Agreement had knowledge of his purported complaints of race discrimination. <u>Gupta v. Florida Board of Regents</u>, 212 F.3d 571, 589 (11th Cir. 2000). Pezevan Whatley, the only person to whom Davis reported his complaints of discrimination, was a trainer at the Power Plant who lacked the authority to make any decisions on WCW's behalf relating to Davis's Agreement. (Davis Dep. at 109, 122). By Davis's own admission, there is no evidence that Mr. Whatley reported Davis's alleged complaints of discrimination to anyone at WCW who had the authority to terminate his Agreement, or that any such individual was aware of Davis's alleged complaints at the time that his contract was terminated. (Davis Dep. at 122-24). In fact, the uncontroverted evidence of record establishes that neither Paul Orndorff, the WCW Power Plant Director who determined that Davis's Agreement should be terminated because of Davis's wrestling deficiencies, nor J.J. Dillon, who supervised Mr. Orndorff, had any knowledge of Davis's alleged complaints of discrimination. (Dillon Aff. ¶ 9; Orndorff Aff. ¶ 12). "Where there is undisputed evidence that the decision maker did not have knowledge that the employee engaged in protected conduct," a plaintiff cannot establish that a causal connection existed between the alleged

complaints of discrimination and the adverse contract action.
LeBlanc v. The TJX Co., Inc., 214 F. Supp. 2d 1319, 1325 (S.D.
Fla. 2002).  Because Davis cannot establish that the person making
the decisions with respect to his contract had knowledge of his
purported complaints of race discrimination, his retaliation claim
fails.

Moreover, because Davis was one of a number of independent
contractors affected by WCW's decision to terminate its contracts
with its less talented wrestlers and would have been terminated
even absent his purported complaints, he has failed to establish a
causal connection between the termination of his contract and his
complaints of discrimination.  See LeBlanc, 214 F. Supp. 2d at
1330 (explaining that where the plaintiff's termination was
inevitable, even before the complaint of discrimination was filed,
the plaintiff failed to establish a causal connection between the
complaint and the adverse employment action).

Davis also alleges in support of his retaliation claim that,
because he complained of discrimination to Pezevan Whatley, WCW
retaliated against him by failing to allow him opportunities to
advance within the organization. (Third Amended Complaint ¶ 57).
This claim also fails because Davis cannot establish a causal
connection between WCW's purported "failure to advance" him and
his complaints of discrimination.  As discussed earlier, Davis did

not advance within WCW because he lacked the experience, talent, skills and coordination necessary to wrestle for WCW in live, televised and/or pay-per-view events.  Therefore, even absent his complaints of discrimination, Davis would have been extended the *same wrestling opportunities that he received.*  The uncontroverted evidence of record also shows that WCW terminated the contracts of white wrestlers based on the same or similar reasons (i.e., downturn and cost reduction efforts) as those for which Davis's Agreement was terminated.  (Davis Dep. at 107).  Because Davis cannot show any causal connection between *any action taken by WCW* and his alleged complaints, summary judgment should be granted on Davis's retaliation claim.

## III. SUMMARY JUDGMENT SHOULD BE GRANTED AS TO DAVIS'S TITLE VII CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN DAVIS AND WCW.

Davis also asserts claims of race discrimination under Title VII of the Civil Rights Act of 1964.  (Third Amended Complaint ¶ 52).  The undisputed facts of record conclusively establish that *Davis cannot maintain a discrimination claim under Title VII.*

A Title VII race discrimination claim requires that an **employment relationship** exist between the plaintiff and the defendant.  Holloman v. Northeast Georgia Area Development Comm'n, 740 F. Supp. 1571, 1575 (M.D. Ga. 1990).  Independent contractor relationships are outside the statute's scope.  See Cobb v. Sun

Papers, Inc., 673 F.2d 337, 339-42 (1982), cert. denied, 459 U.S. 874, 103 S. Ct. 163, 74 L. Ed. 2d 135 (1982); see also Holloman, 740 F. Supp. at 1575 (explaining that if the plaintiff "were an independent contractor, and not an agent or employee [of the defendant], then there would be no 'employment relationship' between the two and [the plaintiff] would not be subject to Title VII's protections").

To determine whether a particular individual is an employee or an independent contractor, courts employ common law principles of agency.  See Cobb, 673 F.2d at 341.  Among the factors to be considered in determining whether an individual is an employee or an independent contractor are the hiring party's right to control, the level of skill required, the source of equipment and tools, the duration of the relationship, the method of payment, the provision of employee benefits, the tax status of the parties and the intent of the parties.  Nationwide Mutual Ins. Co. v. Darden, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 117 L. Ed. 2d 581, 589-90 (1992) (citing Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 811 (1989)). Applying the above factors, the uncontroverted evidence establishes that Davis was an independent contractor with WCW, and not an employee.

First, Davis developed his own persona, character, stage name, costume and gimmick. (Davis Dep. at 36). Further, professional wrestling requires significant specialized skills. Davis underwent extensive training in an effort to develop the skills necessary to be a professional wrestler with WCW. (Davis Dep. at 21-28). These factors support the conclusion that Davis was an independent contractor. Wolf v. Coca-Cola Co., 200 F.3d 1337, 1360 (11th Cir. 2000).

Also consistent with the conclusion that Davis was an independent contractor, and not an employee, Davis's Agreement with WCW was for a short and fixed term (one year), Davis received no fringe benefits, and he paid his own taxes. (Davis Dep. at Ex. 7 (1999 Independent Contractor Agreement, ¶ 2)).

Lastly, the parties indisputably understood and intended an independent contractor relationship. The Agreement Davis signed expressly states that Davis was providing services to WCW as an independent contractor, and not as an employee. (Davis Dep. at Ex. 7 (1999 Independent Contractor Agreement, ¶ 2)). The Agreement is also labeled on the first page as an "Independent Contractor Agreement." (Id.) All of the above facts establish that Davis was an independent contractor, and not an employee, of WCW.

This Court has previously considered the issue of whether a professional wrestler for WCW was an independent contractor for purposes of Title VII.  In Ranger Ross v. World Championship Wrestling, Inc., Civil No. 1:93-CV-1206-JEC (N.D. Ga. 1994) (unpublished opinion),[4] the Court concluded that, because the plaintiff professional wrestler had a certain level of control over his performance and creativity for his character, he was an independent contractor and not an employee for purposes of Title VII.  (Id. at 15-16).  Likewise, in this case, given the control Davis had over his performance and character, and all of the factors noted above, the requisite employment relationship did not exist between Davis and WCW for Title VII to apply.  Therefore, summary judgment should be granted as to all of Davis's Title VII claims.[5]

## IV.  SUMMARY JUDGMENT SHOULD BE GRANTED AS TO DAVIS'S FLSA CLAIMS BECAUSE NO EMPLOYER-EMPLOYEE RELATIONSHIP EXISTED BETWEEN DAVIS AND WCW.

Davis asserts that WCW failed to pay him minimum wage and overtime, as required by the FLSA, for translation and cleaning services that he provided and video shoots in which he participated during the time that he was training at the Power

---

[4] A copy of the Court's opinion is attached hereto as Exhibit E.
[5] Davis's Title VII claim also fails for all of the same reasons that Davis's § 1981 claims fail.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (explaining that "both Title VII and Section 1981 have the same requirements of proof and use the same analytical framework").

Plant.  (Third Amended Complaint ¶¶ 63-65, 67-70).  However, FLSA
*provides minimum wage and maximum* hour protection only to
**employees** as defined therein.  29 U.S.C. §§ 203(e)(1) and (g),
206(a), and 207(a).  Because Davis cannot demonstrate that he was
an "employee" of WCW during the time for which he asserts claims
for minimum wage and overtime pay, Davis's FLSA claim fails.

To determine *whether a FLSA-covered employer-employee*
relationship exists, courts "look not to the common law
definitions of those terms, . . . but rather to the 'economic
reality' of all the circumstances concerning whether the putative
employee is economically dependent upon the alleged employer."
Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994)
(emphasis added) (citations omitted), cert. denied, 513 U.S. 943,
115 S. Ct. 351, 130 L. Ed. 2d 306 (1994).  Where an individual
provides services to several different companies, performs his
services *by the job, rather than on a more permanent basis,* uses
his own material, and exercises control over the manner in which
he performs his services, he is, in "economic reality," an
independent businessman, not an employee covered by the FLSA.
Donovan v. Tehco, Inc., 542 F.2d 141, 143-44 (5th Cir. 1981).

Application of the "economic reality" test to Davis
conclusively establishes that, during the time he was training at
the Power Plant, Davis was an independent businessman and not an

employee.  He "invariably worked by the job rather than by the
hour [and] supplied his own materials."  Donovan, 542 F.3d at 140.
(See Davis Dep. at 36, 52, 56).  During the same period that Davis
was training with WCW, Davis also provided wrestling services to
another wrestling organization and was paid accordingly.  (Davis
Dep. at 110-11).  Additionally, as discussed in Section III above,
in connection with his training for WCW, Davis developed his own
gimmick, character, name and persona, and provided his own
costume.  (Davis Dep. at 36).  The fact that Davis engaged in
other compensated work outside of WCW and maintained some creative
freedom over his WCW character during this time further evidences
that he was not an employee of WCW.

WCW also paid Davis for the services that he provided and the
video shoots in which he engaged while at the Power Plant.  (Davis
Dep. at 54-67, Exs. 4-6).  Therefore, Davis has failed to present
any concrete evidence supporting his assertions that he provided
translation services and participated in video shoots for which he
was not paid.  His general and unsupported assertions are not
enough to withstand summary judgment.  Bald Mountain Park, Ltd. v.
Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989).  Therefore,

Defendants are entitled to summary judgment on Davis's FLSA claim.
See <u>Donovan</u>, 542 F.2d at 143-44.[6]

**V.    SUMMARY JUDGMENT SHOULD BE GRANTED ON DAVIS'S INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS CLAIM BECAUSE WCW DID NOT
ENGAGE IN ANY OUTRAGEOUS CONDUCT.**

Davis contends that WCW, by allegedly engaging in racially
discriminatory conduct, intentionally inflicted severe emotional
distress on him.   (Third Amended Complaint ¶ 60).   This claim is
baseless.

To establish a claim for intentional infliction of emotional
distress under Georgia law, a plaintiff must establish: (1)
intentional or reckless conduct; (2) extreme and outrageous
conduct by the defendant; (3) severe emotional distress suffered
by the plaintiff; and (4) a causal connection between the conduct
and the emotional distress.   <u>Hendrix v. Phillips</u>, 207 Ga. App.
394, 395, 428 S.E.2d 91, 92-93 (1993).

To be "extreme and outrageous," the alleged conduct must be
so "terrifying or insulting as naturally to humiliate, embarrass
or frighten" the plaintiff and so severe that "no reasonable man
could be expected to endure" these actions.   <u>Beck v. Interstate
Brands Corp.</u>, 953 F.2d 1275, 1276 (11th Cir. 1992).   Liability for

---

[6] Even assuming, arguendo, that Davis qualifies as an employee for
purposes of the FLSA, Davis's claim with respect to overtime under
FLSA fails, nonetheless, because Davis cannot establish that he
worked in excess of forty (40) hours in any given week that he
provided services to WCW.   (Davis Dep. at 26-27, 130-31).

intentional infliction of emotional distress does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1540 (S.D. Ga. 1995). Thus, when a plaintiff alleges that conduct such as race discrimination constitutes intentional infliction of emotional distress, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault. See Coleman v. Housing Auth. of Americus, 191 Ga. App. 166, 381 S.E.2d 303 (1989). When the alleged conduct is racial epithets and race-based decisions in carrying out a contract, it must be combined with extreme and graphic threats such as of bodily harm, dismemberment and death. See Brown v. Manning, 764 F. Supp. 183, 185 (M.D. Ga. 1991). Davis cannot even come close to meeting this standard.

In this case, Davis cannot provide any evidence of conduct by WCW that satisfies the requirements of "extreme and outrageous" behavior. Rather, Davis has admitted that there is nothing other than WCW's alleged acts of discrimination that caused him emotional harm. (Davis Dep. at 126). Because the undisputed evidence shows that Davis was not subjected to discriminatory treatment, and because Davis must establish more than just alleged discriminatory conduct to sustain his intentional infliction of

emotional distress claim, summary judgment should be entered on this claim.  See Beck, 953 F.2d at 1276 (adverse employment action for allegedly discriminatory reasons insufficient to support intentional infliction of emotional distress claim); Ward, 907 F. Supp. at 1542 (same).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion for Summary Judgment on all of Davis's claims asserted in this action should be granted, and all of Davis's claims should be dismissed.


This 8th day of January, 2003.


TROUTMAN SANDERS LLP


JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 8th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                          )
                                        )
                    Plaintiff,          )
                                        )        CIVIL ACTION FILE
v.                                      )
                                        )        NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and               )
TURNER BROADCASTING SYSTEM, INC.   )
                                        )
                    Defendants.         )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this

*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY*

*JUDGMENT* upon the interested parties by hand delivery to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA  30305

This 8th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000



# EXHIBIT / ATTACHMENT

## _____A_____

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

## AFFIDAVIT OF DIANA MYERS

    DIANA MYERS, who having personally appeared before the
undersigned officer duly authorized to administer oaths and
having been first duly sworn according to law, deposes and
states the following:

14.  At WCW, Wrestlers were compensated and given wrestling opportunities that were commensurate with their skill level and crowd appeal.  Mr. Walker was no exception.

15.  Mr. Walker wrestled in over eighty (80) matches while he was under contract with WCW.  In some of these matches, he prevailed over his opponent.  In other instances, the match was scripted in Mr. Walker's opponent's favor.

FURTHER AFFIANT SAYETH NAUGHT.

This 12TH day of December, 2002.

DIANA MYERS

Sworn to and subscribed
before me this 12TH day
of December, 2002.

Notary Public

My Commission Expires:
March 31, 2005

Sandra M. Gaudet
Commission # DD 002932
Expires March 31, 2005
Bonded Thru
Atlantic Bonding Co., Inc.



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARCIAL DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE |
| v. | ) |
| | ) NO. 1:00-CV-1716-CC |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) |
| TURNER SPORTS, INC., and | ) |
| TURNER BROADCASTING SYSTEM, INC., | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF JOSEPH HAMILTON

JOSEPH HAMILTON, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.     My name is Joseph Hamilton. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.     I first began providing services to Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW") in 1989 as a member of the creative staff. After working with the organization in various capacities, I eventually became the Director of the Power Plant, WCW's training facility.

3.     As part of my duties as Director of the Power Plant, I worked with WCW's professional wrestlers and trainees. At times, members of the creative staff and I would discuss my opinion with respect to wrestling and training talent.

4.    Based on my experience in the wrestling industry and at WCW, the creators, producers, bookers and marketers of professional wrestling programming such as WCW's use their better performers with greater frequency in their wrestling programs. Factors considered by the creators, producers, bookers and marketers of these programs in determining who the better wrestlers are include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique. In light of these factors, I periodically evaluated wrestlers and trainees at the Power Plant, to determine how well they were progressing.

5.    Marcial Davis first became affiliated with WCW in 1998 when he was accepted into the professional wrestling training program at the Power Plant facility. The goal in including Mr. Davis in the training program was to help him develop the physical skills, charisma, stage presence and other characteristics necessary to be a successful wrestler with WCW.

6.    Mr. Davis initially paid a fee to train at the WCW tryout/workout camp. Thereafter, he continued to train at the Power Plant facility and paid WCW periodically for the training and instruction that he received. Eventually, WCW waived the fees associated with Mr. Davis's training.

7.    Although Mr. Davis was in good physical condition at the time that he received his training scholarship, he appeared clumsy, awkward and inexperienced in the wrestling ring, was a slow learner and did not demonstrate the mental ability to lay out and execute a wrestling match logically. Despite his deficiencies, I believed that, with a lot of hard work, Mr. Davis had the potential to be a moderately successful wrestler with WCW.

1095548_1.DOC                          2

8.     Although I was hopeful that Mr. Davis would significantly improve his wrestling talent, he never developed the skills and charisma of WCW's better wrestlers, and he never improved beyond being a preliminary wrestler trainee with WCW.

FURTHER AFFIANT SAYETH NAUGHT.

This ___7th___ day of ___January___, 2003.

_Joseph Hamilton_
JOSEPH HAMILTON

Sworn to and subscribed
Before me this __7th__ day
of __January__, 2003.

_Don Weidler_
Notary Public

My Commission Expires:

_Oct 24, 2005_

1095548_1.DOC                    3



# EXHIBIT / ATTACHMENT

## _____C_____

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                                    )
                                                  )
                    Plaintiff,                    )
                                                  )        CIVIL ACTION FILE
v.                                                )
                                                  )        NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,               )
TURNER SPORTS, INC., and                          )
TURNER BROADCASTING SYSTEM, INC.,                 )
                                                  )
                    Defendants.                   )

## AFFIDAVIT OF JAMES A. MORRISON

JAMES A. MORRISON, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.    My name is James A. Morrison, professionally known as J.J. Dillon. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.    I was employed by World Championship Wrestling, Inc. ("WCW") from approximately November 1996 until March 2001. Prior to becoming an employee of WCW, I provided services to WCW as an independent consultant.

3.    As part of my duties as a WCW employee, I worked with WCW's wrestlers and trainees. During my employment with WCW, Marcial Davis trained with WCW and provided services to WCW as an independent contractor.

1095564_3.doc

4.      Based on my experience in the wrestling industry and at WCW, the creators, producers, bookers and marketers of professional wrestling programming such as WCW's use their better, more polished performers with greater frequency in their wrestling programs. Factors considered by the creators, producers, bookers and marketers of these programs in determining who the better and more polished wrestlers are include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique.

5.      Although Mr. Davis appeared to be in good physical condition for a wrestler, he initially demonstrated a slow and lumbering style in the ring, he lacked the psychology to logically and properly lay out and execute a wrestling match, and he needed more experience to substantially improve his wrestling skills.  For these reasons, Mr. Davis received very limited opportunities with WCW, which included providing translation services because he was bilingual and appearing in commercials for the organization due to his physical size.  These were the only types of opportunities for which he was suited until such time as his wrestling skills showed further improvement.

6.      In mid-1999, Mr. Davis entered into a wrestling trainee contract with WCW.  He was given a trainee contract because he was large in size and had a good look.  After signing his trainee agreement, Mr. Davis still did not receive wrestling opportunities because his wrestling skills had not significantly improved.

7.      In late 1999, WCW was required to terminate the contracts of some of its wrestlers because it was suffering from financial difficulties.  Given that Mr. Davis had received extensive training from WCW, had been given numerous opportunities during training sessions to demonstrate signs of improvement, and had been given opportunities to show his level of crowd appeal, stage presence, charisma, uniqueness, and wrestling ability, but had not become a

polished or skilled wrestler with WCW, WCW reached the opinion that his services were no longer needed by WCW. Accordingly, after giving him the required advance notice under his trainee contract, WCW terminated his trainee contract.

8. The decision to terminate Mr. Davis's contract was not based in any way on his race. Mr. Davis simply never moved above his existing level of wrestling ability, crowd appeal, stage presence, charisma, and performance, and this level did not justify continuing to keep him under his trainee contract with WCW.

9. At the time that Mr. Davis's contract was terminated, I had no knowledge of any alleged complaints of racial discrimination that Mr. Davis might have made to Pezevan Whatley, or any other individual affiliated with WCW.

FURTHER AFFIANT SAYETH NAUGHT.

This __7TH__ day of __JANUARY__, 2003.

JAMES A. MORRISON

Sworn to and subscribed
Before me this _7th_ day
of _January_, 2003.

Notary Public

My Commission Expires:



# EXHIBIT / ATTACHMENT

## _____D_____

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARCIAL DAVIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE |
| v. | ) |
| | ) NO. 1:00-CV-1716-CC |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) |
| TURNER SPORTS, INC., and | ) |
| TURNER BROADCASTING SYSTEM, INC., | ) |
| | ) |
| Defendants. | ) |

## **AFFIDAVIT OF PAUL ORNDORFF**

PAUL ORNDORFF, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.      My name is Paul Orndorff. I am of majority age, and I give this testimony of my own free will. I have personal knowledge of and am competent to testify to the facts stated herein. The facts stated herein are true and correct.

2.      I first began providing services to Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc. and hereinafter referred to as "WCW") in 1994 as a professional wrestler. After working with the organization in various capacities, I eventually became the Director of the Power Plant, WCW's training facility.

3.      As part of my duties as the Director of the Power Plant, I worked with WCW's professional wrestlers and trainees. At times, members of the booking committee and I would discuss my opinion with respect to wrestling and training talent.

1095574_2.DOC                                    1

4.      Based on my experience in the wrestling industry and at WCW, factors to be considered in determining which wrestlers and/or trainees will be well-received by wrestling audiences include the wrestler's crowd appeal, stage presence, charisma, uniqueness, wrestling ability and physique.  In light of these factors, I periodically evaluated wrestlers and trainees at the Power Plant, to determine how well they were progressing.

5.      When I first became familiar with Marcial Davis in 1998 as a Power Plant trainee, he lacked wrestling experience and his wrestling skills and potential were underdeveloped.  He did not catch on to instructions quickly and his wrestling movements were awkward.  He was however, big in physique and he had a good look.

6.      At the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location on Carroll Drive, to a new location on Log Cabin Drive, in Smyrna, Georgia.  This new establishment was to serve as the training facility for a smaller group of wrestler trainees than the group that had previously been training at the old Power Plant location. Each wrestler selected to train at the new Power Plant facility was to be signed to a trainee independent contractor agreement.

7.      To determine which wrestler trainees would receive agreements, I, along with other WCW training officials, spent roughly six to eight weeks evaluating the talent of approximately forty individuals who were then training at the Power Plant.  At the end of this evaluation period, WCW conducted "try outs" for all of the wrestler trainees.  Mr. Davis was selected as one of the wrestler trainees to be signed to an agreement and to continue training at the new Power Plant location.  Although Mr. Davis's wrestling skills were mediocre at best, he was chosen to be signed to an agreement because he had a good look and we thought that he

might have potential. After signing his agreement, Mr. Davis continued training at the new Power Plant facility.

8.     The trainees at the new Power Plant were separated into two groups based upon their skill level. The more advanced wrestlers trained with WCW trainer Dewayne Bruce. The less skilled wrestlers trained with WCW trainer Mike Wenner. Mr. Davis was in the group with the less advanced wrestlers, but was frequently given the opportunity to wrestle in practice against some of the more advanced wrestlers. By allowing Mr. Davis to wrestle against the more advanced wrestlers, WCW gave him the opportunity to learn from those wrestlers and to demonstrate any progress he had made.

9.     In September of 1999, I and others evaluated all of the trainees at the Power Plant, as we did periodically, to determine how the wrestler trainees were progressing. In assessing Mr. Davis's progress, we looked at his wrestling skills, charisma, crowd appeal, persona, and physique. Based upon my extensive experience in the wrestling industry and with WCW, these skills are prerequisites to a wrestler receiving wrestling opportunities on the more popular, televised wrestling programming.

10.    Upon evaluating Mr. Davis's skills, we concluded that despite his extensive training with WCW, Mr. Davis's wrestling skills still were well below expectations, that he was unable to execute the choreography of his wrestling matches in a manner that was convincing and exciting, and that he did not stand out as a potential star wrestler among the trainees. In fact, Mr. Davis's wrestling skills and abilities diminished and regressed, rather than progressing or improving, while he was training under the trainee contract. We also concluded that Mr. Davis was not likely to be a successful wrestler or to advance beyond the level that he had attained at that point as a trainee.

11.     Based on this evaluation of Mr. Davis, WCW terminated his trainee contract in late 1999. This decision had nothing to do with Mr. Davis's race.

12.     At the time that Mr. Davis's trainee contract was terminated, I had no knowledge of any alleged complaints of racial discrimination that Mr. Davis might have made to Pezevan Whatley, or to any other individual affiliated with WCW.

FURTHER AFFIANT SAYETH NAUGHT.

This _6TH_ day of _JANUARY_____, 2003.

_____
PAUL ORNDORFF

Sworn to and subscribed
Before me this _6TH_ day
of _JANUARY_____, 2003.

_____
Notary Public

My Commission Expires:
Notary Public, Hall County, Georgia
My Commission Expires June 29, 2003

1095574_2.DOC                    4



# EXHIBIT / ATTACHMENT

## _____E_____

(To be scanned in place of tab)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT L. ROSS, JR.,                    :

          Plaintiff,                    :

vs.                                     :        CIVIL NO. 1:93-CV-1206-JEC

WORLD CHAMPIONSHIP WRESTLING,           :
INC.,                                   :

          Defendant.                    :

### ORDER

The above entitled action is presently before the Court on the Magistrate Judge's Report and Recommendation [15] granting defendant's Motion For Summary Judgment [11] and denying as moot plaintiff's Motion to Extend Time To April 25, 1994 To Respond To Defendant's Motion For Summary Judgment [12]. Plaintiff has filed no objection(s) to the Magistrate Judge's Report and Recommendation. The Court has reviewed the record and arguments of the parties and concludes that the Magistrate Judge's Report and Recommendation should be received with approval and adopted as the opinion and order of the Court.

ACCORDINGLY, the Court ADOPTS the Magistrate Judge's Report and Recommendation [15] GRANTING defendant's Motion For Summary Judgment [11] and DENYING AS MOOT plaintiff's Extension Of Time [12].

SO ORDERED, this 15 day of October, 1994.

JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

ENTERED ON DOCKET

OCT 21 1994

U.S.D. CLERK

BY ___ DEPUTY CLERK

2

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT   MAY 17 1994
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION                      LUTHER D. THOMAS, Clerk
                                      By: _____
                                                  Deputy Clerk

ROBERT ROSS, JR.,               :    CIVIL ACTION

        Plaintiff,              :    NO. 1:93-CV-1206-JEC

        vs.                     :    Adopted by Judge Carnes
                                     Via order dated
WORLD CHAMPIONSHIP WRESTLING, INC., :  10-19-94

        Defendant.             :


## ORDER FOR SERVICE OF REPORT AND RECOMMENDATION


        Attached is the report and recommendation of the United

States  Magistrate Judge made in this action in accordance

with 28 U.S.C. § 636 and this Court's Local Rule 260-2.   Let

the same be filed and a   copy, together with a copy of this

Order, be served upon counsel for the parties.


        Pursuant  to 28 U.S.C. § 636(b)(1), each party may file

written objections, if any, to the report and recommendation

within  ten (10) days of the receipt of this Order.   Should

objections be filed, they shall specify with particularity the

alleged error or errors made (including reference by page

number to the transcript  if applicable) and shall be served

upon the opposing party.   The party filing objections will be

responsible for obtaining and filing the transcript of any

evidentiary hearing for review by the district court.   If no


                            1

objections are filed, the report and recommendation may be adopted as the opinion and order of the district court and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984).

The Clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

IT IS SO ORDERED, this _17th_ day of May, 1994.


_William L. Harper_
WILLIAM L. HARPER
UNITED STATES MAGISTRATE JUDGE

2

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA   MAY 1 7 1994
ATLANTA DIVISION

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

ROBERT ROSS, JR.,                    :    CIVIL ACTION

          Plaintiff,                 :    NO. 1:93-CV-1206-JEC

          vs.                        :

WORLD CHAMPIONSHIP WRESTLING, INC.,  :

          Defendant.                 :


## MAGISTRATE JUDGE'S ORDER, REPORT AND RECOMMENDATION

     The above-styled employment discrimination action is
presently before the undersigned Magistrate Judge for
consideration of defendant's motion for summary judgment.  For
the reasons set forth below, the undersigned Magistrate Judge
hereby RECOMMENDS that defendant's motion for summary judgment
be GRANTED.


     Defendant filed its motion for summary judgment on March
25, 1994.  (Docket No. 11).  In a letter dated March 30, 1994,
the Clerk of Court notified plaintiff of the filing of
defendant's summary judgment motion, of his duty to respond,
and of the possible consequences of a failure to respond.  On
April 14, 1994, plaintiff filed a motion for an extension of
time within which to respond to defendant's motion, seeking an
extension through and including April 25, 1994.  (Docket No.
12).  Without the benefit of a ruling on this motion,

AO 72A
(Rev. 8/82)

plaintiff filed an untimely response to defendant's motion for summary judgment on April 26, 1994. (Docket No. 13). Defendant has subsequently filed a reply brief. (Docket No. 14).

As plaintiff's response was not filed until April 26, 1994, this response would be untimely even if the court were to grant plaintiff's motion for an extension of time. Accordingly, plaintiff's motion for an extension of time is hereby DENIED as moot.

Local Rule 220-1(b)(1) provides in relevant part that "[f]ailure to file a response [to a motion] shall indicate that there is no opposition to the motion." Accordingly, as no timely response was filed to defendant's motion for summary judgment, the undersigned Magistrate Judge deems this motion to be unopposed.

The applicability of Local Rule 220-1(b)(1) in the specific context of a motion for summary judgment was considered by the Eleventh Circuit Court of Appeals in Dunlap v. Transamerica Occidental Life Insurance, 858 F.2d 629 (11th Cir. 1988). In upholding the District Court's grant of summary judgment in favor of defendant, the court noted:

AO 72A
(Rev. 8/82)

In _Simon v. Kroger Company_, 743 F.2d 1544 (11th Cir. 1984) this court upheld the entry of summary judgment under similar circumstances. The result in _Simon_ was based upon both a finding that the summary judgment motion was well supported and a finding that a local rule in the Northern District of Georgia--which apparently was the predecessor to one of these local rules--was properly applied.

Had the district court based its entry of summary judgment solely on Local Rule 220-1(b), a different question would be presented. Local Rule 220-1(b)(1) might well be inconsistent with Fed.R.Civ.P. 56 if it were construed to mean that summary judgment could be granted as a sanction for failure to respond to a motion for summary judgment. _Cf. Arundar v. DeKalb Cty. School Dist._, 620 F.2d 493 (5th Cir. 1980). In this case, however, Transamerica's motion was supported by evidentiary materials of record, and the district court's orders indicate that the merits of the motion were addressed.

_Dunlap_, 858 F.2d at 632. _See also_, _Kinder v. Carson_, 127 F.R.D. 543, 545 (S.D. Fla. 1989).

The proper approach, therefore, given the applicability of Local Rule 220-1(b)(1) to the present case is succinctly stated by the court in _Kelly v. United States_, 924 F.2d 355, 358 (1st Cir. 1991):

3

AO 72A
(Rev. 8/82)

In the precincts patrolled by Rule 56, the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence. This case is no exception. Given appellant's failure to contest either the government's affidavits or the Statement, the jurisprudence of both Rule 56 and Local Rule 18 demands that the movant's version of the facts be taken as true.

Of course, the district court was still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate. See Mendez v. Banco Popular, 900 F.2d 4, 7 (1st Cir. 1990); Jaroma v. Massey, 873 F.2d 17, 19-20 (1st Cir. 1989) (per curiam); see generally Amsden, 904 F.2d at 753 (court of appeals may reverse a grant of summary judgment, regardless of uncontroverted nature of facts, if "the district court erred in expounding the law").

See also, Anchorage Associates v. Virgin Islands Board of Tax Review, 922 F.2d 168 (3rd. Cir. 1990); Mendez v. Banco Popular de Puerto Rico, 900 F.2d 4, 7-8 (1st Cir. 1990).

Additionally, the procedural deficiency of plaintiff's response likewise compels this court to accept defendant's statement of material facts not in dispute as true for purposes of ruling on the merits of defendant's motion for

4

summary judgment.  Local Rule 220-5(b)(2) of the Local Rules of Practice for the United States District Court for the Northern District of Georgia provides:

> The respondent to a motion for summary judgment shall attach to his response a separate and concise statement of material facts, numbered separately, to which he contends there exists a genuine issue to be tried.  Response should be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in his statement shall be deemed to have been admitted.  The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of F.R.Civ.P. 56(f).

Plaintiff's response to defendant's motion for summary judgment is not in compliance with Local Rule 220-5(b)(2). Accordingly, and based upon the untimely nature of this response, the undersigned Magistrate Judge adopts defendant's statement of material facts not in dispute for purposes of resolving the merits of defendant's motion for summary judgment.  These facts are briefly summarized below.

Following plaintiff's honorable discharge from military service, he embarked on a career in professional wrestling.

5

Plaintiff adopted the ring name of "Ranger Ross," and adopted the persona of a decorated war hero.

After some time wrestling in smaller alliances and federations, plaintiff contacted David Crockett, the owner of the National Wrestling Alliance (NWA), regarding the possibility of wrestling within the NWA. At Crockett's urging, plaintiff attended a wrestling school in North Carolina operated by Nelson Royal. Based upon his observations, Royal notified Crockett that plaintiff was qualified to wrestle for the NWA.[1]

In 1988, the NWA was purchased by World Championship Wrestling, Inc. (WCW). In January 1989, plaintiff began to wrestles for WCW. Plaintiff retained the ring name of "Ranger Ross," and continued to use his assumed persona or gimmick. As was true in plaintiff's earlier professional wrestling experiences, plaintiff was required to provide his own equipment and costume at plaintiff's cost.

In this his first tour of duty with WCW, plaintiff received $1,000.00 per week plus an occasional percentage of

---

[1] Plaintiff had previously attended a wrestling school in Atlanta, Georgia, conducted by a popular former professional wrestler, Thunderbolt Paterson.

6

the gate at his matches.  Plaintiff wrestled approximately 15 to 20 days per month.

In May 1990, plaintiff was released due to budgetary restraints on the part of WCW.  After his first WCW stint ended, plaintiff wrestled briefly in Japan.  In January 1991, plaintiff was contacted by WCW President Jim Herd.  After discussing the matter with Herd, plaintiff agreed to sign a form entitled "WCW Freelance Wrestler/Independent Contractor Agreement."  Plaintiff read and fully understood this document before signing.  This document provided that plaintiff would be engaged as an independent contractor rather than an employee, and would not enjoy any of the benefits afforded to WCW employees.  Furthermore, the document provided that plaintiff, rather than WCW, would be responsible for the payment of taxes on plaintiff's income pursuant to the agreement.  Plaintiff was to be paid $1,500.00 per week according to this agreement.

During the course of his relationship with WCW, plaintiff's primary contact was WCW Consultant Virgil Runnels (a/k/a Dusty Rhodes).  In his position as WCW Consultant, Runnels was responsible for booking and scheduling wrestling events, for evaluating and recruiting wrestling talent, for pre-determining the final outcome of each wrestling match, and

7

determining which wrestler or wrestlers to "push" into the position of heavyweight champion.

Plaintiff's performance of his work as a professional wrestler can be briefly summarized in the following manner. Plaintiff would receive a booking sheet from Runnels announcing the wrestling match's location and date approximately two weeks to 30 days in advance of the scheduled match.  Plaintiff was responsible for travel to the wrestling match site, and was responsible for bearing the cost of such travel.  On the date of a match, wrestlers would arrive at the venue, change into their wrestling costumes, and await further instructions.  The participants were then informed which wrestler would win each match, and what the finishing move or technique for accomplishing the "victory" would be.  The wrestlers were free to choreograph the remainder of the wrestling match on their own.  Plaintiff and the other professional wrestlers received little if any other supervision in the performance of their duties.

During the spring and summer of 1991, professional wrestling suffered a decline in popularity.  Based upon declining profits, WCW decided not to renew several wrestler's independent contractor agreements.  Runnels suggested which wrestlers should be allowed to leave based primarily upon

8

their popularity and drawing power.  Rhodes then suggested which wrestlers to include to WCW President Herd.  Rhodes specifically found that plaintiff lacked the charisma and ability to generate significant fan interest or profit for WCW.  Accordingly, Runnels included plaintiff's name on the list of recommended non-renewals.  Runnels suggestions were accepted by Herd, and plaintiff's contract or agreement expired in July 1991.

In all, 14 wrestlers' independent contractor agreements were not renewed during the summer of 1991.  Plaintiff was the only African American included within this list.  At the time of his discharge, plaintiff received compensation at a higher rate than 10 of the other wrestlers whose contracts were allowed to expire.

During the period of plaintiff's association with WCW, defendant employed approximately 334 male wrestlers.  The vast majority (approximately 300) of these male wrestlers were white.  Plaintiff's rate of compensation was higher than approximately 278 of these other professional wrestlers.

Plaintiff was not "pushed" into the position of heavyweight champion by Runnels and other WCW agents based upon their determination that he lacked the charisma and

9

ability to generate widespread interest in his matches. It was plaintiff's deficiency in these areas which primarily separated him from three individuals who were allowed to claim the title of heavyweight champion during approximately the same time period. Of these three individuals, two (Rick Flair and Lex Lugar) were white, while the remaining individual (Ron Simmons) was black.

Runnels actually enlisted plaintiff's aid in pushing Simmons into the position of heavyweight champion. Plaintiff was portrayed as conditioning Simmons through military training thereby preparing him for an "assault" on the heavyweight championship.

After exhausting his administrative remedies, plaintiff filed his complaint in the above-styled employment discrimination action on June 1, 1993. (Docket No. 1). Plaintiff's complaint was premised solely upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Docket No. 1, ¶ 1) (See also, Plaintiff's Answer to Mandatory Interrogatories, Docket No. 2, ¶ 2, which identifies Title VII, albeit incorrectly, as 28 U.S.C. § 2000, et seq.). Within the framework of Title VII, plaintiff leveled the following charges against defendant:

10

a)   Created a "glass ceiling" for non-white employees and independent contractors on hiring and promotional policies to positions of World Championship Wrestler;

b)   Created a practice and/or unwritten policy of putting non-white employees and independent contractors into the role of subsidiary employment or other position, and without concomitant salary, commission, bonus and title advances;

c)   Promoted white employees and independent contractors on a regular basis to higher titles, salaries, commissions and bonuses over non-white employees and independent contractors of longer employment with Defendant, higher performance achievements, better personal skills and management abilities;

d)   Denied non-white employees interview (and thus promotion) opportunities on a regular basis; and

e)   Replaced non-white employees with equal to or less qualified whites when a white employee for the position could be located and installed.

(Docket No. 1, ¶ 6).

11

Under the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." _Celotex Corp. v. Catrett_, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); _Everett v. Napper_, 833 F.2d 1507, 1510 (11th Cir. 1987). On summary judgment, the parties must satisfy the following burdens of proof:

> The party moving for summary judgment bears the initial burden of "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." _Celotex Corp. v. Catrett_, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed. R. Civ. P. 56(c)). An issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. _Matsushita Elec. Indus. Co. v. Zenith Radio_

12

Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89
L.Ed.2d 538 (1986).

Once the moving party meets this initial burden,
summary judgment is then appropriate as a matter of
law against the nonmoving party "who fails to make
a showing sufficient to establish the existence of
an element essential to that party's case, and on
which that party will bear the burden of proof at
trial." Celotex, 477 U.S. at 322, 106 S.Ct. at
2552. In making a sufficient showing, the
nonmoving party must "go beyond the pleadings and
by ... affidavits, or by the 'depositions, answers
to interrogatories, and admissions on file,'
designate 'specific facts showing that there is a
genuine issue for trial.'" Id. at 324, 106 S.Ct.
at 2553 (quoting Fed. R. Civ. P. 56(e). In
opposing summary judgment, the nonmoving party may
avail itself of all facts and justifiable
inferences in the record taken as a whole. See
United States v. Diebold, Inc., 369 U.S. 654, 655,
82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). In
reviewing whether the nonmoving party has met its
burden, the court must stop short of weighing the
evidence and making credibility determinations of
the truth of the matter. Anderson, 477 U.S. at
255, 106 S.Ct. at 2513. Instead, "[t]he evidence
of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his
favor." Id. (citing Adickes v. S.H. Kress & Co.,
398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26
L.Ed.2d 142 (1970). If, so viewed, a rational
trier of fact could find a verdict for the

13

nonmoving party under the substantive evidential standard, the nonmoving party can defeat summary judgment. Id. 477 U.S. at 252, 106 S.Ct. at 2512.

Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-9 (11th Cir. 1992).

In order to fall within the statutory jurisdiction of Title VII, alleged discriminatory conduct must take place within the employer/employee relationship. Specifically, an aggrieved individual may only proceed under Title VII where that individual is an employee rather than an independent contractor. See, e.g., Wilde v. County of Kandiyohi, 15 F.3d 103, 104 (8th Cir. 1994); Cobb v. Sun Papers, Inc., 673 F.2d 337 (11th Cir. 1982), cert. denied, 459 U.S. 874, 103 S.Ct. 163, 74 L.Ed.2d 135 (1982).

In order to determine whether a particular individual is an employee or an independent contractor, courts are to employ common law principles of agency. See, Cobb, 673 F.2d at 341. See also, Nationwide Mutual Insurance Co. v. Darden, 503 U.S. ____, 112 S.Ct. 1344, 117 L.Ed.2d 581, 588-90 (1992). Among the factors to be considered in making this determination are the following: the hiring party's right to control, the level of skill required, the source of equipment and tools, the location of the work, the duration of the relationship between

14

the parties, the right to assign additional work, the method of payment, whether the work in question is an essential part of the hiring party's business in general, the provision of employee benefits, the tax status of the parties, and the intent of the parties. Darden, 117 L.Ed.2d at 589-90 (citing, Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). The application of these factors to the undisputed facts in the present case creates a somewhat "mixed" result. See, Cobb, supra. After carefully weighing these factors, as discussed below, however, the undersigned Magistrate Judge finds that plaintiff was an independent contractor, and that his complaints of alleged discrimination therefore fall outside of the statutory jurisdiction of Title VII.

As to the level of defendant's control over the means and manner of plaintiff's performance, the undisputed facts establish that this control was minimal. Plaintiff was allowed to create his own wrestling persona or gimmick. Furthermore, while the nature of the ending of each match was determined by defendant, plaintiff and his opponent were largely free to choreograph the bulk of the action. The balance struck between control and independence of action in this case is thus completely compatible with a finding that plaintiff was an independent contractor rather than an

15

employee.  See, e.g., North American Van Lines, Inc. v. NLRB,
869 F.2d 596, 599 (D.C. Cir. 1989).

As to the issue of the skill level required in
plaintiff's performance of his duties, plaintiff has testified
regarding the fact that he attended two separate professional
wrestling schools in order to receive training.  Furthermore,
plaintiff admitted that an individual lacking in such training
would not be qualified to perform as a professional wrestler.
Furthermore, plaintiff stated that defendant required him to
be evaluated at the second of these wrestling schools in order
to determine whether or not he was qualified for the position.
Accordingly, this factor also weighs in favor of a finding
that plaintiff was an independent contractor.

Plaintiff admits that with the exception of a rope on one
occasion and perhaps one pair of boots, he was solely
responsible for the provision of his equipment and costumes at
his own expense.  Therefore, this factor weighs in favor of a
finding that plaintiff was an independent contractor.

As to the location of plaintiff's work, it is undisputed
that defendant informed plaintiff of the location of his
various matches.  As defendant controlled the location of

16

plaintiff's work, this factor would tend to weigh against a finding that plaintiff was an independent contractor.

In this case, it is undisputed that plaintiff and defendant's relationship was specifically contracted for a period of six months. This specified period of time for a short duration is consistent with a finding that plaintiff was an independent contractor.

It would not appear that plaintiff had the right or ability to assign his performance to other individuals or assistants. Accordingly, this factor weighs against a finding that plaintiff was an independent contractor rather than an employee. Likewise, the fact that plaintiff was paid a salary, rather than a commission, for the vast majority of his work also tends to weigh against a finding that plaintiff was an independent contractor.

As defendant's sole business is the promotion and performance of professional wrestling matches for profit, the work performed by plaintiff and his fellow grapplers is, of course, essential to defendant's business. The undersigned notes defendant's argument, however, that professional wrestlers often move between federations and alliances and are, in one certain sense, a "fungible good." The undersigned

17

finds ultimately with regard to this factor that it does not weigh heavily toward the conclusion that plaintiff was an independent contractor nor does it suggest that plaintiff was an employee.

The undisputed evidence establishes that plaintiff did not receive any fringe benefits with regard to his relationship with defendant. Furthermore, the agreement entered into between plaintiff and defendant expressly states that plaintiff is not eligible for any benefits provided to defendant's employees. Similarly, plaintiff was responsible for the payment of taxes on money received pursuant to the agreement. Accordingly, the undersigned finds that this factor weighs heavily in favor of a finding that plaintiff was in fact an independent contractor.

Finally, the undersigned considers the question of the party's intent. In the present case, the undisputed evidence inevitably points to the conclusion that both defendant and plaintiff intended to form an independent contractor relationship, and that each party considered the resulting relationship to be, in fact, an independent contractor relationship. Accordingly, the undersigned finds that this factor also weighs heavily in favor of a finding that plaintiff was an independent contractor.

18

AO 72A

As noted above, the application of this common law test to the facts in the present case generates mixed results. Without giving dispositive weight to any particular factor, the undersigned notes that generally the intent of the parties and the level of control over the performance of the individual's work are considered persuasive factors. Based upon the facts of this case, both of these factors point to a finding that plaintiff was an independent contractor. Additionally, the undersigned finds that the balancing of the remaining elements of this test also indicate that plaintiff was an independent contractor.

Accordingly, the undersigned Magistrate Judge finds that plaintiff's relationship with defendant was that of an independent contractor, and that his claims of discriminatory treatment therefore fall outside of the jurisdictional scope of Title VII. Therefore, defendant is entitled to summary judgment in its favor based solely upon this ground.

The undersigned notes, however, that alternative grounds clearly exist in support of this outcome. Specifically, the undersigned finds that plaintiff has failed to meet his burden of producing some evidence which raises a material question of fact as to discriminatory intent on the part of defendant.

19

The basic standards for evaluating a motion for summary judgment have been set forth above.  Other standards specific to claims of discrimination under Title VII are essential to an evaluation of defendant's motion on its merits.

It should be noted that conclusory allegations based on mere subjective beliefs do not create a genuine issue of material fact.  Carter v. Miami, 870 F.2d 578, 585 (11th Cir. 1989); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983).  See also, Earley v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (collecting cases).  Specifically, in regards to plaintiff's claim under Title VII of the Civil Rights Act of 1964, it is well established that a Title VII plaintiff opposing a motion for summary judgment must present significantly  probative  evidence  on  the  issue  of discrimination to avoid summary judgment.  Young v. General Foods Corp., 840 F.2d 825 (11th Cir. 1988), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); Grigsby v. Reynolds Metals Co., 821 F.2d 590 (11th Cir. 1987).  Reliance solely upon speculation and unsubstantiated hearsay constitutes a failure to meet this burden.  See, e.g., Palucki v. Sears, Roebuck and Co., 879 F.2d 1568 (7th Cir. 1989) ("a party to a lawsuit cannot ward off summary judgment with an affidavit or deposition based on rumor or conjecture"); Benson v. Vermont American Corp., 723 F.Supp. 1439 (M.D. Ala. 1988)

20

("inadmissible evidence offered in the form of a deposition, cannot be considered by the court"), aff'd without opinion, 874 F.2d 820 (11th Cir. 1989); Williams v. Housing Authority, 709 F.Supp. 1554 (M.D. Fla. 1988) ("the court cannot base direct-evidence analysis on hearsay testimony by plaintiff"), aff'd without opinion, 872 F.2d 434 (11th Cir. 1989).

A Title VII plaintiff may demonstrate discriminatory intent through either direct or indirect evidence.   Direct evidence consists of the actions or remarks of an employer reflecting a discriminatory attitude.   Wall v. Trust Company of Georgia, 946 F.2d 805, 809-10 (11th Cir. 1991); Hill v. Metropolitan Atlanta Rapid Transit Authority, 841 F.2d 1533, 1539 (11th Cir. 1988), modified, 848 F.2d 1522 (11th Cir. 1988).   See also, Bell v. Birmingham Linen Service, 715 F.2d 1552, 1556 (11th Cir. 1983), cert. denied, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984).   Indirect evidence may be demonstrated through the framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).   For example, an individual may produce indirect evidence of a discriminatory failure to hire by establishing that he is a member of a protected group and that he "applied for an available position for which [he]

21

was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Burdine, 450 U.S. at 253.  This framework, however, is flexible, and can be shaped to fit employment practices other than failure to hire.

If a plaintiff presents direct evidence of discrimination, the burden of proof shifts to defendant to establish that it would have reached the identical employment decision absent unlawful considerations. See, Wall, 946 F.2d at 810 (citing, Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Conversely, where the plaintiff has established a prima facie case of discrimination through indirect evidence a burden of production shifts to the employer "to articulate some legitimate, non-discriminatory reason for the employee's rejection." McDonnell Douglas Corp., 411 U.S. at 802.  If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely pretexts for discrimination.  Id. at 804; Wall, 946 F.2d at 809; Perryman v. Johnson Products Co., 698 F.2d 1138, 1142 (11th Cir. 1983). If the trier of fact rejects defendant's proffered reason as incredible, this rejection, coupled with the elements of

22

plaintiff's prima facie case, may alone support a finding of pretext. St. Mary's Honor Center v. Hicks, ____ U.S. ____, 113 S.Ct. 2742, 125 L.Ed.2d 407, 61 U.S.L.W. 4782, 4784 (1993).

The undersigned first notes that plaintiff has failed to submit any admissible evidence into the record tending to support his claim of discrimination or tending to discredit the affidavit testimony offered by defendant in support of its motion for summary judgment. Instead, plaintiff's deposition testimony is littered with admissions that he has little if any actual knowledge regarding the alleged disparities which existed between him and other supposedly similarly situated white professional wrestlers. (Deposition of Robert Lee Ross, Jr., hereinafter Ross Dep., pp. 118, 120, 124, 125-26). Plaintiff admits that no direct evidence of discrimination exists. (Ross Dep., p. 150). Additionally, the undisputed affidavit testimony offered by defendant is clearly contrary to plaintiff's vague allegations of disparate treatment. Specifically, this testimony indicates that defendant employed approximately 334 male wrestlers during the time that plaintiff wrestled with the WCW. Of this number, approximately 300 were white. Significantly, 278 individuals (the vast majority of them white) earned less compensation

than plaintiff. (Affidavit of Eric Holman, hereinafter Holman Aff., ¶¶ 5 and 6).

As noted above, this testimony is not refuted by plaintiff. Instead, plaintiff's untimely response to defendant's motion for summary judgment is entirely devoted to the argument that plaintiff is entitled to proceed to trial on his claims pursuant to 42 U.S.C. § 1981 as well as his pendant state claims. Significantly, none of these claims were raised by plaintiff in his complaint nor referred to in his answer to mandatory interrogatories. Instead, these phantom allegations appear for the first time in plaintiff's untimely response. In sum, the only evidence arguably offered by plaintiff in contradiction to defendant's affidavit testimony are his conclusory allegations during the course of his deposition that defendant engaged in discrimination against black professional wrestlers. The record is devoid, however, of any admissible evidence tending to establish that similarly situated white wrestlers were given favorable treatment.

Assuming arguendo, however, that plaintiff had established sufficient probative evidence of discrimination to raise a material question of fact as to each element of his prima facie case, defendant has clearly discharged its duty to articulate a legitimate, non-discriminatory reason for its

24

actions.  In short, the undisputed testimony establishes that
Runnels and Herd jointly made the decision not to renew
plaintiff's independent contractor agreement based upon his
lack of wrestling skill, professional growth, popularity, and
gate appeal.  (Affidavit of James Herd, hereinafter Herd Aff.,
¶ 6; Affidavit of Virgil Runnels, hereinafter Runnels Aff., ¶¶
6-7).

The undersigned is aware of the recent precedent of this
circuit that summary judgment is generally inappropriate in
Title VII cases where a plaintiff has established sufficient
evidence of each element of his prima facie case.  Hairston v.
Gainesville Sun Publishing Co., 9 F.3d 913, 919 (11th Cir.
1993).  The entry of summary judgment in favor of defendant is
still appropriate, however, "when evidence of discriminatory
intent is totally lacking."  Hairston, 9 F.3d at 921.  In the
present case, plaintiff has failed to present one shred of
admissible evidence which would tend to establish that
defendant's proffered legitimate, non-discriminatory reason
was pretextual, or to otherwise establish discriminatory
intent on the part of defendant.  In view of this fact,
defendant is entitled to summary judgment in its favor even in
light of the demanding standards set forth in Hairston, supra.

25

Based upon the above facts, the undersigned Magistrate Judge hereby RECOMMENDS that defendant's motion for summary judgment be GRANTED.

IT IS SO ORDERED, REPORTED AND RECOMMENDED, this 17th day of May, 1994.

WILLIAM L. HARPER

UNITED STATES MAGISTRATE JUDGE

26

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                        )
                                      )
            Plaintiff,                )
                                      )
v.                                    )    CIVIL ACTION FILE
                                      )    NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER       )
BROADCASTING SYSTEM, INC.,            )
                                      )
            Defendants.               )

### DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS
### IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants Universal Wrestling Corporation (f/k/a World
Championship Wrestling, Inc.) ("WCW"), Turner Sports, Inc. ("TSI")
and Turner Broadcasting System, Inc. ("TBS") submit this Statement
of Undisputed Material Facts in support of their Motion for
Summary Judgment as to all claims brought by Plaintiff Marcial
Davis ("Davis").

1.    WCW created, produced, and marketed professional
wrestling events during the 1990s and through March 2001, which
were seen by live audiences and/or aired on various television
networks and pay-per-view cable and satellite systems.  (Affidavit
of Diana Myers (hereinafter "Myers Aff.") ¶ 3).

2.    The wrestlers and other on-screen wrestling talent who
appeared in WCW's wrestling events generally provided their
services to WCW as independent contractors, either through formal

written contracts or without written agreements.    (Myers Aff.
¶ 4).

　　3.    A creative team of writers and producers at WCW created
WCW's wrestling events, both live and taped, with the goal of
entertaining wrestling fans and general audiences nationwide.
(Myers Aff. ¶ 4).

　　4.    After having much commercial and financial success in
the mid-to-late 1990s, WCW's business suffered a sharp downturn
during 1999.    (Myers Aff. ¶ 6).

　　5.    In 1999, WCW lost significant sums of money and, thus,
only added new talent that it perceived was likely to generate
substantial revenue, began reducing the compensation of existing
talent, and began producing fewer and fewer wrestling events.
(Myers Aff. ¶ 7).

　　6.    Because of this downturn and reduced number of
productions, in 1999 and over the next two years, WCW had less and
less need for wrestling services, including on-screen talent,
trainers, and creative staff.    (Myers Aff. ¶ 7).

　　7.    WCW even terminated some of its televised events,
including a taped television show commonly referred to as its
"Saturday Night" show, in early 2000.    (Myers Aff. at ¶ 6).

　　8.    Despite WCW's efforts, WCW's business downturn
continued, and in March 2001, WCW sold certain of its assets,

ceased its operations, and changed its name to Universal Wrestling Corporation. (Myers Aff. at ¶ 8).

9. Davis's relationship with WCW began in February 1998 when he was accepted into the professional wrestling training program held at WCW's "Power Plant" facility. (Deposition of Marcial Roberto Davis Archbold (hereinafter "Davis Dep.") at 23, Ex. 1).

10. Davis did not have any prior wrestling experience and had never received any wrestling instruction before he commenced WCW's training program. (Davis Dep. at 17-18).

11. The purpose behind the Power Plant training program was to help Davis develop the mental and physical wrestling skills and the charisma necessary to compete in WCW's professional wrestling matches with minimal instruction. (Affidavit of Joseph N. Hamilton (hereinafter "Hamilton Aff.") ¶ 5).

12. Davis initially paid a fee for wrestling training and instruction at the WCW Tryout/Workout Camp, and after completing this initial training period, he continued to train at the Power Plant on an ongoing basis and paid WCW periodically for his training and instruction. (Davis Dep. at 21-22; Hamilton Aff. ¶ 6).

13.  Eventually, WCW allowed Davis to continue receiving wrestling instruction and training without the obligation to pay the associated fees.  (Davis Dep. at 21-22; Hamilton Aff. ¶ 6).

14.  Davis needed additional training because he appeared awkward in the wrestling ring, was unconvincing in executing his wrestling matches and needed to substantially improve his wrestling skills.  (Hamilton Aff. ¶ 7; Deposition of Paul Orndorff (hereinafter "Orndorff Dep.") at 58-59); Deposition of Joseph N. Hamilton (hereinafter "Hamilton Dep.") at 64-65; Deposition of James A. Morrison (p/k/a "J.J. Dillon") (hereinafter "Dillon Dep.) at 122-23).

15.  In fact, despite training, Davis was still unnatural on stage, his wrestling movements still appeared too mechanical and choreographed, and he still lacked the excitement and charisma necessary to generate crowd interest.  (Hamilton Aff. ¶ 7; Hamilton Dep. at 64-65; Orndorff Dep. at 58-59; Deposition of Dewayne E. Bruce (hereinafter "Bruce Dep.) at 59-61).

16.  Davis also lacked the ability to convincingly and logically achieve the predetermined result of his wrestling matches.  (Hamilton Aff. ¶ 7; Affidavit of James A. Morrison (p/k/a "JJ Dillon") (hereinafter "Dillon Aff.") ¶ 5; Bruce Dep. at 59-61).

4

17.  Nevertheless, WCW offered Davis the opportunity to continue training at the Power Plant because Joseph Hamilton, the Director of the Power Plant, believed that, with hard work and determination, Davis had the potential to substantially improve his wrestling skills.  (Hamilton Aff. ¶ 7).

18.  Despite WCW's efforts to develop Davis's skills, Davis often missed training sessions and failed to capitalize upon all available opportunities to improve his wrestling skills. (Bruce Dep. at 59-61).

19.  As a result, Davis never developed his potential and was unable to master basic wrestling maneuvers.  (Id.; Hamilton Aff. ¶ 8.)

20.  In an effort to allow Davis to demonstrate and improve upon his wrestling skills during training sessions at the Power Plant, WCW frequently allowed him to wrestle against other more successful wrestlers.  (Davis Dep. at 112-113; Affidavit of Paul Orndorff (hereinafter "Orndorff Aff.") ¶ 7).

21.  Nonetheless, Davis remained slow in the wrestling ring, and his wrestling movements continued to be awkward and uncoordinated.  (Hamilton Aff. ¶¶ 7-8; Orndorff Aff. ¶ 10; Dillon Aff. ¶ 7).

22.  In addition to frequently giving Davis the opportunity to wrestle against and learn from big-name wrestlers during

training, WCW also gave Davis other opportunities to promote himself within WCW, such as by making commercials for the organization. (Davis Dep. at 67).

23. In fact, while training, Davis appeared in a promotional video with Ric Flair, who was, at that time, a popular and successful wrestler for WCW. (Id.)

24. WCW also occasionally gave Davis the opportunity to provide services as a translator for its Spanish-speaking wrestlers, because Davis was bilingual. (Dillon Dep. at 235-36; Dillon Aff. ¶ 5).

25. WCW was only able to provide Davis with limited opportunities of this type, because Davis's wrestling deficiencies did not permit WCW to place him on live or televised events. (Dillon Aff. ¶ 5).

26. At the end of 1998 and into 1999, WCW transferred its Power Plant facility from its previous location to a new location on Log Cabin Drive, in Smyrna, Georgia. (Orndorff Aff. ¶ 6).

27. WCW established this new facility to serve as its training facility for a smaller group of wrestler trainees than the group that had previously been training at the former Power Plant location. (Id.)

28.  WCW intended to enter into written independent
contractor agreements with all of the wrestlers selected to train
at this new facility.  (Id.)

29.  To select the individuals who would be signed to these
agreements, WCW training personnel devoted roughly six to eight
weeks evaluating the skills and talents of the approximately forty
individuals who were then training at the Power Plant.  (Orndorff
Aff. ¶ 7).

30.  At the end of this period, WCW conducted "tryout"
sessions and matches among all of the trainees.  (Id.)

31.  At the conclusion of these try-outs, Davis was among
those trainees selected to be signed to an agreement and to
continue training at the new Power Plant location.  (Id.)

32.  Although Davis had not developed his skills to the
degree expected of WCW's professional wrestlers, Davis was chosen
because he was big in size, had a good "look," and was still,
despite his lack of development, perceived to have potential that
could be developed.  (Id.)

33.  After the try-out process, Davis formally entered into a
trainee Agreement with WCW, as an independent contractor, on April
19, 1999.  (Davis Dep. at 70; Independent Contractor Agreement,
dated April 19, 1999 ("Agreement"), Defendants' Exhibit 7 to Davis
Dep.).

34.  The Agreement had a term of one year, and established
that Davis would be paid $2,600 per month.  (Davis Dep. at 69, Ex.
7).

35.  The Agreement also expressly provided that WCW could
terminate it for any reason with fourteen (14) days advance
notice.  (Davis Dep. at Ex. 7).

36.  After signing the Agreement, Davis continued to train in
the new Power Plant location.  (Orndorff Aff. ¶ 7).

37.  At the new Power Plant, WCW separated the wrestler
trainees into training groups based upon skill level.  (Id. at ¶
8).

38.  In an attempt to help some of the lesser skilled
wrestlers develop their wrestling skills, WCW trainers conducted
practice wrestling matches between trainees.  (Id.)

39.  Davis often participated in these matches and competed
against the more advanced wrestler trainees.  (Id.)

40.  In facilitating these matches, WCW gave Davis the
opportunity to learn from the more advanced wrestlers and to
demonstrate any progress that he had made.  (Id.)

41.  Although Davis was permitted to wrestle in practice
matches during training, he was not given the same live and
televised wrestling opportunities as other wrestlers and trainees
who were more experienced, polished and/or talented, because Davis

did not have the requisite skills to appear on WCW's live and/or televised events.  (Dillon Aff. ¶ 6).

42.   In September of 1999, the Director of the Power Plant, Paul Orndorff, evaluated all of the trainees at the Power Plant, a process in which he periodically engaged, to assess their overall progress and development.  (Orndorff Aff. ¶ 9).

43.   In evaluating Davis, Mr. Orndorff determined that Davis's wrestling skills had not only failed to improve, but that they had in fact diminished since he began training at the new Power Plant.  (Orndorff Aff. ¶ 10).

44.   Mr. Orndorff also noted that Davis did not stand out as a potential star wrestler among the trainees and was not likely to develop his skills to the point necessary to be a successful wrestler with WCW or to advance beyond the trainee level.  (Id.)

45.   During this same, time WCW was suffering from financial difficulties and had embarked on a major cost reduction effort. (Dillon Aff. ¶ 7).

46.   As part of this effort, WCW terminated the contracts of some of its lesser skilled trainees and wrestlers.  (Id.)

47.   Because Davis had failed to improve his wrestling skills to the point necessary to appear on WCW's live and/or televised events, after giving Davis the required advance notice, WCW

terminated his Agreement in October of 1999.  (Davis Dep. at 86-87, Ex. 10; Dillon Aff. ¶¶ 7-8; Orndorff Aff. ¶ 11).

48.  At the time that WCW terminated Davis's Agreement, neither Paul Orndorff, the WCW Power Plant Director, nor J.J. Dillon, who supervised Mr. Orndorff, had knowledge of any alleged complaints of discrimination made by Davis to WCW trainer Pezevan Whatley, or to any other individual affiliated with WCW.  (Dillon Aff. ¶ 9; Orndorff Aff. ¶ 12).


This 8th day of January, 2003.


TROUTMAN SANDERS LLP


JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 233873
ERIC A. RICHARDSON
Georgia Bar No. 431851
EVAN H. PONTZ
Georgia Bar No. 583577

Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

```
MARCIAL DAVIS,                        )
                                      )
              Plaintiff,              )
                                      )
v.                                    )    CIVIL ACTION FILE
                                      )    NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and TURNER       )
BROADCASTING SYSTEM, INC.,            )
                                      )
              Defendants.             )
```

### CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this ***DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT*** upon the interested parties by hand delivering a copy of the same to:

> Cary Ichter
> Kelly Jean Beard
> Charles Gernazian
> Michelle M. Rothenberg-Williams
> MEADOWS, ICHTER AND BOWERS, P.C.
> Fourteen Piedmont Center, Suite 1100
> 3535 Piedmont Road
> Atlanta, GA  30305

This 8th day of January, 2003.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

1097941_1.DOC