ORIGINAL

ET ... CLERK'S OFFICE

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAN - 8 2003

LUTHE ...... Clerk

By: _____
Deputy Clerk

MARCIAL DAVIS, )
)
                    Plaintiff, )
)                               CIVIL ACTION FILE
v. )
)                               NO. 1:01-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and )
TURNER BROADCASTING SYSTEM, INC., )
)
                    Defendants. )

## DEFENDANTS' NOTICE OF FILING APPENDIX

Defendants Universal Wrestling Corporation (f/k/a World
Championship Wrestling, Inc.), Turner Sports, Inc. and Turner
Broadcasting System, Inc. (collectively "Defendants") hereby
serve notice that they are filing herewith in the above-
captioned case an Appendix containing copies of relevant
deposition testimony and exhibit documents in support of
Defendants' Motion for Summary Judgment filed with this Court.

$10^3$

This 8th day of January, 2003.

_____
JOHN J. DALTON
Georgia Bar No. 203700
JAMES A. LAMBERTH
Georgia Bar No. 431851
ERIC A. RICHARDSON
Georgia Bar No. 233873
EVAN H. PONTZ
Georgia Bar No. 583577

Attorneys for Defendants

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

1097149_1.DOC

-2-

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARCIAL DAVIS,                          )
                                        )
                    Plaintiff,          )
                                        )        CIVIL ACTION FILE
v.                                      )
                                        )        NO. 1:01-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and                )
TURNER BROADCASTING SYSTEM, INC.,  )
                                        )
                    Defendants.         )

CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANTS' NOTICE OF FILING APPENDIX* upon the interested

parties by hand delivery to:

                    Cary Ichter
                    Kelly Jean Beard
                    Charles Gernazian
                    Michelle M. Rothenberg-Williams
                    MEADOWS, ICHTER AND BOWERS, P.C.
                    Fourteen Piedmont Center, Suite 1100
                    3535 Piedmont Road
                    Atlanta, GA  30305

This 8th day of January, 2003.

EVAN H. PONTZ
Georgia Bar No. 583577

TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

1097149_1.DOC

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 0 8 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

MARCIAL DAVIS,                    )
                                 )
                Plaintiff,        )
                                 )         CIVIL ACTION FILE
v.                                )
                                 )         NO. 1:00-CV-1716-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and          )
TURNER BROADCASTING SYSTEM, INC.  )
                                 )
                Defendants.       )

**APPENDIX OF DEPOSITION EXCERPTS AND EXHIBITS**

103

## **INDEX**

1. Deposition of Dewayne E. Bruce

2. Deposition of Marcial Davis

3. Deposition of Joseph N. Hamilton

4. Deposition of James A. Morrison

5. Deposition of Paul Orndorff



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION
 3   Davis v. World Championship Wrestling, Inc. and Turner
            Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
 4   Saengsiphan v. World Championship Wrestling, Inc. and
            Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
 5   Speight v. World Championship Wrestling, Inc. and
     Turner
 6          Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
     Worthen v. World Championship Wrestling, Inc. and
 7   Turner
            Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
 8   Reeves v. World Championship Wrestling, Inc. and Turner
            Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
 9   Easterling v. World Championship Wrestling, Inc. and
     Turner Sports, Inc., Civ. File No. 1-00-CV-1715-CC;
10   Onoo v. World Championship Wrestling, Inc., and Turner
            Sports, Inc., Civ. File No. 1:00-CV-0368-CC;
11   Norris v. World Championship Wrestling, Inc., and
     Turner
12          Sports, Inc., Civ. File No. 1:00-CV-0369-CC;
     Walker v. World Championship Wrestling, Inc., and
13   Turner
            Sports, Inc., Civ. File No. 1:00-CV-0367-CC;
14   Patterson v. World Championship Wrestling, Inc., Turner
            Sports, Inc. and Turner Entertainment Group, Inc.,
15          Civ. File No. 1:01-CV-1152-CC
16   _____
17              DEPOSITION OF DEWAYNE E. BRUCE
                      NOVEMBER 21, 2002
18
19   _____
20
21
22
23
24
25              CERTIFIED COURT REPORTERS
The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
```

404-237-1990
800-317-5773

Page 59

1  know, just in general -- they wouldn't give you

2  specific stuff.  They would just say work on his

3  agility or whatever, you know.

4      Q      And in general before a particular match,

5  do you remember them mentioning anything about what to

6  work on for Hardbody?

7      A      Not right offhand.  I don't recall.

8      Q      Okay.  Sorry I jumped around a little bit.

9  Let's go back to Darron Easterling.  Did you ever watch

10  him wrestle in a WCW event?

11      A      Right now I don't recall.

12      Q      And how did you compare Easterling with

13  let's say Chase Tatum?

14      A      They are just two completely different

15  guys, you know, so their attributes are going to be

16  different.

17      Q      How about Chuck Palumbo?

18      A      I would say -- I mean right now in my

19  mind it's hard to compare them.

20      Q      Okay.  Now let me ask you about Marcial

21  Davis.  Do you remember him?

22      A      Yes, sir.

23      Q      And how did you evaluate him?

24      A      Marcial was a big guy and he moved pretty

25  well.  Sometimes he was sporadic about coming to

1    school.  He had missed some here and there but he was

2    okay.  He was pretty good.

3         Q     And do you remember whether or not he

4    actually got a contract to wrestle?

5         A     I don't know.

6         Q     You don't remember that?

7         A     I don't remember.

8         Q     How did you -- how would you evaluate

9    Marcial Davis compared to Chuck Palumbo?

10        A     They both had their own attributes, you

11   know, that -- I would say Chuck was a little more

12   fluid and stuff about his work, you know, but that's

13   about it.

14        Q     Can you give me any other details?

15        A     Just how fast he picked it up.  Marcial

16   sometimes didn't -- you would have to go over things

17   more with him than -- but that's everybody.  Everybody

18   is going to have little hangups here and there, you

19   know.

20        Q     How about The Wall, comparing Marcial Davis

21   with The Wall?

22        A     They were both similar size.  Jerry is

23   definitely a better wrestler than him but Jerry has

24   been wrestling a while.

25        Q     And why do you say he's a better wrestler?

Page 61

```
 1        A      Like I say, he's been wrestling a while
 2   so he's going to become better.  If one guy leaves the
 3   school or whatever, whatever reason -- if you work
 4   four days a week or whatever, you are going to get
 5   better than me if I work once, you know.
 6        Q      Okay.  Well, I understand that but what
 7   specifically made him better?  I understand you saying
 8   he had a lot more experience.
 9        A      Yeah, just his work, you know, just
10   because he had more experience.
11        Q      How about Lash LaRue, is he as big as
12   Marcial Davis?
13        A      No.
14        Q      Could you compare the two?
15        A      No, Lash had definitely -- you know, it
16   all comes down to experience here because Davis, he
17   didn't have the mic skills that Lash had.  Lash was a
18   little faster, you know.
19        Q      So it sounds like what you are saying is
20   that some of these guys like The Wall had the
21   experience, they were given the opportunities to
22   practice and that made them a lot --
23        A      Well, Jerry already worked before he came
24   down.  He already worked smaller independent shows.
25        Q      No, I understand but what I am saying is it
```



# EXHIBIT / ATTACHMENT

## _____ 2 _____

(To be scanned in place of tab)

1    IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF GEORGIA
2      ATLANTA DIVISION

3

Davis v. World Championship Wrestling, Inc., Turner
4  Sports, Inc., Civ. File No. 1:00-CV-1716-CC
Saengsiphan v. World Championship Wrestling, Inc.,
5  Turner Sports, Inc., Civ. File No. 1:00-CV-1719-CC
Speight v. World Championship Wrestling, Inc., Turner
6  Sports, Inc., Civ. File No. 1:00-CV-1718-CC
Worthen v. World Championship Wrestling, Inc., Turner
7  Sports, Inc., Civ. File No. 1:00-CV-1717-CC
Reeves v. World Championship Wrestling, Inc., Turner
8  Sports, Inc., Civ. File No. 1:00-CV-1720-CC
Easterling v. World Championship Wrestling, Inc.,
9  Turner Sports, Inc., Civ. File No. 1:00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner
10  Sports, Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
11  Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
12  Sports, Inc., Civ. File No. 1:00-CV-0367-CC
Patterson v. World Championship Wrestling, Inc.,
13  Turner Sports, Inc., and Turner Entertainment
  Group, Inc., Civ. File No. 1:01-CV-1152-CC

14

15  ————————————————————————————

16 VIDEOTAPED DEPOSITION OF MARCIAL DAVIS ARCHBOLD
      MARCH 12, 2002
17      10:00 a.m.

18  ————————————————————————————

19

20

21

22

23

24

25   CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
404-237-1990

Page 17

```
 1        Q     And you saw a number on a TV.  Tell me
 2   about that.
 3        A     An ad that said you want to become a
 4   professional wrestler in this industry with WCW, call
 5   the number and to schedule your tryout date.
 6        Q     Where were you living when you saw that
 7   ad on TV?  Was that in Miami that you saw that?
 8        A     No.
 9        Q     You had already moved to Atlanta?
10        A     Yes, sir.
11        Q     So you did try out; is that correct?
12        A     Yes, sir.
13        Q     I'm going to have you identify this
14   document.
15                          (Whereupon, the court
                            reporter marked
16                          Defendant's Exhibit 1 for
                            identification.)
17
18        Q     BY MR. RICHARDSON:  Mr. Davis, would you
19   take a look at what I've handed you as Exhibit 1.
20   Tell me if you recognize this document.
21        A     Yes, sir.
22        Q     Says at the top, waiver and release of
23   liability form.  Do you recall signing this at about
24   the time you tried out for WCW?
25        A     Before tryouts.  Yes, sir.
```

1   Q  Was that the same day you tried out?

2   A  Same day.

3   Q  And is that your signature at the bottom?

4   A  Yes, sir.

5   Q  And that was your address at the time

6 that you signed it?

7   A  Yes, sir.

8   Q  Now, this was your first experience of

9 any kind with professional wrestling; is that right?

10   A  Yes, sir.

11   Q  What did they have you do at the tryout?

12   A  Tryouts is they have you do a lot of

13 exercise concerning wrestling and a lot of endurance

14 and strength exercise.

15   Q  When you went to try out how many people

16 other than you were there trying out would you

17 estimate?

18   A  I don't remember.

19   Q  Do you think it was more than 50?

20   A  No, sir.

21   Q  Do you think it was more than 20?

22   A  No, sir.

23   Q  More than ten?

24   A  I really don't remember, but it is -- I

25 don't remember.

Page 21

```
 1        Q     Did you agree to come back at that time?

 2        A     Yes, sir.

 3        Q     Was there any discussion at that point

 4   about what the training would entail or how long it

 5   would be or what the cost would be?

 6              MR. GERNAZIAN:  Objection.  Compound.

 7              THE WITNESS:  Can you repeat?

 8        Q     BY MR. RICHARDSON:  Was there any

 9   discussion about how long the training would be?

10        A     How long it would be?

11        Q     Yes.

12        A     They did not say.

13        Q     Any discussion about what cost there

14   might be?

15        A     Yes, sir.

16        Q     Who talked to you about cost?

17        A     Mr. Jody Hamilton.

18        Q     What did Mr. Hamilton tell you about

19   cost?

20        A     He say to become a professional wrestler

21   you have to pay $3,000.

22        Q     Did you pay $3,000?

23        A     No, sir.

24        Q     Did you pay anything?

25        A     Yes, sir.
```

Page 22

1      Q      How much did you pay?

2      A      I don't remember, but it was over half.

3      Q      Did you pay any amount before you

4   actually started training?

5      A      Yes, sir.

6      Q      How much did you pay up front?

7      A      I don't remember.

8      Q      Did you pay some up front and then some

9   over time?

10     A      Yes, sir.

11     Q      Who made the decision to invite you to

12  become a trainee?

13     A      Can you repeat that question?

14     Q      Do you know who from WCW made the

15  decision to invite you to become a trainee?

16     A      Yes, sir.

17     Q      Who made that decision?

18     A      Trainers and Mr. Jody Hamilton.

19     Q      You understand that that was a collective

20  decision on their part?  Or was there one person in

21  charge?

22     A      I don't know.

23     Q      Out of the people who were there when you

24  tried out were there any others invited to become

25  trainees?

1        A    I don't know.

2        Q    You don't recall any one person who was

3   invited to become a trainee?

4        A    I don't know.

5        Q    How long after your tryout did you start

6   training?

7        A    I don't remember, but I know it was

8   shortly.

9        Q    You say shortly.  Was it days, weeks?

10        A    Weeks.

11        Q    A few weeks?

12        A    I believe.  Two or three weeks.

13        Q    Tell me the best you can remember what

14   you did the first day you came in to train.

15        A    Another tryout.

16        Q    And how long did this tryout last?

17        A    It was just like the first time, three

18   days.

19        Q    And who conducted the tryout from WCW's

20   side?

21        A    Trainers, Duane, Sarge, Mike Wenner, and

22   others -- other trainees from WCW.

23        Q    Before you started the training did

24   anyone from WCW tell you anything about what your

25   chances were of becoming a professional wrestler?

1      A    Can you repeat that?

2      Q    Before you started your training when you

3  were invited to become a trainee, did anyone from WCW

4  talk to you about what your chances would be of

5  becoming a professional wrestler?

6      A    Yes, sir.

7      Q    Who talked to you about that?

8      A    Mike Wenner.

9      Q    Anyone else?

10     A    No, sir.

11     Q    What did Mike Wenner tell you about your

12  chances?

13     A    It was actually one day before the

14  training.  He told me, you have the height, you have

15  the weight, you look like you're in shape.  He say, I

16  know you can do it.  Come prepared tomorrow for the

17  tryout.

18     Q    Did anyone promise you that you would be

19  a professional wrestler?

20     A    No, sir.

21     Q    So you understood there was no guarantee

22  that you would become a successful pro wrestler?

23     A    Yes, sir.

24     Q    When you first began your training I

25  think you said you started out with another three-day

Page 25

1    tryout?

2          A    Yes, sir.

3          Q    And what happened after that?

4          A    We had to show up in the morning, every

5    morning at nine o'clock -- that was the time the

6    school opened -- until 5:00 p.m. every day from

7    Monday through Friday.

8          Q    Someone from WCW told you you had to show

9    up?

10         A    Trainers.

11         Q    That was Sarge and Mike Wenner?

12         A    Yes, sir.

13         Q    Do you have an understanding of what

14   would happen if you didn't show up on a particular

15   day or at the right time?

16         A    No, sir.

17         Q    On an average day would you have breaks

18   during the day?

19         A    We have -- yes.  Yes, sir.

20         Q    Do you break for lunch?

21         A    Yes, sir.

22         Q    About how much of that nine to five,

23   that's an eight-hour time frame.  On an average day

24   how many hours would you say would actually be spent

25   wrestling, training?

Page 26

1          A     It depends how the trainer feel that

2     particular day.

3          Q     What would be the variation that if the

4     trainer felt -- if the trainer felt like -- I'm not

5     sure I understand.

6          A     Can you ask me that question again.

7          Q     The actual hours you spent wrestling in a

8     given day, as I understand it, depended on how the

9     trainer felt that day?

10         A     Uh-huh.

11         Q     If the trainer wasn't actually -- if you

12    weren't actually wrestling or training to wrestle

13    what other things would you do during the day?

14         A     Clean the warehouse, take the mats off

15    the rings, put new mats, adjust it, and equip the

16    ring for the work during the daytime.

17         Q     Were there days where you didn't wrestle

18    or train at all?

19         A     Yes, sir.

20         Q     How often did that happen?

21         A     Repeat that question, please.

22         Q     How often would it be that you would have

23    a day where you didn't wrestle or train at all?

24         A     Two days of the week, sometimes three.

25         Q     Tell me, if you could, in an average

Page 27

1    week -- we've got, looks like roughly 40 hours a

2    week.  How much of the 40 hours would you estimate

3    was spent training?

4           A    Can you define training?

5           Q    Doing your -- well, let me ask it this

6    way.  Let me ask it this way first:  As a trainee,

7    other than the work you did setting up and the rings

8    and cleaning up, what sort of activities did you do?

9           A    Stretching, warming up sessions, run,

10   cardiovascular exercise, weight training, and actual,

11   actual moves; trained, you know, to learn the moves.

12          Q    Anything else that you recall?

13          A    And lots of squats and neck arches, back

14   arches, neck exercise, things like those.

15          Q    So you did -- there were physical

16   exercises.  That was a component?

17          A    Yes.

18          Q    And there was a learning wrestling part

19   of it; is that right?

20          A    Yes, sir.

21          Q    Now, going back to my earlier question

22   how -- in a 40-hour week on average how much of that

23   40 hours was spent doing the physical exercises and

24   the learning wrestling?

25          A    I would say like 20 hours, between 20 and

1    25.

2         Q    Then the other part of that time would be

3    spent doing work around the warehouse or --

4         A    Cleaning.  Just according to the day and

5    which show was taking place in the other cities.  So

6    everything would leave the power plant, and we were

7    the one who help to do the job.

8         Q    If there was a show outside of the city

9    what specifically did the trainees have to do?

10        A    Go to the storage room, select mats and

11   select ropes for the ring, posts, and load the truck.

12        Q    When you first began your training how

13   many other wrestlers were there, trainees?

14        A    I don't remember.

15        Q    Do you think it was more than 20?

16        A    I would say approximately.

17        Q    About 20?

18        A    I don't know.

19        Q    Were there other African-American

20   trainees when you first started?

21        A    Yes, sir.

22        Q    How many?

23        A    I don't remember.

24        Q    Do you remember the names of any

25   African-Americans that you trained with?

1          A     Yes, sir.

2          Q     Did Caucasian wrestlers have to clean the

3    warehouse and set up and take down the ring?

4          A     Yes, sir.

5          Q     While you were training were you ever

6    graded or evaluated?

7          A     Yes, sir.

8          Q     By who?

9          A     The trainers and Mr. Jody Hamilton.

10         Q     And how often were you graded or

11   evaluated?

12         A     Three times that I know of.

13         Q     So during the entire time that you

14   trained you were evaluated about three times as best

15   as you can recall?

16         A     Yes, sir.

17         Q     Okay.  And what did the evaluation

18   consist of?

19         A     Go out in the ring and perform.

20         Q     And after you performed was the results

21   of your evaluation communicated to you?

22         A     Yes, sir.

23         Q     Do you recall if it was in writing?

24         A     No, sir.

25         Q     You don't recall, or it wasn't in

1     writing?

2          A     It wasn't in writing.

3          Q     Okay.  Tell me the best as you can recall

4     what you were told after your first evaluation.

5          A     They told me I did a good job, and they

6     told me points where -- things not to do and things

7     to do to get better.

8          Q     Who told you those things?

9          A     Mr. Hamilton.

10         Q     The next evaluation, do you recall about

11    how long a period of time it was between your first

12    and your next evaluation?

13         A     I don't remember.

14         Q     Tell me the best as you can remember what

15    you were told at the next evaluation.

16         A     Real good.

17         Q     Anything else you recall being told

18    specifically?

19         A     No, sir.  No, sir.

20         Q     And who told you that?

21         A     The trainers.

22         Q     All of them?  Or was there some specific

23    trainer who communicated that to you?

24         A     Mike Wenner.

25         Q     The next time that you were evaluated do

Page 36

1    a sign-in sheet?

2         A    Yes, sir.

3         Q    Did you sign in the time that you

4    started?

5         A    Yes, sir.

6         Q    And did you sign in the time that you

7    left?

8         A    Yes, sir.

9         Q    Other than the ring equipment and the

10   weight training equipment did WCW provide you with

11   any equipment to use in your training?

12        A    No, sir.

13        Q    Did they provide you with any clothes?

14        A    No, sir.

15        Q    Did you have a ring name or character?

16        A    Yes, sir.

17        Q    What was your ring name?

18        A    Mercenary.

19        Q    How did you come up with the character

20   Mercenary?

21        A    I've always loved the work soldiers do

22   for the country and people who, you know, fight for

23   the country and nobody don't know about it.

24        Q    Have you ever had any military training?

25        A    No, sir.

Page 54

1                              (Whereupon, the court
                         reporter marked
2                        Defendant's Exhibit 4 for
                         identification.)
3

4        Q    BY MR. RICHARDSON:  Handing you what's

5   been marked as Exhibit 4 and ask you if you recognize

6   that.

7        A    Yes, sir.

8        Q    What is this?

9        A    Oh, this is a name label of the

10  commercial that they were supposed to film that day.

11       Q    A label?

12       A    Yes.  Company Crawford, a label that they

13  stick on the tape of the --

14       Q    Where did you get this label from?

15       A    I may have made a mistake.  I was looking

16  on work at PC&E studio down here.

17       Q    But tell me if you could where you got

18  this label that is Exhibit 4.

19       A    It was given to us like a tape of the

20  actual --

21       Q    The commercial?

22       A    The commercial.

23       Q    This was a tape that was provided to you

24  after the commercial was done?

25       A    Yes, sir.

Page 55

```
 1        Q    And who gave you the tape?

 2        A    It was given to us at the school.

 3        Q    When you say us, who do you mean?

 4        A    To other wrestlers that was involved in

 5   the taping of it.

 6        Q    How many wrestlers were involved in this

 7   taping?

 8        A    I don't remember.

 9        Q    Do you still have the tape in your

10   possession?

11        A    No, sir.

12        Q    What was done with the tape?

13        A    I don't remember.

14        Q    Did you give the tape to your lawyers?

15        A    No, sir.

16        Q    There are two dates on it, on this label.

17   One says event date, Sunday, April 11th, 1999.  And

18   then there's another date at the bottom, WCW 2/12/99.

19             Do you recall if either of those dates

20   were the dates that you did studio work?

21        A    I don't remember.

22        Q    Do you recall how much time you spent

23   doing studio work?

24        A    It was like a whole day.

25        Q    One whole day?
```

Page 56

1          A     Like from early in the morning until late

2     in the evening.

3          Q     How did you come to be involved in this

4     studio work?

5          A     It was trainers were making up a list for

6     wrestlers who wanted to be in studio work.  I asked

7     to participate, put my name on that list.

8          Q     Do you have an understanding as to

9     whether you were to be paid for that work?

10         A     Yes, sir.

11         Q     What was your understanding?

12         A     $300.

13         Q     And who at WCW did you have discussions

14    with regarding payment?

15         A     Mr. Jody Hamilton.

16         Q     Jody Hamilton tell you that was what

17    you'd be paid for it?

18         A     Yeah.  Yes, sir.

19         Q     Were you paid for that work?

20         A     No, sir.

21         Q     Do you know why you weren't paid?

22         A     No, sir.

23         Q     Did you ever ask why you weren't paid?

24         A     No, sir.

25         Q     Subpart H on page nine of your

Page 57

1    interrogatory responses says two days studio work for

2    PC&E studio.  What is that?

3        A    This was the one that I made mistake with

4    when I was telling you about Spring Stampede, because

5    PC&E studio is pretty close to the school, to the old

6    school.  And that was the commercial that they was

7    supposed to film between Lex Luger and other

8    wrestler.  We was asked to be there.

9        Q    Who asked you to be there?

10       A    The trainers.

11       Q    Anyone in particular?

12       A    Sarge and Padwood (phonetic).  They

13   were -- we was to set up the ring and everything.

14       Q    And did you do that?

15       A    Yes, sir.

16       Q    And that was two days of work?

17       A    Yes, sir.

18       Q    Did you have an understanding as to

19   whether you were going to be paid for that?

20       A    Yes, sir.

21       Q    What was your understanding?

22       A    I don't remember those two days.

23       Q    Do you remember what you were supposed to

24   be paid for those two days?

25       A    I don't recall at this moment.

Page 58

1      Q    Do you recall what two days those were,

2   when it was that you did that work?

3      A    No, sir.

4      Q    Do you have any documents in your

5   possession that would show what days you worked?

6      A    No, sir.

7      Q    Were you paid for that work?

8      A    No, sir.

9      Q    The last subpart, subpart I, says

10  promotional work with Ric Flair.  What is that?

11     A    That was, I was asked to be part of the

12  crew to put these -- to put the ring together.  Not

13  the ring, but to help set the place up for these --

14  this act.  It was something that would show that Ric

15  Flair was in the crazy house.

16     Q    So this was kind of a skit, a little

17  acting skit involving Ric Flair?

18     A    Yes.

19     Q    Like a story?

20     A    Yes.

21     Q    Do you recall when that was?

22     A    I don't recall.

23     Q    Who asked you to do that?

24     A    Trainers.

25     Q    Which trainers asked you to do that?

Page 59

1        A     Mike Wenner.

2        Q     How much time did you spend doing that

3    work with Ric Flair?

4        A     I don't remember.

5        Q     Do you know if it was more than a day?

6        A     It was -- I don't remember.  It was like

7    evening time until show time.

8        Q     Do you know what show it was that you did

9    this for?

10       A     No, sir.

11       Q     Do you know if it was a Pay-Per-View or a

12   television taping?

13       A     It was a live shot.

14       (Whereupon, a discussion ensued off the record.)

15       Q     BY MR. RICHARDSON:  Did you have an

16   understanding of whether you were to be paid for

17   doing this work?

18       A     Yes, sir.

19       Q     And what were you told about payment?

20       A     Just put your name on this sheet, and you

21   will be paid $300.

22       Q     Who told you that?

23       A     Mr. Jody Hamilton.

24       Q     You did that work?

25       A     Yes, sir.

Page 60

```
1        Q    Were you paid?

2        A    No, sir.

3        Q    Did you ever ask why you weren't paid?

4        A    No, sir.

5        Q    Did you have any documents that would

6    show what -- indicate what day it was that you did

7    this one?

8        A    No, sir.

9        Q    Is there any other work that you did that

10   you can tell me about that you believe you weren't

11   compensated appropriately for other than what we've

12   just talked about here in your interrogatory

13   responses?

14       A    I did not include the mileage, all the

15   times that I used my vehicle to pick up the

16   wrestlers.

17       Q    Did you ever record the mileage that you

18   used on your vehicle?

19       A    I had, but I did not -- I could not find

20   my -- the papers where I wrote it down.

21       Q    Did you ever submit mileage for

22   reimbursement to anyone at WCW?

23       A    Yes, sir.

24       Q    Who did you submit your mileage to?

25       A    To Brenda Smith.
```

Page 61

1          Q      When you say that you had a paper where

2     you wrote down the mileage?

3          A      Yes, sir.

4          Q      That was -- was that a record you made at

5     or about the time that you were doing it?

6          A      That split second before I gave it to her

7     because I did not know it was going to be a problem.

8          Q      So any records that you gave -- any

9     record that you made of the miles that you drove on

10    your car you gave to WCW --

11         A      Yes.

12         Q      -- you don't have anymore in your

13    possession?

14         A      No, sir.

15         Q      Do you know how many miles that was?

16         A      I don't recall, sir.

17         Q      Can you give me a rough estimate?

18         A      No, sir.

19         Q      Anything else that you believe you

20    weren't appropriately compensated for?

21         A      Not that I recall at this moment, sir.

22         Q      Is there anything that you think would

23    help refresh your recollection?

24         A      No, sir.

25    ///

```
1                              (Whereupon, the court
                          reporter marked
2                         Defendant's Exhibit 5 for
                          identification.)
3

4        Q    BY MR. RICHARDSON:  Hand you a group of

5   documents that have been marked as Exhibit 5.

6   They're Bates labeled WCW 002412 through WCW 002416.

7              Look through those and tell me if you

8   recognize any of these documents.  Have you had time

9   to familiarize yourself with those documents?

10       A    I'm trying to.

11       Q    Do you recognize any of those documents

12  there?  Why don't we just take them page by page.

13             Take a look at the first page which

14  appears to be a check and a check summary in the

15  amount of $1,440 paid to the order of you and dated

16  5/24/99.

17             Do you recall receiving this check from

18  WCW on or about May 24th, 1999?

19       A    I started receiving payments like after

20  they gave me my contract.

21       Q    Right?

22       A    But I do not recall check by check.

23       Q    But at this point in time you were

24  receiving checks from WCW?

25       A    Yes, sir.
```

Page 63

1     Q     Twice a month?

2     A     Yes, sir.

3     Q     You don't have any reason to believe that

4  you didn't receive this check, do you?

5     A     I don't recall.

6     Q     Now, there's a little chart at the top of

7  this first page which has date, invoice numbers, and

8  amounts.  There's one at the top of the cover page

9  has a date January 7, 1999, in the amount of $105.

10          Do you see that there?

11    A     Yes, sir.

12    Q     I'll ask you to turn to the next page

13  which is labeled WCW 002413 at the bottom.

14    A     (The witness complies with the request of

15  Counsel.)

16    Q     This page, is any of this handwriting

17  yours?

18    A     The first part.

19    Q     The name and address?

20    A     Yes, sir.

21    Q     What about where it says international

22  withhold?  Is that your handwriting?

23    A     No, sir.

24    Q     Do you know why that was put there next

25  to your social security number?

Page 64

1       A       No, sir.

2       Q       Do you know whose handwriting that is?

3       A       No, sir.

4       Q       A little bit farther down it says in

5    handwriting 1/7/99 talent Toy Biz, COMM, shoot, $150.

6    Is that your handwriting?

7       A       No, it's not.

8       Q       Do you know whose handwriting that is?

9       A       No, sir.

10      Q       Do you recall doing a commercial shoot on

11   or about January 7th, 1999?

12      A       Which commercial?

13      Q       For Toy Biz?

14      A       Commercials that I did, I don't recall

15   the name of it, the company.

16      Q       Do you recall doing commercials for toy

17   companies during the time you were at WCW?

18      A       No, sir.

19      Q       You recall on occasion doing commercials,

20   though?

21      A       They did not say specifically you go do

22   commercial.  They need -- what they said that they

23   need workers for this event.

24      Q       Do you recall being paid for any of the

25   events that they told you they needed workers for?

Page 65

```
1          A     No, sir.

2          Q     Take a look at the next page.  That's

3    labeled WCW 002414.  Is any of the handwriting on

4    this page yours?

5          A     No, sir.

6          Q     Have you ever seen this document before?

7          A     No, sir.

8          Q     Take a look at the next page, WCW 002415.

9          A     (The witness complies with the request of

10   Counsel.)

11         Q     Have you ever seen this document before?

12         A     I don't remember.

13         Q     Is any of this handwriting yours?

14         A     Yes, sir.

15         Q     Which handwriting is yours?

16         A     The part that says the address, 6591

17   Coventry Point, phone number.

18         Q     Where it says social security number,

19   again, it says international withhold.  Do you know

20   who put that there?

21         A     No, sir.

22         Q     Do you know who else's handwriting is on

23   this?

24         A     No, sir.

25         Q     Do you recall doing any work for WCW
```

1    Spring Stampede on or about February 4th, 1999?

2         A    I don't recall.  I don't remember.

3                         (Whereupon, the court
                         reporter marked
4                         Defendant's Exhibit 6 for
                         identification.)
5

6         Q    BY MR. RICHARDSON:  I'll ask you to take

7    a look at what's been marked as Exhibit 6.  Tell me

8    if you recognize any of these documents.  This is a

9    three-page document, Bates labeled WCW 002422 through

10   WCW 002424.

11              Let's try and take it page by page.

12        A    (Witness nods head.)

13        Q    First page appears to be a copy of a

14   check and a check summary dated July 6, 1999, paid to

15   the order of you in the amount of $300.

16              Do you recall receiving this check?

17        A    I don't remember.  Like I said, after my

18   contract I started getting paid, but I don't remember

19   check by check.

20        Q    Turn the page to the next document, page

21   labeled WCW 002423.

22        A    (The witness complies with the request of

23   Counsel.)

24        Q    Typewritten document with some

25   handwriting.  Is any of that handwriting yours?

Page 67

```
 1        A    No, sir.

 2        Q    Do you know whose handwriting any of that

 3   is?

 4        A    No, sir.

 5        Q    Have you seen this document before?

 6        A    No, sir.

 7        Q    Do you recall doing a video shoot with

 8   Ric Flair on April 26th, on about April 26th of 1999?

 9        A    I recall doing -- yes, sir.

10        Q    Do you think it was -- the time you spent

11   there was from about 2:00 p.m. to 11:00 p.m.?

12        A    I don't remember the time.

13        Q    Does that sound about right?

14        A    I don't remember.

15        Q    Will you turn to the last page.

16        A    (The witness complies with the request of

17   Counsel.)

18        Q    Looks like a slightly different version

19   of the previous page with some different handwriting

20   on it.  Do you recognize any of this handwriting on

21   this page?

22        A    No, sir.

23             MR. RICHARDSON:  Why don't we go off the

24   record.

25             (Whereupon, a luncheon recess was taken.)
```

Page 70

1        Q     Yes.  Is that your signature there?

2        A     Yes, sir.

3        Q     And you recall this was signed in April

4   of 1999?  If you look at the front page, the very

5   first paragraph it says, made and entered into at

6   this blank date of April 1999.

7        A     Yes, sir.

8        Q     Is that about the time that you signed

9   it?

10       A     Yes, sir.

11       Q     And you were to be paid $2600 per month

12  under this contract, correct?

13       A     Yes, sir.

14       Q     Take a look at page three.

15       A     (The witness complies with the request of

16  Counsel.)

17       Q     Paragraph two.  I'm going to read where

18  it says independent contractor.  Says trainee in the

19  performance of the services agreed to in this

20  document is an independent contractor.  In the

21  performance of this agreement both WCW and trainee

22  shall be acting in their own separate capacities and

23  not as agents, employees, partners, joint venturers,

24  or associates of one another.

25              Do you recall reading that before you

Page 77

1        Q     After you signed your contract do you

2   recall having any discussions with anyone at WCW

3   regarding your performance as a trainee?

4        A     No, sir.

5        Q     Were you given any kind of feedback at

6   all about your training?

7        A     No, sir.

8              We would go, you know -- every day when

9   we trained they would tape it, and you would wrestle

10  and then come back and look at the tape.  You know,

11  one of the trainers will review it with you.

12       Q     Was that something that was done before

13  you signed the contract?

14       A     After.

15       Q     That started after?

16       A     (Witness nods head.)

17       Q     What else started after?

18       A     After we moved to the new school and the

19  black wrestlers and some of the whites that were

20  rookies would do the job of cleaning around the Power

21  Plant.

22       Q     Anything else that you recall that was

23  different after you signed the contract?

24       A     Different in what way?

25       Q     The ways in which your training was

Page 86

1          THE WITNESS:  O-r-n-d-o-r-f.  P-a-u-l.

2          MR. GERNAZIAN:  Are you okay to keep

3    going?

4          THE WITNESS:  I'm okay.

5      Q    BY MR. RICHARDSON:  In the message did

6    the person who left the message give you a reason why

7    you were being -- why you were told not to come back?

8      A    No.  He just told me not to return to the

9    Power Plant, that whatever information would be

10   mailed to me.

11                         (Whereupon, the court
                           reporter marked
12                         Defendant's Exhibit 10 for
                           identification.)
13

14     Q    BY MR. RICHARDSON:  Mr. Davis, would you

15   take a look at what's been marked as Exhibit 10.

16   Appears to be a letter dated September 28th, 1999,

17   addressed to you from J. J. Dillon.

18          Do you recall receiving this letter on or

19   about September 28th, 1999?

20     A    I don't remember.

21     Q    The first paragraph of the letter says,

22   pursuant to our recent phone conversation this letter

23   shall confirm that WCW is exercising its right under

24   paragraph 8B to terminate your independent contractor

25   agreement as of the end of your current one-month

Page 87

1    period, October 31, 1999.

2           Do you recall having a conversation with

3    J. J. Dillon about your agreement?

4       A    If he was the one -- a conversation with

5    J. J. Dillon?  I don't remember.

6       Q    Have you ever spoken to J. J. Dillon?

7       A    I have, but not in this matter.  Phone

8    conversations say they would mail whatever they were

9    supposed to mail to me.

10      Q    Did you ever ask anyone at WCW why your

11   contract was terminated?

12      A    I didn't have nobody to ask.

13      Q    So you never asked anyone?

14      A    No, sir.

15      Q    Do you know who made the decision to

16   terminate your contract?

17      A    No, sir.

18      Q    Do you know if any other trainees'

19   contracts were terminated in September 1999?

20      A    No, sir.

21      Q    How about in October, November, or

22   December of 1999?

23      A    No, sir.

24      Q    During the time that you were a trainee

25   for WCW did you ever wrestle for WCW in any wrestling

1    eventually awarded a contract, he was still not given

2    an opportunity to wrestle, was denied promotion, and

3    was eventually terminated on the basis of his race.

4           Who do you claim denied you the

5    opportunity to wrestle because of race?

6           A    Trainer, Paul Orndorff.  Trainer and Paul

7    Orndorff.

8           Q    Which trainer?

9           A    Duane, Sarge.

10          Q    When did Sarge deny you an opportunity to

11   wrestle because of your race?

12          A    Began like before.  I was supposed to

13   clean the bathroom that day, and it was almost time

14   to go home.  And he went upstairs to supervise, and

15   he found that bathroom floor was still dirty.

16          He got mad, and he told me, he said, you

17   black motherfucker, you will never get anywhere in

18   this company or whatever you are.

19          Q    Who was it that told you that?

20          A    Duane.

21          Q    When did he tell you that?

22          A    It was at the new school.  I don't

23   remember the time period.

24          Q    You think this was after you signed your

25   contract?

1        A     Yes, sir.

2        Q     You believe that's why you weren't given

3    an opportunity to wrestle?

4        A     Yes, sir.

5        Q     How did Paul Orndorff deny you an

6    opportunity to wrestle?

7        A     In Ms. Brenda, she always would give me

8    the work with the wrestlers.  So one specific day --

9    I don't remember dates -- I was in her office, and he

10   was kind of angry.

11             He told me that Brenda wasn't the right

12   person to stick around, that I had to kiss his ass to

13   get anywhere in this company.  And other time I have

14   heard him say things like some of the best wrestlers,

15   they are under six foot.

16       Q     Did you ever ask Sarge for an opportunity

17   to wrestle?

18       A     No, sir.

19       Q     Did you ever ask Paul Orndorff for an

20   opportunity to wrestle?

21       A     No, sir.

22       Q     How do you know that they denied you an

23   opportunity to wrestle?

24       A     Because Paul Orndorff took a small

25   wrestler who did not have no skill at all from the

Page 97

1    street.  He call Shark Boy.  He did not do any

2    tryout, no nothing.

3            He have been on independent shows, and he

4    brought him into the Power Plant, and he went on TV

5    and everything.  I felt like we who have been -- me

6    personally and all the blacks who have been there

7    doing the work and thing like that should get the

8    opportunity to wrestle.

9            And other occasions this guy they call --

10   white guy they called The Wall, they had like he was

11   supposed to be Berlyn bodyguard.  He came in from the

12   street also, no tryout, no nothing.  He went straight

13   over me and other black wrestlers, and they just put

14   him on TV everything.

15           Chuck Palumbo, all of them that was in

16   magazines and thing like that.  Martin Jindrak, they

17   come -- this other white wrestler, I'm skipping his

18   name right now.

19           Allen Funk, he went on TV and was

20   wresting and he's like -- he did not have the weight

21   or the height requirement that they was asking for to

22   come to be a wrestler at the Power Plant.  They all

23   came in, before me they went on TV.

24           And the day when Paul told me that I have

25   to kiss his ass to be something in this company and

1    when Sarge told me what he did say I just -- I didn't

2    feel like I had or other black folk had a chance

3    anymore.

4         Q    Weren't some black wrestlers given an

5    opportunity to wrestle on TV?

6         A    One.

7         Q    Who was that?

8         A    Elix Skipper wrestling name prime time.

9         Q    Why do you think he was given an

10   opportunity and other -- some other black wrestlers

11   weren't?

12        A    I don't know.

13        Q    Any others that you recall being able to

14   wrestle on TV?

15        A    Hardbody Harrison.  They would give him

16   squash match and go up, and they beat him up,

17   national TV.

18        Q    Did Elix Skipper have to wrestle squash

19   matches?

20        A    I don't know.

21        Q    You mentioned somebody named Shark Boy?

22        A    Yes, sir.

23        Q    It's your understanding that Shark Boy

24   had wrestled in some independent wrestling

25   organizations before coming to WCW?

Page 99

1        A     Yes, sir.

2        Q     How about The Wall?

3        A     The Wall, he did independent also.

4              And they used me as a dummy for a lot of

5     the white wrestlers, like training dummy.  And every

6     time it was my turn to do something, everybody would

7     say I was too heavy and I couldn't -- they would not

8     give me a chance to learn also.

9        Q     What do you mean when they said that you

10    were too heavy?

11       A     I was, like, at that time at the school I

12    was six foot eight.  I was taller than all the other.

13       Q     Are you saying that other wrestlers did

14    not want you to wrestle with them?

15       A     You know, when you got to train a new

16    move, like when you just learning to drop the elbow,

17    so if you make a mistake people will get hurt.

18       Q     Right.

19       A     So they will use me for others to train

20    on.

21       Q     So they could drop the elbow on you?

22       A     And other black wrestlers also.  I didn't

23    get no chance to train.  I had to use the real dummy.

24              This particular wrestler that I'm talking

25    about, The Wall, he came in.  I was the one who have

Page 100

1    to walk him through moves and the way to wrestle,

2    without hurting somebody.   Afterward they took him,

3    what they said, he have the right look, and they put

4    him on TV.

5         Q    Who said he had the right look?

6         A    Paul Orndorff.

7         Q    Do you know who made the decision

8    regarding who would get an opportunity to wrestle on

9    television?

10        A    No, sir.

11        Q    Do you know what the decision would be

12   based on?

13        A    No, sir.

14        Q    You've already mentioned some white

15   wrestlers that got opportunities to wrestle while you

16   were there.   Let me ask you a question this way:

17   What white wrestlers did you believe got an

18   opportunity to wrestle who were less qualified than

19   you?

20        A    Martin Jindrak, Chuck Palumbo, Mike

21   Sanders, Lash LaRue, The Wall, Shark Boy, Allen Funk.

22        Q    Are there -- were there any white

23   wrestlers there that got an opportunity to wrestle

24   that you believe were more qualified than you?

25        A    There was a white guy that was -- the guy

Page 101

1    I told you before they called T-Rex, but he probably

2    be at the school once or twice.  He was always on the

3    road.

4            I don't believe somebody because of their

5    agility and stamina and everything -- I would say

6    it's a black wrestler name Harrison Norris.

7            MR. RICHARDSON:  Can you read the answer

8    back.

9                        (Whereupon, the record was

10                        read by the court

11                        reporter.)

12    Q    BY MR. RICHARDSON:  So you believe

13    Harrison Norris was more qualified to wrestle than

14    you were?

15    A    Talking about being like in the whole

16    school, he was one other person who would teach me a

17    lot of things.  I would say he was one of the best --

18    I'm not saying he was more qualified than me, but I

19    respect him, you know, to be one of the best

20    wrestlers I've seen at the Power Plant.

21    Q    Do you know what qualifications WCW was

22    looking for in deciding who was to be given an

23    opportunity to wrestle?

24    A    Well, they say it was -- I don't know.

25    Q    Isn't it possible that WCW people thought

Page 102

1    that some of those other wrestlers that they gave

2    opportunities to wrestle were better wrestlers than

3    you?

4         A     No.

5         Q     Is it possible, you think, that WCW

6    people thought that some of those other wrestlers

7    were able to produce more entertaining wrestling

8    matches than you?

9         A     No.  Otherwise, they would never have

10   used me to train them.

11        Q     Anything else that you can tell me that

12   leads you to believe that the decision not to allow

13   you to wrestle was based on race?

14        A     While talking to other wrestlers and in

15   lunchtime and in school sometimes you will hear the

16   "N" word.  That's all that I can recall at this time.

17        Q     Other wrestlers were using the "N" word?

18        A     White wrestlers.

19        Q     And why did that make you believe that

20   you weren't getting an opportunity because of race?

21        A     Because trainers would be seated at the

22   table also, and they wouldn't try to correct it.

23        Q     What trainers heard other wrestlers use

24   the "N" word?

25        A     I do not know if they heard, but they

Page 103

1    would all sit in one table.

2         Q    Anything else that led you to believe you

3    weren't given an opportunity to wrestle because of

4    your race?

5         A    When I was -- when the Mexican wrestlers

6    would come, and they don't have no other way to

7    communicate and we will speak in Spanish, that was

8    something else that they would get back at you.  They

9    would say smart things like, stop speaking that crap

10   in here, things like those.

11        Q    Who said that?

12        A    White wrestlers.

13        Q    Did any of the trainers ever say that?

14        A    I don't know.

15        Q    You don't have any recollection?

16        A    I don't have no recollection.

17        Q    Anyone at WCW other than another wrestler

18   ever use a racial slur in your presence?

19        A    Not that I can recall.

20        Q    Also mentioned here in paragraph nine of

21   your complaint that you were denied promotion on the

22   basis of race.

23             What promotion do you believe you were

24   denied because of your race?

25        A    When you are a wrestler, being promoted

1   is like they put you out there so people can see you,

2   be seen.

3          Q     Would you say that being denied promotion

4   is essentially the same thing as being denied an

5   opportunity to wrestle, or is there something

6   different about promotion?

7          A     I'm kind of confused with that.  Being

8   given a chance to wrestle, and it's in payment at the

9   same time.

10         Q     Do you believe that you were paid

11  differently than other wrestlers because of your

12  race?

13         A     Yes, sir.

14         Q     Why do you believe that?

15         A     Because a few of the other wrestlers that

16  I mentioned they're like similarly situated, they got

17  paid -- at least they say they got paid a lot more

18  than what I did.

19         Q     I think two of those wrestlers you

20  mentioned before.  I think it was Palumbo and

21  Jindrak?

22         A     Jindrak.  And Lash LaRue, he went

23  straight on TV.

24         Q     Do you know how much he was paid?

25         A     No, sir.

Page 105

1          Q    Did you ever try and independently verify
2     what Mr. Jindrak and Mr. Palumbo told you they were
3     making?

4          A    No, sir.

5          Q    Do you have any other information
6     regarding what other trainees were making?

7          A    No, sir.

8          Q    Going back to promotions, tell me any
9     other way in which you believe you were denied
10    promotion because of your race other than what we've
11    already talked about.

12         A    Any other way that I was denied
13    promotion?

14         Q    Yes.

15         A    I just think that these wrestlers, they
16    came in, they didn't go through the tryouts, nothing,
17    they came and went above me.  They got promoted.
18    They went on TV.  Whereas, I was denied.  I didn't
19    get a chance to wrestle or be seen on TV.

20         Q    Okay.  Did Jindrak and O'Hare, did they
21    start training before you?

22         A    O'Hare, he was not in Power Plant.  And I
23    do not know about Jindrak.  I don't know when he took
24    his tryout or nothing.  So but we was practically at
25    the same time.

1          Q     Okay.  You mentioned Shark Boy and The

2     Wall who came in after you and were given

3     opportunities to wrestle.

4               Who else can you tell me came after you

5     and were given opportunities to wrestle?  Let me ask

6     you this:  Any black wrestlers who came after you who

7     were given opportunities to wrestle?

8          A     I don't remember.

9          Q     How about white wrestlers?

10         A     Came after me was The Wall and Shark Boy,

11    and I do not know about Allen Funk, but I do believe

12    he came after me.

13         Q     Let's talk about termination of your

14    contract.  You claim that the termination of your

15    contract was based on your race?

16         A     Yes, sir.

17         Q     Do you know who specifically made the

18    decision to terminate your contract?

19         A     No, sir.

20         Q     Why do you believe it was because of your

21    race?

22         A     Because of the way Mr. Paul approached me

23    and Mr. Duane, the trainer, and the way black

24    wrestlers were treated and differently and training

25    separately, and all that brought me to that

Page 107

1    conclusion.

2        Q    And when you say the way Sarge and

3    Orndorff approached you, what are you referring to?

4    Are you referring to the conversations we talked

5    about before regarding the cleaning the bathroom and

6    kissing up to Mr. Orndorff?

7        A    Yes, sir.

8        Q    Referring to any other conversations or

9    ways that they approached you?

10        A    Just ways in general how they treated

11    blacks in that school.

12        Q    Weren't some white wrestlers' contracts

13    terminated, too?

14        A    Yes, sir.

15        Q    Not every black wrestler's contract was

16    terminated, was it?

17        A    I don't know.

18        Q    Elix Skipper's contract wasn't

19    terminated, was it?

20        A    No, sir.

21        Q    Do you know why his contract wouldn't be

22    terminated but yours would?

23        A    No, sir.

24        Q    Did you ever complain to anyone about any

25    treatment you received by WCW that you thought was

1    discriminatory?

2         A    Yes, sir.

3         Q    Who did you complain to?

4         A    Mr. Pez Whatley.

5              MR. RICHARDSON:  W-h-a-t-l-e-y.

6         Q    BY MR. RICHARDSON:  When did you complain

7    to Pez Whatley?

8         A    I don't remember.  I don't recall the

9    time.

10        Q    Do you think it was before or after you

11   signed your contract?

12        A    After I signed my contract.

13        Q    What did you tell Pez Whatley?

14        A    I told him about what the trainer, Sarge,

15   told me in the restroom and what Mr. Paul Orndorff

16   had told me, and the different treatment, separate

17   training, two different trainings, you know.

18             These white wrestlers were over this

19   side, and getting more advanced training, and we was

20   still going through holds and trying to -- you do one

21   move, and you keep on doing it, keep on doing it.  We

22   wouldn't advance from that.

23        Q    Anything else you complained to him

24   about?

25        A    Not that I recall.

Page 109

1      Q    What was his response to that?

2      A    He kind of smiled, and he didn't give me

3  no response.  So, therefore, I didn't know who else

4  to approach with this, and I was scared I would get

5  in trouble for it.

6      Q    So other than Pez Whatley you didn't

7  complain to anyone else at WCW about it?

8      A    No, sir.

9      Q    Now, you mentioned white wrestlers

10  training separately and getting advanced training?

11      A    When was time to train, Sarge would take

12  his group of wrestlers.  And the majority of the

13  wrestlers, white wrestlers, that he would pick on one

14  side, those are the majority of the guys -- those

15  were the guys then who got promoted.

16           And the rest of us, we would be black

17  wrestlers, and others would be over here in another

18  ring with Mike Wenner.  All we would do is just go

19  over the basic holds, lock up, things like those.

20      Q    Were any white wrestlers put in the group

21  with Mr. Wenner?

22      A    Yes, sir.

23      Q    What white wrestlers do you recall

24  wrestling in the group with Mr. Wenner and you, your

25  group?

Page 110

1        A        Eventually, like, Ric Flair's son.

2        Q        David Flair?

3        A        David Flair.  We have Hunke would be with

4    us sometimes and the, like, the beginners, the

5    rookies, the white rookie then we start.  So we were

6    like instead of going to a more advanced training, we

7    was to take these rookies through the same moves that

8    we have learned a few months ago.

9        (Whereupon, a discussion ensued off the record.)

10        Q        BY MR. RICHARDSON:  I apologize if I

11    asked you this before, but just so I'm clear, did you

12    ever get to go and wrestle in the group with Sarge,

13    the advanced group?

14        A        At this time period not with him, but we

15    have been at the same, like an event that is away

16    from the school.  Hardbody, he would wrestle in some

17    different place, and then he would pay Sarge to

18    wrestle.

19                And others, they will give you like a

20    little gas money for to you wrestle so you would have

21    an opportunity to show yourself to a live audience.

22        Q        Did you ever wrestle for a live audience?

23        A        I have.

24        Q        While you were at WCW?

25        A        Yes, sir.

Page 111

1          Q      How many times did you wrestle for a live

2     audience?

3          A      I do not remember.

4          Q      Do you think it's more than ten?

5          A      No.  Less than that.

6          Q      When you wrestled for a live audience was

7     it in the Atlanta area, or did you ever have to

8     travel?

9          A      It's pretty close in the Atlanta area.

10    On the trainers thing there would be there.

11         Q      And were you paid for any of this?

12         A      From Harrison, like gas money.  Sometimes

13    $5 or things like that.

14         Q      Is it your understanding that it was

15    Harrison, that this was something that -- a promotion

16    or an event that a wrestler was conducting?

17               MR. GERNAZIAN:  Can I interject

18    something.  Are you answering about during WCW when

19    you wrestled in front of live audiences?

20               THE WITNESS:  No.  I didn't wrestle for

21    WCW no live audience.

22               MR. RICHARDSON:  Okay.

23               THE WITNESS:  I did not, no.

24               MR. RICHARDSON:  We had a

25    misunderstanding there.

1      Q     BY MR. RICHARDSON:   Going back to my

2   initial question is, while you were at WCW we talked

3   about how Sarge took a group and Mike Wenner took a

4   group.   Sarge had the more advanced group?

5      A     Yes.

6      Q     Did you ever get to wrestle in the more

7   advanced group with Sarge while you were training at

8   WCW?

9      A     After we went to the new school.   Not to

10  train in it, but when they have an event you would

11  actually wrestle.

12     Q     But did any of those events occur while

13  you were still training at WCW?

14     A     Yes, sir.

15     Q     Okay.   That's where I'm getting confused.

16     A     You talking about no live audiences.

17  This is all inside the school.

18     Q     So while you were training at WCW you

19  would wrestle -- they would have events at WCW at the

20  Power Plant?

21     A     No.   That would be between only the guys

22  who training at WCW.

23     Q     They would set up an event where the

24  wrestler trainees would wrestle each other?

25     A     Yes.

Page 113

1     Q      There would be no audience?

2     A      No audience.

3     Q      Would it be videotaped?

4     A      Sometimes it would.

5     Q      On those occasions you would sometimes

6  wrestle with wrestlers who were in Sarge's group?

7     A      Yeah.

8     Q      But other than those events when you were

9  just doing your regular everyday training, you never

10 wrestled in -- you never trained in Sarge's group?

11    A      No, sir.

12    Q      Did any black wrestlers ever train in

13 Sarge's group?

14    A      Elix Skipper.

15    Q      Do you know why he was chosen to wrestle

16 in Sarge's group and you and some other black

17 wrestlers weren't?

18    A      I may want to think that he was -- they

19 would try a lot of moves so that we use him to be

20 thrown around.  I guess he was light, and he just

21 easy to pick up, you know.

22    Q      It's possible that people at WCW thought

23 he was a better wrestler than some of the other black

24 wrestlers?

25    A      I don't know.

Page 114

1          Q      Who at WCW do you believe discriminated

2    against you intentionally?

3          A      Sarge.

4          Q      Anyone else?

5          A      The white wrestlers did.

6          Q      Which ones, which wrestlers?

7          A      Mark Sanders and Lash LaRue.  The Wall.

8          Q      How did they discriminate against you?

9          A      They didn't like me to speak Spanish

10   around.  I'll just get carried away and start singing

11   a song in Spanish, and, you know.  They will -- they

12   will say, like, do not speak that crap in this school

13   and all different type things.  And they would say

14   things in joke, you know, joking about it, and they

15   in their little group just laughing.

16         Q      Any other facts you can tell me to

17   support your claims that you were not given

18   opportunities to wrestle because of your race?

19         A      Can you repeat that question for me.

20         Q      Any other facts that you can tell me to

21   support your claim that you were not given

22   opportunities to wrestle because of your race?

23         A      When I was hurt Paul told me that I was

24   supposed to go to school.  My knee had been real

25   swollen, and I went to the doctor and everything.

1    And he said I was still supposed to come to the

2    school in spite, although my leg was -- I couldn't --

3    wouldn't give me a chance to heal.

4            And I was to be standing up with the

5    crutches and writing down whatever they were doing.

6    He even bring the Smith, he stated why they don't let

7    you stay home.  I have a real small vehicle, and it's

8    so difficult for me, and my leg couldn't bend.  So I

9    was to put my leg across the seat and try to drive

10   with my left leg.

11           And I thought that was -- even though I

12   told Paul the difficulties, you know, of me coming to

13   the school and everything, he wouldn't give me a

14   break.  When I went to do physical therapy and

15   everything he was, like, trying to speed me up so I

16   could come back to do a shooting with 20/20, and an

17   agility and stamina test.

18           So I was -- they released me from the

19   physical therapy place, but my knee wasn't well, and

20   the following day they released me one day before the

21   20/20.  The following day I was to go to strenuous

22   exercise, tie like those rubber that you tie on your

23   waist on the ring and you got to run.  After that my

24   knee just swolled up again.

25           And you can see right knee the difference

Page 116

1    of the two knee on this day with this extra ball on

2    top of my knee.  And I think they could have gave me

3    an opportunity to at least heal before to start

4    again.  I've never asked nobody before for no break

5    for nothing.  I took everything they told me;

6    everything they told me to do, I did it.

7         Q    Why do you believe that that was because

8    of race?

9         A    Because before he stated, you know -- in

10   my mind he had problem from me just being around

11   Brenda.  So I just think that just because she were

12   black wasn't allowed to be around her so much, and I

13   wasn't giving him the attention that he probably

14   think I should have.

15        Q    You said that Brenda Smith was black?

16        A    Yes, sir.

17        Q    Do you know what her position was?

18        A    No, sir.

19        Q    Did you ever talk to her about

20   discrimination?

21        A    No, sir.

22        Q    Do you have any idea what issue, if any,

23   Paul Orndorff had with Brenda Smith?

24        A    No, sir.

25        Q    Any other facts you can tell me that --

Page 117

1        A      Not that I recall.

2        Q      Okay.  Let's turn to page 13 of your

3   complaint, paragraph 42.  It says in violation of 42

4   USC section 1981 and/or 42 USC section 200E et seq.

5   defendants fostered and encouraged a hostile work

6   environment wherein plaintiff and other minorities

7   suffered severe and pervasive hostility in the form

8   of racial slurs, jokes, and other sanctioned

9   abasement.

10              Tell me, in what way was your work

11   environment hostile?

12        A      They was tougher on the black wrestlers

13   than training, thing like those.  They say you have

14   to be here from nine to five, even though the black

15   wrestlers, them, and rookie white wrestlers, they

16   will come in on time.  Then they started out with

17   rigorous training.

18              They was allowed to come in whenever they

19   want.  That was one of it.  Whites training

20   separately.  And for you to be able to get to a

21   point, because there are certain things that you do,

22   compound movements and compound different moves.

23              like going to a wrestling match.  If you

24   keep on just doing, training the actual move and just

25   training it and not, like, what you can do after this

1    and this and the other.  So, therefore, we was a lot

2    farther back.

3            We kept back a lot because when these

4    white wrestlers was going and learning new moves and

5    actually wrestling, we was supposed to walk the

6    youngsters, the rookies through the first lock up and

7    movements.  Numerous of times I have heard, you know,

8    people in conversation, I don't know if they actually

9    know what they saying, the "N" word, or monkey or

10   chimp or whatever, however, thing like those.  They

11   would laugh.

12           And after work they would say things

13   like, are you a Mexican?  And then they will laugh

14   about that.  And I just didn't think nothing like

15   that was funny.  Indeed, that hurt me real bad

16   inside.  So, you know, working harder than the other

17   wrestlers and stuff, you know, I just working harder

18   and loading trucks.

19           At the time you were supposed to load

20   trucks, and blacks and the rookies were -- a few of

21   the rookies they learned fast.  They would disappear

22   on time of work.  Some of the guys that was there,

23   white wrestlers that was there longer, they would

24   disappear also, and they come back when the -- like

25   we ending the work.  Nobody would not tell them

Page 119

1    anything.   Trainers was aware of it.

2         Q    How do you know the trainers were aware

3    of it?

4         A    Because they are just -- they right

5    there, looking at us while we doing it.

6         Q    You never saw the trainers take any

7    action against these white wrestlers?

8         A    Not that I know of.

9         Q    It's possible they could have taken some

10   action that you're unaware of?

11             MR. GERNAZIAN:   Objection.   Calls for

12   speculation.

13             THE WITNESS:   Do I have to answer that?

14        Q    BY MR. RICHARDSON:   Yes.   You can answer

15   it if you can.

16        A    I don't know.

17             When Jody knew that he would pull black

18   wrestlers, you know, to help him build the rings.

19   He was in charge to build the ring and thing like

20   that.   When he knew, had a little knowledge of

21   building the rings, carpentry, he -- any given time

22   that he had to build rings he would come get me and

23   other black wrestlers.

24             The whites, they were like -- white

25   wrestlers be training.   They would be wrestling

Page 120

1    and --

2         Q    Did anyone ever use a racial slur

3    directed at you?

4         A    Can you define slur?

5         Q    Like calling you the "N" word or

6    something like that?

7         A    No, sir.

8         Q    Have you heard the "N" word used?

9         A    Yes, sir.

10        Q    How about jokes?  Did anyone make any

11   racial jokes in your presence?

12        A    Yes, sir.

13        Q    Who did?

14        A    Mike Sanders, Lash LaRue, and others I

15   don't recall right now.  They would laugh about it.

16   They would say and laugh.

17        Q    Did any of the trainers know about this?

18        A    I don't know.

19        Q    Did you ever see anyone from WCW ask a

20   wrestler, any black wrestler, to wear stereotypical

21   ethnic clothing?

22        A    If I've ever seen a wrestler?

23        Q    Have you seen anyone from WCW ask a

24   wrestler --

25        A    No.

Page 121

```
 1        Q     -- to wear stereotypical clothing?

 2        A     No, sir.

 3        Q     Anyone from WCW -- did you ever see

 4   anyone from WCW ask African-Americans to act

 5   according to some racial stereotype?

 6        A     No, sir.

 7        Q     Turn back to paragraph 15 of the

 8   complaint.  It's on page six.  Paragraph 15 says, in

 9   a typical demonstration of WCW's hostile attitude

10   towards minorities WCW directed a white wrestler,

11   Marcus Buff Bagwell to appear on national television

12   in a match against an African-American in black face

13   and to act in a racially derogatory manner towards

14   African-Americans.

15              Did you ever witness that?

16        A     No, sir.

17        Q     Do you know who, if anyone, directed Buff

18   Bagwell to do that?

19        A     No, sir.

20        Q     Do you know who Marcus Bagwell is?

21        A     Yes, sir.

22        Q     What else about your work environment was

23   racially hostile?

24        A     I can't recall any more at this time.

25        Q     Did you complain to anyone that --
```

Page 122

1    regarding racially hostile work environment?

2         A    No, sir.

3         Q    Let's turn back to paragraphs 46 and 47

4    in your complaint, starting at the bottom of page 17,

5    carrying over to page 15.  Paragraph 46, bottom of

6    page 14.

7              During his tenure with defendant he and

8    other minority wrestlers raised concerns about

9    racially discriminatory practices.

10             Other than Pez Whatley who else did you

11   raise concerns about racially discriminatory

12   practices to?

13        A    Nobody else.

14        Q    What other minority wrestlers that you

15   know of raised concerns about racially discriminatory

16   practices?

17        A    Repeat that question, please.

18        Q    What other minority wrestlers that you

19   know of raised concerns about racially discriminatory

20   practices?

21        A    Vic Violent, Joe and Charles.  There was

22   Bounthan --

23        Q    Bounthan Saengsiphan?

24        A    Yes.  Saengsiphan.  Bounthan and

25   Easterling and Harrison Norris.

Page 123

1        Q      Who did they raise concerns to?

2        A      Well, I say that according to what they

3    have told me about everything that was going on in

4    the environment in this school.  And when we was like

5    loading trucks, unloading trucks, they would say

6    things like those.

7        Q      So they told you that they had complained

8    about discrimination to --

9        A      No.  They didn't told me that they have

10   been complaining.  But they have been -- they spoke

11   about the way the white wrestlers train apart and the

12   excessive work that we blacks we were doing.  And the

13   white rookies, and you know, how nobody wasn't

14   concern about the other guys that was supposed to be

15   doing it also.

16       Q      Do you know of any minority wrestler who

17   complained to anyone at WCW about racially

18   discriminatory practices?

19       A      No, sir.

20       Q      Paragraph 47 on the next page:  Plaintiff

21   asserts that as a direct and proximate result of

22   having raised concerns about defendants'

23   discriminatory conduct defendants retaliated by

24   refusing to promote or otherwise continue plaintiff's

25   tenure resulting in plaintiff's continuous and

Page 124

1    serious injury, including but not limited to economic

2    losses, humiliation, embarrassment, emotional

3    distress, and deprivation of his statutory protected

4    civil rights.

5           Why do you believe you were retaliated

6    against?

7           A    Because of what Sarge told me and what

8    Paul Orndorff told me.

9           Q    But if I'm correct, you never raised

10   concerns to anyone at WCW about discriminatory

11   conduct?

12          A    I told Mr. Pez Whatley, and he was the

13   only black trainer, like, that would be -- sometimes

14   he was away.  But when he was at the school he was

15   the one who would stay with the black wrestlers on

16   one side and teach us advanced moves and secrets of

17   wrestling.

18          Q    Do you think that Pez Whatley retaliated

19   against you?

20          A    No.

21          Q    Do you believe that Pez Whatley

22   communicated your concerns to anyone at WCW?

23          A    I don't know.

24          Q    Now, what Sarge said to you about the

25   restroom, that had nothing to do with you making a

1                    Other than your claims of discrimination

2      that we've already discussed, is there anything else

3      that WCW did to you that you believe intentionally

4      inflicted emotional distress on you?

5           A    What I told you about the injury that

6      forced me to -- it kept me back from getting well.  I

7      would have liked for them to approach me, like, in a

8      different way to give me the notice of termination.

9                    After that event happened I was -- it

10     took me a while to get back to myself, and my wife,

11     you know, she stopped working for a few days because

12     she didn't want to leave me alone.  So I believe it

13     was hader on my wife than.

14                   When you try to do everything somebody

15     asks and give more than what you can do, that's the

16     only thing that I can recall.

17                   (Whereupon, a recess was taken.)

18          Q    BY MR. RICHARDSON:  Mr. Davis, going back

19     to your complaint on page 16 there is a count four,

20     failure to pay the minimum wage as required by the

21     FLSA.

22                   During what time period are you claiming

23     that you were not paid minimum wage?

24          A    Where?

25          Q    Count four, failure to pay the minimum

1    and storage houses.

2           Sometimes I was to clean the storage

3    houses out and move cages in or move cages out, move

4    things out.  It would take a lot of time.

5        Q    Do you have any documents that would show

6    any time that you spent more than 40 hours a week

7    working?

8        A    No, sir.

9           Hector Garza, also, when he got operated

10   on his knee he was at the hotel, they was no like

11   room service to take care of him.  He was there, no

12   family over here, nobody at all.

13          So I was the one who was in charge of.

14   The majority of the time it would take me like about

15   til twelve o'clock at night.  He cannot move.

16   According to him, whatever they had to do it was not

17   included in the room.  So everything else was like

18   extra.  He had to pay for it.

19       Q    Have you ever spent more than 40 hours a

20   week doing the translating services?

21       A    Well, it was like kind of compound.  You

22   translate when you had to.  Like, pick them up, help

23   them get to the vehicle whenever they can't walk, and

24   take them to doctor's office.  And while they was at

25   the doctor's office translate back and forth and

1    bring them back to the main office.  I would

2    translate because nobody understand what they saying.

3    Then return to the hotel.

4         Q    Now, when you were doing these

5    translating services you were usually excused from

6    training at the Power Plant, weren't you?

7         A    They would, yes.  They would excuse me

8    right away.  The majority of the time trainers would

9    tell me, they would say Ms. Brenda need you to go to

10   the airport to pick somebody up.

11        Q    Was anyone ever fired from the Power

12   Plant?

13        A    Was anyone ever fired?

14        Q    Yes.

15        A    Talking about wrestlers or whatever?

16        Q    Wrestlers.

17        A    The only person I can put the finger on

18   is myself.

19        Q    Your contract was terminated?

20        A    Terminated, yes.

21        Q    When you were training do you know

22   anybody who didn't have a contract who was told, you

23   can't train here anymore?

24        A    No, sir.

25        Q    Do you know of anyone who was ever --



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**



DEPOSITION
EXHIBIT

## WAIVER AND RELEASE OF LIABILITY FORM
### READ CAREFULLY!

1.     Whereas, _DAVIS MARSHALL_ (herein after known as the Undersigned), who is not an employee of WORLD CHAMPIONSHIP WRESTLING, INC. (herein after "WCW") has a desire to participate in various exercises and workouts at a WCW Tryout/Workout Camp (herein after "Camp"), and;

2.     Whereas, the Undersigned fully understands the risk involved in that it is possible to sustain serious injury during the course of said exercises and workouts, and;

3.     Now therefore, in consideration of the opportunity to participate in the aforementioned exercises and workouts, I, the Undersigned, fully covenant not to sue and forever discharge the WCW, its officers, trainers, physicians, players, and coaches (herein after known as Releases) from any and all liabilities to the Undersigned, my personal representatives, assigns, heirs and next of kin for any and all loss or damage, and any claim or demands thereof, on account of injury to the person or property or resulting in the death of the Undersigned whether caused by negligence of Releases or otherwise;

4.     The Undersigned further represents and warrants:
       A.  That all logistics, costs, and expenses associated with my participation in the camp, including but not limited to arrangements and expenses for travel, room and board are my responsibility.

       B.  That my participation in the Camp does not create any obligation of the part of WCW, including future wrestling opportunities or services.

       C.  That I will be, at the time of my tryout, between the ages of eighteen (18) and thirty (30) years of age (NO EXCEPTIONS)

       D.  That I am in excellent physical health with no limitations that would prohibit or impair my participation in the Camp, and have obtained a letter or certification from a licensed physician verifying this.

I HAVE READ THE ABOVE WAIVER AND RELEASE AND FULLY UNDERSTAND ITS CONTENTS.

NAME:_____Davis Marcia_____   ADDRESS:___795 Beryl St SW___

SIGNATURE:_____   ___Atlanta GA 30310___

WITNESS:_____   _____

The Power Plant • 1530 Carroll Drive, Building 106 • Atlanta, Georgia  30318 • 404-351-4959

CONFIDENTIAL          WCW 002457



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

08/12/99

# CRAWFORD

COMMUNICATIONS, INC.

WCW SPRING STAMPEDE
IMAGE SPOTS
EVENT DATE:SUNDAY APRIL 11, 1999
CABLE-PPING( :SH ONLY)
( 1X:60 )( 1X:30 )( 1X:15 )
WCW 7/12/99    REF:169087



toll free 800-831-6021
tel 404 876 7149

**DEPOSITION
EXHIBIT**

3/12    4    ats



# EXHIBIT / ATTACHMENT

## *5*

(To be scanned in place of tab)

010999
00011339



## APPLICATION

NAME: *Marcial R. Davis*

ADDRESS: *6591 Coventry Point Austell GA.*
*Z. 30168*


SOCIAL SECURITY NUMBER *International with Hold*

DATE OF BIRTH *22 Mar 68*

HEIGHT *6'8*          WEIGHT *300 P.*

PRIOR WRESTLING TRAINING

*1/7/99 - Talent Toy Biz Comm. Shoot.*

*$ /50.00*

PRIOR WRESTLING OR RELATED EXPERIENCE   *(-45) 211200-6110.00*

*$105 total*

NAME AND ADDRESS OF PHYSICIAN

ENTERED MAR 0 3 1999

*520300*

*RS 60/475 00*
*Toy Biz Shoot*

CONFIDENTIAL

WCW 002413

# WCW WORLD CHAMPIONSHIP WRESTLING

# CHECK REQUEST

PAY TO  _Marcial Davis_

PURPOSE / CHECK  Pay for interprette  See attached email

BILL TO

☐ MAIL
☒ DO NOT MAIL
   FORWARD TO: _USA_

☐ REGULAR
☐ SPECIAL
   NEED BY: _/_

$ 804.25

2/22/99 DATE

REQUESTED BY L. Alberg

APPROVED BY 2/24/99

**CONFIDENTIAL**

D0010 98

WCW 002414

## ACCOUNTS PAYABLE CODING TICKET

INVOICE NO.: 1/22/99
VENDOR NO.: 33602

INVOICE DATE: 1 / 22 / 99
PAYMENT DUE DATE: _/ /_

ENTERED MAR 4 1999

MODEL NO.: _____

CREDIT MEMO ☐

DELIVER TO/REMITTANCE MESSAGE

| AMOUNT | CORP | ACCOUNT | CENTER | PROJ. CO. | PROJECT | DESC. 2 | NOTES |
|--------|------|---------|--------|-----------|---------|---------|-------|
| 999999.99 | 1234 | 123456 | 12-345-678-901 | 123A | 123456789 | 123 | |
| 279.25 | 6010 | 520300 | 601746 | 601P | —100— | | |
| –75.00 | 6010 | 21210 | 691010 | 601P | –000– | | |
| | 6010 | | 601491 | 601P | –000– | | |
| | 6010 | | | 601P | –000– | | |
| | 6010 | | | 601P | –000– | | |
| **TOTAL** | | | | | | | |

Turner Broadcasting System • Atlanta

**Turner**

One CNN Center
Atlanta, GA 30345-5366

WORLD CHAMPIONSHIP WRESTLING
(404) 603-3123

| DATE | CHECK NO. |
|---|---|
| 05/24/99 | 050080 |

BU-6010        IN-0000033602

| DATE | INVOICE/CREDIT MEMO | TYPE | DESCRIPTION | GROSS | DISCOUNT | NET |
|---|---|---|---|---|---|---|
| 01/07/99 | 010799 | | | 105.00 | 0.00 | 105.00 |
| 01/22/99 | 012299 | | | 204.25 | 0.00 | 204.25 |
| 02/04/99 | 020499 | | | 105.00 | 0.00 | 105.00 |
| 04/30/99 | PE043099 | | | 1,025.75 | 0.00 | 1,025.75 |

**DEPOSITION EXHIBIT**

DA 5
3/12

| | | | THE ATTACHED CHECK IS IN PAYMENT FOR THE ITEMS DESCRIBED ABOVE. | **TOTAL** | $1,440.00 | $0.00 | $1,440.00 |
|---|---|---|---|---|---|---|---|

---

THIS DOCUMENT HAS A COLORED BACKGROUND—NOT A WHITE BACKGROUND.

**Turner**

One CNN Center Atlanta, GA 30345-5366
(404) 603-3123

WORLD CHAMPIONSHIP WRESTLING

FIRST UNION NATIONAL BANK          64-875
Savannah, GA                        812

| CHECK NO. |
|---|
| 050080 |

**PAY**

ONE THOUSAND FOUR HUNDRED FORTY AND XX / 100 US DOLLARS

Void After 180 Days

| DATE | CHECK AMOUNT |
|---|---|
| 05/24/99 | ------$1,440.00 |

TO THE ORDER OF

ARCHBOLD DAVIS, MARCIAL R
6591 COVENTRY POINT
AUSTELL, GA 30168

**WCW 002412**

BY _____

NON NEGOTIABLE

BY _____
                          SIGNATURE

CONFIDENTIAL

⑆250080⑆ ⑈061308256⑈ 20?9930006635⑈



# INVOICE

**WCW SPRING STAMPEDE '99**
**2/4/99**

NAME: *Marcial Davis*

ADDRESS: *6591 Coventry point*
*Austell GA*

$ 150
-45
total $ 105

PHONE: *(770) 739-0195*

SSN: *International with hold*

ENTERED MAR 0 3 1999

TIME IN: *930 800AM*

LUNCH { TIME OUT: *130p*

{ TIME IN: *830p*

TIME OUT: *830p*

TOTAL HOURS: (*11.5*)

7-25-99
60131600
p-4-99
623300

**CONFIDENTIAL**

WCW 002415



# EXHIBIT / ATTACHMENT

_6_

(To be scanned in place of tab)

**Jurner**

One CNN Center
Atlanta, GA 30345-5366

WORLD CHAMPIONSHIP WRESTLING
(404) 603-3123

| DATE | CHECK N |
|------|---------|
| 07/06/99 | 070348 |

BU-6010    IN-0000033

| DATE | INVOICE/CREDIT MEMO | TYPE | DESCRIPTION | GROSS | DISCOUNT | NET |
|------|---------------------|------|-------------|-------|----------|-----|
| 04/26/99 | 042699 | | | 300.00 | 0.00 | 300 |

**DEPOSITION EXHIBIT**

3/12  6

THE ATTACHED CHECK IS IN PAYMENT FOR THE ITEMS DESCRIBED ABOVE.

| | TOTAL | $300.00 | $0.00 | $300.0 |
|--|-------|---------|-------|--------|

---

THIS DOCUMENT HAS A COLORED BACKGROUND—NOT A WHITE BACKGROUND.

**Jurner**

One CNN Center - Atlanta, GA 30345-5366
(404) 603-3123

WORLD CHAMPIONSHIP WRESTLING

FIRST UNION NATIONAL BANK
Savannah, GA

64-975
912

| CHECK N |
|---------|
| 070348 |

PAY

THREE HUNDRED AND XX/100 US DOLLARS

| DATE | CHECK AMOUNT |
|------|--------------|
| 07/06/99 | ******$300.00 |

Void After 180 Days

TO THE ORDER OF

ARCHBOLD DAVIS, MARCIAL R
6591 COVENTRY POINT
AUSTELL, GA 30168

**CONFIDENTIAL**

BY

NON NEGOTIABLE

BY

SIGNATURE

⑈070348⑈  ⑆061209756⑆  20799300044 35⑈

WCW 002422

*Called*
*n/A*
*5/25*

*Called*
*n-a*
*6/1*

STATEMENT# B-426
MARCIAL R. DAVIS
6591 COVENTRY PL.
AUSTELL, GA.  30168
SS#-???
D.O.B. - 3/22/68
PH# - 770-739-0195



RECEIVED
MAY 25
WCW ACCOUNTING

FOR THE RIC FLAIR SHOOT ON APRIL 26th.  2:pm to 11:pm.    $300.00
PAYABLE TO MARCIAL DAVIS..............$300.00

*Duplicate*

FOR DISTRIBUTION TO MIKE SCHOCHET.

*MS  60/8/00*

**CONFIDENTIAL**

**WCW 002423**

```
STATEMENT# B-426
MARCIAL R. DAVIS
6591 COVENTRY PL.
AUSTELL, GA.  30168
SS#-???
D.O.B. - 3/22/68
PH# - 770-739-0195
```

FOR THE RIC FLAIR SHOOT ON APRIL 26th.  2:pm to 11:pm.     $300.00
PAYABLE TO MARCIAL DAVIS..................$300.00

FOR DISTRIBUTION TO MIKE SCHOCHET.

*Please Sign & Return to.*
*Lisa Havens in Acct.*
*Thanks.*
*Brenda Smith.  3-1030*

c#0
TNTO46699
520300   60181000
B.

ENTERED JUL 0 2 1999

CONFIDENTIAL

WCW 002424



# EXHIBIT / ATTACHMENT

## 7

(To be scanned in place of tab)

# INDEPENDENT CONTRACTOR AGREEMENT

THIS INDEPENDENT CONTRACTOR AGREEMENT (the "Agreement") is made and entered into as of the _____ day of April, 1999 by and between **WORLD CHAMPIONSHIP WRESTLING, INC.**, a Georgia corporation located at One CNN Center, Box 105366, Atlanta, Georgia 30348 ("WCW"), and MARCIAL DAVIS ("Trainee").

FOR AND IN CONSIDERATION of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**DEPOSITION EXHIBIT**

3/12

1.      Services.

(a)      Subject to the terms and conditions set forth in this Agreement, Trainee agrees to provide the following services as requested by WCW (the "Services") (i) appear and perform as a professional wrestler at events, including without limitation, live and taped television shows, pay-per-view telecasts, live arena shows and other promotional events, as requested by WCW ("Events"); (ii) cooperate with and assist in activities intended to publicize, advertise and promote the Events, WCW and WCW merchandise, including, but not limited to, on-sale ticket appearances, media interviews and other publicity appearances; (iii) develop his own, individual wrestling style and persona, with advice from WCW, that will be attractive to wrestling fans; (iv) provide all wardrobe, props and make-up necessary for his performance at any Event; provided, however, all such items shall be subject to approval by WCW prior to their use in an Event; and (v) perform such other services as may be reasonably requested by WCW.  In addition to the foregoing, Trainee shall attend regular training sessions at the designated WCW work out

1

WCW 002758

CONFIDENTIAL

facility and follow the instructions of the WCW trainers. Trainee agrees to use his best

efforts to perform the Services in a professional manner consistent with the customs of

the professional wrestling industry.

(b)     In connection with Trainee's performance of the Services, Trainee

grants WCW the following exclusive, paid-up, worldwide rights: (i) to arrange Trainee's

performance or appearance at Events; (ii) to sell or distribute admission tickets for all

Events; (iii) to create, publish, distribute, broadcast, photograph, film, tape or otherwise

record (or authorize others to do so), in any and all available media, any or all of the

Events or animated programs (any such creation or recording shall be referred to as a

"Program"); and (iv) to use, exhibit and distribute, and to license others to use, exhibit

and distribute, in perpetuity, any Program, or any part or segment of any Program, in any

and all media and by any and all methods, whether now known or coming into existence

hereafter, and, in connection therewith, to utilize and exploit the name, image, likeness,

character, costume, props, ring name, voice, logo, service marks, trademarks, trade

names, signature, gimmicks, routines, themes and charicatures and any and all other

distinctive and identifying indicia as used by or associated with Trainee. The rights

granted by this section shall be exclusive to WCW during the Term and for the period set

forth in section 9(b), and shall be non-exclusive thereafter. Trainee expressly

acknowledges and agrees that the rights granted to WCW in section 1(b)(iv) shall

continue in effect after the expiration, nonrenewal or termination (for any reason) of this

Agreement. WCW and Trainee acknowledge and agree that they have entered into that

certain Merchandising Agreement of even date herewith with respect to certain specified

merchandising activities.

**CONFIDENTIAL**

2

**WCW 002759**

2.    **Independent Contractor.**  Trainee, in the performance of the Services

agreed to in this document, is an independent contractor.  In the performance of this

Agreement, both WCW and Trainee shall be acting in their own separate capacities and

not as agents, employees, partners, joint venturers or associates of one another.  It is

expressly understood and agreed that Trainee is not authorized to bind WCW to any

liability or obligation or to represent that it has any such authority.  Trainee is responsible

for all of his expenses, including without limitation, medical expenses, health and welfare

insurance, disability insurance, training expenses, props, wardrobe, make-up and other

expenses necessary to perform the Services under this Agreement.  Without limiting the

generality of the foregoing, Trainee acknowledges that, as between WCW and Trainee,

Trainee shall be solely responsible and liable for the payment of any and all withholding

or other taxes levied, assessed or due as a result of the services which are performed by

Trainee under this Agreement.  Any and all travel incurred by Trainee in the performance

of services hereunder shall be pursuant to WCW's Travel Policy, as amended by WCW

from time to time.

3.    **Compensation.**

(a)    As full and complete compensation for the Services, WCW shall

pay to Trainee, and Trainee shall accept, the payments described on Exhibit A, attached

hereto and incorporated herein by reference.

(b)    For general payment purposes, Trainee's compensation shall be

payable in equal installments on a twice a month basis or based on such schedule as

WCW may implement from time to time.

**CONFIDENTIAL**

**WCW 002760**

4.    **Ownership of Work Product.** All work product, themes, routines, characters, storylines, property, data, documentation or information or materials conceived, discovered, developed or created by Trainee pursuant to this Agreement including, without limitation, the Programs (collectively, the "Work Product") shall be owned exclusively by WCW.  To the greatest extent possible, any Work Product shall be deemed to be a "work made for hire" (as defined in the Copyright Act, 17 U.S.C.A. §§ 101 et seq., as amended) and owned exclusively by WCW.  Trainee hereby unconditionally and irrevocably transfers and assigns to WCW all right, title and interest in or to any Work Product, including, without limitation, all patents, copyrights, trade secrets, trademarks, service marks and other intellectual property rights therein. Trainee agrees that any ring name, nickname, persona, logo or character developed by him and/or WCW during the Term and used by him in connection with performance of the Services shall be part of the "Work Product," and shall be the exclusive property of WCW.  WCW shall have the right to register any such name, nickname or logo as a trademark or service mark of WCW, to the extent WCW considers such registration to be permitted and appropriate under any applicable law.  Without regard to any such registration, Trainee hereby covenants that he shall not use any such ring name, nickname, persona, logo or character developed during the Term for any purpose at any time, in perpetuity, without the express consent of WCW.  Trainee agrees to execute and deliver to WCW any transfers, assignments, documents or other instruments which WCW may deem necessary or appropriate, from time to time, to vest complete title and ownership of any Work Product, and all associated intellectual property and other rights, exclusively in WCW.  If such Work Product is not considered to be a "work made for hire," Trainee hereby

CONFIDENTIAL

4

WCW 002761

assigns to WCW for One Dollar ($1.00) in hand and other good and valuable consideration all rights, title and interest in and to the copyright thereof and all renewals and extensions thereof that may be secured under the laws of any country now or hereafter in force and effect. WCW shall have full, immediate and unrestricted access to all Work Product during the Term of this Agreement.

5.    **Compliance with Laws, Rules and Regulations.**  (a) Trainee agrees to comply with all applicable policies, rules, procedures and regulations adopted from time to time by WCW (including without limitation the WCW Independent Contractor Rules and Regulations and Travel Policy) and all other applicable federal, state and local laws, rules, regulations, or ordinances; (b) Trainee further agrees to abide by the terms and conditions of the WCW Substance Abuse Policy which Trainee agrees he has received and reviewed.

6.    **Representations and Warranties.**  Trainee hereby represents and warrants to WCW as follows: (a) Trainee has the full power, authority, ability and legal right to execute and deliver this Agreement and to perform his obligations hereunder; (b) Trainee has all legal rights, power, authority and ability to convey the Work Product to WCW; (c) this Agreement constitutes the legal, valid and fully binding obligation of Trainee and is enforceable in accordance with its terms; (d) the execution, delivery and performance of this Agreement have been consented to and authorized by all individuals or entities required to consent to and authorize the same, will not contravene any law, regulation, judgment or decree applicable to Trainee, and will not cause or result in a breach of or default under any other agreement, contract or understanding to which Trainee is a party; (e) there are no pending claims or litigation which would or might

5

CONFIDENTIAL

WCW 002762

interfere with the performance of Trainee's obligations or the enjoyment of WCW's rights under this Agreement; and (f) Trainee is not currently using, and during the term of this Agreement, shall not use, any illegal drugs, steroids or other substances prohibited by WCW.

       7.     **Indemnification.** Trainee agrees to indemnify, defend and hold harmless WCW, its directors, officers, and shareholders, and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs, attorneys' fees and allocable costs of in-house counsel), losses, liabilities and claims of any kind, caused by or resulting from any breach of this Agreement or by any other act or omission of Trainee whether the same may be the result of negligence, willful act, responsibility under strict liability standards, any other substandard conduct or otherwise.

      Trainee shall at all times be responsible for any loss or damage to any WCW property by Trainee or while in the possession of Trainee, unless said damage occurs at the direct instruction of WCW as part of a storyline. The loss or damage thereto shall be restored at Trainee's expense.

       8.     **Term, Termination and Incapacity.**

         (a)     Unless sooner terminated in accordance with the provisions of this Agreement, the term of this Agreement shall be as described in Exhibit A attached hereto and incorporated herein by reference.

         (b)     The term of this Agreement shall be divided into consecutive one (1) month periods. During any such period, WCW may terminate this Agreement with or without cause after giving Trainee at least fourteen (14) days prior written notice of such

CONFIDENTIAL

6

WCW 002763

termination. Any such termination shall be effective at the end of the then-current three
(3) month period.

(c)     Trainee may terminate this Agreement upon the occurrence of any
material breach of any provision hereof by WCW which remains uncured for a period of
fifteen (15) consecutive days after Trainee has provided WCW with written notice of the
breach.

(d)     WCW may immediately terminate this Agreement upon the
occurrence or at any time during the continuation of any material breach of any provision
hereof by Trainee.

(e)     WCW may terminate this Agreement or suspend Trainee without
pay, for "Good Cause" by written notice setting forth the reason for such termination or
suspension. For the purposes of this Agreement, the WCW shall have "Good Cause" for
termination of Trainee's Agreement or suspension without pay (i) if Trainee is convicted
of or pleads guilty to any felony or a crime involving theft, fraud, or moral turpitude; (ii)
if Trainee intentionally violates any law, rule, regulation or order of any governmental
authority, thereby exposing WCW, its parent, subsidiaries or any affiliated entity of the
WCW to potential civil or criminal penalties; (iii) if Trainee fails to adequately or
completely perform any of his duties or obligations hereunder, whether express or
implied; (iv) if Trainee fails to follow the direction of WCW's officers; (v) if Trainee
engages in conduct or activities involving moral turpitude materially damaging to the
business or reputation of WCW; (vi) if Trainee violates the WCW Substance Abuse
Policy; (vii) if Trainee otherwise breaches any provision or representation of this
agreement; or (viii) if Trainee intentionally misappropriates for his own purpose and

WCW 002764

CONFIDENTIAL

benefit any property of the WCW, its parent, subsidiaries or any affiliated entity of WCW or appropriates any corporate opportunity of WCW, its parent, subsidiaries or any affiliated entity of WCW. Trainee acknowledges that a waiver by WCW of its rights with respect to any provision of this paragraph in one instance will not be deemed to constitute a waiver of its rights with respect to the same or a similar breach thereafter.

(f)     This Agreement shall terminate automatically upon the death or incapacity of Trainee.

(g) Trainee acknowledges his present eligibility for workers' compensation through WCW. For so long as WCW maintains worker's compensation coverage, Trainee agrees to accept the benefits provided by said workers' compensation coverage as his sole and exclusive remedy against WCW, (including its parent, affiliates, employees and agents), for any and all injuries sustained during the Term provided said coverage is maintained by WCW and is in effect with respect to such injury. Notwithstanding anything herein to the contrary, WCW shall not be obligated to maintain workers' compensation coverage.

9.     **Restrictive Covenants**.

(a)     Confidentiality. "Confidential Information" shall mean any confidential, proprietary, business information or data belonging to or pertaining to WCW that does not constitute a "Trade Secret" (as defined under applicable law) and that is not generally known by or available through legal means to the public. In recognition of WCW's need to protect its legitimate business interests, Trainee hereby covenants and agrees that Trainee shall not, unless specifically directed by WCW, for any reason or in any fashion, either directly or indirectly use, disclose, transfer, assign, disseminate,

CONFIDENTIAL

8

WCW 002765

reproduce, copy, or otherwise communicate any: Confidential Information, at all times

during his contractual relationship with WCW and for a period of one (1) year following

the termination thereof for any reason; and Trade Secrets, at all times such information

remains a "trade secret" under applicable law. During the Term, Trainee shall: exercise

his best efforts to ensure the continued confidentiality of all Trade Secrets and

Confidential Information of WCW known by, disclosed to or made available to Trainee,

whether in connection with this Agreement or any other past or present relationship with

WCW; immediately notify WCW of any unauthorized disclosure or use of any Trade

Secrets or Confidential Information of which Trainee becomes aware; and assist WCW,

to the extent necessary, in the procurement of or any protection of WCW's rights to or in

any of the Trade Secrets or Confidential Information.

      (b)    <u>Noncompetition</u>. During the Term and within the Territory of this

Agreement, Trainee shall perform the Services exclusively for WCW and shall not,

directly or indirectly, be employed by, perform services for, or engage or be connected in

any manner with any other business entity without the express written consent of WCW.

Trainee expressly covenants and agrees that for a period of one hundred and twenty (120)

days after any termination or expiration of this Agreement, for any reason (the "Non-

Compete Period"), he shall not provide those Services specifically delineated in sections

1(a)(i) and (ii) to any other individual, company or business in the United States, Canada

and Japan. In addition, during the Non-Compete Period, Trainee shall not appear or

perform in any media (including but not limited to broadcast, pay-per-view and cable

television, video replay, telephone hot-line, radio, magazine and internet) in any manner

or capacity relating to wrestling or any other related professional, entertainment or

**CONFIDENTIAL**

**WCW 002766**

athletic event for or on behalf of Titan Sports, Inc. (WWF) or HHG Corporation (ECW)

in the United States, Canada and Japan or for broadcast therein. Trainee acknowledges

that the Non-Compete Period shall be increased to six (6) months in the event this

Agreement is terminated for Good Cause pursuant to paragraph 8(d).

      (c)    Acknowledgment of Reasonableness. The parties expressly

acknowledge the reasonableness and content of the covenants and agreements contained

in this section.

     10.    **Notices.** All notices and statements provided for or required by this

Agreement shall be in writing, and shall be delivered personally to the other designated

party, or mailed by certified or registered mail, return receipt requested, or deposited with

a recognized national overnight courier service. Notices shall be deemed effective on the

earlier of when hand delivered, when deposited with a recognized national overnight

courier service or when received by mail.

     11.    **Miscellaneous.**

      (a)    This Agreement, and the documents referenced herein, contain the

entire agreement and understanding and shall supersede all prior agreements or

understandings concerning the subject matter hereof between the parties hereto. No

waiver, termination or discharge of this Agreement, or any of the terms or provisions

hereof, shall be binding upon either party hereto unless confirmed in writing. This

Agreement may not be modified or amended, except by a writing executed by both

parties. No waiver by either party of any term or provision of this Agreement or of any

default hereunder shall affect such party's rights thereafter to enforce such term or

WCW 002767

**CONFIDENTIAL**

provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)  This Agreement is the product of arm's-length negotiations between Trainee and WCW.  Trainee expressly states that he has had the opportunity to seek and obtain consultation in connection with the negotiation and execution of this Agreement, and that he fully understands the rights and obligations set forth herein.  In the construction and interpretation of this Agreement, no account shall be taken of which party requested or drafted any particular provision or provisions of this Agreement.

(c)  Regardless of the place of execution hereof, this Agreement and all amendments hereto, shall be deemed to have been negotiated, made, entered into and fully performed in the State of Georgia, without regard to the actual location at which Trainee provides Services to WCW.  This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Georgia applicable to contracts made, entered into and performed entirely therein, without giving effect to its conflict of laws provisions. Trainee and WCW hereby (i) submit to the jurisdiction of the United States District Court for the Northern District of Georgia and of any Georgia state court sitting in Atlanta for the purposes of all legal proceedings arising out of or relating to this Agreement and (ii) irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such proceeding which is brought in such a court.  Additionally, the  parties hereto agree that the State of Georgia shall be the exclusive forum and situs for the resolution of any and all disputes, controversies or matters arising herefrom or related hereto. Trainee's Home Base is

11

WCW 002768

CONFIDENTIAL

identified solely for travel purposes and shall not affect the choice of law, jurisdiction or venue hereunder.

(d)     The parties further agree, notwithstanding the consideration provided for herein, that because of the special, unique and extraordinary nature of the Services hereunder and of the rights and licenses which are the subject matter of this Agreement, WCW shall be entitled to injunctive and other equitable relief to prevent any breach or default by Trainee hereunder, and such relief shall be without prejudice to any other rights or remedies of WCW as may be provided by law.

(e)     WCW may hereby assign its rights and delegate its obligations under this Agreement, and if such assignee shall assume WCW's obligations in writing, WCW shall have no further obligations to Trainee.  Trainee may not assign this Agreement, in whole or in part, without the prior written consent of WCW, and any attempted assignment not in accordance herewith shall be null and void and of no force or effect.

(f)     This Agreement shall be binding on Trainee and his successors and permitted assigns.

(g)     Nothing herein shall be deemed to obligate WCW to use the services of Trainee and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein.

(h)     With respect to WCW's rights hereunder, WCW shall have the sole right and discretion to bring any and all claims including but not limited to infringement or unfair competition claims.

CONFIDENTIAL

12

WCW 002769

(i)     The headings contained herein are for the convenience of the parties only and shall not be interpreted to limit or affect in any way the meaning of the language contained in this Agreement.

(j)     This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

(k)     If any provision of this Agreement shall be held void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

(l)     Upon the request of WCW, Trainee agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement.

(m)     Notwithstanding any termination of this Agreement, all provisions which, by their terms or reasonable interpretation thereof, sets forth obligations that extend beyond the termination of this Agreement hereof shall survive and remain in full force and effect.

CONFIDENTIAL

13

WCW 002770

**IN WITNESS WHEREOF,** the parties hereto have executed or caused their duly

authorized representatives to execute this Agreement to be effective as of the day and

year first above written.

"TRAINEE"                                    "WCW"

Signature: _Marcel Davis_                    By: _[signature]_

Printed Name: _MARCIAL DAVIS_                Title: _APRIL 28, 1999_

_DIRECTOR TALENT RELATIONS_

CONFIDENTIAL

WCW 002771

14

## INDEPENDENT CONTRACTOR AGREEMENT

FOR:   MARCIAL DAVIS

### EXHIBIT "A"

**COMPENSATION:**   In consideration of Trainee's grant of the rights, licenses and services hereunder, and provided Trainee faithfully and fully performs all of his obligations hereunder, WCW shall pay Trainee $ @2,600.00 per month.

**TERM:**   This Agreement shall commence as of the date first written above and shall continue for a Term of one (1) year.  Thereafter, this Agreement shall automatically renew for two additional Terms of like duration at the same rate set out above, unless WCW shall serve written notice to Trainee at least thirty (30) days prior to the end of the Term of this Agreement of its decision to terminate this Agreement at the end of the Term. Reference herein to the Term hereof means the original term and any such renewal or extended term.

**HOME BASE:**  Atlanta, GA

**ADDRESS:** _____

**SOCIAL SECURITY NUMBER:** _____

_____         _____
TRAINEE                                     WORLD CHAMPIONSHIP WRESTLING, INC.

**CONFIDENTIAL**

**WCW 002772**

15

TALENT

WCW 00277

CONFIDENTIAL





bcc: Bill Busch
Diana Myers
Greg Prince
Amy Davidson

CONFIDENTIAL
WCW 002779

# EXHIBIT / ATTACHMENT

## 10

(To be scanned in place of tab)





**JAMES J. DILLON**
Chairman, Executive Committee
jj.dillon@turner.com

*World Championship Wrestling*
*A Division of Turner Sports*
*One CNN Center*
*Box 105366*
*Atlanta, GA 30348-5366*

**FEDERAL EXPRESS**

September 28, 1999

Mr. Marcial Davis
6591 Coventry Point
Austell, GA  30168

Dear Marcial:

Pursuant to our recent phone conversation, this letter shall confirm that WCW is exercising its right under paragraph 8(b) to terminate your Independent Contractor Agreement as of the end of your current one (1) month period, October 31, 1999.

Upon termination, you will be released from any further obligation under your current Independent Contractor Agreement and Merchandising Agreement with the exception of those provisions which specifically survive termination.

Marcial, I want to thank you for your efforts on behalf of WCW and your hard work and dedication during your time with us.  I wish you the best of luck in all your future endeavors.

Sincerely,

JJ Dillon

**DEPOSITION EXHIBIT**
*No. 10 JS*

**WCW 002780**

*A Time Warner Company*

**CONFIDENTIAL**

**FedEx** *USA Airbill*   FedEx Tracking Number   **8089170876L2**

Form 0210   SNA13   **Sender's Copy**

**1 From** (please print and press hard)
Date 9/28/99   Sender's FedEx Account Number 2231-1177-7

Sender's Name Georgia Davidson   Phone (404) 603-3626

Company WORLD CHAMPIONSHIP WRESTLING

Address 2865 LOG CABIN DR

City SMYRNA   State GA   ZIP 30080

**2 Your Internal Billing Reference information**

**3 To** (please print and press hard)
Recipient's Name Marcial Davis   Phone ( )

Company

Address 6591 Coventry Point

City Austell   State GA   ZIP 30168

For HOLD at FedEx Location check here

**4a Express Package Service** Packages under 150 lbs.
☒ FedEx Priority Overnight   ☐ FedEx Standard Overnight
☐ FedEx First Overnight
☐ FedEx 2Day   ☐ FedEx Express Saver

**4b Express Freight Service** Packages over 150 lbs.
☐ FedEx Overnight Freight   ☐ FedEx 2Day Freight   ☐ FedEx Express Saver Freight

**5 Packaging**   ☐ FedEx Letter   ☐ FedEx Pak   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other Pkg.

**6 Special Handling**
Does this shipment contain dangerous goods?   ☒ No   ☐ Yes   ☐ Yes   ☐ Cargo Aircraft Only
☐ Dry Ice

**7 Payment**
☒ Sender   ☐ Recipient   ☐ Third Party   ☐ Credit Card   ☐ Cash/Check

FedEx Account No.
Credit Card No.

**CONFIDENTIAL**

Total Packages   Total Weight   Total Declared Value   Total Charges
$ .00 $

**8 Release Signature** Sign to authorize delivery without obtaining signature

321

**Questions?**
Call 1·800·Go·FedEx® (800)463-3339

*The World On Time.*

0077060097

**WCW 002781**



# EXHIBIT / ATTACHMENT

3

(To be scanned in place of tab)

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                ATLANTA DIVISION

3   Walker v. World Championship Wrestling, Inc., Turner
     Sports, Inc., Civ. File No.  100-CV-0367-CC
4   Onoo v. World Championship Wrestling, Inc., Turner
     Sports, Inc., Civ. File No. 1:00-CV-0368-CC
5   Norris v. World Championship Wrestling, Inc., Turner
     Sports, Inc., Civ. File No. 1:00-CV-0369-CC
6   Easterling v. World Championship Wrestling, Inc., Turner
     Sports, Inc., Civ. File No. 1:00-CV-1715-CC
7   Davis v. World Championship Wrestling, Inc. and Turner
     Sports, Inc., Civ. File No. 1:00-CV-1716-CC
8   Worthen v. World Championship Wrestling, Inc. and Turner
     Sports, Inc., Civ. File No. 1:00-CV-1717-C
9   Speight v. World Championship Wrestling, Inc. and Turner
     Sports, Inc., Civ. File No. 1:00-CV-1718-CC
10  Saengsiphan v. World Championship Wrestling, Inc. and
     Turner Sports, Inc., Civ. File No. 1:00-CV-1719-CC
11  Reeves v. World Championship Wrestling, Inc. and Turner
     Sports, Inc., Civ. File No. 1:00-CV-1720-CC
12  Patterson v. World Championship Wrestling, Inc., Turner
     Sports, Inc. and Turner Entertainment Group, Inc.,
13  Civ. File No. 1:01-CV-1152-CC

14  _____

           DEPOSITION OF JOSEPH N. HAMILTON
15              MARCH 22, 2002
                1:30 P.M.
16  _____

17

18                         COPY

19

20

21    Premier

22

23

24

25          CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia 30326 • www.premierrptg.com
404-237-1990
800-317-5773

Page 64

1    looking than Marcial Davis?

2         A    I don't think too many guys are.

3         Q    You don't think?

4         A    I don't think too many guys are better

5    looking than Marcial Davis.

6         Q    So Davis might even be better looking than

7    Palumbo?

8         A    Oh, yeah.

9         Q    And Davis was bigger than Palumbo, right?

10        A    Yeah.

11        Q    And Davis was just as ripped and cut,

12   right?

13        A    No, he wasn't as ripped and cut.

14        Q    Okay.

15        A    He didn't -- he didn't -- he didn't have

16   as good a body.  He had a good body, but he didn't

17   have as good a body as Palumbo.

18        Q    Did he have just as good moves as Palumbo?

19        A    No.

20        Q    Okay.  What were better about Palumbo's

21   moves than Davis?

22        A    Well, they were just sharper and more

23   crisp.

24        Q    Anything else?

25        A    That's basic.

Page 65

1       Q       How about Lash LaRue?  How did you

2    evaluate him as a wrestler?

3       A       I thought he was very good.

4       Q       Did you think he was better than

5    Bobby Walker?

6       A       Yeah.

7       Q       In what ways?

8       A       I just thought he had a more -- more -- he

9    showed more ring savvy and -- and a better ability to

10   adapt to mistakes in the ring than -- than Bobby.

11      Q       Anything else?  You have to say yes or no,

12   sir.

13      A       Well, I'm trying to think.  That's --

14      Q       Okay.  Please, take your time.

15      A       No.  That's about all I can think of.

16      Q       Okay.  How about comparing Lash LaRue with

17   Marcial Davis?

18      A       Well, that's comparing oranges and apples,

19   because you've got one guy that's six-seven and you've

20   got another guy that's five-nine or ten.  And so

21   you're talking about two completely different styles.

22   You're talking about a big guy, a super heavyweight

23   against a cruiser weight, so it's -- it's an unfair

24   evaluation.

25      Q       So Lash LaRue was a cruiser weight?



# EXHIBIT / ATTACHMENT

## 4

(To be scanned in place of tab)

Page 1

1             IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3   DAVIS v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-1716-CC;
4   SAENGSIPHAN v. WORLD CHAMPIONSHIP WRESTLING, INC. and
            TURNER SPORTS, INC., CIV. FILE NO. 1:00-CV-1719-CC;
5   SPEIGHT v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-1718-CC;
6   WORTHEN v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-1717-CC;
7   REEVES v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-1720-CC;
8   EASTERLING v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-1715-CC;
9   ONOO v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-0368-CC;
10  NORRIS v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-0369-CC;
11  WALKER v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., CIV. FILE NO. 1:00-CV-0367-CC;
12  PATTERSON v. WORLD CHAMPIONSHIP WRESTLING, INC. and TURNER
            SPORTS, INC., and TURNER ENTERTAINMENT GROUP, INC.,
13          CIV. FILE NO. 1:00-CV-1152-CC;

14

15

16  _____

17             DEPOSITION OF JAMES A. MORRISON
                      MAY 17, 2002
18                     10:10 A.M.

19  _____

20

21

22

23

24

25          CERTIFIED COURT REPORTERS
The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
                      404-237-1990
                      800-317-5773

1          A       Yes.

2          Q       And they were what?

3          A       He was, he certainly had size.  He was a big

4     kid.  General impression, he was, kind of tended to be a

5     little bit slow and lumbering.  And I don't remember the

6     specific time frame that I first saw him or last observed

7     him, but it was over a period of time, and I didn't see any

8     appreciable improvement in what I saw with him that would

9     lead me to believe that he had any great potential.

10         Q       Over what period of time did you see him?

11         A       I don't have a recollection.  It would, I

12    would say for sure over a period of months, but I don't

13    know in the specific time frame or even the dates.

14         Q       Do you know if anybody at the WCW ever told

15    Mr. Davis that he did not appear to be improving as time

16    went by?

17         A       No.

18         Q       Do you know if anybody actually encouraged

19    him and told him that he was doing better?

20         A       I don't know that either.

21         Q       Do you know if anybody ever told him that he

22    would get an opportunity to wrestle on TV?

23         A       I don't know that anybody specifically told

24    him that, but I think all of them in general thought that

25    that was kind of a goal, to eventually improve to the level

Page 123

1   that the creative team or someone would put them on

2   television.

3           Q       While Mr. Davis was at the Power Plant

4   training, do you know if he was under contract?

5           A       Are you talking about the old Power Plant or

6   the new building in Smyrna?

7           Q       At any time that he was training at the WCW.

8           A       There were limited people who might have

9   been contracted training at the old Power Plant.  And I

10  don't have specific knowledge of who did or who didn't.  At

11  the new Power Plant, the understanding was that everybody

12  that was there would have been on some type of

13  developmental contract in which they were being compensated

14  to train.

15          Q       When was that decision made?

16          A       When they moved into the new building in

17  Smyrna, which would have been, if they closed in March of

18  2001, I would estimate they probably had been there two

19  years at that time.  I think the facility opened around

20  March, April, May, somewhere in that time frame.

21          Q       Of 2000?

22          A       No.  Of probably '99.

23          Q       1999?

24          A       I think they had been there two years.

25          Q       And why was the decision made, if you know,

Page 235

1      MR. PONTZ:  Object to the form of the question.

2      THE WITNESS:  Well, who were the four again?

3   BY MR. ICHTER:

4      Q      Elix Skipper, Stevie Ray, Ernest Miller or

5   Harrison Norris.

6      MR. PONTZ:  Object to the form of the question.

7      MR. ICHTER:  I was answering a question.

8      THE WITNESS:  Well, I think all four of them I have

9   no recollection of ever having a problem with any of the

10  four in terms of tardiness, no showing or anything else

11  that I would regard as a problem from a talent management

12  perspective.

13     MR. ICHTER:  Why don't we take a break, and I'll

14  figure out if there's anything else that I wanted to ask

15  you.

16     THE WITNESS:  All right.

17          (Whereupon, there was a brief recess.)

18  BY MR. ICHTER:

19     Q      Mr. Dillon, Marcial Davis worked as an

20  interpreter for Mexican wrestlers; correct?

21     MR. PONTZ:  Object to the form of the question.

22     THE WITNESS:  He helped out on occasion, because he

23  spoke Spanish.  And I remember a couple of instances where

24  we had a couple of guys from Mexico that were injured, came

25  to town for treatment.  Marcial helped to get them to

1    doctor's appointments.  Marcial was a nice guy.

2    BY MR. ICHTER:

3         Q    Was he paid for that work?

4         A    I don't know.

5         Q    Was he under contract at the time?

6         A    He would have, I assume, I don't know for a

7    fact, but I assume he would have been under contract still

8    as a trainee at the Power Plant if he was assisting in that

9    capacity.

10        Q    And even if it was at the old Power Plant?

11        A    I don't remember.

12        Q    Well, the old Power Plant still would have

13   been in existence as of January of 1999; correct?

14        MR. PONTZ:  Object to the form of the question.

15        THE WITNESS:  I don't know when they closed down.

16   And I don't remember dealing with Marcial on helping with

17   the Hispanics over at the new Power Plant.  But I'm not

18   certain of that.

19                         (Whereupon, counsel marked

20                          Plaintiff's Exhibit 57 for

21                          identification.)

22   BY MR. ICHTER:

23        Q    I'll show you what's been marked as Exhibit

24   No. 57.  It purports to be an E-mail from Brenda Smith to

25   you and Diana Myers regarding interpreters for Mexican



# EXHIBIT / ATTACHMENT

## _5_

(To be scanned in place of tab)

Page 1

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3   Davis v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
4   Saengsiphan v. World Championship Wrestling, Inc. and
         Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
5   Speight v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
6   Worthen v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
7   Reeves v. World Championship Wrestling, Inc. and Turner
         Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
8   Easterling v. World Championship Wrestling, Inc. and
     Turner Sports, Inc., Civ. File No. 1-00-CV-1715-CC;
9   Onoo v. World Championship Wrestling, Inc., and Turner
         Sports, Inc., Civ. File No. 1:00-CV-0368-CC;
10  Norris v. World Championship Wrestling, Inc., and Turner
         Sports, Inc., Civ. File No. 1:00-CV-0369-CC;
11  Walker v. World Championship Wrestling, Inc., and Turner
         Sports, Inc., Civ. File No. 1-00-CV-0367-CC;
12  Patterson v. World Championship Wrestling, Inc., Turner
         Sports, Inc. and Turner Entertainment Group, Inc.,
13       Civ. File No. 1:01-CV-1152-CC

14

15

16  _____

17               DEPOSITION OF PAUL ORNDORFF
                      MAY 7, 2002
18                    10:00 A.M.

19  _____

20

21

22

23

24

25           CERTIFIED COURT REPORTERS
he Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com
                        404-237-1990
                      800-317-5773

Page 58

1   with Mark Jindrak?

2             MR. PONTZ:  I don't think he is asking

3   you about the document.  Just answer his question.

4             THE WITNESS:  Oh, say it again.

5   Marcial, he was a big guy.  He didn't catch on real

6   quick.  He didn't really get any better.  He was very

7   slow, sort of.  It was hard -- not everybody's made

8   for this business.  I mean, not everybody -- and he

9   didn't have anything, any special tools or anything.

10            He was just a big guy that I kept him for a

11  while just for potential, to see if he would get better

12  and better and better, which we had like Jindrak.  He

13  could do anything practically.  He was a heck of an

14  athlete, big kid too.  No comparison abilitywise.

15       Q    BY MR. GERNAZIAN:  Okay.  What could Jindrak

16  do that Davis couldn't do?

17       A    He was a lot athletically, moves,

18  leapfrogs, different stuff like that, aerial moves

19  that Marcial couldn't do.  He couldn't do them.  He

20  was 6 foot 5 or 6 foot 6, and Jindrak was about 6'5"

21  and very athletic, very athletic.

22       Q    Okay.  Do you know what happened to Marcial

23  Davis?

24       A    We let him go.

25       Q    Okay.  Who made that decision?

Page 59

1        A      I think I did because we had to get down.

2    Because I took the best that they had over there that

3    I thought.  We brought them over to the new Power

4    Plant, and they all knew that we are going to be

5    watching you and see how you progress, do you get

6    better and this and this and this, and, you know,

7    you'll be given a contract, but we can let you go at

8    any time.  They will do that, and Marcial just wasn't

9    getting any better.  It's that simple.  We had to --

10   go ahead.

11       Q      My question is:  Who made the decision?

12              MR. PONTZ:  Object to the form.  Asked

13   and answered.

14              MR. GERNAZIAN:  I am entitled to a

15   responsive answer.

16       A      I probably mentioned it because, see, we

17   would evaluate them.  We'd have J.J.  Whenever it came

18   to evaluations, J.J. was there and whoever was down

19   there looking too, and we would make a decision on

20   that.

21              So it wasn't just me, no, because I never

22   made that decision totally by myself.  I might have

23   brought somebody up, but then have J.J. who was always

24   there with me, or whoever else was there to, you know,

25   what's your opinion, because if they saw something in

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

WILLIAM WORTHEN,                        )
                                        )
                    Plaintiff,          )
                                        )        CIVIL ACTION FILE
v.                                      )
                                        )        NO. 1:00-CV-1717-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
TURNER SPORTS, INC., and                )
TURNER BROADCASTING SYSTEM, INC.        )
                                        )
                    Defendants.         )


CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

***DEFENDANTS' APPENDIX OF DEPOSITION EXCERPTS AND EXHIBITS*** upon

the interested parties by hand delivery to:

                    Cary Ichter
                    Kelly Jean Beard
                    Charles Gernazian
                    Michelle M. Rothenberg-Williams
                    MEADOWS, ICHTER AND BOWERS, P.C.
                    Fourteen Piedmont Center, Suite 1100
                    3535 Piedmont Road
                    Atlanta, GA  30305

This 8th day of January, 2003.

_____
EVAN H. PONTZ
Georgia Bar No. 583577

TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, N.E.
Suite 5200
Atlanta, GA  30308-2216
(404) 885-3000 (voice)
(404) 885-3995 (facsimile)

1097686_1.DOC