FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 3 0 2003

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MARCIAL DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No.: |
| v. | ) | 1:00-CV-1716 (CC) |
| | ) | |
| WORLD CHAMPIONSHIP WRESTLING, | ) | **JURY TRIAL DEMANDED** |
| INC., TURNER SPORTS, INC. and | ) | |
| TURNER BROADCASTING SYSTEM, | ) | |
| INC. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## PLAINTIFF'S NOTICE OF FILING APPENDIX

Plaintiff, MARCIAL DAVIS, hereby serves notice that he is filing herewith in the above-styled case an Appendix containing copies of relevant deposition testimony and exhibit documents in support of his Response To Defendants' Motion For Summary Judgment filed with this Court.

This 30th day of January, 2003.

_____
Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

**MEADOWS, ICHTER & BOWERS, P.C.**
Fourteen Piedmont Center, Suite 1100
3535 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

112

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all parties in the foregoing matter with the foregoing **Plaintiff's Notice of Filing Appendix** by depositing a copy of same in the United States Mail, postage prepaid and properly addressed as follows:

> Eric Richardson
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This 30th day of January, 2003.

Michelle M. Rothenberg-Williams

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MARCIAL DAVIS, )<br><br>    Plaintiff, )<br>)<br>v. )<br>)<br>WORLD CHAMPIONSHIP WRESTLING, )<br>INC., TURNER SPORTS, INC. and )<br>TURNER BROADCASTING SYSTEM, )<br>INC. )<br>)<br>    Defendants. )<br>_____) | Civil Action File No.:<br>1:00-CV-1716 (CC)<br><br>**JURY TRIAL DEMANDED** |

## APPENDIX OF EXHIBITS AND DEPOSITION EXCERPTS

A.   Affidavit of Marcial Davis

B.   Plaintiffs' Exhibit No. 7

C.   Plaintiffs' Exhibit No. 6

D.   Plaintiffs' Exhibit No. 48

E.   Plaintiffs' Exhibit No. 73

F.   Plaintiffs' Rule 26 Expert Report of Dr. David Rasmussen

G.   Marcial Davis ICA

H.   Excerpts of Deposition Transcript of William Boulware

I.   Excerpts of Deposition Transcript of Tony Carr

J.   Declaration of J.P. Snakovsky

K.   Declaration of George Grace

L.   Carr Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

M.   Ross Memorandum of Law In Support of Defendants' Motion
     for Summary Judgment

N.   Supplemental Report of Dr. David Rasmussen

O.   Harman Order For Service of Report and Recommendation;
     USDC, NDGA CAFN 1:00-CV-3375-WBH

P.   Plaintiffs' Exhibit No. 75

Q.   Plaintiffs' Exhibit No. 76

R.   Plaintiffs' Exhibit No. 64

S.   Plaintiffs' Exhibit No. 44

T.   Plaintiffs' Exhibit No. 2

U.   Declaration of Sgt. Steve Hicks

V.   Affidavit of Bobby Walker

W.   Plaintiffs' Exhibit No. 49

X.   Affidavit of Moses Williams

Y.   Excerpts of Deposition Transcript of Pez Whatley

Z.   Interview of Olie Anderson

AA.  Affidavit of Pamela Collins

BB.  Plaintiffs' Exhibit No.  5

CC.  Plaintiffs' Exhibit No.  10

DD.  Plaintiffs' Exhibit No.  15

EE.  Defendants' Supplemental Responses to Plaintiffs'
     Interrogatories



# EXHIBIT / ATTACHMENT

## A

(To be scanned in place of tab)

## AFFIDAVIT OF MARCIAL DAVIS

STATE OF GEORGIA
COUNTY OF FULTON

Before the undersigned officer appeared Marcial Davis, who, after being placed under oath, says and deposes as follows:

1.

My name is Marcial Davis.  I am over eighteen (18) years of age, and I am otherwise competent to make this affidavit.

2.

I responded to a WCW advertisement, and attended a three day try-out.  At the conclusion of the tryout, I was invited to join the WCW's training program.

3.

I was evaluated three times during training and was told that I did a good job by Jody Hamilton and Mike Wenner.

4.

During the time that I was at the Power Plant, no one ever told me that my wrestling skills weren't improving as well as they should be or that I wasn't performing as well as I should.

5.

During the time that I was training, there were days that I did not participate in training because I was assigned to work as a translator.

6.

When working as a translator, I was given flight information by Brenda Smith and instructed to go to the airport and pick up arriving wrestlers, take them to their hotel, to doctors appointments and other locations, and return them to the airport.

7.

At times, I was instructed to use my own vehicle.  I understood that I was to be paid $250 per day for providing driving and translating.  I received a few payments that were less than the stated amount and did not receive payment for mileage or reimbursement for any expenses associated with performing this work.

8.

During an average week, I spent approximately 20 hours training and another 20 hours cleaning, taking mats off the rings, putting them back on, cleaning the Power Plant, loading and unloading trucks with wrestling rings and equipment, adjusting equipment, and the like.

9.

While at the Power Plant, only blacks and white "rookies" were required to clean the facility.  If white and black wrestlers were training and a truck arrived to be loaded or unloaded, only the black wrestlers would be directed to interrupt their training and load or unload the truck.

10.

I was called a "black motherfucker" by Dwayne Bruce, a Power Plant trainer, when he wasn't satisfied with the way I cleaned a bathroom floor.

11.

While at the Power Plant, I often heard black wrestlers referred to as "the 'N' word, or monkey or chimp" or similar names.

12.

While at the Power Plant, white and black wrestlers were separated.  The white wrestlers received more advanced training, and black wrestlers were not advanced beyond the basics.

13.

During the time I was at WCW, I regarded the work environment as being hostile to blacks.  The use of racial slurs, the unequal treatment of blacks in their work opportunities, the fact that black wrestlers were called upon to do work that white wrestlers were not required to do all made blacks feel they were unwelcome and wanted only for the purpose of temporary exploitation at WCW.  This hostile work environment discouraged me and made me worry that I would never be given a chance to succeed at WCW.  I believe that, while I always did my best at WCW, the environment there had a negative effect upon my performance over time.

14.

After signing a contract in April 1999, I was never evaluated and did not receive any feedback concerning my training.

15.

After signing a contract, no one at WCW ever expressed to me that they thought I wasn't progressing the way I should.

16.

Bookers and agents decided the storylines the dictated the outcomes of matches, the specific outcomes of each match and the manner in which the outcome would be achieved.  While the wrestlers would have little input as to how the match would be performed, the bookers always had the final say as to every aspect of the result of the matches and how they were performed.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Marcial Davis

_____
Jan-28-03
Executed on (Date)

Sworn and subscribed
before me, this **28** day
of January, 2003.

_____
Notary Public



# EXHIBIT / ATTACHMENT

## B

(To be scanned in place of tab)

TALENT EVALUATIONS FOR THE POWER PLANT, JANUARY, 1999:

"HEAVYWEIGHT DIVISION

MARSHIAL DAVIS:   $500.00

6ft. 8in. 280lbs.  VERY GOOD BODY, TAKES GREAT BUMPS FOR A BIG MAN,  HE WORKS
GOOD IN THE RING AND IS IMPROVING EVERY DAY, HE HAS THE CARRIBEAN ACCENT
WHEN SPEAKING ENGLISH, BUT ALSO SPEAKS SPANISH AND FRENCH, AS WELL AS ALL
THE DIFFERENT DIALECT'S SPOKEN IN THE ISLANDS.

"LOOK FOR TV."

WELL BUILT WITH PLENTY OF SIZE,  AND A NATURAL "GIMMICK CHARACTER" JUST
BEING HIMSELF  AND WHAT HE REALLY IS ,,AN  ISLANDER,,,



PLAINTIFF'S
EXHIBIT



"MERCENARY"
(MARCIAL DAVIS)

WCW 002744

CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## C

(To be scanned in place of tab)

FULL LEGAL NAME: _Marcial R. Davis Archbold_

RING NAME: _M. D. Ponisher_

D.O.B. _03/22/68_

CURRENT ADDRESS _6591 Coventry Pt. Austell GA. 30168_

PHONE: _(770) 739-0195_

SS#: _____

EMERGENCY CONTACT: _Arlene Witson 6591 Coventry Pl Austell GA. 30168 (770) 739-0195_

TRY OUT DATE: _Feb - 98_

STARTING DATE: _7/20/98_

COMMENTS: BIG GOOD-LOOKING ISLANDER THAT SPEAKS SEVERAL LANGUAGES. CAN BE DEVELOPED INTO TOP TALENT.



WCW 002738

CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## D

(To be scanned in place of tab)

Author: Randy Melcher at TBSCENTRAL
Date:    3/15/99  02:51 PM
Priority: Normal
TO: Brenda Smith at TBSCNNCTRWCW
CC: Diana Myers at TBSCNNCTRWCW
CC: JJ Dillon at TBSCNNCTRWCW
CC: Brett Hellenga at TBSCENTRAL
CC: Paul Boatman at TBSCENTRAL
Subject: WCW - Power Plant Trainees / Workers Compensation
----------------------------------- Message Contents -----------------------------------
Brenda,

According to Diana Myers, WCW is leaning towards having the WCW Power Plant
trainees sign agreements under which they will receive a small stipend for
expenses and/or another form of compensation, etc.  Only those trainees who have
potential in WCW's estimation will be allowed to train and workout at the Power
Plant.  It was agreed that going-forward, all WCW Power Plant trainees should be
covered under the WCW worker's compensation program.

Once the WCW Power Plant reopens for tryouts, we will continue to have the
participants sign releases.  Diana has a copy of the latest version.

Please let me know if you have any questions or if I may be of further
assistance.

Best regards,

Randy



PLAINTIFF'S
EXHIBIT

48

WCW 018436
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## E

(To be scanned in place of tab)

Myers, Diana

| | |
|---|---|
| From: | Wilson, Cie Cie |
| Sent: | Monday, April 19, 1999 3:23 PM |
| To: | Myers, Diana |
| Cc: | Wilkinson, Scott |
| Subject: | Power Plant contracts |

The following "Power Plant Trainees" are being offered contracts as of 4/19/99. Paul Orndorff is deliverying the contracts to the following people:

Marcial Davis
Michael Sanders
Sonny Uaita Seaki
Charles R. Palumbo
Mark Robert Jindrak
Harrison Norris Jr.
Elix Skipper
Gregory J. Hunke
Allen Erik Funk
Jon Hugger
Bret Yokley
Kevin Tilton

I instructed Paul to return the contracts to my office with signatures in the designated areas and then we would continue the process.

Dave B

PLAINTIFF'S
EXHIBIT
73
PENGAD-Bayonne, N. J.

WCW 020626
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

## _____ F _____

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

PLAINTIFFS' RULE 26(a)(2) DISCLOSURES OF
EXPERT TESTIMONY OF DR. DAVID W. RASMUSSEN

Pursuant to Federal Rule of Civil Procedure 26(a)(2),

Plaintiffs hereby identify the expert testimony of their

statistician, Dr. David W. Rasmussen, who is the James H.

Gapinski Professor of Economics at Florida State University, as

follows:

A.    Opinions, Basis and Reasons:

Introduction

This report evaluates the contention that the World

Championship Wrestling (WCW) denied equal treatment to African-

American wrestlers in terms of employment, salary and other contract terms. The statistical evidence presented here sheds light on this question in two ways. First, evidence is presented that shows African-Americans are under-represented among WCW wrestler positions. These data are consistent with the contention that African-American wrestlers did not encounter an equal opportunity employer when dealing with WCW. Second, the salary and other compensation of African-American wrestlers are explored. The fact that African-Americans are significantly underrepresented among wrestlers hinders formal statistical analysis of their salaries relative to other wrestlers, but the available evidence strongly indicates that African-Americans performers did not receive compensation that is commensurate with other wrestlers.

## Hiring

*Methodology.* The following statistical analysis uses the methodology that is generally accepted in Title VII litigation. At issue is whether the WCW hired African-Americans in proportion to their representation in the qualified applicant pool. The crucial question to be answered is how far the proportion of African-Americans among total paid wrestlers stray from the expected proportion and still be regarded as "racially neutral." This is a straightforward statistical problem, and the prevailing legal doctrine is in accord with the standard

- 2 -

methods used in social science: discrimination is revealed when the employer's actual behavior results in the number of African-Americans hired to be more than two standard deviations below the number expected based on their availability in the workforce.[1] Statistical analysis allows the analyst to make probability statements. When actual number of African-Americans hired is two standard deviations below the expected number, it reveals that there is only one chance in twenty (five percent) that an equal opportunity employer by chance would have the racial distribution of retention decisions that is observed.

This statistical calculation is driven by three numbers: the actual number of African-Americans hired, the total number of persons hired, and the expected proportion of African-Americans among these hires. Generally, the actual numbers of African-Americans and total hires are relatively free of controversy. More contentious is the proportion of hires that are expected to be African-American, the "benchmark" by which actual hiring performance is evaluated. This controversy is minimized when there is a good record of all persons who applied for employment together with identification of those who are African-American. For obvious reasons, these data are not

---

[1] Statistical formula for calculating the number of standard deviations is the actual number of African-Americans hired minus the expected number divided by the standard deviation which is the square root of np(1-p) where n is the total number of hires and p is the benchmark measuring the percent African-Americans that are available. It should be noted that social scientists recognize that important differences may occur even when customary significance levels are not realized.

- 3 -

generally available. However, even excellent applicant flow data may be compromised if qualified African-Americans are reluctant to apply because they believe that the employer will discriminate against them.[2]  Thus when good applicant flow data that identifies African-Americans are not available, as in this case, it is customary to use labor market statistics to approximate the expected proportion of African-Americans among qualified applicants.

*Wrestlers*

Data are available to examine the number of African-American wrestlers under contract with WCW between 1996 and 2000.[3]  The evidence available at this time suggests that there are 228 wrestlers, 17 (7.5 percent) of whom were African-American.[4]  The crucial question is: by what benchmark are we to evaluate this hiring performance?

One possible starting point is to get information about the relative number of African-Americans who are interested in becoming professional wrestlers.  WCW has a school, the Power Plant, to train wrestlers.  The proportion of African-Americans among qualified persons who desire to attend this school would

---

[2] This "chilling" effect that potentially lowers the percent African-American among applicants is analogous to the "discouraged worker" classification used by the U.S. Department of Labor.  Discouraged workers are those that would look for work if they believed they could find a job somewhere in the economy.  The chilling effect represents firm specific discouraged workers: individuals do not apply because they believe the employer is not an equal opportunity employer.

[3] *Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3., Exhibit A.*

provide an expression of interest in this line of work. Unfortunately, Universal Wrestling Corporation has stated that it does not have this information.[5]   There is, however, testimony from five individuals who report their personal impressions of the representation of African Americans among school participants.

Five individuals have testified as to their impressions of the representation of African-Americans among persons at the Power Plant.[6]   These are recorded in Table 1.  As is clear in the Table, three of these individuals provide an estimated range and two provide a specific figure.  Estimates of the percent African-American range from 10 to 40 percent.  Column 1 counts each estimate as an independent observation, so Carr, Hamilton, and Snakovsky, in effect, get two votes.  The mean of these eight estimates is 23.5 percent African-American, the median (the mid-point of the range of estimates) is 27.5 percent, and the mode (the most frequent estimate) is 40 percent.

One could reasonably object to counting any individual's estimate twice, so column two provides the mid-point of the ranges provided by Carr, Hamilton, and Snakovsky.  The resulting

---

[4] I have been provided with a copy of Exhibit A that identifies persons who are African-American and persons whose presence on the list is disputed. These data have been supplemented by Plaintiffs' counsel and a draft Affidavit by Bobby Walker.

[5] Defendant Universal Wrestling Corporation's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to Defendants World Championship Wrestling, Inc. and Turner Sports, p. 4

- 5 -

mean is 26.4 percent African-American and the median is 32.5 percent.

TABLE 1

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN-AMERICAN | |
| --- | --- | --- |
| | ESTIMATES | AVERAGE |
| T.B. Carr | | 32.5 |
|     Low | 25 | |
|     High | 40 | |
| J.N. Hamilton | | 12.5 |
|     Low | 10 | |
|     High | 15 | |
| J.P. Snakovsky | | 35 |
|     Low | 30 | |
|     High | 40 | |
| B.F. Smith | 12 | 12 |
| M. Williams | 40 | 40 |
| | | |
| Mean | 23.5 | 26.4 |
| Median | 27.5 | 32.5 |
| Mode | 40 | n.a. |

Even if collectively these approximations of applicant flow give an accurate picture of African-American representation at the Power Plant, this estimate of interest  among qualified African-Americans could be biased downward if African-American applicants are discouraged from applying because they believe

---

[6] This information is given in depositions, the date of which is following the person's name: Tony Byron Carr (January 28, 2002); Joseph N. Hamilton (March 22, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); and Moses Williams (May 28, 2002)

WCW is not an equal opportunity employer. This is the chilling effect described above.

Another source of information about the availability of African-Americans as wrestlers is a list by which the WCW has identified each individual who was a trainee at the Power Plant over the 1996-2000 period.[7]  Of 82 persons on this list, 11 (13.4) have been identified as African-American.  This is obviously a flawed benchmark since it can obviously be a product of discrimination if the Defendant has a bias against choosing African-Americans as trainees.  Nevertheless, the 13.4 percent figure is useful as a lower bound estimate of African-American interest and availability in a wrestling career since WCW in fact achieved this level of representation at the Power Plant.

One way to approximate what an estimate applicant flow in the absence of a chilling effect is to consider the representation of African-Americans in activities that require attributes similar to those of professional wrestling: a list that would include excellent athletic ability, physical strength and size, and to be able follow a highly scripted sequence of events.  These attributes are obviously found in professional football.  African-Americans are much more highly represented in professional football than they are in the general population: blacks account for 67 percent of the players in the National

- 7 -

Football League.[8]   These data indicate African-American participation that is far in excess of any of the estimates provided in Table 1, which suggests these estimates may be downward biased estimates of a true measure of the availability of African-Americans who are interested in and qualified to be professional wrestlers.

Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period.  First consider Table 2. The first column shows the number of contract wrestlers listed in Exhibit A.[9] Column two shows a variety of benchmarks, the percent African-American expected among these wrestlers, which are drawn from Table 1.  Column three shows the number of African-American wrestlers expected given the benchmark (column 1 times column 2); column 4 shows the actual number of African-Americans identified in Exhibit A, and column five reports the difference actual and expected number of African-Americans.  The last column shows the number of standard deviations.   Recall that the prevailing standard is that a difference of two or more standard deviations is statistically significant.

Five benchmarks are used.  First, is the African-American representation among trainees at the Power Plant, 13.4 percent.

---

[7] *Supra*, note 3, Exhibit B.
[8] John Simons, U.S. News and World Report (March 24, 1997, pp. 46-48).  The same source indicates that blacks account for 80 percent of the players in the National Basketball Association.

WCW hired 228 persons during 1996-2000, and had they hired
African-Americans at a rate of 13.4 percent the expected number
of African-American hires would be 30.6. Instead, only 17 were
hired; -2.63 standard deviations from the expected number. This
is statistically significant. In probability terms this could
happen by chance alone only one time in 100.

Subsequent benchmarks come from Table 1. The statistical
analysis in row two uses the average (mean) availability from
column one (23.5 percent); row three is the median estimate from
column one (27.5 percent); row four is the median value of
column 2 (32.5) and row five is the most frequently cited
estimate in column one (40 percent).

The number of standard deviations range from -2.63 to
-10.03, far beyond the standard of -2.00 standard that indicates
that chance does not account for the under-representation of
African-Americans at WCW. To put these statistics in
perspective, there is only 1 chance in 1,000 that WCW is an
equal opportunity employer when the number of actual African-
American wrestlers is 3.00 standard deviations below the
expected number. When the shortfall of African-American
wrestlers is -6.00 standard deviations, as in row two of Table
2, this result is expected by chance in less than 1 chance out
of 100,000.

---

[9] *Supra* note 3.

TABLE 2

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
REPRESENTATION AMONG WRESTLERS (1996-2000)

A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 228 | 13.4 | 30.6 | 17 | -13.6 | -2.63 |
| 228 | 23.5 | 53.4 | 17 | -36.4 | -7.71 |
| 228 | 27.5 | 62.7 | 17 | -45.7 | -6.78 |
| 228 | 32.5 | 74.1 | 17 | -57.1 | -8.07 |
| 228 | 40.0 | 91.2 | 17 | -74.2 | -10.03 |

B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 232 | 13.4 | 31.1 | 20 | -11.1 | -2.14 |
| 232 | 23.5 | 54.5 | 20 | -34.5 | -5.35 |
| 232 | 27.5 | 63.8 | 20 | -43.8 | -6.44 |
| 232 | 32.5 | 75.4 | 20 | -55.4 | -7.77 |
| 232 | 40.0 | 92.8 | 20 | -72.8 | -9.76 |

Panel B of Table 2 is identical to Panel A except that the
four disputed wrestlers are included in the analysis.  Three of
the disputed persons are African-American, so the total number
of wrestlers rises to 232 and the actual number of African-
Americans hired rises to 20.  The results do not change: the
number of standard deviations range from -2.14 to -9.76, once
again indicating statistically significant under-representation
of African- Americans.  The number of African-American wrestlers
will be 2.14 standard deviations below the expected number by
chance alone three times in 100.  Recall that -6.00 standard

deviations will occur by chance in less than once in 100,000 cases.

The analysis is Table 2 is flawed in that it considers the number of persons in Exhibit A but does not account for the actual frequency of employment. As an illustration, suppose an employer hired two persons, a Caucasian and an African American, over a 10-year period. Using the method employed in Table 2, African-American representation would be 50 percent. But suppose that the Caucasian worked in each of the 10 years and the African-American worked in only one. By looking at African-American representation by salary years a very different picture emerges: instead of 50 percent, African-American representation is only 1 out of 11, or 9.1 percent.

Table 3 investigates African-American representation among WCW wrestlers using salary years as the unit of observations. In Exhibit A, there are 681 cells in which a person is reported to have received a salary. Of these cells, 51 (7.5 percent) represent salaries earned by African-Americans. The benchmarks that measure African-American availability are identical to those in Table 2. When the benchmark is 13.4 percent, the lowest in the Table, the shortfall of African-American wrestlers is -4.53 standard deviations from the expected number. As in Table 2, the number of standard deviations rises with the benchmark: when the benchmark is 40 percent, the shortfall is

- 11 -

~17.32 standard deviations.   There is less than one chance in a million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 681 | 13.4 | 91.3 | 51 | -40.3 | -4.53 |
| 681 | 23.5 | 160.0 | 51 | -109.0 | -9.85 |
| 681 | 27.5 | 187.3 | 51 | -136.3 | -11.70 |
| 681 | 32.5 | 221.3 | 51 | -170.3 | -13.94 |
| 681 | 40.0 | 272.4 | 51 | -221.4 | -17.32 |

This analysis strongly suggests that African-Americans are significantly under-represented among wrestlers at WCW.   Even when African American representation at the Power Plant is used as the benchmark, African Americans are significantly under-represented.   Even the highest benchmark in Tables 2 and 3 may under estimate the true availability of qualified African-Americans since it is possible that if WCW was a truly equal opportunity employer it would confront an applicant pool of interested and qualified persons that mirrored that of professional basketball or professional football.

## Salary

Salaries of wrestlers within any year vary greatly.   For example, in 1999 annual compensation varies from under $10,000

- 12 -

to $4.65 million.  The average wrestler's salary was $237,933
that year.  Of the 160 wrestlers receiving compensation that
year, 54 (33.1%) received under $50,000 and another 33 (20.6%)
received a salary between $50,000 to $99,999.  This
concentration of salaries at the lower end of the overall salary
range is reflected in the median (50 percent of the distribution
lie on both sides of the median) income compared to the mean
income: the median is $87,000 while the mean is about $238,000.
At the other end of the spectrum, only 14 wrestlers received
salaries in excess of $500,000 and only 9 earned more the
$750,000 in 1999.  This dispersion of salaries limits the
possibilities to statistically evaluate the compensation of
African-Americans relative to other wrestlers.

The structure of WCW wrestling salaries, then, appears to
be one in which most wrestlers make a relatively modest salary
and a few do very well.  Therefore the statistical analysis
focuses on the opportunities for African-Americans to enter the
ranks of the most successful wrestlers or what we will call the
salary elite.  Discrimination, of course, can take many forms.
Therefore we also investigate the possibility that African-
Americans who are relatively successful at WCW in terms of
compensation may have suffered from unequal employment practices
because it took them longer to achieve high standing than
comparable Caucasian wrestlers.

- 13 -

*Defining the Salary Elite*

Table 3 shows the salary distribution for wrestlers in 1999, which clearly reveals that there is a break in the distribution at $500,000. Only 8.7 percent of the wrestlers in that year earned over one-half million dollars and only 5.6 percent earned over $750,000. The $750,000 figure is the most appropriate definition of elite salary status for two reasons. First, most wrestlers who reached this salary figure eventually earned an annual salary in excess of $1 million. This is not the case for those whose top salary was in the $500,000 to $750,000 range. Second, licensing income as a percent of salary makes a sharp jump when salaries are in excess on $750,000. In 1999, licensing income as a percent of salary was 14.71 for the 9 wrestlers making over $750,000 but only 4.03 percent for the five wrestlers making between $500,000 and $749,999. In absolute figures the former group had an expected licensing income of $83,584 more than the lower income group. This is just slightly lower than the median wrestlers annual salary. Thus, it seems appropriate to define the salary elite to be the top five percent of the salary distribution, or those that make in excess of $750,000.

- 14 -

TABLE 4

SALARY DISTRIBUTION OF WRESTLERS, 1999

| SALARY | NUMBER | PERCENT |
|---|---|---|
| 0 - 49,999 | 53 | 33.1 |
| 50,000 - 99,999 | 33 | 20.6 |
| 100,000 - 199,999 | 38 | 23.8 |
| 200,000 - 499,999 | 22 | 13.8 |
| 500,000 - 749,999 | 5 | 3.1 |
| 750,000 - 999,990 | 1 | .6 |
| 1,000,000 - 2,000,000 | 5 | 3.1 |
| Over 2,000,000 | 3 | 1.9 |
| TOTAL | 160 | 100.0 |

*African American Wrestlers Among the Salary Elite*

During the 1996-2000 period, 10 wrestlers earned $750,000 or more. Combined they account for 29 years earning an "elite" salary. These elite salary earners are shown in Table 5. Since African-Americans account for 7.5 percent of all salary years during this time period, we expect that they should receive about that portion of these elite salary years. The expected number of African-Americans is 2.18, but in fact there are none achieving elite status. This shortfall in the expected number of African-Americans is -1.18 standard deviations from the actual number; this is not statistically significant at customary test levels. However, it is worth noting that this

- 15 -

test statistic means that there is about .13 percent chance of observing this result due to chance.[10]  This means that there is less than 1 chance in 7 that there would be no African-Americans in the elite status due to chance.

### TABLE 5

### WRESTLERS WITH ELITE SALARIES AND YEARS IN SERVICE
### BEFORE MAKING $600,000 OR MORE

| NAME | NUMBER OF SALARY YEARS | | | TIME TO |
| | $1M | $750-$1M | $600-$750 | $600+ |
|------|-----|----------|-----------|-------|
| ABBOT | 0 | 0 | 1 | 1 |
| BOLLEA, T | 4 | 0 | 0 | na |
| BORDEN | 2 | 2 | 0 | 1 |
| EUDY | 0 | 1 | 1 | 0 |
| FALKENBERG | 2 | 0 | 0 | 1 |
| FLIEHR | 0 | 0 | 1 | 2 |
| GOLDBERG | 2 | 0 | 0 | 3 |
| HALL | 1 | 2 | 1 | 1 |
| HART | 3 | 0 | 0 | 1 |
| NASH | 3 | 1 | 0 | 1 |
| PFOHL | 2 | 1 | 1 | 1 |
| POFFO, R. | 3 | 0 | 1 | na |
| RECHSTEINER | 0 | 0 | 2 | 3 |
| TOOMBS | 0 | 0 | 3 | 1 |
| HUFFMAN, B[A] | 0 | 0 | 2 | 3 |
| HUFFMAN, L[A] | 0 | 0 | 1 | 3 |
| TOTAL | 22 | 7 | 14 | |

[A]African-American

*Putting in Your Time: Are African-American Wrestlers Treated Equally?*

---

[10] This is using a one-tail test that assumes that there is an *a priori* reason to expect that African-Americans will be under-represented among those with elite salary status. Given the extreme under-representation of African-Americans in employment among wrestlers, this expectation is warranted. If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

- 16 -

It is impossible to test whether African-Americans spend more time than Caucasians waiting to achieve elite status since none have reached this status when it is defined as an annual salary of $750,000. Time waiting in this context cannot be defined. To facilitate this analysis of waiting time, the definition of elite status is lowered to $600,000 so two African-Americans are included among the elite.[11]

Waiting time to elite status is defined as the number of years that a wrestler receives a salary before achieving elite salary status.[12] For example, S. Borden received $72,205 in 1996 and achieved elite status a year later with a salary of $913,304. His waiting time is therefore recorded as one year. Waiting time is defined for wrestlers who reached a salary exceeding $600,000 after 1996 in Exhibit A.[13] The sign test provides a way to investigate whether African-American wrestlers spent more time waiting to achieve their elite status. If African-Americans are treated equally it is expected that the number of times they spend more time waiting for elite salary status than Caucasians should be about equal to the number of times they reach this status faster. In a sign test ties, i.e.,

---

Americans in employment among wrestlers, this expectation is warranted. If this assumption is rejected, there is less than one chance in three that no African-Americans would be among the salaried elite.

[11] They are B. Huffman and L. Huffman.

[12] The salary data are found in Defendant's Exhibit A. Two wrestlers (T. Bollea and R. Poffo) have elite status in the first year recorded in Exhibit A and are not included in this analysis because waiting time is unknown.

[13] The status of seven wrestlers is disputed in this case and they are not included. In four of these seven cases, no salary statistics are shown in the Exhibit.

- 17 -

an equal number of years waiting, are excluded from the analysis.

Table 5 shows all the wrestlers who earned at least $600,000 after 1996, notes whether they are African-American, and gives the number of years they received a salary before reaching elite status.  The African-Americans, B. Huffman and L. Huffman, each waited three years before achieving $600,000 salary status.  Among the 14 Caucasians reaching this salary status, only Goldberg and Rechsteiner waited that long. Comparing each Huffman with every Caucasian (eliminating ties) shows that the Caucasians achieved this salary faster than the African-Americans: subtracting the years African-Americans waited from that of Caucasians yields 10 comparisons.  The sign is negative (i.e., African Americans waited longer) in each case.  This is statistically significant with less than one chance in 100 that this outcome could occur by chance alone.

**B.   Data Considered:**

The data I considered is outlined in the prior section of this report.  I have also considered racial identification data that was provided to me by Plaintiffs' counsel.

**C.   Exhibits to be Used:**

(1)   Defendant Universal Wrestling Corporation's Supplemental Responses and Objections to Plaintiffs' First Interrogatories to Defendants World Championship Wrestling, Inc. and Turner Sports, Inc.;

(2)  Demonstrative exhibits created with the data and opinions referenced herein.

D.  **Qualifications:**

A copy of my resume was attached as Exhibit (B)(2)(a) to

Plaintiffs' Amended Supplemental Responses to Initial

Disclosures Providing Expert Disclosures Pursuant to Federal

Rule of Civil Procedure 26(a)(2).

E.  **Compensation:**

I will bill Plaintiffs $200.00 per hour for my time, and

$300.00 per hour for any time testifying at deposition or at

trial.

F.  **Other cases in which I have testified as an Expert at Trial or by Deposition within the Preceding Four (4) Years:**

Curtis Major et al. v. Eller Media Company
S.D. of Fla. (Miami Division)
Case No.: 00-3870-CIV-MORENO (pending)
(Report and deposition).

Lemuel Middleton et all., v. Publix Super Markets
U.S.D.C. M.D. of Fla. (Tampa Division)
Case No.: 97-760-CIV-T-25E
(Report and deposition).

Linden Adams et al., v. BellSouth Telecommunications, Inc.
U.S.D.C. S.D. of Fla.
Case No.: 96-2473-CIV-ZLOCH
(Report).

Zaidy Gantt, et al. v. The Martin Brower Company
U.S.D.C. S.D. of Fla.
Case No.: 97-6233-CIV-ZLOCH
(Testified).

Additional Cases:

Dixon v. Coca Cola Bottling Co., et al., N.D. of Fla.

- 19 -

Newton, et al. v. The Sherwin Williams Co., W.D. of
Kentucky

Walker v. Smith, TCA 79-895, N.D. of Fla.

Forehand v. Florida State Hospital, TCA 83-7107-WS, N.D. of
Fla.

Pollocks v. Sunland, TCA 87-40103, N.D. of Fla.

Worlds v. Sunland, TCA 77-0741, N.D. of Fla.

Winfield v. St. Joe Paper Co., MCA 76-28, N.D. of Fla.

Griffin v. Wainright, TCA 79-1016, N.D. of Fla.

Nickyson v. City of Tallahassee, TCA 76-118, N.D. of Fla.


_Dard W Rasmuss_

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to
supplement this disclosure in any manner permitted under
the Federal Rules of Civil Procedure, the Local Rules of
this Court or any other applicable law.

This 12th day of November, 2002.

_Cary Ichter_

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road

- 20 -

Atlanta, GA   30305
Telephone:   (404) 261-6020
Telecopy:       (404) 261-3656

## CERTIFICATE OF SERVICE

This is to certify that I have this day served all

parties in the foregoing matter with the foregoing

**Plaintiffs' Third Amended Supplemental Responses to Initial**

**Disclosures Providing Expert Disclosures Pursuant to**

**Federal Rule of Civil Procedure 26 (a)(2)(B)** via hand

delivery properly addressed as follows:

> John J. Dalton
> James Lamberth
> Evan Pontz
> Troutman Sanders LLP
> Suite 5200, Bank of America Plaza
> 600 Peachtree Street, N.E.
> Atlanta, Georgia  30308-22165

This _____ day of November, 2002.

_____
Michelle M. Rothenberg-Williams



# EXHIBIT / ATTACHMENT

## _____G_____

(To be scanned in place of tab)

# INDEPENDENT CONTRACTOR AGREEMENT

**THIS INDEPENDENT CONTRACTOR AGREEMENT** (the "Agreement") is made and entered into as of the _____ day of April, 1999 by and between **WORLD CHAMPIONSHIP WRESTLING, INC.**, a Georgia corporation located at One CNN Center, Box 105366, Atlanta, Georgia 30348 ("WCW"), and MARCIAL DAVIS ("Trainee").

**FOR AND IN CONSIDERATION** of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

DEPOSITION
EXHIBIT
3/12

1.    **Services**.

(a)    Subject to the terms and conditions set forth in this Agreement, Trainee agrees to provide the following services as requested by WCW (the "Services") (i) appear and perform as a professional wrestler at events, including without limitation, live and taped television shows, pay-per-view telecasts, live arena shows and other promotional events, as requested by WCW ("Events");  (ii) cooperate with and assist in activities intended to publicize, advertise and promote the Events, WCW and WCW merchandise, including, but not limited to, on-sale ticket appearances, media interviews and other publicity appearances; (iii) develop his own, individual wrestling style and persona, with advice from WCW, that will be attractive to wrestling fans; (iv) provide all wardrobe, props and make-up necessary for his performance at any Event; provided, however, all such items shall be subject to approval by WCW prior to their use in an Event; and (v) perform such other services as may be reasonably requested by WCW.  In addition to the foregoing, Trainee shall attend regular training sessions at the designated WCW work out

1

WCW 002758

CONFIDENTIAL

facility and follow the instructions of the WCW trainers. Trainee agrees to use his best efforts to perform the Services in a professional manner consistent with the customs of the professional wrestling industry.

(b)      In connection with Trainee's performance of the Services, Trainee grants WCW the following exclusive, paid-up, worldwide rights: (i) to arrange Trainee's performance or appearance at Events; (ii) to sell or distribute admission tickets for all Events; (iii) to create, publish, distribute, broadcast, photograph, film, tape or otherwise record (or authorize others to do so), in any and all available media, any or all of the Events or animated programs (any such creation or recording shall be referred to as a "Program"); and (iv) to use, exhibit and distribute, and to license others to use, exhibit and distribute, in perpetuity, any Program, or any part or segment of any Program, in any and all media and by any and all methods, whether now known or coming into existence hereafter, and, in connection therewith, to utilize and exploit the name, image, likeness, character, costume, props, ring name, voice, logo, service marks, trademarks, trade names, signature, gimmicks, routines, themes and charicatures and any and all other distinctive and identifying indicia as used by or associated with Trainee. The rights granted by this section shall be exclusive to WCW during the Term and for the period set forth in section 9(b), and shall be non-exclusive thereafter. Trainee expressly acknowledges and agrees that the rights granted to WCW in section 1(b)(iv) shall continue in effect after the expiration, nonrenewal or termination (for any reason) of this Agreement.  WCW and Trainee acknowledge and agree that they have entered into that certain Merchandising Agreement of even date herewith with respect to certain specified merchandising activities.

CONFIDENTIAL

2

WCW 002759

2.    **Independent Contractor**. Trainee, in the performance of the Services agreed to in this document, is an independent contractor. In the performance of this Agreement, both WCW and Trainee shall be acting in their own separate capacities and not as agents, employees, partners, joint venturers or associates of one another. It is expressly understood and agreed that Trainee is not authorized to bind WCW to any liability or obligation or to represent that it has any such authority. Trainee is responsible for all of his expenses, including without limitation, medical expenses, health and welfare insurance, disability insurance, training expenses, props, wardrobe, make-up and other expenses necessary to perform the Services under this Agreement. Without limiting the generality of the foregoing, Trainee acknowledges that, as between WCW and Trainee, Trainee shall be solely responsible and liable for the payment of any and all withholding or other taxes levied, assessed or due as a result of the services which are performed by Trainee under this Agreement. Any and all travel incurred by Trainee in the performance of services hereunder shall be pursuant to WCW's Travel Policy, as amended by WCW from time to time.

3.    **Compensation**.

(a)    As full and complete compensation for the Services, WCW shall pay to Trainee, and Trainee shall accept, the payments described on Exhibit A, attached hereto and incorporated herein by reference.

(b)    For general payment purposes, Trainee's compensation shall be payable in equal installments on a twice a month basis or based on such schedule as WCW may implement from time to time.

CONFIDENTIAL

3

WCW 002760

4.     **Ownership of Work Product.**  All work product, themes, routines,

characters, storylines, property, data, documentation or information or materials

conceived, discovered, developed or created by Trainee pursuant to this Agreement

including, without limitation, the Programs (collectively, the "Work Product") shall be

owned exclusively by WCW.  To the greatest extent possible, any Work Product shall be

deemed to be a "work made for hire" (as defined in the Copyright Act, 17 U.S.C.A. §§

101 et seq., as amended) and owned exclusively by WCW.  Trainee hereby

unconditionally and irrevocably transfers and assigns to WCW all right, title and interest

in or to any Work Product, including, without limitation, all patents, copyrights, trade

secrets, trademarks, service marks and other intellectual property rights therein. Trainee

agrees that any ring name, nickname, persona, logo or character developed by him and/or

WCW during the Term and used by him in connection with performance of the Services

shall be part of the "Work Product," and shall be the exclusive property of WCW.  WCW

shall have the right to register any such name, nickname or logo as a trademark or service

mark of WCW, to the extent WCW considers such registration to be permitted and

appropriate under any applicable law.  Without regard to any such registration, Trainee

hereby covenants that he shall not use any such ring name, nickname, persona, logo or

character developed during the Term for any purpose at any time, in perpetuity, without

the express consent of WCW.  Trainee agrees to execute and deliver to WCW any

transfers, assignments, documents or other instruments which WCW may deem necessary

or appropriate, from time to time, to vest complete title and ownership of any Work

Product, and all associated intellectual property and other rights, exclusively in WCW.  If

such Work Product is not considered to be a "work made for hire," Trainee hereby

CONFIDENTIAL

4

WCW 002761

assigns to WCW for One Dollar ($1.00) in hand and other good and valuable

consideration all rights, title and interest in and to the copyright thereof and all renewals

and extensions thereof that may be secured under the laws of any country now or

hereafter in force and effect. WCW shall have full, immediate and unrestricted access to

all Work Product during the Term of this Agreement.

5.    **Compliance with Laws, Rules and Regulations.**  (a) Trainee agrees to

comply with all applicable policies, rules, procedures and regulations adopted from time

to time by WCW (including without limitation the WCW Independent Contractor Rules

and Regulations and Travel Policy) and all other applicable federal, state and local laws,

rules, regulations, or ordinances; (b) Trainee further agrees to abide by the terms and

conditions of the WCW Substance Abuse Policy which Trainee agrees he has received

and reviewed.

6.    **Representations and Warranties.**  Trainee hereby represents and

warrants to WCW as follows: (a) Trainee has the full power, authority, ability and legal

right to execute and deliver this Agreement and to perform his obligations hereunder; (b)

Trainee has all legal rights, power, authority and ability to convey the Work Product to

WCW; (c) this Agreement constitutes the legal, valid and fully binding obligation of

Trainee and is enforceable in accordance with its terms; (d) the execution, delivery and

performance of this Agreement have been consented to and authorized by all individuals

or entities required to consent to and authorize the same, will not contravene any law,

regulation, judgment or decree applicable to Trainee, and will not cause or result in a

breach of or default under any other agreement, contract or understanding to which

Trainee is a party; (e) there are no pending claims or litigation which would or might

**CONFIDENTIAL**

**WCW 002762**

5

interfere with the performance of Trainee's obligations or the enjoyment of WCW's rights under this Agreement; and (f) Trainee is not currently using, and during the term of this Agreement, shall not use, any illegal drugs, steroids or other substances prohibited by WCW.

7.     **Indemnification.** Trainee agrees to indemnify, defend and hold harmless WCW, its directors, officers, and shareholders, and their respective agents, officers and employees, against any and all suits, damages, expenses (including, without limitation, court costs, attorneys' fees and allocable costs of in-house counsel), losses, liabilities and claims of any kind, caused by or resulting from any breach of this Agreement or by any other act or omission of Trainee whether the same may be the result of negligence, willful act, responsibility under strict liability standards, any other substandard conduct or otherwise.

Trainee shall at all times be responsible for any loss or damage to any WCW property by Trainee or while in the possession of Trainee, unless said damage occurs at the direct instruction of WCW as part of a storyline. The loss or damage thereto shall be restored at Trainee's expense.

8.     **Term, Termination and Incapacity.**

(a)     Unless sooner terminated in accordance with the provisions of this Agreement, the term of this Agreement shall be as described in Exhibit A attached hereto and incorporated herein by reference.

(b)     The term of this Agreement shall be divided into consecutive one (1) month periods. During any such period, WCW may terminate this Agreement with or without cause after giving Trainee at least fourteen (14) days prior written notice of such

CONFIDENTIAL

6

WCW 002763

termination. Any such termination shall be effective at the end of the then-current three (3) month period.

        (c)     Trainee may terminate this Agreement upon the occurrence of any material breach of any provision hereof by WCW which remains uncured for a period of fifteen (15) consecutive days after Trainee has provided WCW with written notice of the breach.

        (d)    WCW may immediately terminate this Agreement upon the occurrence or at any time during the continuation of any material breach of any provision hereof by Trainee.

        (e)     WCW may terminate this Agreement or suspend Trainee without pay, for "Good Cause" by written notice setting forth the reason for such termination or suspension. For the purposes of this Agreement, the WCW shall have "Good Cause" for termination of Trainee's Agreement or suspension without pay (i) if Trainee is convicted of or pleads guilty to any felony or a crime involving theft, fraud, or moral turpitude; (ii) if Trainee intentionally violates any law, rule, regulation or order of any governmental authority, thereby exposing WCW, its parent, subsidiaries or any affiliated entity of the WCW to potential civil or criminal penalties; (iii) if Trainee fails to adequately or completely perform any of his duties or obligations hereunder, whether express or implied; (iv) if Trainee fails to follow the direction of WCW's officers; (v) if Trainee engages in conduct or activities involving moral turpitude materially damaging to the business or reputation of WCW; (vi) if Trainee violates the WCW Substance Abuse Policy; (vii) if Trainee otherwise breaches any provision or representation of this agreement; or (viii) if Trainee intentionally misappropriates for his own purpose and

<div style="text-align:center">7</div>

WCW 002764

CONFIDENTIAL

benefit any property of the WCW, its parent, subsidiaries or any affiliated entity of WCW or appropriates any corporate opportunity of WCW, its parent, subsidiaries or any affiliated entity of WCW. Trainee acknowledges that a waiver by WCW of its rights with respect to any provision of this paragraph in one instance will not be deemed to constitute a waiver of its rights with respect to the same or a similar breach thereafter.

(f)    This Agreement shall terminate automatically upon the death or incapacity of Trainee.

(g)  Trainee acknowledges his present eligibility for workers' compensation through WCW. For so long as WCW maintains worker's compensation coverage, Trainee agrees to accept the benefits provided by said workers' compensation coverage as his sole and exclusive remedy against WCW, (including its parent, affiliates, employees and agents), for any and all injuries sustained during the Term provided said coverage is maintained by WCW and is in effect with respect to such injury. Notwithstanding anything herein to the contrary, WCW shall not be obligated to maintain workers' compensation coverage.

9.    **Restrictive Covenants**.

(a)    Confidentiality. "Confidential Information" shall mean any confidential, proprietary, business information or data belonging to or pertaining to WCW that does not constitute a "Trade Secret" (as defined under applicable law) and that is not generally known by or available through legal means to the public. In recognition of WCW's need to protect its legitimate business interests, Trainee hereby covenants and agrees that Trainee shall not, unless specifically directed by WCW, for any reason or in any fashion, either directly or indirectly use, disclose, transfer, assign, disseminate,

CONFIDENTIAL

8

WCW 002765

reproduce, copy, or otherwise communicate any: Confidential Information, at all times during his contractual relationship with WCW and for a period of one (1) year following the termination thereof for any reason; and Trade Secrets, at all times such information remains a "trade secret" under applicable law. During the Term, Trainee shall: exercise his best efforts to ensure the continued confidentiality of all Trade Secrets and Confidential Information of WCW known by, disclosed to or made available to Trainee, whether in connection with this Agreement or any other past or present relationship with WCW; immediately notify WCW of any unauthorized disclosure or use of any Trade Secrets or Confidential Information of which Trainee becomes aware; and assist WCW, to the extent necessary, in the procurement of or any protection of WCW's rights to or in any of the Trade Secrets or Confidential Information.

      (b)    Noncompetition. During the Term and within the Territory of this Agreement, Trainee shall perform the Services exclusively for WCW and shall not, directly or indirectly, be employed by, perform services for, or engage or be connected in any manner with any other business entity without the express written consent of WCW. Trainee expressly covenants and agrees that for a period of one hundred and twenty (120) days after any termination or expiration of this Agreement, for any reason (the "Non-Compete Period"), he shall not provide those Services specifically delineated in sections 1(a)(i) and (ii) to any other individual, company or business in the United States, Canada and Japan. In addition, during the Non-Compete Period, Trainee shall not appear or perform in any media (including but not limited to broadcast, pay-per-view and cable television, video replay, telephone hot-line, radio, magazine and internet) in any manner or capacity relating to wrestling or any other related professional, entertainment or

**CONFIDENTIAL**

9

**WCW 002766**

athletic event for or on behalf of Titan Sports, Inc. (WWF) or HHG Corporation (ECW) in the United States, Canada and Japan or for broadcast therein. Trainee acknowledges that the Non-Compete Period shall be increased to six (6) months in the event this Agreement is terminated for Good Cause pursuant to paragraph 8(d).

(c)    Acknowledgment of Reasonableness. The parties expressly acknowledge the reasonableness and content of the covenants and agreements contained in this section.

10.    **Notices.** All notices and statements provided for or required by this Agreement shall be in writing, and shall be delivered personally to the other designated party, or mailed by certified or registered mail, return receipt requested, or deposited with a recognized national overnight courier service. Notices shall be deemed effective on the earlier of when hand delivered, when deposited with a recognized national overnight courier service or when received by mail.

11.    **Miscellaneous.**

(a)    This Agreement, and the documents referenced herein, contain the entire agreement and understanding and shall supersede all prior agreements or understandings concerning the subject matter hereof between the parties hereto. No waiver, termination or discharge of this Agreement, or any of the terms or provisions hereof, shall be binding upon either party hereto unless confirmed in writing. This Agreement may not be modified or amended, except by a writing executed by both parties. No waiver by either party of any term or provision of this Agreement or of any default hereunder shall affect such party's rights thereafter to enforce such term or

10

WCW 002767

CONFIDENTIAL

provision or to exercise any right or remedy in the event of any other default, whether or not similar.

(b)  This Agreement is the product of arm's-length negotiations between Trainee and WCW.  Trainee expressly states that he has had the opportunity to seek and obtain consultation in connection with the negotiation and execution of this Agreement, and that he fully understands the rights and obligations set forth herein.  In the construction and interpretation of this Agreement, no account shall be taken of which party requested or drafted any particular provision or provisions of this Agreement.

(c)  Regardless of the place of execution hereof, this Agreement and all amendments hereto, shall be deemed to have been negotiated, made, entered into and fully performed in the State of Georgia, without regard to the actual location at which Trainee provides Services to WCW.  This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of Georgia applicable to contracts made, entered into and performed entirely therein, without giving effect to its conflict of laws provisions. Trainee and WCW hereby (i) submit to the jurisdiction of the United States District Court for the Northern District of Georgia and of any Georgia state court sitting in Atlanta for the purposes of all legal proceedings arising out of or relating to this Agreement and (ii) irrevocably waive, to the fullest extent permitted by law, any objection which it may now or hereafter have to the venue of any such proceeding which is brought in such a court.  Additionally, the  parties hereto agree that the State of Georgia shall be the exclusive forum and situs for the resolution of any and all disputes, controversies or matters arising herefrom or related hereto. Trainee's Home Base is

WCW 002768

CONFIDENTIAL

identified solely for travel purposes and shall not affect the choice of law, jurisdiction or venue hereunder.

(d)    The parties further agree, notwithstanding the consideration provided for herein, that because of the special, unique and extraordinary nature of the Services hereunder and of the rights and licenses which are the subject matter of this Agreement, WCW shall be entitled to injunctive and other equitable relief to prevent any breach or default by Trainee hereunder, and such relief shall be without prejudice to any other rights or remedies of WCW as may be provided by law.

(e)    WCW may hereby assign its rights and delegate its obligations under this Agreement, and if such assignee shall assume WCW's obligations in writing, WCW shall have no further obligations to Trainee.  Trainee may not assign this Agreement, in whole or in part, without the prior written consent of WCW, and any attempted assignment not in accordance herewith shall be null and void and of no force or effect.

(f)    This Agreement shall be binding on Trainee and his successors and permitted assigns.

(g)    Nothing herein shall be deemed to obligate WCW to use the services of Trainee and WCW shall have fully discharged its obligations hereunder by paying the amount specified herein.

(h)    With respect to WCW's rights hereunder, WCW shall have the sole right and discretion to bring any and all claims including but not limited to infringement or unfair competition claims.

CONFIDENTIAL

12

WCW 002769

(i)      The headings contained herein are for the convenience of the parties only and shall not be interpreted to limit or affect in any way the meaning of the language contained in this Agreement.

(j)      This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

(k)      If any provision of this Agreement shall be held void, voidable, invalid or inoperative, no other provision of this Agreement shall be affected as a result thereof, and accordingly, the remaining provisions of this Agreement shall remain in full force and effect as though such void, voidable, invalid or inoperative provision had not been contained herein.

(l)      Upon the request of WCW, Trainee agrees to take any and all actions, including, without limitation, the execution of certificates, documents or instruments, necessary or appropriate to give effect to the terms and conditions set forth in this Agreement.

(m)      Notwithstanding any termination of this Agreement, all provisions which, by their terms or reasonable interpretation thereof, sets forth obligations that extend beyond the termination of this Agreement hereof shall survive and remain in full force and effect.

**CONFIDENTIAL**

13

WCW 002770

**IN WITNESS WHEREOF,** the parties hereto have executed or caused their duly authorized representatives to execute this Agreement to be effective as of the day and year first above written.

"TRAINEE"                                         "WCW"

Signature: _Marcial Davis_                        By: _____
Printed Name: _MARCIAL DAVIS_                      Title: _APRIL 28, 1999_
                                                   _DIRECTOR OF TALENT RELATIONS_

**CONFIDENTIAL**

**WCW 002771**

14

## INDEPENDENT CONTRACTOR AGREEMENT

FOR:   MARCIAL DAVIS

## EXHIBIT "A"

**COMPENSATION:**   In consideration of Trainee's grant of the rights, licenses and services hereunder, and provided Trainee faithfully and fully performs all of his obligations hereunder, WCW shall pay Trainee $ ___02,600.00___ per month.

**TERM:**   This Agreement shall commence as of the date first written above and shall continue for a Term of one (1) year.  Thereafter, this Agreement shall automatically renew for two additional Terms of like duration at the same rate set out above, unless WCW shall serve written notice to Trainee at least thirty (30) days prior to the end of the Term of this Agreement of its decision to terminate this Agreement at the end of the Term. Reference herein to the Term hereof means the original term and any such renewal or extended term.

**HOME BASE**:  Atlanta, GA

**ADDRESS:** _____

**SOCIAL SECURITY NUMBER:** _____

_____     _____
TRAINEE                                 WORLD CHAMPIONSHIP WRESTLING, INC.

**CONFIDENTIAL**

15

WCW 002772

TALENT

WCW 00277

CONFIDENTIAL



bcc:    Bill Busch
        Diana Myers
        Greg Prince
        Amy Davidson

CONFIDENTIAL

WCW 002779



# EXHIBIT / ATTACHMENT

## _____H_____

(To be scanned in place of tab)

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3
   WILLIAM BOULWARE, JR.,          )
4  et al.,                         )
                                   )
5          Plaintiffs,             )
                                   )
6      vs.                         )  CIVIL ACTION FILE
                                   )  NO. 1:01-CV-0915-CC
7  WORLD CHAMPIONSHIP WRESTLING,   )
   INC.,                           )
8                                  )
           Defendant.             )
9                                  )

10

11

12  ─────────────────────────────────────────────

13         DEPOSITION OF WILLIAM BOULWARE, JR.
                 NOVEMBER 16, 2001
14                  10:09 A.M.

15  ─────────────────────────────────────────────

16

17

18

19

20

21

22

23

24

25
```

CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com

404-237-1990

800-317-5773

Page 70

1  18 years in the career. You got to understand, most
2  of these guys we used to have a circle, and you see
3  these guys all the time. And like you might -- you
4  -- well, you at arena or not, you see them. You-all
5  go to the same places. I go to places looking for
6  talent. I see Nick Patrick. I'd see JJ Dillon. I'd
7  see Arn Anderson. I'd maybe see them once or twice a
8  week.
9    Q    My question, though, about the referees.
10   A    Yes.
11   Q    You'd remembered Nick Patrick's name, but
12 you said you couldn't remember the names of other
13 referees?
14   A    The name Nick Patrick -- give me a minute.
15   Q    Please?
16   A    I'll give it to you. Nick Patrick? It's
17 just too far. I mean, I know -- they right in front
18 of me, but I can't --
19   Q    Well, if you do remember, if you will just
20 let me know, or let your lawyer know if it's not
21 during the course of the day.
22   A    Okay.
23   Q    How do you know that -- you said a minute
24 ago that you thought they were employees. How do you
25 know they were employees?

Page 71

1    A    Well, Terry Taylor told me.
2    Q    What did Terry tell you?
3    A    Well, it was a guy came in by the name of
4  Chip Crockett. His family used to own the wrestling,
5  and we all -- Pez, myself, everybody was sitting there
6  and he became an employee.
7    Q    Was he a referee?
8    A    No. He was an employee. So I went to Terry
9  and, I'm saying, how did this guy, white, come on and
10 ain't had no experience in the business and become an
11 employee?
12          He said, to me, this is the way we
13 operate. Turner told us we don't need to use you-all
14 niggers. Just like that. Something about survey or
15 whatever.
16          And I kept saying, why?
17          He said, we got it from the big office.
18 They told us we don't have to use you-all.
19          And I asked Terry. I said, well, why?
20          He said, we make employee to people, white
21 people, not black people.
22   Q    When did he say this to you?
23   A    Terry told me this in -- I had this
24 conversation with a few of them in the last few months
25 before they closed.

Page 72

1    Q    Well, back up for a second. You had that
2  conversation with --
3    A    Terry Taylor --
4    Q    -- Terry Taylor. When was that?
5    A    That was, like, it had to have been in '98
6  or '99.
7    Q    Where did that happen?
8    A    At one of the arena.
9    Q    Was anybody else around?
10   A    No. Not at the time.
11   Q    And you said you've had a similar
12 conversation with other people?
13   A    Yes, I have.
14   Q    Who have you had that conversation with?
15   A    Well, I had a conversation with Arn
16 Anderson.
17   Q    When was this?
18   A    Shoot, probably -- about a month or two
19 months before you-all closed, before Turner closed. I
20 guess most of the guys was -- I thought they was
21 coming down off their bigotry they had been with us,
22 but they were mad at Turner because they figured they
23 had no job no more. I don't know what it was.
24          I run into JJ. I run into Paul Orndorff.
25 Paul called me about using the kid in my wrestling

Page 73

1  organization, and I replied to Paul, I said, why now
2  you-all want to work with me when I been trying to be
3  a referee, I been trying to put my company out there?
4          And Paul basically told me that they had
5  got some word from Turner Sports that black people
6  don't buy tickets; they don't use no niggers.
7    Q    Paul said that to you?
8    A    Yes. Paul said that to me. I was Paul
9  partner one time, so I been knowing him for over the
10 period of time, and the word nigger, buckwheat,
11 crackhead, you got to understand, was something they
12 used. I mean, it wasn't --
13   Q    When you say they, who are they?
14   A    Well, Jody Hamilton, JJ Dillon, Paul
15 Orndorff, Mike Wenners. All employees. Doug
16 Dellenger.
17   Q    Let me get back to your point. We'll talk
18 about that a little more, but let me get back to your
19 point. You said that you believed referees were
20 employees, and what I want to know is, what evidence
21 do you have --
22   A    Nick told me.
23   Q    -- that they were employees?
24   A    Me and Nick was going down the road one day,
25 and Nick, I would say, about, I need some insurance

Page 122

1   them over. They had young guys come like I mentioned
2   the guy, a distant friend. This kid come in, white
3   guy. I mean, basically couldn't even wrestle. They
4   made -- from wrestle, they know he was a booker. He
5   had no prior qualifications of that. I mean, I'd been
6   wrestling ten years before he even got in the
7   business.
8      Q   So, Mr. Boulware, is it your complaint that
9   you didn't get these job opportunities? It's not
10  really that you didn't get paid the same as them?
11  It's --
12    A   I didn't get the paid the same also.
13    Q   Because you weren't doing the job; right?
14  You said you couldn't get the job?
15    A   Well, for example, when I was ring -- the
16  ring guy, where they call ring boy, or ring guy, they
17  have a guy that was over here making $50,000.
18    Q   Who?
19    A   Gordon Nelson.
20    Q   Was Pez Whatley making $50,000?
21    A   Not at that time. Not at that time.
22    Q   Did he make $50,000 on the ring crew? Do
23  you know?
24    A   I don't know exactly what he made, but he
25  got a raise after I complained so much to Time Warner

Page 123

1   and the Turner people, then they gave him --
2    Q   How do you know how much Mr. Nelson was
3  making?
4    A   He told me several times. We rode the truck
5  together. He laughed about it. He laughed about it.
6  He made a joke about it. It was out in your face. It
7  wasn't like they here behind your back and you hear
8  them whispering. They would say it to your face.
9  They have no problem with saying it.
10    Q   Other than Mr. Nelson telling you what he
11  made, do you have any other evidence as to what he --
12    A   Him, Klondike -- Bill Klondike, Chip
13  Crockett. I mean, the list go on.
14    Q   I need you to listen to my question, Mr.
15  Boulware. My question was, other than Mr. Nelson
16  telling you how much Mr. Nelson made, do you have any
17  other evidence how much Mr. Nelson was paid?
18    A   Yes.
19    Q   What's your evidence?
20    A   I have -- Terry told me. We talk about it
21  all the time.
22    Q   What did Terry tell you?
23    A   Terry basically told me -- I asked why my
24  pay different from theirs, and it always basically
25  come back, the color of your skin, and you're not in

Page 124

1   the clique.
2    Q   Did Terry Taylor say the reason you were
3  paid differently than Mr. Nelson was the color of your
4  skin?
5    A   Yes. He said that.
6    Q   Did he say those words?
7    A   He said that, oh, yes.
8    Q   What words did he use?
9    A   He use several different -- I talked to him
10  several different times.
11    Q   What do you remember him saying?
12    A   I remember him basically telling me -- do
13  you want me to use a good example?
14    Q   What I'd like you to do is tell me what he
15  said. Not basically what he said, but --
16    A   I can't remember the exact words he said.
17    Q   Tell me what you remember him saying.
18    A   I remember him telling me about that I knew
19  how -- what was going on. Why would I keep bothering
20  him, because things wasn't going to change. And I
21  asked him a couple times, why? And that when I --
22  finally everybody started telling me -- everybody,
23  meaning JJ, Dusty -- I even talked to Dusty about it
24  also. He was in management. That the Turner people
25  basically told them, when no black people come to the

Page 125

1   show, then they didn't have to use no black, period.
2   I don't know if it was true. I know they told me.
3    Q   This is Terry Taylor?
4    A   Terry. JJ told me the same thing. Arn
5  Anderson. The list go on. Each one of them sit down
6  basically when we was away from all the record and
7  stuff going on and look me in the eye and told me that
8  was the reason I wasn't getting no promotion and why I
9  wasn't going to be nothing but the worst job that they
10  could give me. And they basically told me that.
11    Q   What other evidence do you have that
12  supports your claim that you were paid differently
13  because of your race?
14    A   Well, okay. Chip Crockett back again. We
15  was in Philadelphia, and I had just received my
16  paycheck, and I had my check, and Chip telling me, he
17  said, well, I got direct deposit. Well, how you get
18  direct deposit? You're not no employee.
19         He said, oh, you didn't know? I'm an
20  employee, and I can get paid more than you. And even
21  I showed him my check. He said no, I got a guaranteed
22  salary. I don't get paid by the low end.
23         I'm, like, how can you do that and you
24  came here probably 16 years after I been in the
25  business?



# EXHIBIT / ATTACHMENT

## I

(To be scanned in place of tab)

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF GEORGIA

3              ATLANTA DIVISION

4

5   TONY BYRON CARR,                )
                                     )
6           Plaintiff,              ) Civil Action File No.
    vs.                             ) 1-00-CV-1721 (CC)
7                                    )
    WORLD CHAMPIONSHIP WRESTLING,   )
8   INC., and TURNER SPORTS, INC.,  )
                                     )
9           Defendants.             )

10              DEPOSITION OF TONY BYRON CARR
                    JANUARY 28, 2002
11                     10:00 a.m.

12

13

14

15

16

17

18

19

20

21

22

23

24

25          CERTIFIED COURT REPORTERS

1   a truck driver.  First time he said, I don't know who's

2   blowing smoke up your ass, kid, but they ain't hiring no

3   niggers.

4        Q.   This is what Jody Hamilton said?

5        A.   This is what Jody Hamilton said.

6        Q.   When did he say that?

7        A.   He said it right before we left Carol Drive.  Then

8   we got up here, when he hired me back as a truck driver, you

9   know, I told him I still want to wrestle.  I still brought

10  my wrestling gear.  I still talked to the bookers.  Hey, you

11  know, if you all need somebody, I want to wrestle.  I didn't

12  come here to be a truck driver.  I want to wrestle.  So I

13  was trying to network any way I could to get back in, you

14  know, so --

15       Q.   Okay.  And how did that conversation go when you

16  talked to him about that?

17       A.   Well, that's when he said, he said -- this time he

18  cleaned up.  He said, we're not hiring any blacks, you know.

19       Q.   Did he refer to anyone in particular.

20       A.   No, he just said --

21       Q.   Did he give you a name as to who's making this

22  decision?

23       A.   He just said the higher-ups.

24       Q.   Okay.  But you don't know who actually made the

25  decision not to give you a wrestling contract?

1      A.    Well, I had been hearing the whole time that Jody

2    Hamilton was a racist.  His brother was in the Ku Klux Klan,

3    all this stuff here.  Jody would say certain things but I

4    didn't hear that stuff.  All I know, I wanted to be a

5    wrestler, you know.  I heard the stuff.  I didn't hear it.

6    I heard the jokes.  I heard the comments.

7      Q.    What kind of jokes or comments did you hear

8    personally?

9      A.    Okay.  Well, Sarge, if we call people -- he

10   referred to this Asian guy as -- who was in the ring,

11   playing the ring, wrestling around, he's like, there's soul

12   food and oriental food in the ring or something like that,

13   you know, stuff like that.

14     Q.    Okay.  What else do you remember hearing that you

15   thought was a racial comment?

16     A.    Taylor Terry would come by and say stuff like

17   there was a time when the air conditioner broke and he said,

18   well, you'd better turn the air conditioner on because you

19   know, these niggers, they can't take this cold weather.

20     Q.    Did you hear that?

21     A.    Yes.

22     Q.    When was this?

23     A.    This was -- can't remember the dates on it.

24     Q.    How long had you been at the Power Plant when that

25   occurred?

1      A.    Paul said they're not hiring any blacks.  This was

2  down at the new school, because what happened, went through

3  tryouts and Jody told me that -- made the comment or

4  whatever, but I hadn't talked to Paul Orndorff yet.

5      Q.    Okay.  So when was this conversation with Paul?

6      A.    This was sometime late '99.

7      Q.    Okay.  And what did he say to you?

8      A.    He said they ain't hiring no niggers.

9      Q.    And did he use the word "nigger"?

10     A.    Yes, he did.

11     Q.    Okay.  And do you know who he was referring to?

12     A.    Well, I was the only one in the room and I was

13  trying to get a job.

14     Q.    No, no.  When he said "they", do you know who he

15  meant by "they"?

16     A.    I assume he meant WCW.

17     Q.    But you don't know in particular who he --

18     A.    No.

19     Q.    Did Paul Orndorff ever say anything else that you

20  thought was racially discriminatory?

21     A.    No, I didn't see Paul a whole lot after that.

22     Q.    Tell me someone else that you believe down at the

23  Power Plant, said something that you believe was racially

24  discriminatory.

25     A.    Okay.  At the Power Plant.  Like I said, Jody

1      Q.    Okay.

2      A.    You know, and then I didn't hear from him for a

3   while, and then about a month later he called me and asked

4   me if I wanted to get back on the ring truck, and I said

5   yes.

6      Q.    So he offered you a job on the ring crew?

7      A.    Yeah, you know.

8      Q.    Any other conversations with Jody Hamilton you

9   think were discriminatory?

10     A.    Okay.  All right.  What happened, on the days

11  where I was off, Jody would have me come down there and move

12  a lot of stuff, you know, rings, you know, just shift stuff

13  around in the new building here on Log Cabin.

14          I'd unload trucks by myself, move rails, and then

15  I come back and sit down, I take a lunch break or whatever,

16  and he had these stories and they start talking about the

17  problems with the black community.

18          He made this thing about Martin Luther King.  He

19  was like, well, Martin Luther King started all this problem

20  and that's why black people are having so much trouble now.

21  He started segregation and a lot of black people got, you

22  know, sucked up in it because they weren't smart enough to

23  keep up with the white people, so it's bringing down the

24  society.

25          That's the kind of comments he was making, you



# EXHIBIT / ATTACHMENT



J

(To be scanned in place of tab)

## DECLARATION OF JOHN SNAKOVSKY

STATE OF GEORGIA
COUNTY OF _____

John Snakovsky gives the following declaration under penalty of perjury and states as follows:

1. J.S.

I became a wrestler WCW in 1994.  My wrestling name and professional name is Johnny Boone.

2. J.S.

In 1999, I became a referee.  In my capacity as a wrestler, and then as a referee, I was in a position to personally observe many of the WCW officials, especially those who worked in the Booking Department.

3. J.S.

On numerous occasions, I heard Terry Taylor use offensive and negative words in describing minorities.  I heard him call Sonny Onoo a "Jap" on several occasions.  I also heard him refer to Sonny Onoo as a "Gook."

4. J.S.

I also heard Terry Taylor use the word "nigger" on many occasions.  In fact, he constantly used that word when referring to African-American wrestlers.

5. J.S.

I heard Terry Taylor call Ernest Miller ("The Cat") a "nigger."

6. J.S.

I also heard Terry Taylor call Harrison Norris ("Hard Body") a "nigger."

7.  J.S.

On one occasion, I heard Terry Taylor state that neither
Bobby Walker nor Hard Body Norris would make it in the wrestling
profession because they were "black."

8.  J.S.

Based on my observations of Mr. Taylor, including his use
of the words "nigger" and "gook" I believe that Taylor was
discriminating against non-Caucasians.

9.  J.S.

For example, I recall that Terry Taylor often "pushed" a
Caucasian wrestler by the name of Joey Mags.  Upon information
and belief, Mr. Mags had many personal problems.  Joey Mags did
not possess many skills and abilities as a wrestling performer.
Nevertheless, I am personally aware that Terry Taylor "pushed"
Joey Mags over Ernest Miller.  Although Ernest Miller was a much
better athlete, better wrestler, and better performer, Terry
Taylor "pushed" Joey Mags over Ernest Miller.

10.  J.S.

I also am aware that Terry Taylor pushed Joey Mags, but did
not push Hard Body Norris or Bobby Walker.

11.  J.S.

I personally observed Terry Taylor treat Sonny Onoo
horribly.  Terry Taylor always referred to Sonny in a negative
and/or racist manner, and never provided Sonny with an
opportunity fully use his talents.

12.  J.S.

Sonny played a very unique role at WCW.  Sonny was neither
a wrestler nor a referee, but worked as a manager/entertainer.
Sonny was extremely professional, very diligent, and always
demonstrated a thorough understanding and knowledge of the
wrestling industry.

13.  J.S.

Based on my observations and experience, Sonny Onoo was a
much better entertainer and/or manager than Sherry Martil.

Similarly, he was much better than Tori Wilson.  As to each of
these individuals, Sonny demonstrated much better role-playing
and more professionalism.  He also demonstrated a greater degree
of wrestling expertise in his approach to wrestling events.

14.

Sonny Onoo was also a better manager/entertainer than
Colonel Parker.  I believe that Sony was better at involving the
crowd, and getting a crowd reaction to various staged events
than was Colonel Parker.  He also was more knowledgeable about
wrestling, and was a much harder worker than Colonel Parker.

15.

In addition to Terry Taylor, I heard many other WCW
officials use racist and/or negative words such as "nigger."  I
cannot recall with certainty the identity of the other
individuals, but I am confident that I heard these words from
WCW officials in addition to Terry Taylor.

16.

In the summer of 2000, I was working as a referee.  That
night, the WCW held a World Championship wrestling match.  The
match was scheduled between Booker T and Jeff Jarrett.  Based on
my recollection, Booker T was <u>not</u> "pencilled in" to win the
fight.  As those of us in the industry know, a particular
wrestler is scripted to prevail in a fight.  I believe that Jeff
Jarrett was scripted to win the world championship over Booker T
on that particular date.

17.

Before the actual wrestling match, I had heard Vince Russo
and Terry Taylor discussing a lawsuit filed by Hard Body Norris
and Bobby Walker.  I believe I also heard them refer to a
wrestler named Ice Train during this conversation.  All of these
individuals are African-American.

18.

During the conversation, I heard Terry Taylor and Vince
Russo state that these African-American wrestlers had sued WCW
for racial discrimination.  I recall Taylor saying, in reference
to Hard Body Norris, "that nigger Hard Body is no good."

19. *J. S.*

During the same conversation, I heard Vince Russo and Terry Taylor state that they would have to do something about the racial allegations against WCW.

20. *J S.*

Each of them indicated that they would have to do something to deflect racial allegations brought against WCW.  During the conversation, they made it clear that they were going to make an African-American the champion in order to make it appear that they were not discriminating against African-Americans. Terry Taylor indicated that by making Booker T, an African-American, the champion, it would "get them off of our backs."  In sum, they made it clear that they were concerned about racial allegations brought by Bobby Walker, Hard Body Norris, and other African-American wrestlers.  In order to make themselves appear not to be racist, they scripted Booker T, an African-American, to become the WCW champion in response to the lawsuit alleging racial discrimination.

I declare under penalty of perjury that the foregoing is true and correct.

John Snakovsky

April 5, 2002
Executed on (Date)



# EXHIBIT / ATTACHMENT

## K

(To be scanned in place of tab)

## DECLARATION OF GEORGE GRACE

STATE OF GEORGIA
COUNTY OF _ _ _._ _

    George Grace gives the following declaration under penalty
of perjury and states as follows:

1.

    I am over eighteen years of age and competent to give this
testimony, which is based upon my personal knowledge.

2.

    I am the President of Grace Market Research, Inc. ("Grace
Market") and served in this position in March, 2000.

3.

    In March, 2000, Grace Market conducted an online survey for
World Championship Wrestling, Inc.

4.

    In this survey, respondents were asked to rate a number of
wrestling performers on a number of factors, including the
familiarity and likeability.  A true and correct copy of this
survey is attached hereto as Exhibit "A."

5.

    Respondents were also asked to provide some information
about themselves, including their ethnicity.  Specifically,
Question No. 152 asked each respondent to provide his or her
ethnicity.  The survey provided the following options as
possible responses to this question: (1) African/American/Black;
(2) Asian; (3) Caucasian/White; (4) Hispanic/Latino; and (5)
Other.

6.

    According to the information provided by the respondents,
the ethic make-up of the respondent group was as follows
(percentages rounded to the nearest whole number):

| | |
|---|---|
| Base/ Total Number of Respondents | 1379 |
| Percentage of Total | 100% |
| | |
| African/American/Black: Total Number | 51 |
| Percentage of Total | 4% |
| | |
| Asian: Total Number | 32 |
| Percentage of Total | 2% |
| | |
| Caucasian/White: Total Number | 1173 |
| Percentage of Total | 85% |
| | |
| Hispanic/Latino: Total Number | 66 |
| Percentage of Total | 5% |
| | |
| Other: Total Number | 57 |
| Percentage of Total | 4% |

7.

This information was provided to WCW at some point during the spring or summer of 2000.

8.

Grace Market maintains this information on a database in electronic format.  The information is no longer maintained by Grace Market in hard-copy form.

I declare under penalty of perjury that the foregoing is true and correct.

George Grace

George Grace

12 — 18 — 2002
Executed on (Date)



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

FILED IN CLERK'S OFF'
U.S.D.C. Atlanta

MAR - 8 2002

LUTHER D. THOMAS, Cle
    By:

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                          )
                                          )
            Plaintiff,                    )
v.                                        )       CIVIL ACTION FILE
                                          )       NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                  )
                                          )
            Defendants.                   )

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendants Universal Wrestling Corporation (f/k/a World Championship Wrestling, Inc.) ("WCW") and Turner Sports, Inc. ("TSI") submit this memorandum in support of their Motion for Summary Judgment on all claims brought by Plaintiff Tony Carr. Mr. Carr filed this action on July 10, 2000, alleging race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Mr. Carr alleges that WCW (i) discriminated against him due to his race (black) with regard to wrestling opportunities and compensation, (ii) retaliated against him for filing this lawsuit, and (iii) subjected him to a racially hostile work environment. In addition, Mr. Carr claims that this same alleged conduct constituted intentional infliction of emotional distress ("IIED") under state law. Finally, Mr. Carr asserts that

WCW owes him unpaid minimum wages and overtime under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA").

As shown below, these claims are without merit. Mr. Carr was never treated differently due to his race, and was given opportunities and paid like other similarly situated whites at WCW. Likewise, Mr. Carr was not subjected to any retaliation for filing this lawsuit, nor was he subjected to a racially hostile work environment. All actions taken regarding Mr. Carr were based on legitimate, non-discriminatory business reasons that had nothing to do with his race. Mr. Carr offers no evidence of race discrimination, and accordingly, summary judgment should be entered on all of his discrimination claims.

Similarly, summary judgment should be granted on Mr. Carr's IIED claim because this claim is based on nothing other than his allegations of race discrimination, which cannot, under Georgia law, constitute IIED. Finally, summary judgment must be granted on Mr. Carr's FLSA claims because he was not an employee under the FLSA and he never worked any unpaid overtime hours for WCW.

## II.   STATEMENT OF FACTS

### A.   WCW's Business

WCW created, produced, and marketed professional wrestling programs during the 1990s through March 2001. (Affidavit of Diana Myers ("Myers Aff.") ¶ 3 (copy attached as Exh. A)). WCW's

wrestling programs were seen by live audiences and/or aired on various television networks and pay-per-view systems. <u>Id.</u> Wrestlers in WCW's programs provided their services as independent contractors, either under formal Independent Contractor Agreements or without written contracts. (<u>Id.</u> at ¶ 4). WCW's programs were created by writers and producers, with the goal of entertaining wrestling fans and general audiences nationwide. (<u>Id.</u> at ¶ 3).

After having much commercial and financial success in the mid to late 1990s, WCW's business suffered a sharp downturn. (Myers Aff. ¶ 5). In 1999, WCW was losing significant sums of money, and so it began reducing the number of talent it contracted with and the compensation of existing talent, and began producing fewer and fewer wrestling programs. <u>Id.</u> WCW even terminated some of its wrestling programs in early 2000. <u>Id.</u> Accordingly, in 1999 and over the next two years, WCW had less and less need for wrestling services. (<u>Id.</u> at ¶ 6). Despite WCW's efforts, the business downturn did not stop, and in March 2001, WCW sold its principal assets and closed its operations. (<u>Id.</u> at ¶ 7). After this sale was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations. <u>Id.</u>

**B.   Mr. Carr's Background And Relationship With WCW.**

Mr. Carr first came to WCW in 1995 for a try out to train as a professional wrestler. (Deposition of Tony Carr (hereinafter

"Carr Dep.") at 25).    Mr. Carr tried out and was invited to train
at WCW's training facility, known as the Power Plant.    (Id. at
28).    Mr. Carr, like other trainees, paid WCW to train at the
Power Plant.    (Id. at 28, 33, 43).    After completing his initial
training period, Mr. Carr continued to work out at the Power Plant
through 1999 while holding jobs with other employers.    (Id. at 11-
12, 34, 43, 62, 87).    During this time, Mr. Carr provided
occasional, infrequent wrestling services to WCW, receiving a flat
fee each time he wrestled with WCW.    (Id. at 45-46, 50, 89).

In 1998 and 1999, Mr. Carr also provided services to WCW's
ring crew as an independent contractor.    (Id. at 62-64).    The ring
crew consisted of individuals who, working in teams of two, were
responsible for the wrestling rings used for the matches.    (Id. at
107; Affidavit of Joseph Hamilton ("Hamilton Aff.") ¶ 6 (copy
attached as Exh. B)).    The ring crew transported the ring to each
match; set up the ring; maintained and cleaned it before, during
and after the matches; and broke down the ring and hauled it to
the next match.    (Carr Dep. at 63, 109-110; Hamilton Aff. ¶ 6).
Mr. Carr was paid a flat fee each time he provided these ring
transport services.    (Carr Dep. at 45-46, 50, 89).

In 1998, WCW decided to move the Power Plant from its
previous location on Carroll Drive in Smyrna, Georgia to a new
location on Log Cabin Drive, also in Smyrna.    (Id. at 87; Myers

4

Aff. ¶ 9; Hamilton Aff. ¶ 4).   This new Power Plant facility was established specifically to work with a smaller group of wrestler trainees rather than the large, undefined number that had been working out at the previous location.   (Myers Aff. ¶ 9; Hamilton Aff. ¶ 4; Affidavit of James Morrison ("Morrison Aff.") ¶ 5 (copy attached as Exh. C)).   This smaller group of wrestlers training at the new facility were signed to Independent Contractor Agreements with WCW.   (Myers Aff. ¶ 10; Morrison Aff. ¶ 6).   Previously, Mr. Carr and other individuals working out at the Power Plant were non-contract independent contractors paid a flat fee each time they participated in a WCW event.   (Myers Aff. ¶ 10).

After evaluating the individuals who were then training at the Power Plant, including Mr. Carr, WCW selected approximately twelve trainees to continue training at the new facility and to be offered Independent Contractor Agreements.   (Morrison Aff. ¶ 8). This selection process involved the evaluation of these individuals' wrestling skills, physique, and demeanor and their drive, ambition, and raw potential to become successful professional wrestlers.   Id.   Mr. Carr was not among the roughly twelve individuals selected to train at the new facility because he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of

951536_3.DOC                                    5

being compensated to train or having his professional services contracted to WCW. (Id.; Carr Dep. at 87).

In 1999, after the move to the new location, Joseph Hamilton, who was responsible for WCW's ring crew, offered Mr. Carr a position as a ring crew employee. (Carr Dep. at 97, 104; Hamilton Aff. ¶ 7). Unlike wrestling on a non-contract basis, the ring crew job provided steady work as an employee of WCW, with better compensation. (Hamilton Aff. ¶ 7; Carr Dep. at 105). Mr. Carr accepted the job and remained a ring crew employee until WCW ceased its operations in March 2001 and discharged its employees. (Myers Aff. ¶ 12; Carr Dep. at 107, 114).

### III. ARGUMENT AND CITATION OF AUTHORITY

**A.  Defendant TSI Is Entitled To Summary Judgment On All Of Plaintiff's Claims Because There Is No Basis For Vicarious Liability Of TSI.**

All of Mr. Carr's claims involve allegations against WCW. WCW, not TSI, is the entity for whom Mr. Carr performed services as an independent contractor; WCW is the entity that employed him from 1999 to 2001 on its ring crew; and WCW is the entity that paid Mr. Carr for these services. (Carr Dep. at 45-46, 50, 62-64, 89, Exh. 4). As Mr. Carr admits, he never had any interaction with anyone at TSI. (Id. at 154-55).

Mr. Carr wants to "pierce the corporate veil" and assert liability against TSI under agency, alter ego, or joint venture

theories.   (See Second Amended Complaint, ¶¶ 37-40).   Despite the sweeping allegations of his Complaint, Mr. Carr can offer no evidence of any agency, alter ego, or joint venturer relationship between TSI and WCW.   (Carr Dep. at 154-57).   While WCW and TSI are sister subsidiaries of a common parent, there is no evidence that WCW acted as the agent or alter ego of TSI or as a joint venturer with TSI.   Id.   Mere allegations that two corporations are related, even as parent and subsidiary, are insufficient to create vicarious liability between the corporations.   Soerries v. Dancause, 546 S.E.2d 356, 358 (Ga. App. 2001).   Corporations normally use their subsidiaries to promote their own purposes, but this does not lead to piercing the corporate veil or vicarious liability, absent evidence of fraud or a sham corporation. Florida Shade Tobacco Growers, Inc. v. Duncan, 256 S.E.2d 645 (Ga. App. 1979); Boafa v. Hosp. Corp. of America, 338 S.E.2d 477, 479 (Ga. App. 1985).   Mr. Carr can offer no evidence of any relationship between TSI and WCW that would support any theory for vicarious liability against TSI.   Therefore, TSI is entitled to summary judgment on all of Mr. Carr's claims.   See, e.g., Williams Plaza, Inc. v. Sedgefield Sportswear Div. of Blue Bell, Inc., 297 S.E.2d 342, 343 (Ga. App. 1982) (summary judgment granted to corporation where "there is no evidence that the [affiliated] corporation 'was a sham, or that it was used to defeat a public

convenience, to justify wrong, protect fraud, defend crime, or any other reason which in equity and good conscience would justify the disregard of its separate entity'").[1]

**B.    Any Of Plaintiff's Claims Based On Events Occurring Prior To July 10, 1998 Are Barred By The Applicable Statutes Of Limitations.**

The U.S. Supreme Court has characterized a claim under 42 U.S.C. § 1981 as a personal injury cause of action to which state statutes of limitations for personal injury actions apply. Alexander v. Fulton Cnty., GA, 207 F.3d 1303, 1346 (11th Cir. 2000). For § 1981 claims brought in federal courts in Georgia, "the applicable statute of limitations is found in O.C.G.A. § 9-3-33 and is 2 years." Butler v. Matsushita Comm. Indns. Corp. of U.S.A., 203 F.R.D. 575, 582 (N.D. Ga. 2001). Mr. Carr filed his Complaint on July 10, 2000. Accordingly, any of his claims based on events arising prior to July 10, 1998, are barred as a matter of law. Alexander, 207 F.3d at 1346; Butler, 203 F.R.D. at 582.[2]

---

[1] Should the Court find that TSI is somehow vicariously liable to Mr. Carr, TSI is nonetheless entitled to summary judgment on Mr. Carr's claims on all of the same grounds as WCW.

[2] With respect to Mr. Carr's Title VII claim, a Charge of Discrimination must be filed with the EEOC within 180 days from the date of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e). Mr. Carr filed his Charge of Discrimination on May 10, 2000. Thus, any Title VII claim by Mr. Carr arising more than 180 days before he filed his Charge, or before November 12, 1999, is barred by Title VII's statute of limitations as well.

Mr. Carr's FLSA claim, discussed infra, is also subject to a two-year statute of limitations, similar to his § 1981 claim. See

It is undisputed that many of the actions alleged by Mr. Carr
to have created a supposedly racially hostile work environment at
WCW occurred (if at all) prior to July 10, 1998.   (Carr Dep. at
49-50, 87, 92-93, 166-167).   Likewise, it is undisputed that much
of the conduct made the basis of Mr. Carr's claim that he was
denied opportunities to provide wrestling services to WCW occurred
before July 10, 1998.   (Carr Dep. at 25, 45-46).   Any claims of a
hostile work environment or other types of discrimination based on
these events are barred by the applicable statutes of limitations.
In addition, any other § 1981 claims based upon events occurring
before July 10, 1998, also are time-barred.   Mr. Carr obviously
knew of these alleged discriminatory acts before he filed his
Complaint:   Mr. Carr alleges that he was aware of WCW's alleged
discriminatory actions as early as 1998, if not before.   (Carr
Dep. at 137).   A plaintiff "who knowingly fails to seek relief is
exactly the danger Congress was trying to protect against in
establishing the statute of limitations."   Butler, 203 F.R.D. at
583.   Thus, any claims that Mr. Carr was subjected to a racially
hostile work environment or otherwise discriminated against prior
to July 10, 1998 are time-barred, and summary judgment should be
granted on these claims.

---

29 U.S.C. § 255.   Accordingly, any claim for wages allegedly due
for work performed before July 10, 1998 is also barred.

C.   **Mr. Carr Cannot Produce Any Evidence That He Was Discriminated Against On The Basis Of His Race.**

    1.   *Federal Discrimination Laws Are Not Vehicles For General Judicial Review Of Business Decisions.*

Title VII and § 1981 are not vehicles for general judicial review of business decisions. Discrimination laws were "not intended to diminish traditional management prerogatives." <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981). Nor do these laws "limit an employer's right to exercise his informed judgment as to how to best run his shop." <u>Gilchrist v. Bolger</u>, 733 F.2d 1551, 1553-54 (11th Cir. 1986). This Court's role is to prevent unlawful practices, "not to act as a 'super personnel department' that second-guesses employers' business judgments." <u>Lee v. GTE Florida, Inc.</u>, 226 F.3d 1249, 1254 (11th Cir. 2000), <u>cert. denied</u>, 121 S. Ct. 1486 (2001).

    2.   *Mr. Carr Is Required To Present Substantial Evidence That WCW Actually And Intentionally Discriminated Against Him On The Basis Of His Race.*

In a disparate treatment case such as this one, Mr. Carr must prove "intentional discrimination." <u>Burdine</u>, 450 U.S. at 256; <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 153 (2000). In such a case, "[p]roof of discriminatory motive is critical." <u>Teamsters v. United States</u>, 431 U.S. 324, 335-36 n.15 (1977). Mr. Carr must carry the initial burden of establishing a prima facie case of discrimination. <u>McDonnell Douglas Corp. v.</u>

Green, 411 U.S. 792 (1973).  Even if he can establish a prima facie case, WCW's burden is merely to offer evidence, but not persuade, showing that the actions complained of were taken for a "legitimate, nondiscriminatory reason."  Reeves, 530 U.S. at 142.

Once such a reason is articulated, any presumption of discrimination arising out of the prima facie case "simply drops out of the picture."  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11 (1993).  Mr. Carr must then "prove by a preponderance of the evidence that the legitimate reason(s) offered . . . were not [the] true reasons, but were a pretext for discrimination."  Burdine, 450 U.S. at 253; see Reeves, 530 U.S. at 143.  Mr. Carr must present "concrete evidence in the form of specific facts which show that [WCW's] proffered reason is mere pretext.  Conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "The ultimate burden of persuading the trier of fact that defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  St. Mary's Honor Center, 509 U.S. at 507 (quoting Burdine, 450 U.S. at 253).

### 3.   Mr. Carr Cannot Produce Any Evidence That He Was Denied Wrestling Opportunities Because Of His Race.

Most of Mr. Carr's allegations boil down to a "failure-to-hire" type claim.  He alleges that since 1998, WCW failed to provide him with opportunities to wrestle, both on a non-contract,

951536_3.DOC                              11

independent contractor basis and under an Independent Contractor Agreement.  Mr. Carr, however, cannot produce any evidence that WCW actually and intentionally refused to give him wrestling opportunities "because of" his race.  Oncale v. Sundowner Offshore Services, Inc. 523 U.S. 75, 78 (1998)(quoting 42 U.S.C. § 2000e-2(a)(1)).  Further, Mr. Carr cannot produce any evidence that WCW's legitimate, nondiscriminatory reasons for its decisions were false and a mere pretext for unlawful discrimination.

> **(a)  Mr. Carr Cannot Establish A Prima Facie Case Of Race Discrimination In WCW's Not Providing Him With Additional Wrestling Opportunities.**

In a "failure-to-hire" type case, establishing a prima facie case requires evidence to demonstrate that plaintiff:  (1) is a member of a protected minority; (2) was qualified for and applied for a position for which the defendant was accepting applications; (3) was rejected despite these qualifications; and (4) after this rejection the position remained open or was filled by a person outside his protected class.  Schoenfield v. Babbitt, 168 F.3d 1257, 1267 (11th Cir. 1999); Welborn v. Reynolds Metals Co., 810 F.2d 1026, 1028 (11th Cir. 1987).  Here, Mr. Carr cannot establish the second or fourth elements of his prima facie case because he cannot establish that wrestling opportunities were available that he was qualified for but did not receive.

While Mr. Carr provided occasional, infrequent services to WCW as a wrestler, he claims that in 1998 and 1999, he should have received additional wrestling opportunities. It is undisputed, however, that Mr. Carr did not receive more opportunities because he lacked unique wrestling skills, physique, demeanor, and other characteristics of WCW's better performers. (Morrison Aff. ¶ 4). Mr. Carr's wrestling character, style, and persona were not particularly interesting, unique, or entertaining. Id. Further, by early 1999, WCW was already experiencing and responding to a business downturn and had less need for wrestling talent. (Myers Aff. ¶¶ 5-6). WCW was in no position to give additional opportunities to lesser performers. (Id.; Morrison Aff. ¶ 4). Because Mr. Carr cannot dispute that there were fewer opportunities available and he was considered a lesser performer, he cannot make out a prima facie case.

Mr. Carr further claims that he should have been awarded an Independent Contractor Agreement with WCW. (Carr Dep. at 51-52, 116). But Mr. Carr offers no evidence that he was qualified for such a contract with WCW, and the undisputed evidence shows he was not judged to be a sufficient performer to warrant a contract. Mr. Carr had only limited experience as a wrestler, and he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of being

951536_3.DOC                              13

compensated to train or having his professional services contracted to WCW.   (Carr Dep. at 45-46; Morrison Aff. ¶¶ 4, 8). This is why he was not chosen to receive a contract.   (Morrison Aff. ¶ 8).   Because he cannot show that he was qualified for an Independent Contractor Agreement or possessed the skills and talent to be a contract performer, Mr. Carr cannot make out a prima facie case on this claim.

> **(b)   WCW Has Articulated Nondiscriminatory Reasons For Not Providing Mr. Carr With Additional Wrestling Opportunities.**

WCW has clearly articulated legitimate, nondiscriminatory reasons for Mr. Carr's not receiving more wrestling opportunities or a contract with WCW, and Mr. Carr can offer no evidence that these reasons are a pretext for unlawful discrimination.   As shown above, (1) WCW had fewer wrestling opportunities available, and Mr. Carr was not considered a sufficient performer appropriate to be used for those appearances; and (2) Mr. Carr was not qualified for an Independent Contractor Agreement.[3]   These reasons constitute

---

[3]   That some of the qualifications for being a professional wrestler, such as demeanor or raw potential, involve subjective considerations in no way diminishes WCW's legitimate, nondiscriminatory reasons for selecting other wrestlers over Mr. Carr.   Denney v. City of Albany, 247 F.3d 1172, 1185 (11th Cir. 2001) ("an employer's use of subjective factors in making a hiring or promotion decision does not raise a red flag"); Chapman v. Al Transport, 229 F.3d 1012, 1034 (11th Cir. 2000) (federal anti-discrimination statutes do not "deprive an employer the ability to rely on important criteria in its . . . decisions merely because those criteria are only capable of subjective evaluation").

legitimate, nondiscriminatory reasons for WCW's actions. Thus, the burden shifts to Mr. Carr to "directly persuade the court that a discriminatory reason more likely motivated [WCW] or indirectly [prove discrimination] by showing that [WCW]'s proffered explanation is [pretextual and] unworthy of credence." Burdine, 450 U.S. at 255 (1981). This Mr. Carr cannot do.

To establish pretext, Mr. Carr must present "concrete evidence in the form of specific facts which show that the [WCW]'s proffered reason is mere pretext." Earley, 907 F.2d at 1081. Mr. Carr's assertion of his subjective belief that discrimination occurred is not enough. Id.; Elliott v. Grp. Med. & Surg. Serv., 714 F.2d 556, 567 (5th Cir.), cert. denied, 467 U.S. 1215 (1994).

The undisputed evidence is that opportunities to wrestle for WCW on a non-contract basis were diminished at WCW post-1998, and because Mr. Carr had only limited experience as a wrestler and lacked the unique wrestling skills, physique, demeanor, and other characteristics consistent with WCW's better performers, he did not receive those opportunities, nor an Independent Contractor Agreement with WCW. (Myers Aff. ¶ 6; Morrison Aff. ¶¶ 4, 8). Mr. Carr's mere opinion that he was better qualified than wrestlers who appeared on WCW shows or were awarded contracts because he "trained at the Power Plant and these guys never trained anywhere" is insufficient. (Carr Dep. at 119). It is well-settled that "an

951536_3.DOC                                    15

employee's own opinions about his qualifications do not give rise to a material factual dispute." Lee, 225 F.3d at 1254 (quoting Simms v. Oklahoma ex rel. Dept. of Mental Health & Substance Abuse Svcs., 165 F.3d 1321, 1329-30 (10th Cir.), cert. denied, 120 S. Ct. 53 (1999)); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983); see also Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perception of his performance."). Mr. Carr cannot substitute his own subjective judgment for WCW's judgment about how to weigh time spent training at WCW's facility against wrestling skills, persona, and other traits necessary to be a wrestler with WCW. See Lee, 226 F.3d at 1254 (court's role is "not to act as a 'super personnel department' that second-guesses employer's business judgments"); Nix v. WLCY Radio/Rahall Comm., 738 F.2d 1181, 1187 (11th Cir. 1984) (refusing to overturn an employer's decision that may seem "unfair" to outside observers); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829 (1985) ("courts must refrain from . . . second-guessing a business's decision-making process").

The only other "evidence" of discrimination that Mr. Carr offers is his own self-serving statement that he was denied opportunities to wrestle "because they [WCW] were racist." (Carr Dep. at 120-121). This baseless allegation does not satisfy his

burden of proving pretext.   Mr. Carr presents no "concrete evidence in the form of specific facts" to show that WCW's proffered reasons are pretextual.[4]   Earley, 907 F.2d at 1081.   In short, none of Mr. Carr's proffered testimony establishes that WCW's reasons for not providing him with additional wrestling opportunities or a contract are pretextual.   Mr. Carr has offered nothing but "conclusory assertions," which are insufficient to defeat summary judgment.   Id.

---

[4] Mr. Carr may attempt to demonstrate pretext by pointing to an alleged statement by Joseph Hamilton that "we're not hiring any blacks."   (Carr Dep. at 54-55, 90-91).   Even assuming, for purposes of summary judgment only, that this alleged comment was in fact made, it is irrelevant to the issue of pretext in this case.   Mr. Hamilton did not decide whether to offer Independent Contractor Agreements to wrestlers.   (Hamilton Aff. ¶ 5).   As Mr. Carr concedes, he does not even know who made the decisions regarding contracts or what factors went into those decisions. (Carr Dep. at 55-56, 90-91, 96).   The Eleventh Circuit "has explained that comments by non-decisionmakers do not raise an inference of discrimination" at the pretext stage.   Mitchell v. USBI Co., 186 F.3d 1352, 1355 (11th Cir. 1999); see Miller v. Bed, Bath & Beyond, Inc., No. CV 01-134-1277-S, 2002 WL 214762, at *14 (N.D. Ala. Jan. 31, 2002) ("comments indicating an improper bias by non-decisionmakers generally do not raise an inference of discrimination or pretext on the part of the employer"). Accordingly, Mr. Hamilton's alleged comments are insufficient to establish pretext.   Mitchell, 186 F.3d at 1355; Fletcher v. ADT Sec. Services, Inc., No. 1:99-CV-0504-CC, 2000 WL 33231616, at *10 (N.D. Ga. Dec. 7, 2000) ("Statements made by a non-decisionmaker . . . are not relevant to the issue of whether a decisionmaker's reasons for firing an employee are pretextual" (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)).

**4.    Mr. Carr Cannot Produce Any Evidence That WCW Paid Him Less Than Similarly Situated Individuals Because Of His Race.**

To establish a prima facie case of discriminatory pay, Mr. Carr must show that he was "paid less than a member of a different race was paid for work requiring substantially the same responsibility." Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981). Here, Mr. Carr cannot establish that he was paid less than anyone who worked in a substantially similar position. Mr. Carr limits his pay claim to the time that he was an employee on WCW's ring crew. (Carr Dep. at 128-130). Mr. Carr asserts that he was paid less than his fellow ring crew employee Mike Wenner. (Id. at 105-106, 129-130). In fact, the undisputed evidence is that Mr. Carr was paid more than Mr. Wenner for performing the same job. (Myers Aff. ¶ 12).[5] Accordingly, Mr. Carr cannot establish a prima facie case of discriminatory pay, and summary judgment should be granted.

The foregoing discussion illustrates that Mr. Carr has utterly failed to meet his burden of producing "significant probative evidence" of intentional race discrimination. Clark, 717 F.2d at 529 n.5. There is simply no evidence that WCW discriminated against Mr. Carr due to his race at any time, or in

_____

[5] Mr. Carr's hearsay statement that Mr. Wenner said he made $51,000 per year does not create a factual dispute. Indeed, Mr. Carr admits that Mr. Wenner could have been wrong about his salary or could have been making it up. (Carr Dep. at 105-106).

any form or fashion, because "[n]ondiscriminatory reasons just as readily explain [any alleged] difference in treatment." Id. at 1186.   This Court therefore should enter summary judgment on all of Mr. Carr's discrimination claims because he has failed to "put on sufficient evidence to allow a factfinder to disbelieve [WCW's] proffered explanation for its actions." Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998).[6]

### 5. *Mr. Carr Cannot Produce Any Evidence Of A Racially Hostile Work Environment.*

To succeed with his hostile environment claim, Mr. Carr must demonstrate that the alleged actions of WCW "altered the condition of the workplace, creating an objectively abusive and hostile atmosphere." Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).   "For example, the racial slurs allegedly

---

[6] Summary judgment should also be entered on any retaliation claim brought by Mr. Carr.   Although he asserts that WCW retaliated against him for filing the instant lawsuit, Mr. Carr cannot demonstrate that WCW took any adverse action against him in retaliation for filing his Complaint or otherwise.   (Carr Dep. at 133, 135-36, 138-39).   A retaliation claim requires proof of three elements:   (i) engaging in statutorily protected conduct; (ii) suffering an adverse employment action; and (iii) a causal connection between the adverse action and the protected conduct. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).   Mr. Carr cannot provide any evidence that he suffered any adverse employment action after filing his lawsuit.   (Carr Dep. at 133, 135-36, 138-39).   Nor can he show any causal relation between any action and the filing of his Complaint.   Accordingly, summary judgment should be granted on Mr. Carr's retaliation claim.

spoken . . . had to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" Id. Factors to consider include the frequency and severity of the alleged discriminatory conduct, whether the conduct was threatening or humiliating, and whether it unreasonably interfered with Mr. Carr's work performance. Id. at 1521-22.

Even assuming *arguendo* the truth of every incident Mr. Carr describes to support his claim, these incidents are insufficient as a matter of law to create a racially hostile work environment. The alleged discriminatory conduct was far from "commonplace;" it was not harsh or severe; and it was not physically threatening. (Carr Dep. at 94-95, 97-100, 103). Nor did the conduct affect Mr. Carr's performance at WCW. In fact, he continued performing his job on the ring crew without impact until WCW completely closed down. (Myers Aff. ¶ 12; Carr Dep. at 107, 114). Simply put, Mr. Carr can offer no evidence of the kind of "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, 510 U.S. at 21; Wallace, 49 F.3d at 1521. Accordingly, summary judgment should be granted on Mr. Carr's hostile environment claim.

D. **Summary Judgment Should Be Granted On Mr. Carr's State Law Intentional Infliction Of Emotional Distress Claim.**

To establish a claim for intentional infliction of emotional distress ("IIED") under Georgia law, a plaintiff must establish four elements: (1) intentional or reckless conduct, and (2) extreme and outrageous conduct by the defendant; (3) severe emotional distress suffered by the plaintiff; and (4) a causal connection between the conduct and the emotional distress. Hendrix v. Phillips, et al., 428 S.E.2d 91, 92-93 (Ga. App. 1993). To be "extreme and outrageous," the alleged conduct must be "so terrifying or insulting as naturally to humiliate, embarrass or frighten" the plaintiff and so severe that "no reasonable man could be expected to endure" these actions. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992). Liability for IIED does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Ward v. Papa's Pizza To Go, Inc., 907 F. Supp. 1535, 1540 (S.D. Ga. 1995). Thus, when a plaintiff alleges that conduct such as race discrimination constitutes IIED, he must provide more than just allegations of discrimination. Rather, the alleged conduct must be severe, such as an on-going pattern of explicit and oppressive harassment that includes or resembles a physical assault, see Coleman v. Hous. Auth. of Americus, 381 S.E.2d 303 (Ga. App. 1989), or racial epithets and race-based decisions in carrying out

a contract combined with extreme and graphic threats of bodily harm, dismemberment and death, see Brown v. Manning, 764 F. Supp. 183, 185 (M.D. Ga. 1991).

Here, Mr. Carr cannot meet this high burden of establishing the required level of outrageous conduct. Rather, Mr. Carr testified that there is nothing other than WCW's alleged discrimination that caused him emotional harm. (Carr Dep. at 132). Because Mr. Carr must establish more than just allegedly discriminatory conduct to proceed with his claim for IIED, summary judgment should be entered on this claim. Beck, 953 F.2d at 1276 (discharge of employee for allegedly discriminatory reasons insufficient to support IIED claim); Ward, 907 F. Supp. at 1542 (repeated refusal to hire an individual under circumstances that could constitute unlawful discrimination insufficient to establish IIED claim); Borden v. Johnson, 395 S.E.2d 628 (Ga. App. 1990) (demotion or discharge for whatever reason, even a discriminatory reason, does not give rise to IIED claim).

**E.    Plaintiff's FLSA Claims Have No Merit.**

### 1.    Mr. Carr Was Not An Employee Of WCW During The Relevant Time Period.

Mr. Carr asserts that WCW failed to pay him the minimum wage and overtime, as required by the FLSA, during the time he was training at the Power Plant and providing wrestling services to

WCW.   (Complaint ¶¶ 54-65; Carr Dep. at 140).[7]   The FLSA, however, provides minimum wage and maximum hour protection only to employees as defined therein.   29 U.S.C. §§ 203(e)(1) and (g), 206(a), and 207(a).   As shown below, Mr. Carr cannot demonstrate that he was an "employee" of WCW during the time for which he brings claims for minimum wage and overtime pay.

To determine whether an FLSA-covered employer/employee relationship exists, courts "look not to the common law definitions of those terms, . . . but rather to the 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994) (emphasis added) (citing Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)).   Where an individual provides services to several different companies, performs his services by the job rather than on a more permanent basis, uses his own material, and exercises control over the manner in which he performs his services, he is in "economic reality" an independent businessman, not an employee covered by the FLSA.   Donovan v. Tehco, Inc., 542 F.2d 141, 143-44 (5th Cir. 1981).

---

[7] Mr. Carr does not claim that he was not paid minimum wage or overtime during his employment on WCW's ring crew.   (Carr Dep. at 140).

Applying the "economic reality" test to Mr. Carr, during the time he was training at the Power Plant and providing services to WCW as a wrestler he was in reality an independent businessman. He "worked for several other [employers] during the period at issue, invariably worked by the job rather than by the hour, supplied his own materials on occasion, and possessed complete independence in" deciding when and whether to come to the Power Plant and train. Id. at 440; (Carr Dep. at 43-44, 48, 50, 61-62, 69-70). He also filed federal income tax returns as a sole proprietorship, listing his income from WCW as "nonemployee compensation." (Id. at Exh. 4). These undisputed facts demonstrate, as a matter of "economic reality," that Mr. Carr was not "economically dependent upon" WCW. Aimable, 20 F.3d at 439. Accordingly, he was not an employee under the FLSA, and WCW is entitled to summary judgment on Mr. Carr's FLSA claims. Id.; Donovan v. Tehco, 542 F.2d at 143-44.

### 2. Mr. Carr Did Not Work Any Overtime During The Relevant Time Period.

Mr. Carr's claim for overtime pay also fails because he did not work more than forty (40) hours in any workweek. The FLSA requires an employer to pay overtime only if an employee is required to work "a workweek longer than forty hours." 29 U.S.C. § 207(a)(1). As Mr. Carr admitted, he never performed more than five or six hours of work per week for which he claims he should

951536_3.DOC                                24

have been paid but was not paid.   (Carr Dep. at 140-43).   Since
Mr. Carr concedes that the work for which he is claiming overtime
never involved work hours in excess of forty hours per week, WCW
is entitled to summary judgment on Mr. Carr's overtime claims.   29
U.S.C. § 207(a)(1).

## IV.   CONCLUSION

For all of the foregoing reasons, Defendants' Motion for
Summary Judgment should be granted.


This 8th day of March, 2002.

                         TROUTMAN SANDERS LLP


                         _____
                         JOHN J. DALTON
                         Georgia Bar No. 203700
                         JAMES A. LAMBERTH
                         Georgia Bar No. 431851
                         EVAN H. PONTZ
                         Georgia Bar No. 583577

                         Suite 5200, Bank of America Plaza
                         600 Peachtree Street, N.E.
                         Atlanta, GA  30308-2216
                         (404) 885-3000

                         Attorneys for Defendants
                         Universal Wrestling Corporation
                         (f/k/a World Championship Wrestling,
                         Inc.) and Turner Sports, Inc.

## CERTIFICATION

Pursuant to Local Rule 7.1(D), I certify that this Memorandum of Law has been prepared with one of the fonts and point selections ("Courier New 12") approved by the Court in Local Rule 5.1(B).

This 8th day of March, 2002.

Evan H. Pontz
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                    )
                                    )
              Plaintiff,            )
v.                                  )        CIVIL ACTION FILE
                                    )        NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,            )
                                    )
              Defendants.           )

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of this
*MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT* upon the interested parties by depositing a copy of same
in the U.S. Mail, properly addressed with adequate postage, to:

            Lee Breedlove
            1st Union Bank Building
            250 E. Ponce DeLeon Avenue
            Suite 425
            Decatur, Georgia   30030

This 8th day of March, 2002.

                        _____
                        Evan H. Pontz
                        TROUTMAN SANDERS LLP
                        Suite 5200, Bank of America Plaza
                        600 Peachtree Street, N.E.
                        Atlanta, GA   30308-2216
                        (404) 885-3000

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                          )
                                          )
                    Plaintiff,            )
                                          )        CIVIL ACTION FILE
v.                                        )
                                          )        NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                  )
                                          )
                    Defendants.           )

## AFFIDAVIT OF DIANA MYERS

DIANA MYERS, who having personally appeared before the undersigned officer duly authorized to administer oaths and having been first duly sworn according to law, deposes and states the following:

1.   My name is Diana Myers.  I am of majority age, and I give this testimony of my own free will.  I have personal knowledge of and am competent to testify to the facts stated herein.  The facts stated herein are true and correct.

2.   I was employed by Universal Wrestling Corporation (f/k/a/ World Championship Wrestling, Inc. and hereinafter referred to as "WCW") beginning in October 1997 and most recently held the title of Vice President of Business and Legal Affairs.  In my position at WCW, I was familiar with virtually all aspects of WCW's business and legal affairs.

3.   WCW created, produced, and marketed professional wrestling programs during the 1990s and through March 2001. WCW's wrestling programs were seen by live audiences and/or aired on various television networks and pay-per-view cable and satellite systems.   WCW's wrestling programs, both live and taped, were created by writers and producers at WCW, with the goal of entertaining wrestling fans and general audiences nationwide.

4.   WCW's wrestling programs included appearances by many types of live or "on-screen" talent, including wrestlers, match referees, and other wrestling talent appearing on camera or at live (but non-televised) events.   These individuals appearing in wrestling programs provided their services to WCW as independent contractors, either through formal Independent Contractor Agreements or without written contracts.

5.   WCW had much commercial and financial success during the mid to late 1990s.   In 1999, WCW's business suffered from a sharp downturn and WCW was losing significant sums of money. Therefore, WCW began downsizing it operations by reducing the number of talent it contracted with, reducing the compensation of existing talent, and producing fewer and fewer wrestling programs.   As part of the downsizing, WCW considered canceling some of its shows.   In early 2000, WCW in fact terminated some

of its programs and also reduced the length of some of its other remaining wrestling programs.

6.   Due to these business circumstances and WCW's downsizing efforts, in 1999 and over the next two years, WCW had less and less need for wrestling services, including on-screen wrestling talent.

7.   The downsizing efforts did not stop WCW's business downturn, and in March 2001, WCW sold its principal assets and completely closed down its operations.   After the sale of assets was completed, WCW changed its name to Universal Wrestling Corporation to close up remaining corporate operations.

8.   From 1995 through approximately 1999, Mr. Carr provided occasional, infrequent services to WCW as an independent contractor wrestler.   Mr. Carr was paid a flat fee each time he provided wrestling services.

9.   In 1998, WCW decided to move the Power Plant from the previous location on Carroll Drive in Smyrna, Georgia to a new location on Log Cabin Drive, also in Smyrna.   This new Power Plant facility was specifically established to work with a smaller group of wrestler trainees rather than the large, undefined group that had been training or working out at the previous Power Plant location.

10.   This smaller group of wrestlers who would be training at the new facility were given the opportunity to sign

Independent Contractor Agreements with WCW.  Previously, these wrestlers had not had agreements with WCW but were non-contract independent contractors paid a flat fee each time they participated in a WCW event.

11.  After evaluating all of the individuals who were then training at the Power Plant, including Mr. Carr, WCW selected approximately twelve trainees who would be allowed to continue training at the new facility and would be offered ICAs.  This selection process was based on the evaluation of these individuals' wrestling skills and persona and their display of the traits necessary to become successful professional wrestlers.  Mr. Carr was not selected to train at the new facility because he was not considered among the best talents of those training at the Power Plant.

12.  In 1999, Mr. Carr became an employee of WCW, working on WCW's ring crew.  As a ring crew employee, Mr. Carr earned $35,000 annually.  Mr. Carr's co-employee on the ring crew, Mike Wenner, who at the time held the same ring crew position as Mr. Carr, earned $34,000 annually in that position.    Mr. Carr remained an employee on the ring crew until WCW ceased its operations in March 2001, when the employees on the ring crew and elsewhere with WCW were discharged.

FURTHER AFFIANT SAYETH NAUGHT.

This 26th day of February, 2002.

_____
DIANA MYERS

Sworn to and subscribed
before me this 28th day
of February, 2002.

_____
Notary Public

My Commission Expires:
Notary Public, Henry County, Georgia
My Commission Expires Jan. 11, 2006.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| TONY BYRON CARR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE |
| v. | ) |
| | ) NO. 1:00-CV-1721-CC |
| WORLD CHAMPIONSHIP WRESTLING, INC., | ) |
| and TURNER SPORTS, INC., | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF JOSEPH HAMILTON

BEFORE ME, the undersigned Notary Public, appeared JOSEPH HAMILTON, who deposes and says as follows:

1.  My name is Joseph Hamilton.  I am of majority age, and I give this testimony of my own free will.  I have personal knowledge of and am competent to testify to the facts stated herein.  The facts stated herein are true and correct.

2.  I was employed by World Championship Wrestling, Inc. ("WCW") through the 1990s and until March 2001, most recently as Director of Transportation of Ring Equipment for Television. Prior to that position, I was in charge of training programs at WCW's Power Plant wrestling training facility located at Carroll Drive in Smyrna, Georgia.

3.   As part of my duties in charge of the wrestling training programs at the Power Plant at Carroll Drive, I worked with WCW's wrestlers and trainees.   From 1995 through approximately 1999, Tony Carr provided occasional, infrequent services to WCW as an independent contractor wrestler without a written agreement.

4.   In 1998, WCW decided to move its Power Plant wrestling training facility from the location on Carroll Drive to a new location on Log Cabin Drive, also in Smyrna.  At this new Power Plant location, WCW worked with only a smaller group of wrestler trainees than the large number that had been training or working out at the previous location.

5.   It is my understanding that this smaller group of wrestlers who would be training at the new facility were selected to sign Independent Contractor Agreements ("ICAs") with WCW.   I had no involvement in the decisions whether to offer ICAs to wrestlers.

6.   After the Power Plant moved to the Log Cabin Drive location, I assumed the position of Director of Transportation of Ring Equipment for Television.   In this position, I was responsible for directing WCW's ring crew.   The ring crew consisted of a number of individuals who, working in teams of

two, were responsible for the wrestling rings used for the matches. The ring crew transported the ring to each match location; set up the ring; maintained and cleaned it before, during and after the wrestling matches; and then broke down the ring and hauled it to the next designated match location.

7. Sometime after the move to the new location, Mr. Carr was offered a position as an employee on the ring crew. The ring crew jobs provided steady work, and offered better compensation than wrestling on an independent contractor basis. Mr. Carr accepted the position as a ring crew employee.

FURTHER AFFIANT SAYETH NAUGHT.

This 27th day of February, 2002.

_Joseph Hamilton_
JOSEPH HAMILTON

Sworn to and subscribed
before me this 27th day
of February, 2002.

_Carol D. Fernandez_
Notary Public

My Commission Expires:

Notary Public, Cobb County, Georgia
My Commission Expires March 22, 2004

955559-1                                    3

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TONY BYRON CARR,                         )
                                         )
              Plaintiff,                 )
                                         )    CIVIL ACTION FILE
v.                                       )
                                         )    NO. 1:00-CV-1721-CC
WORLD CHAMPIONSHIP WRESTLING, INC.,)
and TURNER SPORTS, INC.,                 )
                                         )
              Defendants.                )

## AFFIDAVIT OF JAMES A. MORRISON

BEFORE ME, the undersigned Notary Public, appeared JAMES A.
MORRISON, who deposes and says as follows:

1.    My name is James A. Morrison, professionally known as
J.J. Dillon.  I am of majority age, and I give this testimony of
my own free will.  I have personal knowledge of and am competent
to testify to the facts stated herein.  The facts stated herein
are true and correct.

2.    I was employed by World Championship Wrestling, Inc.
("WCW") from approximately November 1996 until March 2001.
Prior to becoming an employee of WCW, I provided services to WCW
as an independent consultant.

3.    As part of my duties as a WCW employee, I worked with
WCW's wrestlers and trainees.  During my employment with WCW,
Tony Carr provided occasional, infrequent services to WCW as an
independent contractor wrestler without a written agreement.

4.    Based on my experience in the wrestling industry and at WCW, the creators, producers, and marketers of professional wrestling programming such as WCW's use their better performers with greater frequency in their wrestling programs.    The reason Tony Carr did not receive more opportunities to wrestle for WCW on an independent contractor basis was that he was not one of WCW's better performers.    Mr. Carr lacked unique wrestling skills, physique, demeanor, and other characteristics consistent with WCW's better performers.    Mr. Carr's wrestling character, style and persona were not particularly interesting, unique, or entertaining.

5.    In 1998, WCW decided to move its Power Plant wrestling training facility from its original location on Carroll Drive to a new location on Log Cabin Drive.    As part of my duties as a WCW employee, I oversaw the changes in office structure and setup that occurred when the Power Plant moved to the new location.

6.    At the new Power Plant location, WCW elected to work with a smaller group of wrestler trainees rather than the large number that had been training or working out at the previous location.    This smaller group of wrestlers who would be training at the new facility were selected to sign Independent Contractor Agreements with WCW.

959496-1                        2

7.   As part of my duties as a WCW employee, I evaluated the wrestler trainees who wanted to continue training at the new location.   This evaluation was based on these individuals' wrestling skills, physique, and demeanor and their drive, ambition, and raw potential to become successful professional wrestlers.

8.   Mr. Carr was not among the roughly 12 individuals selected to train at the new facility because in my opinion he lacked unique wrestling skills, physique, demeanor, and the raw potential to become a successful professional wrestler worthy of being given compensation to train or having his professional services contracted to WCW.   The decision not to select Mr. Carr was not based in any way on his race.


FURTHER AFFIANT SAYETH NAUGHT.

This ___ day of March, 2002

                                    JAMES A. MORRISON

Sworn to and subscribed
before me this _07_ day
of March, 2002.

_____
Notary Public

My Commission Expires:

_____

959496-1                              3



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 25 1994

LUTHER D. Thomas
By:
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )      CIVIL ACTION
                                    )      FILE NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP                  )
WRESTLING, INC.                     )
                                    )
            Defendant.              )

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## WORLD CHAMPIONSHIP WRESTLING, INC.'S
## MOTION FOR SUMMARY JUDGMENT

COMES NOW World Championship Wrestling, Inc. ("WCW"),
Defendant in the above-styled action, and pursuant to Rule 56(c)
of the Federal Rules of Civil Procedure and Rule 220-5 of the
Local Rules to the United States District Court, Northern
District Court of Georgia, timely files this Memorandum of Law in
support of its Motion for Summary Judgment.

### I.   INTRODUCTION

On June 1, 1993, Plaintiff Robert L. Ross, Jr. ("Plaintiff")
filed the instant lawsuit against WCW.  In his Complaint,
Plaintiff alleged that WCW: (1) paid him less than similarly
situated white wrestlers, (2) failed to promote him to
heavyweight champion, (3) denied him promotion and/or endorsement
opportunities with other companies, and (4) "terminated" him on
the basis of his race (black), in violation of Title VII of the
Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000(e).  WCW
timely filed an Answer to Plaintiff's Complaint, denying its

WCW 102106

material allegations and asserting several affirmative defenses. The discovery period as established by this Court's local rules has ended, and pursuant to this Court's Order, dated December 31, 1993, WCW now moves for summary judgment on Plaintiff's claims on the following grounds:

1. The undisputed facts establish that Plaintiff was never an employee of WCW, but was an independent contractor as a matter of law, and therefore, this Court lacks subject matter jurisdiction over Plaintiff's claim;

2. The undisputed facts establish that Plaintiff cannot present a _prima facie_ case of race discrimination as a matter of law; and

3. The undisputed facts establish that at all times WCW acted with respect to Plaintiff on the basis of legitimate, non-discriminatory reasons unrelated to Plaintiff's race.

Because the undisputed facts show that Plaintiff cannot  meet the burden of proving his claims at trial, WCW's Motion for Summary Judgment should be granted and Plaintiff's Complaint should be dismissed.

## II.   STATEMENT OF FACTS

### A.   Plaintiff's Background

Plaintiff graduated from North Cobb High School in 1977, and immediately entered the Army. (Deposition of Plaintiff Robert L. Ross, Jr. (hereinafter "Ross Dep."), pp. 9-10)). While in the Army, Plaintiff rose to the rank of Platoon Sergeant in the Army Rangers, and was honorably discharged in 1986. (Ross Dep., p. 10)  Prior to his discharge, Plaintiff determined that he wanted to pursue a career as a professional wrestler.[1]

---

[1]     Plaintiff had previously wrestled in high school and in the Army. (Ross. Dep., p. 21)

In pursuit of this goal, Plaintiff took an extended vacation
from the Army in October 1985 and attended well-known wrestler
Thunderbolt Patterson's wrestling school in Atlanta, Georgia.
(Ross Dep., pp. 20-24)  Thunderbolt Patterson trained Plaintiff
approximately two to three (2-3) hours per night, three to four
(3-4) times per week for a period of three months.  (Ross Dep.,
p. 20)  For his training, Plaintiff paid Thunderbolt Patterson
the sum of twelve hundred dollars ($1200) from his savings.

Upon his discharge from the Army, Plaintiff adopted the ring
name "Ranger Ross," and the "gimmick" of portraying himself as a
war hero.  (Ross Dep., p. 19)  Plaintiff purchased a costume and
equipment with his own money, and began wrestling for Deep South
Championship Wrestling ("DSCW").  (Ross Dep., pp. 12-16)
Plaintiff testified that his relationship with DSCW was typical
of the relationship between wrestlers and wrestling companies
throughout the industry.  Plaintiff wrestled three or four times
weekly, under the terms of an oral independent contractor
agreement, and was subject to minimal supervision.  (Ross Dep.,
pp. 13-16)

Plaintiff's boss at DSCW, Jody Hamilton, would contact
Plaintiff, provide him with the schedule of events and their
locations, instruct Plaintiff as to the outcome of his matches,
and pay him the agreed upon amount.  (Ross Dep., pp. 13-16)
Although the wrestlers were told where, when and whom to wrestle,
as well as who was to win the match, the details of each match
were left to Plaintiff and his opponent.  During the entire year

3

WCW 102108

and a half that Plaintiff wrestled for DSCW, DSCW did not
withhold social security tax or payroll tax from Plaintiff's pay,
and DSCW did not provide Plaintiff with any vacation, pension,
insurance or medical benefits.  (Ross Dep., pp. 14-16)

While wrestling for DSCW, Plaintiff also held a full-time
position (40 hours per week) as a press operator at a local
textile company, Coates & Clarke, at a salary of $250.00 per
week.  (Ross Dep., p. 16)  Plaintiff testified that nothing in
his agreement with DSCW precluded him from holding other jobs
with other employers.  (Ross Dep., p. 16)

By January 1988, it was apparent to Plaintiff that DSCW was
not drawing large enough crowds and was in financial trouble.  So
Plaintiff went to work for Southern Championship Wrestling
("SCW") under an oral agreement almost identical to his deal with
DSCW.[2]  (Ross Dep., p. 18)  Plaintiff wrestled for SCW
approximately three days per week, was paid by the match, and
also was paid a percentage of the gate.  (Ross Dep., pp. 18-19)
Plaintiff's pay averaged between two hundred to three hundred
dollars ($200-$300) per week.  Plaintiff continued to wrestle
under the name "Ranger Ross."  Like DSCW, SCW did not reimburse
Plaintiff for the cost of his costumes or equipment, did not
withhold social security or payroll taxes, and did not provide
Plaintiff with any vacation, pension, insurance, or medical
benefits.  Plaintiff wrestled for SCW for approximately one year,

---

[2]      DSCW went bankrupt shortly after Plaintiff left in
1988.  (Ross Dep., p. 17)

4

WCW 102109

and continued to hold other full time jobs the entire time.
(Ross Dep., pp. 24, 35)

Around 1987, or 1988, Plaintiff approached The National
Wrestling Alliance's ("NWA") owner, David Crockett, about
wrestling for NWA.  While Crockett declined Plaintiff's request,
Crockett introduced Plaintiff to Nelson Royal, who wrestled for
the NWA and owned a wrestling school in Mooresville, North
Carolina.  (Ross Dep., p. 25)  At the suggestion of Crockett,
Plaintiff went to Royal's wrestling school to be evaluated by
Nelson Royal.  Royal later informed Crockett that Plaintiff was
qualified to wrestle for the NWA.  (Ross Dep., pp. 26-28)

**B.  Plaintiff's First Stint With WCW**

In January 1989, Plaintiff left SCW and began wrestling for
WCW, which had bought out the NWA in 1988.  (Ross Dep., p. 29)
WCW, like other wrestling companies, stages, promotes and
televises professional wrestling matches.  Plaintiff wrestled for
WCW as "Ranger Ross," and retained his original gimmick.  (Ross
Dep., pp. 19, 32-33)  He wrestled approximately fifteen to twenty
days per month under the terms of an oral independent contractor
agreement and was paid $1000.00 per week.  (Ross Dep., pp. 37,
39, 42)  Sometimes Plaintiff received a percentage of the gate
from the wrestling events in which he participated.  (Ross Dep.,
p. 45)  Plaintiff wrestled for a total of seventeen months before
he was released by WCW in May of 1990.  Plaintiff was released
due to budgetary constraints.  (Ross Dep., p. 46)

5

C. **May 1990 and Subsequent Events.**

After leaving WCW, in May of 1990, Plaintiff went to Japan
and wrestled for one month. (Ross Dep., pp. 58-60) In July
1990, upon his return from Japan, Plaintiff began wrestling for
North Atlantic Championship Wrestling ("NACW"). (Ross Dep., p.
61) Plaintiff wrestled for NACW under the terms of an oral
independent contractor agreement, three or four nights per week,
and was paid $100 per night. (Ross Dep., pp. 50, 61-62) As is
standard practice with wrestling companies, NACW did not withhold
social security tax, federal or state payroll tax from these
payments, and provided Plaintiff with no pension, medical,
insurance or vacation benefits. (Ross Dep., p. 62) Further,
Plaintiff, who was still wrestling as "Ranger Ross," paid for all
of his costumes and equipment. (Ross Dep., p. 46)

D. **Plaintiff's Second Stint With WCW.**

In January of 1991, WCW President Jim Herd telephoned
Plaintiff and asked him if he wanted to wrestle for WCW again.
Plaintiff accepted immediately and met with Jim Herd to negotiate
a contract. (Ross Dep., pp. 65, 72) Herd and Plaintiff agreed
on a six month contract under which Plaintiff would earn $1500.00
per week for his services. (Ross Dep., pp. 68, 72) Plaintiff
testified that he agreed to these terms and signed a "WCW
Freelance Wrestler/Independent Contractor Agreement" (the
"Agreement") on January 9, 1991. (Ross Dep., pp. 70-71;
Defendant's Exhibit 2 (attached hereto as Exhibit "A"))

6

WCW 102111

The Agreement itself is in plain language and is simple to read. As Plaintiff testified, he read the Agreement prior to signing it and understood it in its entirety. (Ross Dep., pp. 71-72) Paragraph 2 of the Agreement states:

> I understand and agree that I perform such services as an independent contractor and not as an employee of WCW. I agree that I shall be fully responsible for taxation on the amounts paid to me by WCW as compensation for my services and that WCW shall bear no responsibilities for such taxation. I agree that I am not entitled to the benefits provided by WCW to its employees. I understand that WCW makes no commitment to use my services and makes no guarantee of any number of events or amount of compensation.

(See Exhibit "A" hereto) As this language makes clear, Plaintiff was not an employee of WCW, but was an independent contractor. In fact, Plaintiff testified that he understood that he was not an employee of WCW. (Ross Dep., pp. 72-73)

During his service with WCW from January, 1991 through July, 1991, WCW communicated with Plaintiff primarily through booking sheets which contained pertinent scheduling information. (Ross Dep., pp. 79-80) The booking sheets sent to Plaintiff specified which wrestlers would wrestle whom, and the location and dates of the matches. The booking sheets announced matches anywhere from two weeks to thirty days in advance. (Ross Dep., pp. 79-81) Plaintiff and the other WCW wrestlers were responsible for buying plane tickets and getting to the matches. Once at the venue, the wrestlers would go to the dressing room, get dressed in their costumes, and wait for further instructions. (Ross Dep., pp. 81-82)

7

Then, a representative of WCW, usually the road agent, or sometimes the referee, would make sure that all wrestlers scheduled to wrestle were present, specify which wrestler was supposed to win or lose the various matches, and tell the wrestlers how to finish the match. (Ross Dep., p. 82)  The wrestlers themselves were free to choreograph the remainder of the match up to the finish.  Plaintiff testified that beyond specifying who was to win or lose, and ensuring that the wrestlers were ready to wrestle, WCW did not supervise him further.  (Ross Dep., pp. 83-84)

During the January 1991-July 1991 time period, Plaintiff's primary contact at WCW was Dusty Rhodes.  Mr. Rhodes was responsible for: (a) arranging or booking WCW's professional wrestling matches at various venues throughout the country, (b) determining which wrestlers would wrestle at the events (including which wrestlers would wrestle against each other), (c) determining the final outcome of the wrestling matches, (d) evaluating and recruiting talent, and (e) deciding which wrestler(s) would progress or be "pushed" to the rank of heavyweight champion.  (Affidavit of Virgil Runnels, a/k/a Dusty Rhodes (hereinafter "Rhodes Aff."), ¶ 3)

During the January 1991 through July 1991 time period, it became apparent to WCW that Plaintiff lacked the talent, skills and, most importantly, the audience appeal necessary to be considered to be WCW's heavyweight champion.  (Rhodes Aff., ¶ 6)  Professional wrestlers must be capable of whipping the crowd into

8

a frenzy. Crowds who are vocal and involved in a match enjoy themselves and return to other wrestling events, which ensures the continued financial viability of companies like WCW. (Rhodes Aff., ¶ 6) According to Dusty Rhodes, Plaintiff was unable to generate sufficient excitement and interest among the crowd. (Rhodes Aff., ¶ 6) His performances simply were not sufficiently entertaining. (Rhodes Aff., ¶ 6)

While Plaintiff's gimmick of portraying himself as war hero "Ranger Ross" generated some interest among the crowd (particularly during 1991's Operation Desert Storm), Plaintiff failed to sustain and build upon that interest. (Rhodes Aff., ¶ 6) In short, Plaintiff was one of the hundreds of professional wrestlers who could not sell tickets and could not draw crowds.[3] (Rhodes Aff., ¶ 6) He simply did not stand out. Accordingly, Plaintiff was not qualified to be named WCW's heavyweight champion. (Rhodes Aff., ¶ 6) Conversely, Rick Flair (white), Ron Simmons (black), and Lex Lugar (white), all of whom were heavyweight champions for WCW, each had an appealing gimmick and the charisma and audience appeal to generate massive and unmistakable reactions from the audience. (Rhodes Aff., ¶ 6)

Plaintiff testified that Rhodes approached him in early 1991 and enlisted Plaintiff's help in pushing Ron Simmons, a black wrestler, to the position of WCW's heavyweight champion. (Ross Dep., pp. 77-79, 93) Specifically, Plaintiff testified that

---

[3]     WCW used the services of approximately 334 male wrestlers in 1991. (Holman Aff., ¶ 5)

9

WCW 102114

Rhodes hoped to make Simmons the heavyweight champion, and
further that Rhodes enlisted Plaintiff's assistance by asking
Plaintiff to serve as Simmons' "trainer." (Ross Dep., pp. 77-79)
The idea was to highlight Plaintiff's military background and to
portray Plaintiff as putting Simmons through military style
training in preparation for an "assault" on the heavyweight
title. (Ross Dep., pp. 77-79) It is undisputed that Rhodes
initiated Simmons' push to heavyweight champion, and asked for
Plaintiff's help in that process, before the expiration of
Plaintiff's Agreement in July of 1991. (Ross Dep., pp. 77-79)
Further, it is undisputed that Ron Simmons, a black male,
thereafter became WCW's heavyweight champion. (Ross Dep., pp.
122-123)

In mid-1991, due to the declining popularity of professional
wrestling, WCW was forced to cut its budget. (Herd Aff., ¶ 6)
As part of the measures taken to cut the budget, WCW did not
renew the independent contractor agreements of several wrestlers,
including Plaintiff's. (Herd Aff., ¶ 6) It is, however,
undisputed that Plaintiff was not terminated or fired by WCW.
Rather, his Agreement simply was not renewed. (Ross Dep., p. 73)

Plaintiff was one of fourteen professional wrestlers whose
agreements were not renewed by WCW during the summer of 1991.
(Rhodes Aff., ¶ 8; Affidavit of WCW's James Herd (hereinafter
"Herd Aff.") ¶ 6) Significantly, Plaintiff was the only black
among the fourteen wrestlers released by WCW in the summer of
1991. (Rhodes Aff., ¶ 8) Moreover, Plaintiff earned more than

10

WCW 102115

ten of the fourteen wrestlers that were released with him in the
summer of 1991.  Pertinent data on the fourteen (14) wrestlers
released by WCW in the Summer of 1991 (i.e. their names, their
1991 earnings, the length of time they were active, and their
race) is as follows:

| NAME | 1991 EARNINGS/TIME ACTIVE | | RACE |
|------|------|------|------|
| Ranger Ross | $36,250.00 | (6 MOS.) | Black |
| Rip Morgan | $29,622.00 | (7.5 MOS.) | White |
| Randy Colley | $29,925.00 | (6.0 MOS.) | White |
| Robert Gibson | $00.00 | (inactive) | White |
| George Gray | * $74,000.00 | (8.5 MOS.) | White[4] |
| Billy Jack Haynes | $16,500.00 | (4.0 MOS.) | White |
| Oliver Humperdink | $00.00 | (inactive) | White |
| Black Bart | $26,350.00 | (7.5 MOS.) | White |
| Dutch Mantel | * $58,240.00 | (9.5 MOS.) | White |
| Dick Murdoch | $16,750.00 | (4.5 MOS.) | White |
| Jack Victory | $32,200.00 | (6.0 MOS.) | White |
| Dick Slater | $16,750.00 | (4.0 MOS.) | White |
| Sam Houston | $19,150.00 | (5.0 MOS.) | White |
| Danny Spivey | * $57,000.00 | (5.5 MOS.) | White |

(Rhodes Aff., ¶ 8; Holman Aff., ¶ 9)

Upon expiration of Plaintiff's Agreement, Plaintiff was
informed that his Agreement would not be renewed.  (Ross Dep.,
pp. 92-93)  After Plaintiff's release, however, WCW contacted him
once to ask him to wrestle at a special event.  (Ross Dep.,
p. 111)  Plaintiff agreed to do so and in fact wrestled at a WCW
event in August 1991.  (Ross Dep., p. 111)  WCW paid Plaintiff a
**flat fee for that one match.  (Ross Dep., p. 111)  Plaintiff**
later filed a charge of discrimination with the Equal Employment
Opportunity Commission ("EEOC").  After receipt from the EEOC of

---

[4]    The three wrestlers who earned more than Plaintiff's
$1500.00 weekly salary are marked with an asterisk (*).

11

WCW 102116

his Right-to-Sue Notice, Plaintiff filed the instant action on
June 1, 1989.

**E.    Events Since Plaintiff's Lawsuit was filed.**

Plaintiff's discovery efforts in this case highlight the
fact that (a) Plaintiff cannot prove the requisite elements of
his claims and (b) that Plaintiff intends to distort the facts in
an attempt to confuse and mislead the Court.  Of the thousands of
documents that WCW made available for Plaintiff's inspection,
Plaintiff chose to copy only a handful of documents.  Instead of
copying all of the documents relating to payments made by WCW to
hundreds of WCW wrestlers, Plaintiff copied only the largest
paycheck stubs of a handful of top white[5] WCW wrestlers from
selected pay periods.  Undoubtedly, Plaintiff will attempt to
distort this limited information and make incorrect
extrapolations about how much certain WCW wrestlers were paid.
Because Plaintiff did not look at all of the documents and
because Plaintiff did not analyze all of the pertinent data,
Plaintiff has no idea of how much other WCW wrestlers were paid,

---

[5]    Plaintiff ignored the files of Ron Simmons and Teddy
Long, black wrestlers who rank among the highest paid at WCW.

12

WCW 102117

and Plaintiff admitted as much during his deposition.[6]   (Ross Dep., pp. 117-118)

Plaintiff took no depositions during discovery in the case. Moreover, throughout his deposition Plaintiff conceded that on every point crucial to his case, his claims rest on nothing but his opinions and conjectures.  Plaintiff admitted that he does not know (a) who at WCW made the decisions about which he complains, or (b) what factors the individuals who did make the decisions relied upon.  (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139)  In such circumstances, WCW is entitled to summary judgment because Plaintiff can produce no evidence whatsoever to support his claims beyond baseless accusations that fly in the face of the voluminous, unrebutted facts.

## III.  ARGUMENT AND CITATION OF AUTHORITY

In his Complaint, Plaintiff alleges that WCW: (1) paid him less than similarly situated white wrestlers, (2) failed to promote him to heavyweight champion, (3) denied him promotion and/or endorsement opportunities, and (4) "terminated" him on the basis of his race in violation of Title VII of the Civil Rights

---

[6]   Amazingly, during his deposition Plaintiff requested the 1099s that show each independent contractors annual earnings, but as of the date of this filing, Plaintiff has not come to Defendant's counsel's office to inspect them.  The 1099s, and other records produced, conclusively establish that there were approximately two hundred and seventy-eight (278) WCW wrestlers, the vast majority of whom were white, who in 1991 were paid less than Plaintiff.  (Holman Aff., ¶ 5-6)

WCW 102118

Act of 1964 ("Title VII"), 42 U.S.C. §2000(e).  Plaintiff's
claims are meritless for several reasons.

     First, Plaintiff readily admitted during his deposition that
he was never an employee of WCW.  Rather, at all times relevant
to this action, Plaintiff was an independent contractor, who
wrestled under the terms and conditions of a written agreement
that clearly and unambiguously provided that he was an
independent contractor.  As an independent contractor, Plaintiff
is not entitled to the protections of Title VII of the Civil
Rights Act of 1964.  Accordingly, this Court lacks subject matter
jurisdiction over Plaintiff's claims, and Plaintiff's Complaint
should be dismissed.

     Second, Plaintiff cannot establish a _prima_ _facie_ case of
discrimination.  Plaintiff cannot show: (1) that he was the
victim of any adverse employment action whatsoever, (2) that he
was qualified to be "pushed" to the rank of heavyweight champion,
or, alternatively, that he was even satisfying the legitimate
expectations of WCW, or (3) that he was replaced, much less by
someone outside the protected classification.

     Third, assuming _arguendo_ that Plaintiff can establish a
_prima_ _facie_ case of discrimination, WCW has articulated
nondiscriminatory, legitimate business reasons for each action
about which Plaintiff complains.  Plaintiff has produced no
evidence whatsoever to meet his burden of rebutting WCW's non-
discriminatory, legitimate business reasons for its actions.  For

14

WCW 102119

these reasons, Plaintiff's claims all fail and are subject to
summary judgment.

A.    **Standard of Review.**

Under Rule 56(c) of the Federal Rules of Civil Procedure,
"[s]ummary judgment is appropriate where there is no genuine
issue of material fact."  Earley v. Champion International
Corporation, 907 F.2d 1077, 1080 (11th Cir. 1990); Fed. R. Civ.
P. 56(c).  As held by the U.S. Supreme Court: "Summary judgment
procedure is properly regarded not as a disfavored procedural
shortcut, but rather as an integral part of the federal rules as
a whole, which are designed 'to secure the just, speedy and
inexpensive determination of every action.'"   Celotex Corp. v.
Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555 (1986).
Consequently:

> Rule 56 must be construed with due regard not
> only for the rights of persons of asserting
> claims and defenses . . . but also for the
> rights of persons opposing such claims and
> defenses to demonstrate in the manner
> provided by the rule, prior to trial, that
> the claims and defenses have no factual
> basis.

Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2555; Barnes v.
Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir.
1987).  Also, "a court must bear in mind the actual quantum and
quality of proof necessary to support liability" in a given case.
Barnes, 814 F.2d at 609 (quoting Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S.Ct. 2505, 2513 (1986)). "The mere existence
of a scintilla of evidence in support of the Plaintiff's position

15

WCW 102120

will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the Plaintiff . . . If the evidence is merely colorable or is not significantly prohibitive summary judgment may be granted." Earley, 907 F.2d at 1080 (quoting Anderson, 477 U.S. at 249-250, 106 S. Ct. at 2511) (emphasis in Earley). While, under Rule 56, a court considering a motion for summary judgment must consider all the evidence in the light most favorable for the non-moving party," Rollins v. Techsouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987); "[a] trial court is not required to resolve all doubts in such a manner." Earley, 907 F.2d at 1080 (quoting Barnes, 814 F.2d at 609) (emphasis in original).

In an employment discrimination case, summary judgment is appropriate where "the Plaintiff fails to raise any issue of fact indicative of . . . discriminatory conduct by the Defendant." Beard v. Annis, 730 F.2d 741, 743-744 (11th Cir. 1984). Where there is a "complete failure of proof concerning an essential element of the non-moving parties case . . . summary judgment is appropriate." Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2552-53.

**B.** **Plaintiff Was An Independent Contractor And As Such Does Not Fall Within The Ambit Of Title VII's Protections.**

Section 703(a) of Title VII prohibits discrimination against "any individual" with respect to "compensation, terms, conditions, or privileges of employment." This Court has held that Title VII does not apply to independent contractor relationships, as the requisite employment setting is lacking.

16

See <u>Mathis v. Standard Brands Chemical Industries, Inc.</u>, 10 FEP

295 (N.D.Ga. 1975)(Title VII does not extend to cover attempts to

enter into independent contract relationships).  In the instant

case, Plaintiff admits that he was never an employee of WCW.

(Ross Dep., pp. 72-73)  Thus, the requisite employment setting is

wholly absent.  Moreover, the plain language of Plaintiff's

Agreement states that Plaintiff is an independent contractor, not

an employee.  (<u>See</u> Exhibit "A" hereto)  In such circumstances,

Plaintiff plainly does not fall within the ambit of Title VII's

protection.

In this circuit, "general common law concepts" are used to

determine whether an individual is an independent contractor or

employee.  <u>Cobb v. Sun Papers, Inc.</u>, 673 F.2d 337 (1982).  In

fact, in the <u>Cobb</u> case the Eleventh Circuit Court of Appeals

adopted an eleven-part test which found its origins in general

principles of the law of agency.  <u>Cobb</u>, 637 F.2d at 340-341.  The

eleven factors enunciated in <u>Cobb</u> are as follows: (1) the

intention of the parties, (2) whether the worker accumulates

retirement benefits, (3) whether the "employer" pays social

security taxes, (4) whether annual leave is afforded, (5) the

length of time during which the individual has worked, (6) the

kind of occupation, with reference to whether the work usually is

done under the direction of a supervisor or is done by a

specialist without supervision, (7) the skill required in the

particular occupation, (8) the manner in which the work

relationship is terminated; i.e., by one or both parties, with or

17

WCW 102122

without notice and explanation, (9) whether the "employer" or the
individual in question furnishes the equipment used and the place
of work, (10) whether the work is an integral part of the
business of the "employer", and (11) the method of payment, by
time or by the job.  Id. at 340.  While Cobb advocates an
analysis using the above listed factors, the Court cautioned that
"no one factor is determinative."[7]  Id. at 340 (citing, Spirides
v. Reinhardt, 613 F.2d 826 (D.C. Cir. 1979)).

        In the instant case, no fewer than ten of the eleven factors
point to the inescapable conclusion that Plaintiff was an
independent contractor, not an employee of WCW.  Paragraph 2 of
Plaintiff's Agreement itself addresses the first four elements of
the test.  That language provides:

> **I understand and agree that I perform such services as
> an independent contractor and not as an employee of
> WCW.**  I agree that I shall be fully responsible for
> taxation on the amounts paid to me by WCW as
> compensation for my services and that WCW shall bear no
> responsibilities for such taxation.  I agree that I am
> not entitled to the benefits provided by WCW to its
> employees.  I understand that WCW makes no commitment
> to use my services and makes no guarantee of any number
> of events or amount of compensation.

(Exhibit "A" hereto)(emphasis added)  Plaintiff bargained for,
read, and signed the Agreement fully knowing and understanding
that it contained the above-quoted language.  (Ross Dep., pp. 72-
75)  More importantly, Plaintiff testified that he understood the

---

        [7]    Indeed, review of Cobb reveals that the Court ignored
several of the above-listed factors, and affirmed the district
court's determination that the appellant was an independent
contractor because most of the evidence supported the lower
court's reasoning.

18

WCW 102123

entire agreement.  (Ross Dep., pp. 72-78)  In fact, Plaintiff testified that he was well aware that he was not an employee of WCW. (Ross Dep., pp. 72-73)  Thus, the intention of the parties was clear and unmistakable:  Plaintiff was to be an independent contractor and not an employee.

The second factor, whether the individual accumulates retirement benefits, is also addressed in Paragraph 2, which states, "I agree that I am not entitled to the benefits provided by WCW to its employees."  (Exhibit "A" hereto)  Plaintiff accumulated no benefits whatsoever beyond the $1500 weekly compensation required under the Agreement.  (Ross Dep., pp. 73-75)  Plaintiff was provided no retirement, medical, or insurance benefits.  (Ross Dep., pp. 73-75)  Moreover, Plaintiff admitted that WCW paid no social security or payroll taxes on his behalf. (Ross Dep., p. 73)

The next factor, whether annual leave is provided, also leads to the conclusion that Plaintiff was not an employee. Again, Paragraph 2 states that Plaintiff would receive no benefits usually accorded WCW employees, and Plaintiff testified that WCW provided him with no annual leave.  (Ross Dep., p. 74; see also, Exhibit "A" hereto)  The next element of the test pertains to the length of time during which the individual worked.  Plaintiff's set six month tenure is inconsistent with an employment relationship.  An employment relationship is not usually of a set duration, but is continuous.

19

WCW 102124

Next, Plaintiff's testimony establishes that the level of supervision that he and other WCW wrestlers were subjected to was negligible at best.  Plaintiff was instructed where to wrestle, whom to wrestle against, and the finish of the match.  (Ross Dep., pp. 81, 83)  The match itself, up to the finish, was choreographed by the wrestlers themselves.  (Ross Dep., pp. 76, 83-84)  Such a minimal level of supervisory involvement is not consistent with an employment relationship.  Instead, as in the typical independent contractor arrangement, WCW specified little else but what the finished product should look like, and left the details up to the wrestlers.  Further, Plaintiff admitted that WCW did nothing to change his gimmick.[*]  Plaintiff chose his own costume, and performed his own techniques while in the ring, without direct supervision.

The next element requires analysis of the level of skill involved in the endeavor.  Professional wrestlers are specialists.  The wrestling techniques and moves Plaintiff employed were developed through years of training.  Plaintiff wrestled throughout high school, continued to wrestle competitively while in the army, and planned to wrestle in the 1980 Olympics, but the U.S. boycott prevented his participation.  (Ross Dep., pp. 21, 23-24)  Moreover, Plaintiff attended two professional wrestling schools to receive the necessary training.  (Ross Dep., pp. 21, 23-24)  In fact, David Crockett of the NWA,

---

[*]     WCW only required a costume change if there was a conflict between two costumes, such as two wrestlers with the same color shorts.  (Ross Dep., pp. 84-85)

20

WCW's predecessor, would not hire Plaintiff until he attended Nelson Royal's wrestling school in Mooresville, North Carolina, where his skills could be evaluated.  There can be no question, then, that Plaintiff, was a highly trained specialist, which supports the conclusion that Plaintiff was an independent contractor.

The next factor, the manner in which the work relationship terminated, also weighs heavily in favor of the conclusion that the Plaintiff was an independent contractor.  Although Plaintiff alleged that he was "terminated," Plaintiff readily admitted during his deposition that he was not terminated.  (Ross Dep., pp. 92-93)  Instead, the parties' relationship in this case just expired when Plaintiff's Agreement expired.  Such an arrangement is wholly inconsistent with a finding that Plaintiff was an employee.  Additionally, Plaintiff knew when he signed the Agreement that his Agreement expired in six months.  Thus, Plaintiff had notice at the very start of his contract that he would be subject to a release in July 1991.  Such notice is consistent with an independent contractor arrangement, not an employment relationship.

Although WCW provided "the place of work," this factor still supports the conclusion that Plaintiff was not an employee.  WCW only provided the place of work to the extent that it booked the particular arena where the matches took place.  The nature of the business itself dictated that WCW, of necessity, provided the place of work.  Also, Plaintiff testified that during his entire

21

professional wrestling career (including his time with WCW), he provided his own costume and equipment.[9] (Ross Dep., pp. 18, 85) Without exception, Plaintiff paid for his costumes from his own money, and was not reimbursed. (Ross Dep., p. 85)

Next, the work in question was not an integral part of the business of the employer. While WCW staged, promoted, and televised professional wrestling matches, Plaintiff's involvement in those matches was not essential to that business. Plaintiff was not one of the top wrestlers, and was relatively fungible.[10]

Thus, application of the Cobb test to the facts in this case leads to the inescapable conclusion that Plaintiff was an independent contractor. As such he is not entitled to Title VII's protections. Thus, Plaintiff's Complaint should be dismissed, as this Court lacks subject matter jurisdiction over Plaintiff's claims.

---

[9]     Plaintiff testified that on one occasion, WCW provided him with a rope from which he rappelled from the ceiling of an arena. (Ross Dep., p. 46)

[10]     While not a factor listed in Cobb, some weight must be given to the practice in the wrestling business. As stated by Dusty Rhodes, who has over twenty (20) years of experience as a professional wrestler, "[i]t is, and always has been, standard industry-wide practice for wrestling promotion companies (like WCW) to retain the services of all professional wrestlers as independent contractors, and not employees." (Rhodes Aff., ¶¶ 11-13) Moreover, Plaintiff admitted that he was treated as an independent contractor in all of his prior wrestling work. (Ross Dep., pp. 13-16, 18-24, 50, and 61-62)

22

WCW 102127

C.   **Plaintiff's Claims Pertaining To His Work For WCW From January 1989 through May 1990 Are Untimely.**

Plaintiff testified in his deposition that WCW discriminated against him during his first stint at WCW (from January, 1989 through May, 1990).  (Ross Dep., pp. 49-50)  But Plaintiff admitted that after he was released by WCW in May, 1990, he did not file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  (Ross Dep., p. 49)

Under Title VII, an individual wishing to bring suit must satisfy several administrative requirements.  See 42 U.S.C. §2000e-5(b)-(k); Tolbert v. U.S., 916 F.2d 245, 247 (5th Cir. 1990); Law v. Hercules, Inc., 713 F.2d 691, 692-93 (11th Cir. 1983).  One of those requirements is that any "charge under [Title VII] must be filed [with the EEOC] within one hundred and eighty days after the alleged unlawful employment practice occurred...."  42 U.S.C. §2000e-5(e).  Thus, by its plain language, Title VII requires any prospective plaintiff to notify the EEOC (through the filing a charge of discrimination) of an alleged discriminatory act no later than one hundred and eighty (180) days after the last discriminatory act took place.  Id.

In Plaintiff's case, the last discriminatory act during his **first stint with WCW** could not have occurred later than Plaintiff's May, 1990 release.  Accordingly, Plaintiff needed to file an EEOC charge by no later than November 1, 1990 (assuming a **May 30, 1990** release date) in order to make a timely claim under Title VII.  Plaintiff testified, however, that he never filed a charge of discrimination pertaining to his work for WCW during

23

**WCW 102128**

the January 1989 through May 1990 time period.  (Ross Dep.,

pp. 50)  Therefore, any and all allegations of discrimination

regarding Plaintiff's work for WCW during the January 1989

through May 1990 time period are untimely and should not be

considered by the Court.  United Airlines, Inc. v. Evans, 431

U.S. 533, 97 S.Ct., 1855 (1977).

**D.    Plaintiff's Claims Pertaining To His Work For WCW From
        January 15, 1991 Through July 14, 1991 Are Subject To
        Summary Judgment.**

        As noted in Section III(B) of this Brief, as an independent

contractor, Plaintiff does not even fall within the ambit of

Title VII's protections.  Moreover, even if this Court were to

find that Plaintiff might fall within the ambit of Title VII,

Plaintiff's claims still are subject to summary judgment for two

reasons.  First, Plaintiff has failed to establish a prima facie

case of race discrimination.  Second, even if he could establish

a prima facie case, Plaintiff has not rebutted (and cannot rebut)

WCW's articulated legitimate, non-discriminatory reasons for its

actions involving Plaintiff.  For these reasons, Plaintiff's

claims are subject to summary judgment.

        1.    Plaintiff's Burden Of Proof

        In a Title VII discrimination case, Plaintiff bears the

fundamental burden of proving that an adverse employment decision

taken against him/her was based upon an unlawful factor.  In this

action, **Plaintiff is alleging disparate treatment under Title

VII.  Accordingly, Plaintiff is required to prove that WCW acted

towards him with discriminatory intent.**  International

24

WCW 102129

Brotherhood of Teamsters v. United States, 431 U.S. 324, 355
n.15, 97 S. Ct. 1843, 1854 n.15 (1977); Pace, 701 F.2d at 1387.
Absent direct evidence, the establishment of discriminatory
motive is governed by the burden of proof and order of proof
requirements set forth in McDonnell-Douglas Corp. v. Green, 411
U.S. 792, 802-804, 93 S. Ct. 1817, 1824 (1973). Archambault v.
United Computing Systems, Inc., 786 F.2d 1507, 1512 (11th Cir.
1986).

　　　Under McDonnell-Douglas, Plaintiff first has the burden of
establishing a prima facie case of illegal discrimination.
McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Second, if
Plaintiff succeeds in establishing the prima facie case, the
burden shifts to the Defendant to "articulate some legitimate,
non-discriminatory reason" for the adverse employment action. If
the Defendant carries this burden, the Plaintiff must prove by a
preponderance of the evidence that the legitimate reason offered
by the Defendant was merely a pretext for discrimination. Id. at
804; 93 S.Ct. at 1825; Perryman v. Johnson Products Co., 698 F.2d
1138, 1142 (11th Cir. 1983). However, the Defendant's burden of
rebuttal is merely one of production, not proof. Lee v. Russell
County Board of Education, 684 F.2d 769, 773 (11th Cir. 1982).
At all times, the "ultimate burden of persuading the trier of
fact that defendant intentionally discriminated . . . remains
with the Plaintiff." Texas Department of Community Affairs v.
Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093 (1981).

WCW 102130

In evaluating whether a Plaintiff has satisfied the initial burden of establishing a prima facie case, the central inquiry is whether the circumstantial evidence presented is sufficient to create an inference, i.e., a rebuttable presumption, that the employer's personnel decision was based upon an illegal factor. Furnco Construction Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949 (1978).

In light of these standards, Plaintiff's own deposition testimony is fatal to his Title VII claim.  During his deposition, Plaintiff admitted that his claims of discrimination rest on nothing other than his opinion. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-128, 132-137, 139)  Plaintiff repeatedly admitted that he has absolutely no idea of who made any of the decisions of which he complains, the reasons they made them, or the factors they considered. (Ross Dep., pp. 53-54, 56-58, 97, 100, 117-121, 123-124, 126, 128, 132-134, 136-137, 139) Therefore, Plaintiff has no evidence to carry his burden.  The law is clear that when an employment discrimination Plaintiff does no more than state his conclusion that alleged actions were discriminatory, a prima facie case of discrimination is not established and summary judgment must be granted as a matter of law.  Locke v. Commercial Union Insurance Co., etc., 676 F.2d 205, 206 (6th Cir. 1982); Mason v. Continental Illinois National Bank, 704 F.2d 361, 367 (7th Cir. 1983); Patterson v. General Motors Corp., 631 F.2d 476, 482 (7th Cir. 1980), cert. den., 451 U.S. 914, 101 S. Ct. 1988 (1988).  In this case, because

26

Plaintiff has come forward with no evidence of any
discrimination, Plaintiff's claims are subject to summary
judgment.

### 2. Plaintiff Has Failed To Establish A Prima Facie Case Of Race Discrimination.

In a race discrimination case, a Plaintiff can establish a
prima facie case in one of three ways; 1) through direct evidence
of discriminatory intent; 2) by demonstrating a pattern of
discrimination through the introduction of statistics; or 3) by
satisfying the elements of McDonnell-Douglas. Early, 907 F.2d at
1081.

Plaintiff testified during his deposition that no one at WCW
made comments to him that were directly attributable to his race.
(Ross Dep., p. 148-150) Thus, it is apparent that Plaintiff
cannot prove his prima facie case through direct evidence. See
Early, 907 F.2d at 1081-82. Likewise, Plaintiff has not
attempted to prove his prima facie case through the use of
statistics. Indeed, as detailed hereinbelow, the statistical
evidence in this case refutes each of Plaintiff's assertions.
Accordingly, Plaintiff must meet the standard enunciated in
McDonnell Douglas to establish a prima facie case.

To establish a prima facie case under McDonnell-Douglas,
Plaintiff must show that he was: (1) a member of the protected
classification, (2) was qualified for the promotion, or at least
was performing up to the legitimate expectations of his employer,
and (3) was subjected to an adverse employment action. Flanagan
v. McKesson Corp., 48 F.E.P. Cases 343, 344 (N.D. Ga. 1988);

27

Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1442-43 (11th Cir. 1985); Hawkins v. CECO Corp., 883 F.2d 977, 982 (11th Cir. 1989), cert. denied, 110 S.Ct. 2180 (1990). While there is no dispute that Plaintiff satisfies the first element of the prima facie case under Title VII, Plaintiff cannot satisfy the remaining elements.

      **a.    Plaintiff Cannot Show That He Was A Victim Of An Adverse Employment Action.**

          (i)  Plaintiff was not "terminated."

To establish a prima facie case under Title VII, Plaintiff must show that he was the victim of an adverse employment action. In his Complaint, Plaintiff alleges that he was "terminated" on July 14, 1991. (Complaint, ¶ 3). However, "[t]he discharge that is proscribed by Title VII is either an actual or constructive discharge." Frazer v. KFC National Management Company, 491 F. Supp 1099 (M.D. Ga. 1980), aff'd 636 F.2d 313 (5th Cir. 1981).

"An actual discharge occurs when an employer fires, dismisses, releases, ousts, lets go, terminates, sacks, gets rid of, gives the gate to, cans, axes, bounces, or give walking papers to an employee . . ." Id. The undisputed facts establish that no such "termination" occurred in this case. In fact, Plaintiff admitted during his deposition that he was not terminated. (Ross Dep., p. 73) On the contrary, Plaintiff testified that WCW fulfilled each and every one of its obligations under the Agreement. (Ross Dep., p. 87) The Agreement simply expired on July 14, 1991. Therefore, Plaintiff

28

WCW 102133

cannot establish a _prima_ _facie_ case by claiming that he was terminated.

<center>(ii) Black wrestlers were not paid less than white wrestlers.</center>

In his Complaint, Plaintiff alleges that WCW "[c]reated a **practice and/or unwritten policy of putting nonwhite employees and independent contractors** into the role of subsidiary employment or other position, and without concomitant salary, commission, bonus . . ." (Complaint, ¶ 6)(emphasis supplied) This claim is not supported by the facts. In 1991, Plaintiff earned $1500.00 per week, and $36,250.00 through the term of his contract. As reported on the 1099's, and other accounting records produced to Plaintiff, **Plaintiff earned more money than approximately 278 of the 334 male independent contractor wrestlers who wrestled for WCW in 1991.** (Holman Aff., ¶ 5-6) Further, Plaintiff earned more than ten of the thirteen wrestlers who also were released by WCW during the Summer of 1991, all of whom were white. (Holman Aff., ¶ 9)

Additionally, six black wrestlers were paid more than Plaintiff. (Holman Aff., ¶ 7-8) In fact, Ron Simmons, a black **male**, was one of the highest paid WCW wrestlers, and earned **$190,442.26 in 1991** (not including $26,592.07 in endorsements paid to him by companies that retained Mr. Simmons to endorse their products and/or services). (Holman Aff., ¶ 7-8) Thus, the unrefuted facts in this case show that WCW paid many white wrestlers less than Plaintiff and several black wrestlers more than Plaintiff. Thus, Plaintiff's allegation that WCW

<center>29</center>

discriminated against him through disparate compensation has no
basis in fact.  Accordingly, Plaintiff cannot rely upon this
claim to satisfy the second element of the <u>prima facie</u> case,
<u>i.e.</u>, that he suffered an adverse employment decision.

> (iii)  **WCW was not the decisionmaker responsible for
> determining which wrestlers received endorsement
> <u>and/or promotion opportunities.</u>**

Plaintiff, likewise, cannot claim that his failure to garner
endorsement and/or promotion opportunities supports his <u>prima
facie</u> case.  While several WCW wrestlers, both black and white,
have endorsement and/or promotion deals with companies that hire
them to promote their products or services, the vast majority of
professional wrestlers, including Plaintiff, <u>never</u> receive such
opportunities.  (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8)
Nevertheless, Plaintiff alleges that WCW prevented him from
getting a wrestling doll contract or other endorsement deals.
(Ross Dep., p. 57)

Plaintiff admits that he has no evidence to support his
claim.  Indeed, while Plaintiff makes bald allegations about
alleged endorsement deals that he was denied, Plaintiff testified
that he has no idea who makes the decisions about which wrestlers
are retained to endorse products or services.  (Ross Dep., pp.
58, 139)  Likewise, Plaintiff testified that he has no idea what
factors such unidentified decisionmakers rely upon.  (Ross Dep.,
p. 139)  The undisputed facts in this case reveal that the
decisions regarding which wrestlers are selected to endorse
and/or promote particular products or services are made by the

30

companies who retain the wrestlers, not WCW. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) In short, WCW does not decide which wrestlers endorse the products or services of other companies.

Even if Plaintiff could establish that WCW had some role in the decisions on endorsements (which Plaintiff cannot), Plaintiff's claim still would fail since it is undisputed that several black WCW wrestlers in the January-July 1991 time period (including Ron Simmons and Teddy Long), did receive such opportunities from companies.[11] (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Further, the fact that Mr. Ross did not receive any such opportunities to endorse or promote products should not be surprising, as hundreds of WCW's other wrestlers, both white and black, never received such opportunities either. (Rhodes Aff., ¶¶ 16-17; Holman Aff., ¶ 8) Therefore, Plaintiff cannot claim that his failure to garner endorsement opportunities from other companies supports a prima facie case that WCW somehow discriminated against him.

     (iv) Plaintiff Was Not Qualified To Be WCW's Heavyweight Champion.

In his deposition, Plaintiff alleged that he was discriminated against because WCW did not make him its heavyweight champion. (Ross Dep., p. 54) In order to establish a prima facie case as to this claim, Plaintiff must prove by a preponderance of the evidence that he was more qualified to be the heavyweight champion than those selected, or alternatively

---

[11]    Ron Simmons made $26,592.07 from endorsements and promotions in 1991 alone. (Holman Aff. ¶ 8)

31

WCW 102136

that he satisfied WCW's legitimate expectations of performance.
Hamalinen, 54 F.E.P. Cases at 70;  Halsell v. Kimberly-Clark
Corp., 683 F.2d 285, 290 (8th Cir. 1982); Lovelace v. Sherwin-
Williams Co., 681 F.2d 230, 239 (4th Cir. 1982); Bauer v. Bailar,
647 F.2d 1047 (10th Cir. 1981).  Plaintiff can make no such
showing.

Plaintiff has come forward with no evidence whatsoever that
he was as qualified as those eventually chosen to be champion, or
even that he was satisfying WCW's performance expectations.
Instead, Plaintiff relies upon his opinion that he was as good a
wrestler as any of WCW's other wrestlers.  Even if true,
Plaintiff misses the point.  The object of professional wrestling
is for wrestlers to excite the crowd to a level where they want
to return to events again and again.  Plaintiff was not arousing
sufficient interest or selling tickets.  (Rhodes Aff., ¶ 6)  He
was not sufficiently entertaining to justify pushing him to
champion, or even renewing his Agreement.  (Rhodes Aff., ¶ 6)

Plaintiff ignores the fact that only one person at a time
can be the WCW heavyweight champion.  In WCW's opinion, Plaintiff
was unqualified to be heavyweight champion.  (Rhodes Aff., ¶ 6)
Plaintiff's assertions to the contrary are entirely irrelevant.

An [individuals] self-serving statements about his ability
. . . are insufficient to contradict an employer's negative
assessment of that ability. (citations omitted).  Such
statements may create a material dispute about [their]
ability, but do nothing to create a dispute about the
employer's honesty - [they] do nothing, in other words, to
establish that the proffered reason is a pretext for
discrimination.

Gustovich v. AT&T Communications, Inc., 972 F.2d at 849.

32

WCW 102137

Always, it is the supervisor's perception of Plaintiff's
ability (not Plaintiff's perception) which is relevant to a
determination of the employers' motive. Smith v. Flax, 618 F.2d
at 1057; See, Newton v. W. R. Grace & Co., Slip Op. No. 87-8961
(11th Cir. 1989); Moore v. Sears Roebuck & Co., 683 F.2d 1321,
1323 n.4 (11th Cir. 1982); Green v. Martin Marietta Data Systems,
42 F.E.P. 1695 (D.D.C. 1987); see, Meiri v. Dacon, 759 F.2d 989
(2d Cir. 1985). Indeed:

> While an employer's judgment or course of action
> may seem poor or erroneous to outsiders, the
> relevant question is whether the given reason [for
> not renewing the Agreement] was a pretext for
> illegal discrimination. The employer's stated
> legitimate reason . . . does not have to be a
> reason that the judge or juror, would act or
> approve on.

Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n.6 (1st Cir. 1979).

Plaintiff has wholly failed to demonstrate that he was
qualified to be champion, or that he even met the legitimate
performance expectations of WCW. Plaintiff's opinion about his
qualifications is not evidence, and is irrelevant to the issue of
his qualifications. Gustovich v. WCW Communications, Inc., 972
F.2d 845, 849 (7th Cir. 1992). Moreover, it is unrefuted that
WCW did not think that Plaintiff was qualified to be its
heavyweight champion. (Rhodes Aff., ¶ 6) Indeed, WCW did not
believe that Ross was even meeting WCW's expectations. (Rhodes
Aff., ¶ 6; Herd Aff., ¶ 6)

Plaintiff undoubtedly will argue that WCW's views about his
qualifications are subjective, not objective. Plaintiff again
misses the point, as even if it is determined that WCW relied

33

WCW 102138

solely upon subjective criteria in assessing Plaintiff's
performance, the law is clear that the use of subjective criteria
does not violate Title VII.  Hester v. Southern Railway Co., 497
F.2d 1374 (5th Cir. 1975).  This is especially true here, since
WCW used the same criteria to justify promoting another black
wrestler, Ron Simmons, to heavyweight champion.  There simply is
no evidence that any discriminatory motive was part of WCW's
evaluation of Plaintiff.  "[W]hatever motives [WCW] may have had
in choosing between two people [in the protected classification]
discrimination cannot be one of them."  De Volld v. Bailar, 568
F.2d 1162 (5th Cir. 1978).

For the foregoing reasons, Plaintiff has not established a
prima facie case of discrimination on any grounds.  EEOC v.
Western Electric Co., 713, F.2d 1011, 1014, (4th Cir. 1983).
Having failed to establish several of the essential elements of a
prima facie case, summary judgment should be granted in favor of
WCW.  Celotex, 474 U.S. 921, 106 S.Ct. at 253.

### 3.    Plaintiff Has Not Rebutted WCW's Legitimate, Nondiscriminatory Reasons for Its Actions

Assuming arguendo that Plaintiff could establish a prima
facie case of discrimination, WCW has the burden of articulating
a legitimate, non-discriminatory reasons for the complained of
actions.  Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181,
1184 (11th Cir. 1984); Conner v. Ft. Gordon Bus Company, 761 F.2d
1495, 1499 (11th Cir. 1985).  This burden of rebuttal is
"exceedingly light."  Id.  To satisfy this burden, WCW need only

34

WCW 102139

"articulate" legitimate reasons without being required to prove
its motivation.  Burdine, 450 U.S. at 254-55, 101 S.Ct. at 1094.

WCW refused to renew Plaintiff's Agreement for a legitimate
business reason:  budgetary constraints.  (Herd Aff., ¶ 6)
Moreover, Plaintiff's performances were not sufficiently
productive to justify renewing his contract.  (Herd Aff., ¶ 6;
Rhodes Aff., ¶ 6)  It must be remembered that in this Court, "[a]
statement that Plaintiff was less productive than others in her
department, without more, constitutes a sufficient articulation
of reasons to carry the employers burden."  Evans, 35 F.E.P.
Cases at 1200; Heffernan v. Western Electric Co., 510 F. Supp.
712, 715 (N.D. Ga. 1981).

In this case, Plaintiff testified that he has no evidence to
rebut WCW's explanation for its actions.  (Ross Dep., pp. 53-54,
56-58, 97, 100, 117-121, 123-126, 128, 132-137, 139)  Plaintiff
not only has no idea of who made the decision not to renew his
contract, but he does not know the reason the decision was made,
or the factors considered by the decisionmaker.  (Ross Dep., p.
97)

Next, the evidence shows that Plaintiff was not paid less
than less qualified white wrestlers.  On the contrary, Plaintiff
earned more than two hundred and seventy eight (278) WCW
wrestlers in 1991, the overwhelming majority of whom were white.
(Holman Aff., ¶¶ 5-8)  Again, Plaintiff has admitted that he has
no evidence to rebut these facts.  (Ross Dep., pp. 117-119, 135-
139)  Plaintiff has no idea what amounts other wrestlers were

35

WCW 102140

paid, who decided what each wrestler was paid, or what factors were considered in making those decisions. (Ross Dep., pp. 117-119, 135-139)

On Plaintiff's claim that he should have become WCW's heavyweight champion, Plaintiff has not offered evidence to overcome WCW's legitimate non-discriminatory reasons for not making him its champion, i.e., he lacked the charisma and audience appeal and just was not that entertaining. (Rhodes Aff., ¶ 6) As detailed in Section III D.2(iv) of this Brief, supra, all Plaintiff offers to refute WCW's rationale is Plaintiff's subjective opinion that he was a good wrestler and should have been WCW's champion. Such allegations are simply legally insufficient. Gustovich v. WCW Communications, Inc., 972 F.2d 845, 849 (7th Cir. 1992).

Finally, WCW was not responsible for Plaintiff's lack of endorsement and\or promotion opportunities. Since WCW was not the decisionmaker, WCW cannot responsible for those decisions. Moreover, the undisputed facts show that several black wrestlers received significant endorsement and/or promotion opportunities, while hundreds of white WCW wrestlers did not. (Rhodes Aff., ¶ 16-17; Holman Aff., ¶ 8) Thus, Plaintiff's claim that he was discriminatorily denied the chance at endorsement deals flies in the face of the undisputed facts.[12]

---

[12]    Naturally, Plaintiff readily admitted he has no idea of who made these decisions either, or what factors were considered. (Ross Dep., pp. 124-126, 135-139)

36

Once the Defendant has rebutted Plaintiff's prima facie
case, the Plaintiff must satisfy his ultimate burden of
establishing by a preponderance of the evidence that a
discriminatory intent motivated the Defendant's actions.
McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; Nix, 738
F.2d at 1184.   Thus, to succeed on the dispositive issue of
motivation, Plaintiff must prove that WCW acted with
discriminatory intent.

    Plaintiff cannot produce any cognizable evidence of
discriminatory intent to establish a genuine issue of whether
WCW's reasons for its decisions are pretextual.   Plaintiff's
"subjective belief, however genuine cannot be the basis for
judicial relief" [in a Title VII or ADEA case].   Elliott v. Group
Medical and Surgical Service, 714 F.2d 556, 567 (5th Cir. 1983),
cert. den., 467 U.S. 1215, 104 S.Ct. 2658 (1984); Houser v. Sears
Roebuck & Co., 627 F.2d 756, 759 (5th Cir. 1980).   In the
Eleventh Circuit, Plaintiff must controvert WCW's legitimate
reasons "by setting forth specific facts . . . showing [an
illegal factor] was a substantial factor in [the] decision."
Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987).
Plaintiff has failed to do so, and the result is that his claims
must fail.

### IV.   CONCLUSION

    For the above and foregoing reasons, Defendant's Motion for
Summary Judgment should be granted on all Plaintiff's claims.

WCW 102142

This _25TH_ day of March, 1994.

Respectfully submitted,

Stephen W. Riddell, Esq.
Georgia State Bar No. 604810

Kip P. Roth (by SWR)

Kip P. Roth
Georgia State Bar No. 615615

Attorneys for Defendant
World Championship Wrestling,
Inc.

**TROUTMAN SANDERS**
**5200 NationsBank Building**
**600 Peachtree Street, N.E.**
**Atlanta, Georgia   30308-2216**
**(404) 885-3000**

(coopcjc)wpdocs\kip\rose\maj.now

38

WCW 102143

## World Championship Wrestling, Inc. Freelance
## Wrestler/Independent Contractor Agreement

1.  I, <u>Robert Ross, Jr.</u>          (<u>Ranger Ross</u>),
         Name                          Ring Name

agree to perform services for World Championship Wrestling, Inc.
("WCW") as requested by WCW at the rate of $1,500.00 per week
for the period of January 15, 1991 through July 14, 1991.  I
understand that I shall be entitled to such compensation only if
I appear and complete the services requested by WCW for such
event and in the manner requested by WCW.

2.  I understand and agree that I perform such services as
an independent contractor and not as an employee of WCW.  I
agree that I shall be fully responsible for taxation of the
amounts paid to me by WCW as compensation for my services and
that WCW  shall bear no responsibility for such taxation.  I
agree that I am not entitled to the benefits provided by WCW to
its employees.  I understand that WCW makes no commitment to use
my services and makes no guarantee of any number of events or
amount of compensation.

3.  I understand that if I am injured inside the ring and
within the crowd barriers at an event while performing services
for WCW pursuant hereto, as determined by the schedule of
physicians provided by WCW, WCW shall assume responsibility for
medical expenses directly related to such injury through and
according to its respective insurance program.  I understand
that I will be paid only for events for which I was scheduled at
the time I was injured and only if WCW's doctor certifies that
the injury prevents me from wrestling and I appear at the event
for interviews and other tasks as requested by WCW (unless I am
unable to appear as certified by WCW's doctor); provided,
however, that such payment shall be reduced by payments other
than those for medical treatment to which I may be entitled
under WCW's insurance or otherwise.  I understand I will not be
paid for events for which I might have been scheduled while I am
injured.

4.  I agree that all programs, recordings and work product
in connection with which I perform services and my contributions
thereto (the "Works") shall belong solely and exclusively to
WCW.  To the extent that such Works are considered contributions
to collective works and/or parts or components of audio-visual
works, I agree that the Works shall be considered "works made
for hire" under the U.S. Copyright Act of 1976, as amended.  To
the extent that such Works are deemed otherwise, I assign to WCW
all rights, title and interest in and to the copyright of such
Works.

EXHIBIT "A"

5.   I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3.   I have read this Agreement and understand its terms.   I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.

World Championship Wrestling, Inc.

By: _____
              Signature

_____
              Date

Independent Contractor

_____
              Signature

_____
              Date

-2-

**WCW 102145**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT ROSS, JR.,                    )
                                     )
        Plaintiff,                   )
                                     )      CIVIL ACTION FILE
v.                                   )
                                     )      NO. 1:93-CV-1206-JEC
WORLD CHAMPIONSHIP                   )
WRESTLING, INC.,                     )
                                     )
        Defendant.                   )

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WORLD CHAMPIONSHIP WRESTLING, INC.'S MOTION FOR SUMMARY JUDGMENT upon opposing counsel by depositing a copy in the United States Mail with sufficient postage thereon addressed to:

        Gary J. Pernice, Esq.
        Pernice & Associates, P.C.
        110 Hammond Drive, N.E.
        Atlanta, Georgia 30328-4806

This 25th day of March, 1994.

Stephen W. Riddell
Georgia State Bar No. 604810

Attorney for Defendant
World Championship Wrestling, Inc.

TROUTMAN SANDERS
600 Peachtree Street, N.E.
Suite 5200
Atlanta, Georgia 30308-2216
(404) 885-3000

WCW 102146



# EXHIBIT / ATTACHMENT

*N*

(To be scanned in place of tab)

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Davis v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1716-CC;
Saengsiphan v. World Championship Wrestling, Inc. and
Turner Sports, Inc., Civ. File No. 1-00-CV-1719-CC;
Speight v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1718-CC;
Worthen v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1717-CC;
Reeves v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1720-CC;
Easterling v. World Championship Wrestling, Inc. and Turner
Sports, Inc., Civ. File No. 1-00-CV-1715-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports,
Inc., Civ. File No. 1:00-CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0369-CC
Walker v. World Championship Wrestling, Inc., Turner
Sports, Inc., Civ. File No. 1:00-CV-0367-CC; Patterson v.
World Championship Wrestling, Inc., Turner Sports, Inc.,
Turner Entertainment Group, Inc. Civ. File No. Civ. File
No. 1:01-CV-1152-CC

SUPPLEMENTAL EXPERT REPORT FOR PLAINTIFFS
TESTIMONY OF DR. DAVID W. RASMUSSEN

This supplemental report uses more recent evidence on the

number of African-Americans attending wrestling tryouts

sponsored by WCW.  Additional testimony confirms the results

reported in my initial report, i.e., that the average estimate

of the availability of African-Americans for employment as

wrestlers is about 25 percent.  This report also uses more

complete data on the racial identification of wrestlers training

at the Power Plant and those actually employed as wrestlers.

The substantive conclusions reported in the original report are

not only confirmed, but the statistical evidence that African-Americans are under-represented as wrestlers is in fact stronger than previously reported.

The availability of African-Americans, the benchmark by which African-American representation is to be evaluated, was based on the personal impressions of five individuals familiar with try-outs held at the Power Plant. I have now received data on the impressions of three more persons whose estimates of African-American availability are included in this report.

The methodology used here is identical to that of the initial report. Seven individuals who have testified as to their impressions of the representation of African-Americans among persons at the try-outs are recorded in Table 1.[1] As is clear in the Table, four of these individuals provide an estimated range and three provide a specific figure. Estimates of the percent African-American range from 10 to 40 percent. Column 1 counts each estimate as an independent observation, so Hamilton, Norris, Snakovsky, and Walker, in effect, get two votes. The mean of these eleven estimates is 26.0 percent

---

[1] This information is given in depositions or by declaration, the date of which is following the person's name: D.E. Bruce (November 21, 2002); Joseph N. Hamilton (March 22, 2002); H. Norris (December 13, 2002); Brenda F. Smith (April 30, 2002); John Paul Snakovsky (May 30, 2002); B. Walker (November 7,2002); and Moses Williams (May 28, 2002). Tony Byron Carr provided his impressions of African-American participation in a deposition (January 28, 2002) and his estimates were included in my original report. His estimates varied widely (from a low of 10 percent to approximately 40 percent), but upon further inspection it is not clear whether these estimates pertain to wrestling tryouts or training at the Power Plant. Given the uncertainty of his testimony, his estimates are not included in this summary report. However, including this estimate has virtually no effect on the benchmarks reported in Table 1 below.

- 2 -

TABLE 1

ESTIMATES OF AFRICAN-AMERICAN REPRESENTATION AT
POWER PLANT TRYOUTS

| SOURCE | PERCENT AFRICAN AMERICAN | |
| --- | --- | --- |
| | ESTIMATES | AVERAGE |
| D. E. Bruce | 33 | 33 |
| J. N. Hamilton | | 12.5 |
| Low | 10 | |
| High | 15 | |
| H. Norris | | 35 |
| Low | 30 | |
| High | 40 | |
| J. Snakovsky | | 35 |
| Low | 30 | |
| High | 40 | |
| B. F. Smith | 12 | 12 |
| B. Walker | | 18 |
| Low | 16 | |
| High | 20 | |
| M. Williams | 40 | 40 |
| Mean | 26 | 26.5 |
| Median | 30 | 33 |
| Mode | 40 | 35 |

African-American, the median (the mid-point of the range of estimates) is 30 percent, and the mode (the most frequent estimate) is 40 percent.

As noted in the original report, one could reasonably object to counting any individual's estimate twice, so column two provides the mid-point of the ranges provided by Hamilton, Norris, Snakovsky, and Walker.  The resulting mean is 26.5

- 3 -

percent African-American, the median is 33 percent, and the mode is 35 percent.[2]

Another source of information about the availability of African-Americans as wrestlers was provided in a list that identifies the race of 82 individuals who were trainees at the Power Plant over the 1996-2000 period.  I have been informed that the most complete list of such persons, identified by whether they are African-American, is in the Declaration of Harrison Norris (dated December 13, 2002).  Of 82 persons being trained at the Power Plant, 14 (17.1 percent) are identified as being African-American.

Five benchmarks are used in the following statistical analysis.  The lowest is the 17.1 percent that represents the actual known African-American participation in the Power Plant. The others are from Table 1: the mean, median, and mode of column one (26, 30 and 40 percent respectively) and the mode of column 2 (35 percent).

As in the initial report, Tables 2 and 3 report the results of the statistical analysis of African-American representation among wrestlers during the 1996-2000 period.  First consider Table 2. The first column shows the number of contract wrestlers reported in the Declaration of H. Norris. Column two shows the

---

[2] Recall that even if collectively these approximations of applicant flow give an accurate picture of African-American representation at the Power Plant, this estimate of interest among qualified African-Americans could be biased downward due to the chilling effect that was described in the initial report.

various benchmarks, the percent African-American expected among
these wrestlers.  Column three shows the number of African-
American wrestlers expected given the benchmark (column 1 times
column 2); column 4 shows the actual number of African-Americans
identified in the declaration of Harrison Norris, and column
five reports the difference between the actual and expected
numbers of African-Americans.  The last column shows the number
of standard deviations.   Recall that the prevailing standard is
that a difference of two or more standard deviations is
statistically significant.

The first benchmark, African-American representation among
trainees at the Power Plant, is 17.1 percent.  WCW hired 227
persons during 1996-2000, and had they hired African-Americans
at a rate of 17.1 percent the expected number of African-
American hires would be 38.8.   Instead, only 17 were hired;
-5.26 standard deviations from the expected number of 38.8.
This is statistically significant.

Subsequent benchmarks, as noted above, come from Table 1.
The number of standard deviations range from -6.36 to -10.0, far
beyond the standard of -2.00 standard that indicates that chance
accounts for the under-representation of African-Americans at
WCW. When the shortfall of African-American wrestlers is more
than -6.00 standard deviations, as in row two of Table 2, this
result is expected by chance in less than 1 chance out of

- 5 -

100,000.[3] The subsequent comparisons are even less likely to occur from an equal opportunity employer if the benchmarks reflect African- American availability and interest in a wrestling career.

TABLE 2

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
REPRESENTATION AMONG WRESTLERS (1996-2000)

A. EXCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 227 | 17.1 | 38.8 | 17 | -21.8 | -3.85 |
| 227 | 26.0 | 59.0 | 17 | -42.0 | -6.36 |
| 227 | 30.0 | 68.1 | 17 | -51.1 | -7.40 |
| 227 | 35.0 | 79.5 | 17 | -62.5 | -8.69 |
| 227 | 40.0 | 90.8 | 17 | -73.8 | -10.00 |

B. INCLUDING DISPUTED WRESTLERS

| NUMBER OF WRESTLERS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 231 | 17.1 | 39.5 | 20 | -19.5 | -3.41 |
| 231 | 26.0 | 60.1 | 20 | -40.1 | -6.01 |
| 231 | 30.0 | 69.3 | 20 | -49.3 | -7.08 |
| 231 | 35.0 | 80.9 | 20 | -60.9 | -8.39 |
| 231 | 40.0 | 92.4 | 20 | -72.4 | -9.72 |

Panel B of Table 2 is identical to Panel A except that the four disputed wrestlers are included in the analysis.  Three of the disputed persons are African-American, so the total number of wrestlers rises to 231 and the actual number of African-Americans hired rises to 20.  The results do not change: the number of standard deviations range from -3.41 to -9.72, once

---

[3] In Table 2 of the original report there was a typographical error in row two of Panel A.  When the benchmark is 23.5 in that table, the number of standard deviations is -5.71, not -7.71 as originally reported.

again indicating statistically significant under-representation
of African- Americans.   The number of African-American wrestlers
will be 3.41 standard deviations below the expected number by
chance alone about one time in 1,000.   Recall that -6.00
standard deviations will occur less than one chance in 100,000
cases.

     As noted in the initial report, the analysis in Table 2 is
flawed in that it considers the number of persons in Exhibit A
but does not account for the actual frequency of employment.   As
an illustration, suppose an employer hired two persons, a
Caucasian and an African-American, over a 10-year period.   Using
the method employed in Table 2, African-American representation
would be 50 percent.   But suppose that the Caucasian worked in
each of the 10 years and the African-American worked in only
one.   By looking at African-American representation by salary
years a very different picture emerges: instead of 50 percent,
African-American representation is only 1 out of 11, or 9.1
percent.

     Table 3 investigates African-American representation among
WCW wrestlers using salary years as the unit of observations.
Based on data used in the original report and the Norris
Declaration, there are 680 cells in which a person is reported
to have received a salary.   Of these cells, 51 (7.5 percent)

- 7 -

represent salaries earned by African-Americans.[4]  The benchmarks
that measure African-American availability are identical to
those in Table 2.  When the benchmark is 17.1 percent, the
lowest in the table, the shortfall of African-American wrestlers
is -6.65 standard deviations from the expected number.  As in
Table 2, the number of standard deviations rises with the
benchmark: when the benchmark is 40 percent, the shortfall is
-17.30 standard deviations.  There is less than one chance in a
million that this result could happen by chance alone.

TABLE 3

STANDARD DEVIATION ANALYSIS OF AFRICAN-AMERICAN
AMONG WRESTLERS BY SALARY YEARS (1996-2000)

EXCLUDING DISPUTED WRESTLERS

| NUMBER OF SALARY YEARS | BENCHMARK | EXPECTED NO. OF AFRICAN-AMERICANS | ACTUAL NUMBER | DIFFERENCE | NO. OF STD DEVIATIONS |
|---|---|---|---|---|---|
| 680 | 17.1 | 116.3 | 51 | - 65.3 | -6.65 |
| 680 | 26.0 | 176.8 | 51 | -125.8 | -11.00 |
| 680 | 30.0 | 204.0 | 51 | -153.0 | -12.80 |
| 680 | 35.0 | 238.0 | 51 | -187.0 | -15.03 |
| 680 | 40.0 | 272.0 | 51 | -221.0 | -17.30 |

     This analysis strongly suggests that African-Americans are
significantly under-represented among wrestlers at WCW.  Even
when African-American representation at the Power Plant is used
as the benchmark, African Americans are significantly under-
represented.  Even the highest benchmark in Tables 2 and 3 may
under estimate the true availability of qualified African-

_____

[4] In the original report there were 681 total salary years, 51 of which were
African-American.

- 8 -

Americans, as noted in the previous report, since it is possible
that if WCW was a truly equal opportunity employer it would
confront an applicant pool of interested and qualified persons
that mirrored that of professional basketball or professional
football.

*Dard W Rasmussen*

Dr. David W. Rasmussen

Plaintiffs specifically reserve the right to
supplement this disclosure in any manner permitted under
the Federal Rules of Civil Procedure, the Local Rules of
this Court or any other applicable law.

This __3rd__ day of January, 2003.

*Charles Gernazian*

Cary Ichter
Georgia Bar No. 382515
Charles J. Gernazian
Georgia Bar No. 291703
Michelle M. Rothenberg-Williams
Georgia Bar No. 615680

MEADOWS, ICHTER & BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA  30305
Telephone:  (404) 261-6020
Telecopy:   (404) 261-3656

- 9 -

## CERTIFICATE OF SERVICE

This is to certify that I have this date served

opposing counsel to this action with the foregoing

**Supplemental Expert Report for Plaintiffs' Testimony of**

**David W. Rasmussen** via hand delivery, addressed as follows:

John J. Dalton
James Lamberth
Eric Richardson
Evan Pontz
Troutman Sanders LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-22165

This __6__ day of January, 2003.

Michelle M. Rothenberg-Williams
Georgia Bar No. 615680



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**

FILED IN CLERK'S OFFICE

DEC 0 3 2002

LUTTER, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRUCE HARMAN, BERT
SILVERMAN, DONALD GUTSTEIN,
and DENNIS RALIN,

        Plaintiff,

v.

LIFE UNIVERSITY,

        Defendant.

CIVIL ACTION FILE

NO. 1:00-CV-3375-WBH

## ORDER FOR SERVICE OF
## REPORT AND RECOMMENDATION

Attached is the report and recommendation of the United States Magistrate Judge made in this action in accordance with 28 U.S.C. § 636(b)(1) and this Court's Local Rules LR 73 and LCrR 58.1. Let the same be filed and a copy, together with a copy of this Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if any, to the report and recommendation within ten (10) days of the receipt of this Order. Should objections be filed, they shall specify with particularity the alleged error or errors made (including reference by page number to the transcript if applicable) and shall be served upon the opposing party. The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the district court. If no objections are filed, the

AO 72A
(Rev.8/82)

53

report and recommendation may be adopted as the opinion and order of the district court and any appellate review of the factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093 (11th Cir. 1983), cert. denied, 464 U.S. 1050, 104 S. Ct. 729, 79 L. Ed. 2d 189 (1984).

The clerk is directed to submit the report and recommendation with objections, if any, to the district court after expiration of the above time period.

**SO ORDERED**, this 3rd day of DECEMBER, 2002.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

2

FILED IN CLERK

DEC 0 3 2002

LUTHER...  ...lerk
By: *Chleucher*
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BRUCE HARMAN, BERT
SILVERMAN, DONALD GUTSTEIN,
and DENNIS RALIN,

        Plaintiffs,

        v.

LIFE UNIVERSITY,

        Defendant.

CIVIL ACTION FILE

NO. 1:00-CV-3375-WBH

### REPORT AND RECOMMENDATION

Plaintiff Bruce Harman, Bert Silverman, Donald Gutstein, and Dennis Ralin filed this employment discrimination action against Defendant Life University on December 19, 2000. [Doc. 1]. All four (4) Plaintiffs contend that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, et seq., by discriminating against them in their employment and subjecting them to a hostile work environment on the basis of their religion, Jewish. [Doc. 1]. Plaintiffs Gutstein and Ralin also assert that Defendant discriminated against them on the basis of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq., and Plaintiff Harman alleges that he was terminated on the basis of his disability, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. [Id.]. Finally, Plaintiff Ralin asserts state law claims of breach of contract and tortious

AO 72A
(Rev.8/82)

interference with business relations, and Plaintiff Gutstein asserts a state law claim of slander per se. [Id.].

Defendant Life University has filed a motion [Doc. 21] for summary judgment on all of Plaintiffs' claims pursuant to Rule 56(b) of the Federal Rules of Civil Procedure based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted by the parties.

## I.    Background Facts

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.  See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1529 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).  Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendant's motion [Doc. 21] for summary judgment.

Defendant Life University ("Life") is an institution of higher education located in Marietta, Georgia, which offers undergraduate, master's and doctor of

AO 72A
(Rev.8/82)

chiropractic programs.[1] [Defendant's Statement of Material Facts ("DSMF") ¶ 1]. All Life programs are accredited by the Southern Association of College and Schools ("SACS"), and Life's doctor of chiropractic program is also accredited by the Council of Chiropractic Education ("CCE"). [DSMF ¶ 2]. Sid E. Williams is Life's President and Founder. [DSMF ¶ 5]. In this capacity, he has the final authority on personnel decisions at Life University, including hiring, termination, promotion, tenure, discipline, and policy development. [Keith Asplin Dep. at 24-26, 36, 40; Kim Williams Dep. at 46, 59-64, 118-25]. Williams' daughter, Kim Williams, serves as presidential liaison[2] and reports directly to Sid Williams. [Kim Williams Dep. at 18, 32]. Keith Asplin, Vice President of Academic Affairs, testified that Kim Williams frequently acts on behalf of the President. Asplin stated, "She now interviews all the faculty and approves their hiring . . . [, and] she signs for [Sid Williams] in the hiring process." [Asplin Dep. at 30]. Asplin also testified that his role as Vice President was limited to making recommendations which had to be accepted or approved by Sid Williams. [Id. at 23-24].

---

[1]The facts as set forth herein pertain to the period of time relevant to the claims of the parties.

[2]Kim Williams' title was changed to "assistant to the president for Executive Administration" in or around 1999. [Kim Williams Dep. at 32].

3

Scanned Image - 1:00CV1375 Document 53 page 5 Thu Dec 05 00:00:00 2002

### A.    Plaintiff Bruce Harman

Plaintiff Bruce Harman, who is Jewish, received a doctor of chiropractic degree from Life in 1980 and was hired by Life in July of 1991. [DSMF ¶ 4]. At the time of Harman's hiring, Sid Williams and other Life officials knew that Harman had back problems and was receiving disability insurance benefits. [DSMF ¶ 5]. Plaintiff Harman was hired as a part-time adjunct professor in Chiropractic Sciences in the summer of 1991 and became a full-time assistant professor in September of 1991. [DSMF ¶ 4; Harman Dep. at 106]. Harman served as Director of Post Graduate Education from approximately October of 1992 to December of 1993. [Harman Dep. at 108-09]. He also served as Department Head for Chiropractic Technique from approximately April of 1997 to March of 1998. [Id. at 109]. Harman testified that he applied for tenure in January of 1997, but he was informed by Keith Asplin, Vice President of Academic Affairs, in June of 1999 that no action had been taken on his tenure application at that time. [Id. at 107].

In a letter dated May 25, 1995, Sid Williams wrote Plaintiff Harman a letter which stated the following:

> Dear B.J.: I called you at home but could not find you. I understand you had a little surgery. I conducted a D. E. one time four days after I broke every bone in my foot. You can sit in a chair and conduct class. I provided the leadership by doing the D. E. with a crushed foot; you can use a wheelchair if needed. Is this hard nosed or what? Jews don't have pain like ordinary people. Hope you are feeling

4

AO 72A
(Rev.8/82)

better. I know there is really nothing wrong with you! Love you, Baby!

[Defendant's Exhibit ("Def. Ex.") 59A]. Approximately a year later, on May 9, 1996, Sid Williams wrote another letter to Plaintiff Harman which read, in part:

Your most recent letter was received in Sarasota. I cannot imagine a New York Jew being disturbed by John Hopkins. I can imagine a New York Jew being irritated. Hopkins has done a great job on this project. The word is out that he is on the prowl and attendance by the faculty has gone from 17 absences last Tuesday to almost zero this week. . . .

[Def. Ex. 60]. Harman also received numerous letters from Williams throughout his employment with Life which were positive, supportive, and favorable. In many of those letters, Williams expressed gratitude toward Plaintiff Harman. [Harman Dep. at 260-64; Def. Exs. 36, 37, 44, 51, 66, 70].

Plaintiff Harman testified that during several assemblies and faculty meetings, Williams would refer to individuals as "New York Jews." [Harman Dep. at 159]. At his deposition, Harman was asked, "Tell me more specifically who he referred to as a New York Jew." In response, Harman testified:

He referred to Dr. Ron Schneltzer, who is a chiropractor from New York. He referred to Dr. Bob Rabin at one time as a southern redneck New York Jew. He made a remark about Dr. Michael Rappaport, saying that he is from Israel. I don't recall the exact terminology that he used. The doctor was talking about arms and a certain chiropractic technique, that Dr. [Mike] Rappaport has short arms but that because he is from Israel he doesn't need his arms to count the money, that he uses a calculator in his head.

5

[Harman Dep. at 159-60]. Harman believed that Williams made these comments in 1998 or 1999. [Id. at 161-62]. Plaintiff Harman also testified that around 1992 or 1993, he and Harvey Fish "would usually sit together in assemblies, and Dr. Williams would refer to [them] as his New York Jews." [Harman Dep. at 236-37].

In January of 1999, Harman requested a transfer to the clinic because of his back problems. Life granted Harman's request and assigned him to the clinic as a full-time faculty clinic doctor beginning in the spring of 1999. [DSMF ¶ 9]. Clinic faculty doctors oversee patient care, conduct case management reviews with students, teach classes in the clinic, and meet with advisees. [DSMF ¶ 10]. They also assess students' skill levels, determine whether students are making satisfactory progress toward completing clinical requirements, conduct competency evaluations, and, on a one-on-one basis, create a faculty model of chiropractic care for students. [Id.]. Harman worked as a full-time clinic doctor during the spring and summer quarters of 1999. [DSMF ¶ 13]. On September 24, 1999, six (6) months after he transferred to the clinic, Harman took twelve (12) weeks of leave under the Family and Medical Leave Act ("FMLA") because of his back problems. [DSMF ¶ 14]. Harman's request for FMLA leave was supported by a letter and certification dated September 24, 1999, from Alan Maloon, his neurologist, who certified that Harman was "unable to perform work of any kind because of a serious health condition." [Maloon Dep. at 31-33; Def. Ex. 141]. Maloon also

6

indicated that there were no accommodations that would enable him to perform the essential functions of his job at that time. [Maloon Dep. at 32; Def. Ex. 141].

While Harman was out of work on FMLA leave, he sold services and products for Now You Know, Inc., a chiropractic related business owned by his wife, Jacqueline Harman, and two (2) friends, Robert Braile and Steve Szabo. [Harman Dep. at 54, 60-64, 81]. Now You Know was started in September of 1998 and incorporated in July of 1999. [Harman Dep. at 54, 81]. Braile owns fifty (50) percent of Now You Know, Szabo owns twenty-five (25) percent, and Jacqueline Harman owns twenty-five (25) percent. [Harman Dep. at 81]. Plaintiff Harman testified that he spent approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know throughout his FMLA leave. [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. Harman took trips to Detroit in October of 1999, to Orlando and Davenport, Iowa in December of 1999, and to Las Vegas in January of 2000, while selling services for Now You Know. Plaintiff Harman testified that Now You Know paid for his trips, but he did not receive any compensation for selling the company's services. [Id.].

Toward the end of his FMLA leave, Harman informed Life that he could not return to his full-time position in the clinic at that time, and he asked Life to give him a part-time position, working two (2) days a week, six (6) hours a day, upon the expiration of his FMLA leave on January 4, 2000. [DSMF ¶ 23]. Harman

7

AO 72A
(Rev.8/82)

testified that his supervisor, Steven Mirtschink, told him that "there would be no part-time schedule available" for him and that he should direct any further communication to Deborah Pogrelis, Chief of Staff of Clinics. [Harman Dep. at 131-32, 275-76]. In a letter dated January 3, 2000, Pogrelis wrote Plaintiff Harman and informed him, "In response to your request of December 22, 1999 there is no possible accommodation available in the clinics. However, I will forward your request up my chain of command to Dr. [Ron] Kirk," Dean of the School of Chiropractic. [Def. Ex. 113]. Kirk wrote Plaintiff Harman a letter dated January 4, 2000, the day Harman's FMLA leave expired, which stated, "There are currently no part-time faculty positions available in the School of Chiropractic." [Def. Ex. 114; DSMF ¶ 27].

Three (3) weeks later, on January 25, 2000, Plaintiff Harman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). [DSMF ¶ 31]. Harman checked the boxes marked "religion," "retaliation," "disability," and "other." [Def. Ex. 117]. In an attachment to the charge, Harman wrote that he believed that Life University had discriminated against him on the basis of his disability, degenerative back disease, in violation of the Americans with Disabilities Act ("ADA"), and on the basis of his religion, Jewish. [Id.]. He also stated his belief that Life had violated the FMLA and that it had retaliated against

8

Scanned Image - 1:00CV2375 Document 53 page 36 Thu Dec 05 09:05:00 2002

him for his "request for accommodation under the FMLA and the ADA." [Id.]. On March 1, 2000, Life terminated Harman's employment. [DSMF ¶ 29].

### B.    Plaintiff Bert Silverman

Plaintiff Bert Silverman, a Jewish male, interviewed for a job at Life University in November of 1996 with Sid Williams and several Life faculty members and administrators. [DSMF ¶ 36]. Silverman testified that, during this interview, Williams said that Silverman would like Life because there were many Jews there. [DSMF ¶ 37]. Silverman found Williams' comment offensive and insulting, but when Williams offered him an associate professor position in the Department of Biochemistry, Silverman accepted the position and began working for Life in December of 1996. [DSMF ¶ 39].

Silverman testified that he heard Sid Williams use the phrase "New York Jews . . . at least a dozen times from 1997 to 1999, referring to faculty, [and] to chiropractors who are not at Life. . . ." [Silverman Dep. at 104]. Silverman stated that Williams referred to Mike Rappaport as a "New York Jew with short arms . . . that Rappaport's short arms were okay to be used for running a calculator, running an adding machine, and counting his damn money." [Id. at 30]. Silverman also testified, "[W]hat I remember as a continuum, as a blur, is Sid referring to Bob Rabin as a New York Jew." [Id. at 104-05].

9

Samuel Demons, Chair of the Basic Sciences Division where Silverman worked, testified that in 1999, he was informed that he needed to reduce the number of faculty members in the division. [Demons Dep. at 57-59]. Ron Kirk, Dean of the School of Chiropractic, gave this instruction to Demons. [Id.]. Demons testified that he and Kirk met with other division chairs and department heads in the School of Chiropractic to discuss criteria which should be used in selecting which professors would be laid off. [Demons Dep. at 58-62, 98-99]. Factors considered were longevity, performance reviews by staff and students, negative disciplinary actions, loyalty, and educational background. [Id.]. Demons asked the department heads to recommend to him who should be terminated. [Id. at 62].

Demons testified that Tom Iha, the Chair of the Biochemistry Department at that time, initially recommended to Demons that Henry Zeidan, another faculty member in the department, be terminated. [Demons Dep. at 65]. Demons, however, stated that he rejected the selection of Zeidan because he was concerned that Iha was basing his recommendation on his personal animosity toward Zeidan. [Demons Dep. at 65, 69-80]. Demons determined that Silverman should be terminated instead. [Id. at 98-99]. Demons then submitted Silverman's name to Keith Asplin, Vice President of Academic Affairs, who then submitted the list of faculty recommended for termination to Williams for his approval. [DSMF ¶ 47].

10

Plaintiff Silverman's employment with Life University was terminated on September 30, 1999. [Asplin Dep. at 127-28; Silverman Dep. at 155]. On March 14, 2000, Silverman filed a charge of discrimination with the EEOC alleging that he was discriminated against on the basis of his religion and that he was subjected to a religiously hostile work environment. [DSMF ¶ 49; Def. Ex. 22].

### C.    Plaintiff Donald Gutstein

Plaintiff Donald Gutstein is a sixty-nine (69) year old Jewish male who first visited Life University in 1994 or 1995. [DSMF ¶ 55]. During this visit, Gutstein heard Sid Williams give a speech in which Williams referred to a group of people with whom Gutstein was sitting as "New York Jews." [Id.]. Gutstein testified that Williams also "made disparaging remarks about [Tom Oliver], that he looked like a faggot, and then made fun of his age." [Gutstein Dep. at 75].

Although Gutstein now says that he was offended, humiliated, demeaned and hurt by these comments, immediately after the visit, he wrote a letter to Williams and applied for a job. [DSMF ¶ 56]. The letter, dated April 16, 1995, read in pertinent part:

> I have heard about you, D.E. and Life College for years now. Experiencing, for myself, this trinity is something words cannot describe. I was thunderstruck, where had I been all these years. Being in Marietta felt like I had come home. I want to thank you all for what you are doing for all of us, not just for chiropractors, but for all people.

11

> Over the years, students of mine, have been telling me that I belonged at Life College. Now, I know they were right. It isn't just the college, it's your vision that is so exciting. What you are able to conceptualize and accomplish is mind boggling; it's never been done in such a grand scale before.
>
> I have been teaching for thirty five years and in continuous practice for thirty four years. Time does fly. I am enclosing a C.V. which tells you some of the things I have been doing all these years. It is by no means complete but is fairly representative of my career.
>
> If you feel that there is a place for me at Life College, I would love to talk with you about the possibilities.

[Def. Ex. 121]. In December of 1995, Life hired Gutstein as Chair of the Physiology Department. He was sixty-two (62) years old at the time. [DSMF ¶ 57].

On November 12, 1996, Life promoted Gutstein to Associate Academic Dean. [DSMF ¶ 58]. The following year, in December of 1997, Williams praised Gutstein's teaching: "You should have more, much more. You are a good teacher." [DSMF ¶ 59].

In August of 1998, after the resignation of his supervisor, Academic Dean Karen Martucci, Gutstein returned to full-time teaching in the Physiology Department. [DSMF ¶ 60]. Gutstein testified that he left the Office of Academic Affairs and returned to teaching because of his fear that he would be fired due to his association with Martucci. [Gutstein Dep. II at 4-5]. He believed that "Kim Williams [presidential liaison] despised Karen Martucci" and that "[t]here was a vendetta going on between then dean James Brown and Karen Martucci." [Id. at 5]. Gutstein further testified, "I also knew, because of remarks that were made by

12

Dr. Williams, that he considered that whole office to be problematic, and, therefore, I all of a sudden became one of the enemies because I was in that office, and so I was frightened that they might get rid of me as well." [Id.].

In the fall of 1999, Keith Asplin, at the direction of Williams, instituted an assessment of all faculty to make sure their credentials were in compliance with SACS and CCE criteria. [DSMF ¶ 61; Plaintiff's Response to ("Pla. Resp.") DSMF ¶ 61; Asplin Dep. at 154]. An initial evaluation by Kim Williams indicated that Gutstein did not have the requisite hours to teach physiology. [Asplin Dep. at 154-55]. Asplin testified, "When that decision was made I met with Sam Demons and said this doesn't make sense, I don't know how this was added up but I want a review of all the course work that [Gutstein] had taken, much of which was called nutrition. But in the analysis of those courses we viewed that many of them were specifically physiology, and when you credited those courses as physiology, . . . it was determined that he had enough course work to be teaching physiology." [Asplin Dep. at 155]. Asplin further testified that when the analysis of Gutstein's credentials was completed, he "attended a SACS meeting at which point SACS defined all professional programs as graduate level programs." [Id. at 155-56]. As a result, lead instructors in Basic Science courses in professional programs, such as Life's Doctor of Chiropractic program, would be required to hold a Ph.D. [Id.].

13

AO 72A
(Rev.8/82)

Under the newly-defined SACS requirement, teachers in all of the Basic Science courses in the School of Chiropractic, including anatomy, physiology, biochemistry, psychology, and nutrition, were required to have a Ph.D. [Asplin Dep. at 85-86]. Lab instructor positions, however, did not require a Ph.D. [Id.]. According to Asplin, Gutstein was not qualified to teach physiology after the SACS change in accreditation requirements, but he could teach some of the courses in the Doctor of Chiropractic curriculum. [Id. at 85-87]. Asplin testified, "For [Gutstein] to have been reassigned to a different course would have meant someone else had to be terminated, and that decision wasn't made." [Asplin Dep. at 157].

Florence Rigby, a faculty member in the Physiology Department, testified, "Dr. Demons made an attempt to find additional hours for [Gutstein] in other divisions and said the other division chairs were unwilling to provide anything." [Rigby Dep. at 23]. Rigby also testified, however, that Matt Williams, head of Clinical Sciences, stated in a curriculum meeting that "he would only employ [Gutstein] with direct orders from the higher administration." [Id.]. Wayne Menkus, head of the Physiology Department, testified that Demons informed him that the number of hours that Gutstein was scheduled to teach was not Demons' decision. [Menkus Dep. at 29]. Deborah Pogrelis, Chief of Staff of Clinics, testified that the CCE standards say that "any doctor that is appointed to a clinic faculty

14

position who is involved in supervising students delivering patient care must be licensed in the state where the institution is domiciled." [Pogrelis Dep. at 70]. Because Gutstein did not have the requisite Georgia chiropractic license and refused to obtain one, he was not permitted to teach in the School of Chiropractic. [DSMF ¶ 69; Pla. Resp. DSMF ¶ 69].

Gutstein testified that Sam Demons and Kim Williams told students that Gutstein was not qualified to teach when they asked Demons about the topic during a meeting on November 9, 1999. [DSMF ¶ 79; Gutstein Dep. II at 56]. The minutes of that meeting were posted by students on a student bulletin board. [Id.]. On January 11, 2000, Gutstein's hours were reduced from full-time to part-time. [DSMF ¶ 70; Pla. Resp. DSMF ¶ 70; Gutstein Dep. II at 115]. Gutstein filed a charge of discrimination with the EEOC on January 25, 2000. [DSMF ¶ 71; Pla. Resp. DSMF ¶ 71]. By the spring or summer of 2001, his hours had dwindled to zero, and his employment with Life ended. [DSMF ¶ 70; Pla. Resp. DSMF ¶ 70].

Plaintiff Gutstein contends that after a meeting which took place between 1996 and 1998, he heard Kim Williams mutter under her breath that Gutstein was an abrasive New York Jew. [Gutstein Dep. II at 12-13]. He also testified that he heard Sid Williams say, "The problem with him is he doesn't answer any questions. He answers questions by asking a question just like a Jew." [Id. at 63-64]. Gutstein did not know to whom Williams was referring. [Id.]. Plaintiff Gutstein

15

AO 72A
(Rev.8/82)

also testified about Williams' comment about Mike Rappaport being a New York Jew with short arms, about Williams' repeated references to "Bob Rabin as a New York Jew, a red neck New York Jew, a red neck New York Jew with white socks," and about Williams' numerous comments about "New York Jews" at orientations, assemblies and faculty meetings. [Id. at 12-13, 17, 30, 63-64]. Gutstein, however, was never singled out by Williams as Jewish. [DSMF ¶ 74].

Plaintiff Gutstein also contends that he heard numerous age-related comments. Although Sid Williams is five (5) years older than Gutstein, Gutstein testified that at least ten (10) times Williams referred to him as "old Gutstein," making comments like, "I keep old Dr. Gutstein here because he makes me look young by comparison." [Gutstein Dep. II at 18]. According to Gutstein, on at least six (6) occasions, Williams joked about the age of Tom Oliver at faculty meetings and assemblies and made comments about the age of Ron Roland, director of Life's senior adult program. [Id. at 18-21]. Gutstein testified that Williams also commented about the age of Edie Dahlhauser: "He was making remarks about her age at a student assembly, and from her age he went on to the number of children she had, then from the number of children she had he went on to remark that they looked so different that he had questions about who was their father, in effect calling them bastards." [Gutstein Dep. II at 19].

16

AO 72A
(Rev.8/82)

### D.      Plaintiff Dennis Ralin

Plaintiff Dennis Ralin, who is Jewish, holds a Ph.D. in zoology. [DSMF ¶ 80].
Life University hired Ralin as an associate professor in its Natural Sciences
Department in 1990.   [DSMF ¶ 81].   Life promoted Ralin to Chairman of
Undergraduate Admissions in 1991 or 1992 and to full professor in 1996. [DSMF
¶ 83]. Ralin was also promoted to Chairman of the Biology Department in 1997.
When the Biology, Physics and Chemistry Departments were consolidated into one
department, Natural Sciences, Ralin was named Department Chair. [DSMF ¶ 83].

Ralin testified that he heard Sid Williams refer to Williams' son-in-law as a
"Philadelphia Jew" at a faculty meeting in 1992 or 1993. [Ralin Dep. at 24-25].
At a meeting in April of 1998, Williams referred to Ralin as "Old Gray Beard" or
"Gray Beard" numerous times. [Id. at 132-33]. Ralin also stated that he heard
Williams make comments during 1999 faculty meetings about Bob Rabin being a
"New York Jew" and about Mike Rappaport having short arms, "but long enough
to reach the cash register." [Id. at 25-30].

In the fall of 1999, Keith Asplin, Vice President of Academic Affairs, notified
Mamie Ware, Dean of the School of Arts and Sciences, that he was moving Michael
Hoefer out of the Academic Affairs office and back to the Natural Sciences
Department. [DSMF ¶ 84]. Asplin informed Ware that she needed to create a
schedule for Hoefer and noted that Hoefer's schedule might impact other faculty

17

AO 72A
(Rev.8/82)

members. [Ware Dep. at 58-53, 78]. Ware testified, "What Dr. Asplin asked me for was to make a schedule for Dr. Hoefer. I made a schedule for Dr. Hoefer. After I made a schedule for Dr. Hoefer, I did not have a schedule for Dr. Ralin. I informed Dr. Asplin that I did not have a teaching schedule for Dr. Ralin, and that's what I gave to Dr. Asplin." [Id. at 78]. Prior to this time, Ralin had been teaching biology courses in the undergraduate school, and Hoefer was only qualified to teach biology. [Ware Dep. at 79-80]. Ware also testified that while Asplin did not explicitly use Ralin's name, it was Asplin who made the decision to cut the teaching hours of Plaintiff Ralin instead of the hours of Scott Carpenter, a faculty member scheduled to teach biology, or Sandra Davidson, the Department Chair. [Ware Dep. at 81-84].

According to Ware, after she turned in the teaching schedule which did not include any classes for Plaintiff Ralin, Asplin sent a letter to Ralin informing him that his employment with Life was terminated. [Ware Dep. at 91-92]. Asplin originally sent Ralin a letter dated December 10, 1999, stating that his termination would be effective January 9, 2000. [Def. Ex. 91]. The letter served as Plaintiff Ralin's thirty (30) days' notice. [Id.]. According to Ralin, when he received the letter, he called Asplin on December 13, 1999, and Asplin asked him to come in to the office that day because Asplin had a plan that would be to Ralin's benefit. [Ralin Dep. at 68].

18

AO 72A
(Rev.8/82)

Ralin met with Asplin that day.  [Ralin Dep. at 68-74].  He testified that during the meeting, "[Asplin] said that instead of working an additional 30 days, that they wanted me paid off immediately and would have a check ready for me this afternoon.  They wanted me off campus immediately."  [Ralin Dep. at 69].  When Ralin was asked to whom Asplin was referring when he used the term "they," Ralin testified that he assumed Asplin was talking about Sid and Kim Williams.  [Ralin Dep. at 71-73].  Asplin also had told Ralin that "they will be in Florida next week," and Ralin knew that the Williamses "have a place in Florida."  [Ralin Dep. at 73].  During the meeting, Asplin gave Ralin another letter, this one dated December 13, 1999, which provided that Ralin's termination was effective immediately.  The letter also read, in part, "In lieu of thirty - (30) calendar days' notice, as provided in your Appointment letter, you will be paid thirty - (30) calendar days' salary."  [Def. Ex. 92].  Ralin testified, "[Asplin] told me that he didn't know about this [Ralin's termination] until Thursday, which would have been the 9th" of December.  [Ralin Dep. at 71-72].

Ware testified that she did not know why Ralin was terminated.  [Ware Dep. at 76].  Ware recommended Ralin for a teaching position in the Cobb County School System.  [DSMF ¶ 92].  Ralin taught as a substitute in the Marietta City Schools and, in August 2000, began working full-time for the Gilmer County School System at a salary of $57,000 per year, $15,000 more per year than his Life

19

salary. [DSMF ¶ 93]. On March 14, 2000, Plaintiff Ralin filed a charge of discrimination with the EEOC, contending that he had been discriminated against because of his religion, Judaism, and his age, fifty-five (55). [Def. Ex. 99]. He also asserted that he had been subjected to a religiously hostile work environment. [Id.].

Additional facts will be set forth below as they become necessary for discussion of Plaintiffs' claims.

## II.    Summary Judgment Standard

The court should grant a motion for summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. The movant carries his burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2553. Generally, "[t]he

20

mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

III.   **Discussion**

All four (4) Plaintiffs, Bruce Harman, Bert Silverman, Donald Gutstein, and Dennis Ralin, contend that Defendant Life University subjected them to a hostile work environment on the basis of their religion, Jewish, in violation of Title VII. [Doc. 1 at 17-19]. In addition, Plaintiff Harman contends that he was terminated on the basis of his religion, in violation of Title VII, and on the basis of his disability, in violation of the ADA. [Id. at 15-17, 22-23]. Plaintiff Silverman argues that he was terminated on the basis of his religion. [Id. at 15-17]. Plaintiff Gutstein argues that he was demoted from full-time to part-time and eventually given no teaching hours on the basis of his religion and his age, in violation of Title VII and the ADEA respectively. [Id. at 15-17, 19-21]. He also asserts a state law claim of slander per se. [Id. at 27-29]. Plaintiff Ralin claims that he was terminated on the basis of his religion and his age, in violation of Title VII and the

21

AO 72A
(Rev.8/82)

ADEA, and he asserts state law claims of breach of contract and tortious interference with business relations. [Id. at 15-17, 19-21, 24-27].

## A.   Religiously Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In the present case, all of the Plaintiffs allege that they were discriminated against on the basis of their religion when they were subjected to a religiously hostile work environment while working at Life University.   An employer's discriminatory conduct results in a hostile work environment when it is "so severe or pervasive that it create[s] a work environment abusive to employees because of their race, gender, religion or national origin." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).  To establish a *prima facie* case of hostile work environment harassment based on religion, Plaintiffs must show the following: (1) they belong to a protected group; (2) they were subjected to unwelcome harassment; (3) the harassment was based upon their religion; (4) the harassment affected a term, condition or privilege of their employment; and (5) a basis for holding Defendant

22

liable.[3]  See Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982); Ellis v. Wal-Mart Stores, Inc., 952 F. Supp. 1513, 1518 (M.D. Ala. 1996).  Because Plaintiffs are Jewish and were subjected to unwelcome comments about their religion, the only elements in question are the last two (2).  Like the majority of cases, the most significant and most contested element in this case is the fourth one: whether the conduct Plaintiffs complain of was severe enough to affect a term, condition or privilege of their employment.

    For harassment to be actionable under Title VII, it "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998). In determining whether the complained of harassment was sufficiently hostile or abusive to affect a term, condition or privilege of employment, courts are to look at all the circumstances, including the frequency and severity of the conduct.  See id.  Courts should also look at whether the conduct is "physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id.  The Supreme Court has made it clear that Title VII is not a "general civility code."  Oncale v. Sundowner Offshore

    [3]In Defendant Life's summary judgment motion, the University addresses all of the Plaintiffs' hostile work environment claims in a single discussion.  [Doc. 21 at 36-40].  The court will do the same.

23

Services, Inc., 523 U.S. 75, 77-79, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d. 201 (1998). "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment. Faragher, 524 U.S. at 788, 118 S. Ct. at 2283 (citations omitted).

Plaintiffs allege that the following support their claim of a religiously hostile work environment: (1) comments made by Sid Williams in 1992 or 1993 during assemblies and faculty meetings in which he referred to Plaintiff Harman and Harvey Fish as "his New York Jews" and to Williams' son-in-law as a "Philadelphia Jew" [Harman Dep. at 236-37; Ralin Dep. at 24-25]; (2) Williams' letter to Plaintiff Harman in 1995 which stated, in part, "Jews don't have pain like ordinary people" [Def. Ex. 59A]; (3) a reference by Williams to a group of people as "New York Jews" in a speech made in 1994 or 1995 [DSMF ¶ 55]; (4) Williams' letter to Plaintiff Harman in 1996 stating, in part, "I can imagine a New York Jew being irritated" [Def. Ex. 60]; (5) Williams' statement to Plaintiff Silverman that he would like Life because there were so many Jews there [DSMF ¶ 37]; (6) Kim Williams muttering that Plaintiff Gutstein was an abrasive New York Jew after a meeting sometime between 1996 and 1998 [Gutstein Dep. II at 12-13]; (7) Sid Williams' statement within earshot of Gutstein that an unidentified person "answers questions by asking a question just like a Jew" [Gutstein Dep. II at 63-64]; (8) Williams stating in a 1999 faculty meeting that Michael Rappaport was a "New York Jew with short

24

Scanned Image - 1:00CV1216 Document 93 page 38 Thu Oct 05 00:00:00 2002

arms" [Ralin Dep. at 25-30]; (9) Williams' use of "New York Jew" more than a dozen times from 1997 to 1999 when referring to Life faculty and chiropractors not at Life [Harman Dep. at 159-60; Silverman Dep. at 104-05]; and (10) Williams' repeated references to Bob Rabin as a "New York Jew" or "a red neck New York Jew" [Gutstein Dep. II at 12-13, 17, 30, 63-64].

The court finds that these incidents are sufficiently severe to allow Plaintiff's religiously hostile work environment claims to survive summary judgment.  As noted *supra*, one of the factors that courts are to consider is the frequency of the conduct.  See Faragher, 524 U.S. at 787, 118 S. Ct. at 2283.  Here, the comments made predominantly by Sid Williams occurred with regularity.  All four (4) Plaintiffs testified that Williams referred to people as New York Jews dozens of times during faculty meetings, assemblies and private meetings.  The fact that so many of these references occurred in public caused Plaintiffs a great deal of humiliation, which is another factor that must be taken into account.  See Edwards v. Wallace Community College, 49 F.3d 1517, 1521 (11th Cir. 1995).

Williams' statement in a letter to Harman that "Jews don't have pain like ordinary people" and his numerous references to "Bob Rabin as a New York Jew, a red neck New York Jew, [and] a red neck New York Jew with white socks" are offensive, anti-Semitic and, quite frankly, bizarre.  [Gutstein Dep. II at 12-13, 17, 30, 63-64; Def. Ex. 59A].  His comment to Rappaport during a 1999 faculty

25

AO 72A
(Rev.8/82)

meeting, which all of the Plaintiffs attended, is particularly appalling.  Plaintiff

Silverman testified that Williams called Rappaport a "New York Jew with short

arms . . . that Rappaport's short arms were okay to be used for running a

calculator, running an adding machine, and counting his damn money."

[Silverman Dep. at 30].  Plaintiff Ralin described the same incident, saying, "Well,

[Williams] was making fun of Dr. Rappaport's short arms, having arms

disproportionately short, I understand, because he had polio or something when

he was a kid or. . . .  And he was making fun of his arms, he said, but long enough

to reach the cash register."  [Ralin Dep. at 27].  The court concludes that a jury

could find that these comments and references, made over and over again, are

more than just "simple teasing" and "offhand comments."  Faragher, 524 U.S. at

788, 118 S. Ct. at 2283.  They certainly were not isolated.  Id.  By offering evidence

showing that the religious harassment affected a term, condition or privilege of

Plaintiffs' employment, they have satisfied the fourth *prima facie* element.

The final *prima facie* element requires Plaintiffs to show that there is a basis

for holding Defendant liable.  In Harris v. Forklift Systems, Inc., *supra*, as the

Supreme Court noted in Faragher, "the individual charged with creating the

abusive atmosphere was the president of the corporate employer, who was

indisputably within that class of an employer organization's officials who may be

treated as the organization's proxy."  Faragher, 524 U.S. at 789, 118 S. Ct. at

26

2284. For this reason, "standards for binding the employer were not in issue in Harris." Id. The same is true in the present case where the person making the harassing comments, Sid Williams, was Life University's President and Founder. Because there is no question that Williams held a position high enough in the University's hierarchy to impute his actions to the employer, Plaintiffs are able to establish the final *prima facie* element of their religiously hostile work environment claims. See id. at 789-90, 118 S. Ct. at 2284-85.

Defendant uses a paragraph to explain that "Plaintiffs did not complain or follow the procedures contained in Life's non-discrimination policies." [Doc. 21 at 39-40]. However, the University makes no argument as to how this is relevant to its summary judgment motion. Presumably, Defendant cites Plaintiffs' failure to complain as evidence that the University can assert the two (2) part affirmative defense established by the Faragher court. The two (2) elements are: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807, 118 S. Ct. at 2293. The court finds, however, that the Faragher affirmative defense is inapplicable in the present case and that Plaintiffs' alleged failure to complain about Williams is not relevant to their claims. As the Eleventh Circuit has noted, "[A]n employer can be held vicariously liable for

27

a supervisor's sexual[4] harassment . . . [when] the supervisor holds such a high position in the company that he could be considered the employer's 'alter ego.'" Dees v. Johnson Controls World Services, Inc., 168 F.3d 417, 421-22 (11th Cir. 1999).  In those instances, the affirmative defense does not apply.  Id.  Sid Williams' position as President of Life is certainly high enough to be considered the University's alter ego.

For all these reasons, the court finds that Plaintiffs are able to establish a *prima facie* case of a religiously hostile work environment.  Because the Faragher affirmative defense is inapplicable, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on this claim.

**B.   Religious Discrimination in Terminations and Demotion**

All four (4) Plaintiffs contend that they were subjected to adverse employment actions on the basis of their religion in violation of Title VII. According to Plaintiffs, Defendant Life University demoted Gutstein and terminated the employment of Harman, Silverman and Ralin on the basis of Plaintiffs' religion, Jewish. [Doc. 1].

---

[4]Most of the cases discussing the issue of hostile work environment have involved claims of sexual harassment, but the same standards apply to harassment based on race, national origin, age and religion. See Deffenbaugh v. Wal-Mart Stores, Inc., 156 F.3d 581, 592-93 (5th Cir. 1998); Wright-Simmons v. The City of Oklahoma City, 115 F.3d 1264, 1270 (10th Cir. 1998); Fierro v. Saks Fifth Avenue, 13 F. Supp. 2d 481, 491 (S.D. N.Y. 1998).

28

AO 72A
(Rev.8/82)

In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against him.  <u>See</u> <u>Texas Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).  The familiar <u>McDonnell Douglas</u> framework governs the allocation of burdens and order of presentation and proof, and they are as follows: (1) plaintiff has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, non-discriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, plaintiff must have an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by defendant was a pretext for discrimination.  <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973).

A plaintiff may establish a *prima facie* case of discrimination under Title VII by presenting direct evidence of discriminatory intent.  Alternatively, a plaintiff may establish a *prima facie* case through a variant of the circumstantial evidence test established in <u>McDonnell Douglas</u>.  In the present case, Plaintiff relies on

29

AO 72A
(Rev.8/82)

circumstantial evidence, rather than direct evidence, to establish a *prima facie* case; therefore, application of the McDonnell Douglas test is appropriate.[5]

A plaintiff can make out a *prima facie* case of disparate treatment by proving (1) that he was within a protected class; (2) that he suffered an adverse employment action; and (3) that a similarly situated employee not within his protected class was not subjected to the adverse employment action. See Burdine, 450 U.S. at 258, 101 S. Ct. at 1096; Krieg v. Paul Revere Life Ins. Co., 718 F.2d 998, 999 (11th Cir.1983). The alleged discriminatory action must be subjectively and objectively adverse. See Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000); Doe v. DeKalb County School District, 145 F.3d 1441 (11th Cir.

---

[5]Plaintiffs contend that they have direct evidence of religious discrimination because the comments made by Sid Williams produce an inference of discriminatory motive. Quoting from Judge Tjoflat's opinion in Wright v. Southland Corporation, 187 F.3d 1287, 1293 (11th Cir. 1999), Plaintiffs write, "The courts have defined 'direct evidence' as that 'from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic.'" [Doc. 50 at 32]. The undersigned disagrees that this is the definition of direct evidence. As the court in Ferrell v. Masland Carpets, Inc., 97 F. Supp. 2d 1114, 1122 n. 11 (S.D. Ala. 2000), explained, "Judge Tjoflat's definition of direct evidence 'is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel joined that portion of the opinion.'" Id. (quoting Copley v. Bax Global, Inc., 80 F. Supp. 2d 1342, 1348 (S.D. Fla. 2000)). The Ferrell court also noted that the Eleventh Circuit has refused to apply Judge Tjoflat's definition of direct evidence since his opinion was issued. Id. (citing Damon v. Fleming Supermarkets of Fla., 196 F.3d 1354, 1358-59 (11th Cir. 1999); Beaver v. Rayonier, Inc., 200 F.3d 723, 729-30 (11th Cir. 1999)). In the present case, Williams' comments are circumstantial evidence of discrimination, and the McDonnell Douglas burden shifting framework is applicable.

30

1998) (adopting an objective test to determine if an employment action is adverse). Moreover, the adversity must be material; that is, it must be more than "some de minimis inconvenience or alteration of responsibilities." DeKalb County School District, 145 F.3d at 1453.

In the present case, the first two (2) *prima facie* elements are satisfied because all four (4) Plaintiffs are Jewish and suffered adverse employment actions. Plaintiffs Silverman and Ralin were terminated, Plaintiff Harman was denied a part-time schedule before being terminated, and Plaintiff Gutstein's teaching hours were reduced from full-time to part-time and eventually to zero. [DSMF ¶¶ 29, 70; Def. Ex. 92; Asplin Dep. at 127-28]. Plaintiffs have also satisfied the final *prima facie* elements by showing that similarly situated non-Jewish employees were retained by Life University.

When Silverman was terminated from his employment in the Biochemistry Department in September of 1999, two (2) other instructors, Henry Zeidan and Bob Waterson, remained employed in the department. [Silverman Dep. at 189]. Neither Zeiden nor Waterson is Jewish. [Waterson Dep. at 8; Gutstein Aff. ¶ 21].

Ralin's teaching hours were cut around the end of November in the fall quarter of 1999, and he was terminated on December 13, 1999. [Def. Ex. 92; Ware Dep. at 78-86]. All of Ralin's courses in the Biology Department were awarded to Michael Hoefer, who is not Jewish. [Plaintiffs' Statement of Material Facts

31

AO 72A
(Rev.8/82)

("PSMF") ¶ 29; Ware Dep. at 48-51, 78-86]. Two (2) other biology teachers who are not Jewish, Scott Carpenter and Sandra Davidson, did not have any of their teaching hours given to Hoefer. [Ware Dep. at 81-84].

Harman was not awarded a part-time position, as he had requested, after he returned from his FMLA leave in January of 2000. [DSMF ¶¶ 23, 27]. However, Deborah Pogrelis, Chief of Staff of Clinics, acknowledged that at least one non-Jewish instructor, Ken Holewinski, worked a part-time schedule at the clinic during this same period of time. [Pogrelis Dep. at 40-49]. Plaintiff Harman contends that since the time he was terminated, two (2) other non-Jewish employees, Malon Harris and Mark Amos, worked part-time schedules at the clinic as well. [Harman Dep. at 144-51].

Gutstein's teaching hours were reduced because, according to Life, his lack of a Ph.D. made him unqualified to be a lead instructor in Basic Science courses. [Asplin Dep. at 85-86, 155-56]. Although Gutstein was qualified to teach lab courses, he was not offered any of these teaching hours. [Asplin Dep. at 157]. However, Robert Burger, a non-Jewish professor, who also did not have a Ph.D., was given hours teaching lab courses immediately after being notified that he could not continue as a lead instructor in the School of Chiropractic. [Burger Dep. at 6, 7, 13, 17-20]. This occurred in the spring of 2001, the same time Plaintiff Gutstein's hours dwindled to zero. [Id.; DSMF ¶ 70].

32

All four (4) Plaintiffs have established a *prima facie* case of religious discrimination. Thus, the burden of production shifts to Defendant Life University to articulate some legitimate, non-discriminatory reasons for the actions taken against Plaintiffs. See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; Burdine, 450 U.S. at 254, 101 S. Ct. at 1094). To satisfy its burden of production, "the defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Id. (quoting Burdine, 450 U.S. at 254-55, 101 S. Ct. at 1094). "[T]he employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. at 257, 101 S. Ct. at 1096). The defendant's burden in the rebuttal stage is "exceedingly light." Walker v. NationsBank of Florida, 53 F.3d 1548, 1556 (11th Cir. 1995); Perrymen v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

Once the defendant satisfies its burden of producing a legitimate, non-discriminatory reason for the actions taken against the plaintiff, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106

33

AO 72A
(Rev.8/82)

F.3d at 1528 (quoting Burdine, 450 U.S. at 255 & n. 10, 101 S. Ct. at 1094-95 &
n. 10). The plaintiff then "has the opportunity to demonstrate that the defendant's
articulated reason for the adverse employment action is a mere pretext for
discrimination." Holifield v. Reno, 115 F.3d 1555, 1565 (11th Cir. 1997) (citing
McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825). Plaintiff's proof of pretext
merges with his "ultimate burden of showing that the defendant intentionally
discriminated against the plaintiff." Id. (citing St. Mary's Honor Ctr. v. Hicks, 509
U.S. 502, 511, 113 S. Ct. 2742, 2749, 125 L. Ed. 2d 407 (1993)). This task is a
highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff
has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons
to permit a reasonable fact finder to conclude that the employer's proffered
'legitimate reasons were not what actually motivated its conduct.'" Combs, 106
F.3d at 1538 (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th
Cir. 1994)). The court's task is to "evaluate whether the plaintiff has demonstrated
'such weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons for its action that a
reasonable fact finder could find them unworthy of credence.'" Id. (quoting
Sheridan v. E.I. DuPont De Nemours & Co., 100 F.3d 1061, 1072 (3rd Cir. 1996)
(en banc), cert. denied, 521 U.S. 1129, 117 S. Ct. 2532, 138 L. Ed. 2d 1031

34

Scanned Image - 1:00CV3379 Document 93 page 36 Thu Dec 05 00:00:00 2002

(1997)). "[A] plaintiff may not in all cases merely rest on the laurels of [his] *prima facie* case in the face of powerful justification evidence offered by the defendant." Grigsby v. Reynolds Metals Co., 821 F.2d 590, 596 (11th Cir. 1987). Plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's proffered explanation is unworthy of credence. See Miles v. M.N.C. Corp., 750 F.2d 867, 870-71 n.4 (11th Cir. 1985).

In the present case, Defendant Life University has satisfied its exceedingly light burden of producing legitimate, non-discriminatory reasons for the various adverse actions. Plaintiffs respond by arguing that pretext can be shown with respect to all of Life's stated reasons. Plaintiffs also argue that the discriminatory animus of Life's President Sid Williams (as revealed by his various comments and statements) is evidence that the stated reasons are not what actually motivated the decisions made by the University. [Doc. 50 at 33, 35-40]. The court will examine Life's proffered reasons and the corresponding arguments of pretext offered by each Plaintiff.

### 1.   Plaintiff Silverman

Defendant Life contends that Bert Silverman was terminated due to the University's reduction-in-force ("RIF") and "because he had the least seniority of the three members of the Biochemistry Department." [Doc. 21 at 33]. After

35

AO 72A
(Rev.8/82)

Silverman's termination in September of 1999, two (2) other instructors, Henry Zeidan and Bob Waterson, remained employed in the Biochemistry Department. [Silverman Dep. at 189].

Sam Demons, Chair of the Basic Sciences Division, wrote a letter in the fall of 1999 to Sid Williams which contained a recommendation from Demons that Plaintiff Silverman should be terminated.[6]  [Def. Ex. 19].  Midway through the letter, after noting personal conflicts between Henry Zeidan and Thomas Iha, Demons wrote, "Seniority of Dr. Silverman and Dr. Zeidan was another consideration for me.  Dr. Zeidan has been with Life for approximately ten years while Dr. Silverman had been here three to four years.  The last hired in [sic] generally the first fired in most situations with all other factors being equal."  [Def. Ex. 19].  Oddly, at his deposition, Demons was asked and testified to the following:

> Q.  Have you ever heard of a policy at Life University that the last person hired is the first one to be released? . . . Is there such a policy, to your knowledge, at Life University that if cutbacks take place that the last person hired is the first person to be fired?
> A.  I haven't heard of that policy.
> Q.  Have you, yourself, ever stated that that was a policy at Life University?
> A.  Not by itself, no.

[Demons Dep. at 56-57].

---

[6]Demons' letter was written in response to a letter from Thomas Iha, Head of the Biochemistry, Microbiology and Pathology Departments.  Iha had written to express his opposition to the release of Silverman instead of Henry Zeidan.  [Def. Ex. 18].

36

AO 72A
(Rev.8/82)

Keith Asplin, Vice President of Academic Affairs and the decisionmaker who

directed Life's deans to identify faculty members for termination, testified similarly:

> Q.  Have you ever heard of a policy at Life University that the last
> that's hired is generally the first fired?
> A.  No.  I have had people use that phrase with me as being a norm
> in the workplace but not that that was a practice.

[Asplin Dep. at 135-36].  Asplin further testified that the sentence in Demons'

letter stating that the "last hired [is] generally the first fired" was an incorrect

statement of Life University policy.  [Def. Ex. 19; Asplin Dep. at 136].  Nevertheless,

Defendant Life now claims that Plaintiff Silverman was selected for termination

because he was hired more recently than two (2) other biochemistry teachers.

And, although Asplin and Demons deny that Life has a "last hired/first fired"

policy, Defendant cites the deposition testimony of both Asplin and Demons in

support of its claim that Plaintiff Silverman was laid off because of a lack of

seniority.  A reasonable jury could find this assertion dubious.

Further evidence supporting Plaintiff Silverman's claim of pretext is the fact

that seniority apparently played no part in the termination decisions of other Life

teachers.   For example, as discussed *infra*, Plaintiff Ralin was selected for

termination over Scott Carpenter, a similarly situated teacher, even though Ralin

had been at Life longer than Carpenter.  [Ware Dep. at 90].  A reasonable jury

could also find that Silverman's religion played a part in his termination given Sid

37

AO 72A
(Rev.8/82)

Williams' comments and statements regarding Jewish employees. This fact is significant because, as Asplin testified, Sid Williams made the final decision with respect to Silverman's termination. [Asplin Dep. at 129-30].

Given Williams' numerous discriminatory comments and the conflicting testimony about why Silverman was selected for termination over Zeidan and Waterson, the undersigned finds that a factfinder could conclude that Life's proffered reasons for terminating Silverman are pretexts for religious discrimination. It is, therefore, **RECOMMENDED** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on Plaintiff Silverman's claim of religious discrimination in his termination.

### 2.    Plaintiff Ralin

Life University asserts that Plaintiff Dennis Ralin was laid off due to the RIF and "because he had poor student evaluations and complaints, had less seniority than [Michael] Hoefer and was not tenured as Hoefer was." [Doc. 21 at 33]. In support of this assertion, Defendant Life cites the deposition testimony of Mamie Ware, Dean of the School of Arts and Sciences. [Doc. 21 at 22-23, 33]. Ware testified that Keith Asplin instructed her to create a schedule for Michael Hoefer, who was moving out of the Academic Affairs office and into a position teaching biology. [Ware Dep. at 79-84]. Ware also testified that Asplin made the decision to cut the teaching hours of Plaintiff Ralin, who was also scheduled to teach

38

AO 72A
(Rev.8/82)

biology, instead of the hours of Scott Carpenter, another faculty member teaching biology. [Id.]. According to Ware, Asplin did not explicitly use Ralin's name, but Ware knew Asplin was referring to Ralin when he instructed her to cut the teaching hours of the person "in the past that may have gotten bad evaluations or had some student problems. . . ." [Ware Dep. at 81-82].

Plaintiffs argue that a reasonable jury could find that Defendant's proffered reasons are actually pretexts for religious discrimination, and the court finds this argument persuasive. Defendant cites Ware's deposition testimony in support of its stated reasons for terminating Plaintiff Ralin's employment. However, at her deposition, Ware made it clear that she did not know why Ralin was terminated, and, as far as she knew, Asplin was the individual "[w]ho made the decision that it would be Dr. Ralin's hours that were cut back for Dr. Hoefer as opposed to Dr. Carpenter or Dr. Davidson." [Ware Dep. at 76, 81, 90-92]. Ware testified that Asplin did not ask for her opinion about the issue. [Ware Dep. at 81]. Ware also stated that she even asked Asplin if she could take teaching hours away from multiple teachers rather than just from one, so that Ralin could remain employed. Asplin responded that she was to take hours away from just one person, and he implied that Plaintiff Ralin was that person. [Ware Dep. at 83]. Defendant Life does not cite, and the court cannot find, any testimony from Asplin explaining why he wanted Ralin terminated. While Asplin apparently had some involvement with

39

the decision, as noted *supra*, Sid Williams had final decisionmaking authority on personnel decisions at Life University, including hiring, firing, promotion, and tenure. [Asplin Dep. at 24-26, 36, 40].

Life contends that Ralin was terminated instead of Hoefer because of complaints made about Ralin by students and because he lacked seniority and tenure. Yet, the University fails to explain why Ralin was selected for termination over Scott Carpenter, another employee who taught biology. Carpenter's hours were not reduced and he was not terminated even though, like Plaintiff Ralin, he lacked tenure and also had been the subject of student complaints in the past. [Ware Dep. at 82-83, 89-90]. In addition, Plaintiff Ralin had been at Life University longer than Carpenter. [Id. at 90]. This casts doubt on Defendant's claim that seniority was a significant factor that the University considered when making termination decisions.

Based on these facts, the court finds that there is sufficient evidence to persuade a jury that Defendant's stated reasons are not what actually motivated the University's decision to terminate Ralin. Accordingly, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on Plaintiff Ralin's claim of religious discrimination in his termination.

40

### 3.   Plaintiff Harman

After Plaintiff Bruce Harman returned from his FMLA leave in January of 2000, he informed Life University that he was unable to return to his full-time position. He requested a part-time position, but the University denied this request. [DSMF ¶¶ 23, 27]. According to Life, "there were no other part-time positions available for which he was qualified" because of the RIF and his physical limitations. [Doc. 21 at 32].

Plaintiff Harman contends that this is a pretext for religious discrimination. Harman argues that other part-time "positions were actually available for the three (3) non-Jewish professors who requested them." [Doc. 50 at 38-39]. In support of this assertion, Harman cites the testimony of Deborah Pogrelis, Chief of Staff of Clinics. The court, however, finds that Plaintiff has not offered any evidence that a part-time schedule was available in the clinic system.

Plaintiff Harman testified that he was told by his supervisor, Steven Mirtschink, that no part-time schedules were available. [Harman Dep. at 131-32, 275-76]. He was also informed via letters from both Pogrelis and Ron Kirk, Dean of the School of Chiropractic, that there were no part-time positions available at that time. [Def. Exs. 113, 114; DSMF ¶ 27]. This explanation has consistently been offered by Defendant as the reason Plaintiff Harman's request for a part-time schedule was denied.

41

At her deposition, Pogrelis testified that she was only aware of one instructor, Ken Holewinski, who had ever worked a part-time schedule. She stated that Holewinski started working part-time at the clinic before January of 1999, when Pogrelis was appointed to her current position. [Pogrelis Dep. at 19-20, 40-49]. Pogrelis also testified that Holewinski was the only part-time clinical instructor from 1998 to 2002 and that there were never any openings for other part-time instructors. [Id.]. There is no evidence in the record which contradicts Pogrelis' testimony. Plaintiff Harman contends that two (2) other employees, Malon Harris and Mark Amos, also worked part-time schedules at the clinic. [Harman Dep. at 144-51]. But Plaintiff has offered nothing to support this claim other than his own hearsay-based testimony. Because Plaintiff Harman is unable to show that a part-time position was available in January of 2000, when Harman requested such a position, he had failed to show that Defendant's stated reason is unworthy of credence.

Defendant Life also asserts that Harman was not qualified for any other position at Life "[b]ecause of his fraudulent use of FMLA leave and his violation of Life's policy on outside employment. . . ."[7]  [Id. at 32-33]. Plaintiff Harman

---

[7]Plaintiff contends that "these are *post-hoc* explanations which Defendant now asserts for purposes of establishing a case." [Doc. 50 at 39]. Plaintiff then goes on to discuss the desired part-time clinic position again. However, as noted, Defendant asserts that these reasons explain why "Harman was not qualified for *any other position at Life.*" [Doc. 21 at 33]. With respect to the part-time clinic

42

acknowledges that while he was out of work on FMLA leave, he traveled and sold services and products for a business owned by his wife and two (2) friends. [Harman Dep. at 54, 60-64, 81]. Nevertheless, Harman argues that he "did not violate the stated Life policy, which prohibits anyone from performing any outside work where 'remuneration is either expected or received' because he did not get paid for this work and did not expect to get paid." [Doc. 50 at 39]. The court finds this argument unpersuasive.

First, it is not clear that Plaintiff did not violate Life's policy. Plaintiff was working between fifteen (15) and twenty (20) hours per week selling services for a company partially owned by his wife. [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. It seems reasonable to interpret Harman's actions as working for remuneration. Moreover, even if Harman, while he was on FMLA leave, did not violate Life University's policy on performing outside work, this is immaterial to the pretext inquiry. "Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true." <u>Sweeney v. Alabama Alcoholic Beverage Control Board</u>, 117 F. Supp. 2d 1266, 1273 (M.D. Ala. 2000). "An employer who fires an employee under the mistaken but honest impression

---

faculty positions, the evidence establishes that the decisionmakers involved in Harman's request, such as Mirtschink, Pogrelis, and Kirk, consistently stated that Plaintiff was not offered such a position because there were none available. [Harman Dep. at 131-32, 275-76; Def. Exs. 113, 114; DSMF ¶ 27].

43

AO 72A
(Rev.8/82)

Scanned Image - 1:00CV2576 Document 53 page 46 Thu Dec 05 00:00:00 2002

that the employee violated a work rule is not liable for discriminatory conduct."

Damon, 196 F.3d at 1363 n. 3. Based on the evidence presented by Plaintiff, the court finds that a reasonable jury could not conclude that "the employer has not given an honest explanation of the employer's behavior."[8] Id.

Defendant Life has offered legitimate, nondiscriminatory reasons for not granting Plaintiff Harman's request for a part-time position, and Plaintiff has failed to show that these reasons are actually pretexts for discrimination. Accordingly, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Harman's claim of religious discrimination in his termination.

### 4.    Plaintiff Gutstein

Donald Gutstein's teaching hours were reduced, according to Defendant Life, due to the RIF and the fact that Gutstein was not qualified to be a lead instructor in Basic Sciences courses because of his lack of a Ph.D.  [Doc. 21 at 33].  Life contends that after the faculty layoffs, there were no positions available for which Gutstein was qualified to teach.  [Id.].  In addition, Life states, "Gutstein did not

---

[8]The court also notes that Plaintiff Harman's opinion about Defendant Life's interpretation of its own policy is irrelevant. As the Eleventh Circuit stated in Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.1984), "Title VII does not take away an employer's right to interpret its rules [and policies] as it chooses, and to make determinations as it sees fit under those rules [and policies]."

AO 72A
(Rev.8/82)

have and was not willing to obtain a Georgia chiropractic license, so he was not

qualified to teach in the Chiropractic School." [Id.].

Plaintiff Gutstein contends that a reasonable jury could conclude that these

stated reasons were not what actually motivated the decisionmakers' conduct.

Plaintiff points out that although the University claims that no teaching positions

were available for Gutstein, Wayne Menkus, Head of the Physiology Department,

stated otherwise.  Menkus testified:

> I had realized that Dr. Gutstein was a great teacher for the school . .
> . and I asked Dr. Mayne, do you have any part-timers that maybe we
> could get rid of, put them on the short list, giving Dr. Gutstein enough
> compliment of hours to keep him at full-time status?  Dr. Mayne's
> response was positive. He did. He had two sections of what are called
> dry lab in Anatomy that would be a total of six hours, which could
> have been taught with the credentials because Dr. Mayne also
> reviewed Dr. Gutstein's college credits and agreed that he could teach
> it.  So between ourselves as department heads, we agreed that what
> we would do between ourselves is give Dr. Gutstein these extra hours
> to help him remain at a full-time status.

[Menkus Dep. at 26-27].

On numerous occasions afterwards, Menkus informed Samuel Demons,

Chair of the Basic Sciences Division, of the solution he had come up with to keep

Gutstein at full-time.   [Id. at 27-28].  Menkus described the third time he

suggested his proposed solution to Demons: "At that point, Dr. Demons told me

that I needed to tell Dr. Gutstein that this is his schedule, and he handed me the

schedule.  That schedule did not contain any of the hours that would have allowed

45

AO 72A
(Rev.8/82)

Dr. Gutstein to remain full time." [Menkus at 28-29]. When Menkus asked Demons why his proposal to allow Gutstein to teach lab courses had been rejected, Demons responded by saying, "[I]t's not my decision, it's not your decision." [Id. at 29]. Demons did not tell Menkus whose decision this was. [Id.]. Menkus testified that he and Demons met with Gutstein to give him his schedule:

> Dr. Gutstein looked at the schedule, noticed that, of course, he's no longer on full-time status, [and] made a comment about that. . . . And at that point I said, Dr. Demons, I just am asking one more time, what about the possibility of giving Don dry lab, an extra six hours, to keep him in full-time status. . . . Dr. Demons then looked at me and then looked at him, gave it to him and said, this is all I can do.

[Menkus Dep. at 30].

Florence Rigby, a faculty member in the Physiology Department who became department head in January of 2000, testified that when she spoke with Demons about giving Gutstein some hours available in the Biochemistry Department, Demons "said simply that he didn't think it would be a good idea." [Rigby Dep. at 30]. Bob Waterson, an instructor in the Biochemistry Department, testified that Demons made it "very clear that we're not to do any favors to help Dr. Gutstein out." [Waterson Dep. at 45]. Rigby also testified that Matt Williams, head of Clinical Sciences, stated in a curriculum meeting that "he would only employ [Gutstein] with direct orders from the higher administration." [Rigby Dep. at 23].[9]

___

[9]Plaintiff Gutstein cites the deposition testimony of Edie Dalhauser in support of his claim that "Kim Williams instructed Sam Demons, the chair of Basic

AO 72A
(Rev.8/82)

As noted *supra*, Asplin testified that although Gutstein was qualified to teach lab courses, he was not offered any of them. [Asplin Dep. at 157]. In the spring of 2001, when Gutstein's hours dwindled to zero, Robert Burger was given hours teaching lab courses immediately after being notified that he could not continue as a lead instructor in the School of Chiropractic because he, like Gutstein, did not have a Ph.D. Burger is not Jewish. [Burger Dep. at 6, 7, 13, 17-20; DSMF ¶ 70].

Given these facts, the court finds that a reasonable jury could conclude that Life's stated reasons for reducing Gutstein's hours were pretexts for discrimination. Defendant Life contends that there were no courses that Plaintiff Gutstein could teach, but testimony from faculty members reveals that teaching hours, at least in the form of lab courses, were available that Gutstein was qualified to teach. Moreover, a reasonable jury could conclude from the testimony discussed above that Demons received instructions from Sid Williams regarding the decision not to offer available teaching hours to Gutstein. In light of the comments regarding Gutstein's religion made by Sid Williams, the fact that Williams appears to have been involved in the decision lends further support to Gutstein's religious discrimination claim. Accordingly, the undersigned

---

Sciences, to cut Gutstein's hours until he quit." [Doc. 50 at 15]. The court will not consider this assertion because it is based solely on hearsay. Dalhauser stated repeatedly that this was a rumor and that she did not even know who told her about it. [Dahlhauser Dep. at 30-31, 37].

AO 72A
(Rev.8/82)

**RECOMMENDS** that Defendant Life University's summary judgment motion [Doc. 21] be **DENIED** on Plaintiff Gutstein's claim of religious discrimination with respect to the reduction of his hours and his eventual termination.

### C.   Age Discrimination Claims Asserted by Ralin and Gutstein

The court will next address the claim made by Plaintiffs Donald Gutstein and Dennis Ralin that Defendant Life University discriminated against them on the basis of their age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, et seq. The ADEA provides in pertinent part:

> It shall be unlawful for an employer– (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; . . .

29 U.S.C. § 623(a)(1).

Because Plaintiffs in the present case are relying on circumstantial evidence, they must first establish a *prima facie* case of age discrimination using a variant of the McDonnell Douglas framework applicable to the facts at hand. To establish a *prima facie* case of age discrimination, a plaintiff-employee must demonstrate (1) that he was in the age group protected by the ADEA, (2) that he was adversely affected by an employment decision, (3) that he was qualified for the position, and (4) he must produce sufficient evidence for a reasonable fact finder to conclude that the decision at issue was based on the employee's age. See O'Connor v.

48

Consolidated Coin Caterers Corp., 517 U.S. 308, 313, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996); Jameson v. Arrow Co., 75 F.3d 1528, 1532 (11th Cir. 1996); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1082 (11th Cir. 1990). A plaintiff may create an inference of age discrimination by showing that he was replaced by a younger employee. See O'Connor, 517 U.S. at 312-13, 116 S. Ct. at 1310.

The court finds that Plaintiffs Ralin and Gutstein are able to establish *prima facie* cases of age discrimination. Ralin was fifty-five (55) when he was terminated on December 13, 1999, and Gutstein was sixty-eight (68) when he was terminated in the spring of 2001, and both men were qualified for their positions. [Def. Ex. 92; Ralin Dep. at 11; Gutstein Dep. I at 5; DSMF ¶ 70]. Defendant argues that certain age-related comments made by Sid Williams, such as referring to Gutstein as "old Dr. Gutstein" and calling Ralin "old gray beard," do not support a finding of age discrimination. [Doc. 21 at 31-32; Doc. 51 at 13-14]. However, Defendant Life does not address the fact that similarly situated younger teachers, such as Robert Burger, David Spring, Michael Hoefer, Scott Carpenter, and Sandra Davidson, were retained after Ralin and Gutstein were terminated. [Doc. 50, Exs. B, D, E]. This is all that is necessary for Plaintiffs to establish *prima facie* cases of age discrimination.

Accordingly, the burden shifts to Defendant Life to produce legitimate, nondiscriminatory reasons for terminating the employment of Plaintiff Ralin and

Gutstein. Defendant's proffered reasons and Plaintiffs' arguments of pretext have been discussed at length *supra* with respect to their religious discrimination claims. Because the same arguments are made with respect to Ralin's and Gutstein's age discrimination claims, the court need not address them in full again. The court simply notes that Life contends that Ralin was terminated during the RIF because of student complaints and because he lacked seniority and tenure compared to Michael Hoefer, who was moving out of the Academic Affairs office and into a position teaching biology. However, Defendant Life does not explain why Plaintiff Ralin was selected for termination over Scott Carpenter, a less experienced biology teacher who, like Ralin, lacked tenure and had been the subject of student complaints in the past. [Ware Dep. at 82-83, 89-90].

As previously discussed, Gutstein, according to Life, was terminated because there were no courses available for him to teach. However, Wayne Menkus, Head of the Physiology Department, testified that teaching hours were available that Gutstein was qualified to teach. Menkus also testified that he suggested on numerous occasions that Gutstein be given enough hours to keep him full-time, but these suggestions were rejected. [Menkus Dep. at 26-30]. To summarize, Plaintiffs have offered evidence which would allow a factfinder to conclude that Life's stated reasons for terminating both Ralin and Gutstein are not what actually motivated its conduct.

50

AO 72A
(Rev.8/82)

The court finds that when this showing of pretext is coupled with the fact that Ralin and Gutstein are able to establish *prima facie* cases of age discrimination, a reasonable jury could conclude that Defendant Life discriminated against Plaintiffs on the basis of their age.  As the Supreme Court recently stated, "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation . . . . Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-48, 120 S. Ct. 2097, 2108-09, 147 L. Ed. 2d 105 (2000) (citations omitted).

Because "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation," the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on the claims asserted by Plaintiffs Ralin and Gutstein that they were terminated on the basis of their age.  Reeves, 530 U.S. at 147, 120 S. Ct. at 2108.

**D.    Plaintiff Harman's Disability Claim**

Plaintiff Bruce Harman's next claim is one based on the Americans with Disabilities Act ("ADA").  Harman experiences low back problems which, he contends, forced him "to give up his chosen profession of practicing chiropractic and further prevents him from prolonged standing, bending, lifting objects over 10

51

pounds and squatting." [Doc. 50 at 42].  Harman argues that Defendant Life University discriminated against him on the basis of his back condition and "further failed to reasonably accommodate such condition by refusing to allow him to return to a part-time schedule after his FMLA expired. . . ." [Doc. 50 at 41].  To qualify for relief under the ADA, Plaintiff Harman must first establish a *prima facie* case of disability-based discrimination.

A plaintiff must show three (3) elements to make out a *prima facie* case: (1) that he has a disability; (2) that he is a qualified individual; and (3) that he was discriminated against because of the disability.  See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132 (11th Cir.), amended, 102 F.3d 1118 (11th Cir. 1996).  The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2).  An impairment is "substantially limiting" when the person claiming disability is either:

> [u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

52

29 C.F.R. § 1630.2(j)(1).  "Major [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).

In the present case, Plaintiff Harman contends that his back condition qualifies as a disability because it "caused him difficulty in standing, bending and lifting within certain restrictions and prevented him from continuing as a chiropractor."  [Doc. 50 at 43].  The court finds that this conclusory statement[10] does not come close to satisfying Plaintiff's burden. With respect to his non-work capabilities, Plaintiff has offered no evidence that any major life activity was affected in any significant way by his back problems.  The undersigned does not deny that Plaintiff's back "caused him difficulty," as he contends, but this falls well short of the ADA standard for determining disability.

Harman testified that even when his back problems were at their worst, that is, when he was out of work on FMLA leave, he performed housework, washed clothes, did light cleaning and cooked.  [Harman Dep. at 128-29].  During this same period of time, he worked approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know, a company partially owned by his wife, and traveled extensively to places like Detroit, Orlando, Las

---

[10]The court notes that this statement, along with many others offered by Plaintiff, includes no citation to the record.  [Doc. 50 at 43].

53

Scanned Image - 1:99CV2375 Document 83 page 35 The Oct 05 00:00:00 2002

Vegas, and Davenport, Iowa.  [Harman Dep. at 52-54, 59-64, 72-74, 78-82].
Moreover, there is no evidence that Plaintiff Harman has ever been severely
restricted in caring for himself or doing any other activity that is "of central
importance to people's daily lives."  Toyota Motor Mfg., Ky., Inc. v. Williams, 534
U.S. 184, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002) (In addressing plaintiff's claim
of disability with respect to performing manual tasks, the Court noted,
"[H]ousehold chores, bathing, and brushing one's teeth are among the types of
manual tasks of central importance to people's daily lives, and should have been
part of the assessment of whether respondent was substantially limited in
performing manual tasks.").

Plaintiff's claim regarding the effect his back condition had on his ability to
work is also unpersuasive.  For an impairment to substantially limit a person's
ability to work, it must significantly restrict "the ability to perform either a class
of jobs or a broad range of jobs in various classes as compared to the average
person having comparable training, skills and abilities."  29 C.F.R. 1630.2(j)(3)(I).
The "inability to perform a single, particular job does not constitute a substantial
limitation in the major life activity of working."  Id.

In the present case, Plaintiff Harman has offered no evidence that his back
problems prevent or significantly restrict him from performing "either a class of
jobs or a broad range of jobs in various classes."  Instead, the evidence indicates

54

that the number of jobs that Plaintiff is incapable of performing is extremely small. Dr. Alan Maloon, Plaintiff Harman's treating physician, testified that Plaintiff was only restricted from performing the job of a chiropractor adjusting patients "plus any job which involves bending, stooping, twisting or anything that involves lower back motion." [Maloon Dep. at 23-24, 43]. Although Harman contends that his back condition forced him "to give up his chosen profession of practicing chiropractic," this is irrelevant to the issue of disability. [Doc. 50 at 42]. As the Supreme Court has stated, "To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or *a particular job of choice*." Sutton v. United Air Lines, Inc., 527 U.S. 471, 492, 119 S. Ct. 2139, 2151, 144 L. Ed. 2d 450 (1999) (emphasis added). Because Plaintiff has failed to offer evidence showing that he is precluded from a *substantial* class of jobs, he has not satisfied this *prima facie* element of disability-based discrimination and summary judgment is, therefore, appropriate.

Plaintiff Harman makes a brief argument that he satisfies the first *prima facie* element based on the ADA's provision that having a disability includes "being regarded as having such an impairment." 42 U.S.C. § 12102(2). Plaintiff argues, "[E]ven if [Plaintiff's] condition had not actually limited one or more of Harman's life activities, Defendant perceived him as suffering from such a disability." [Doc. 50 at 44-45]. This argument is meritless.

55

AO 72A
(Rev.8/82)

The Supreme Court has written, "There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489, 119 S. Ct. at 2149-50. "[C]ourts have observed that the focus of these ADA provisions and regulations is on the impairment's effect upon the attitude of others. These provisions and regulations are intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities." Gordon v. E.L. Hamm & Associates, Inc., 100 F.3d 907, 913 (11th Cir. 1996) (citations omitted). In the present case, Plaintiff argues that Defendant Life regarded him as disabled simply because the University was aware that Plaintiff had a bad back. Plaintiff cites the fact that Defendant granted him FMLA leave in 1999 and that Defendant knew that his back condition prevented him from working as a practicing chiropractor in the fall of 1999. This is simply insufficient.

In analyzing whether an employer mistakenly perceived an employee's impairment to be one that substantially limits a major life activity, "it is necessary first to determine whether an impairment, either actual or perceived, would constitute a disability under the ADA." Bray v. Nat'l Services Industries, Inc., 209

56

F. Supp. 2d 1343, 1350 (M.D. Ga. 2001). As discussed *supra*, Plaintiff Harman's back condition is not a disability. In addition, Harman has failed to produce evidence showing that Defendant Life mistakenly perceived that his back problems substantially limited a major life activity. Defendant Life only became aware of Plaintiff Harman's back condition because he informed Defendant of his limitations and his need to take FMLA leave. "Where a 'defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of a fact,' 'a finding that plaintiff was regarded as disabled and, therefore, [is] entitled to the protections of the ADA[,] is inappropriate.'" Hilburn v. Murata Electronics North America, Inc., 181 F.3d 1220, 1230 (11th Cir. 1999) (quoting McCollough v. Atlanta Beverage Co., 929 F. Supp. 1489, 1498 (N.D. Ga. 1996); Bute v. Schuller Int'l Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998)). Because Plaintiff Harman has failed to offer any evidence that Defendant Life erroneously perceived his back impairment as a disabling condition, he is unable to satisfy this *prima facie* element and summary judgment is appropriate.

The court also notes that even if Plaintiff Harman were able to satisfy the first *prima facie* element, summary judgment would still be necessary because he has not offered evidence which would allow a reasonable jury to find that he is a "qualified individual," the second element necessary to establish a *prima facie* case of disability discrimination. The plaintiff bears the burden of proving that he is a

57

"qualified individual," which the ADA defines as a disabled person "who, with or without reasonable accommodation, can perform the essential functions" of his job. 42 U.S.C. § 12111(8).  Plaintiff's treating physician, Dr. Maloon, certified that Harman was "unable to perform work of any kind because of a serious health condition" as of September 24, 1999. [Maloon Dep. at 31-33; Def. Ex. 141].  Dr. Maloon also indicated that there were no accommodations that would enable him to perform the essential functions of his job at that time. [Maloon Dep. at 32; Def. Ex. 141].

As noted *supra*, during the same period of time, however, Harman spent approximately fifteen (15) to twenty (20) hours per week doing research and selling services for Now You Know.  [Harman Dep. at 52-54, 59-64, 72-74, 78-82]. Harman took trips to Detroit, Orlando, Las Vegas, and Davenport, Iowa while selling services for the company from October of 1999 to January of 2000. [Id.]. On November 12, 1999, while Harman was traveling and selling services for Now You Know, Dr. Maloon certified to an insurance company in support of a claim for disability benefits that Harman was unable to perform his job and that he was unable to work in another occupation. [Maloon Dep.  at 35-36, Def. Ex. 142]. Defendant points this out, and Plaintiff Harman responds that "the relevant inquiry is not what Plaintiff's condition was in November 1999, but what his condition was in January 2000, when he requested to return to work." [Doc. 50 at 45-46].

58

The court finds this insufficient. Plaintiff does not explain why he and his physician informed both Life University and an insurance company that he was incapable of performing either his job or any other job in late 1999, yet he continued to work and travel for Now You Know throughout this time.[11] Moreover, in the statement to the insurance company completed in mid-November of 1999, Dr. Maloon noted that he sees Plaintiff every six (6) months, and he indicated that his opinion regarding Plaintiff's inability to perform any work due to Plaintiff's "permanent" condition was for at least six (6) months. [Maloon Dep., Def. Ex. 142]. Plaintiff bears the burden of offering an explanation for these inconsistencies, and he has failed to provide a sufficient one in the present case. See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 805-07, 119 S. Ct. 1597, 1603-04, 143 L. Ed. 2d 966 (1999). Thus, even if Plaintiff Harman could show that he has a disability as defined by the ADA, he still would not be able to establish a *prima facie* case of disability discrimination because he has offered no evidence that he is a "qualified individual."

For all these reasons, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Harman's claim that he was terminated on the basis of a disability.

---

[11]Plaintiff contends that he was not paid for his services for Now You Know, but this is irrelevant to the issue of Plaintiff's physical ability to work.

AO 72A
(Rev.8/82)

### E.    Plaintiff Gutstein's State Law Slander Claim

The next claim the court will address is Plaintiff Donald Gutstein's claim of slander per se. Plaintiffs assert the following in their complaint: "In January 2000, LIFE, by and through one of their managerial employees, Kim Williams, began informing students and various faculty members that GUTSTEIN did not have the necessary credentials to teach at the university level." [Doc. 1 ¶ 166].  Gutstein contends that "such statements defame GUTSTEIN with respect to his business reputation . . . [and] constitute slander per se." [Id. ¶¶ 172-73].

The statements which the complaint refers to actually occurred on November 9, 1999. [Gutstein Dep. at 56-57, 105-06; Def. Ex. 5].  On that date, a meeting was held with Kim Williams and some Life University students.  Williams allegedly stated that Gutstein was no longer qualified to teach physiology under the accreditation standards of the Council of Chiropractic Education ("CCE").  [Id.]. This statement was described in a student memo allegedly posted on a student bulletin board.  [Id.].

Slander is defined as "[m]aking charges against another in reference to his trade . . . calculated to injure him therein" or "[u]ttering any disparaging words productive of special damage which flows naturally therefrom."  O.C.G.A. § 51-5-

60

AO 72A
(Rev.8/82)

4(a)(3), (4).[12]   "To be actionable, a communication must be both false and malicious." <u>Speedway Grading Corp. v. Gardner</u>, 206 Ga. App. 439, 441, 425 S.E.2d 676, 678 (1992).

Significant to the case at hand is the issue of timeliness with regard to Plaintiff bringing his slander claim. Georgia law provides, "Actions . . . for injuries to the reputation . . . shall be brought within one year after the right of action accrues. . . ." O.C.G.A. § 9-3-33. Defendant Life argues that Plaintiff Gutstein's slander claim is barred by the statute of limitations. Because Williams made the statement on November 9, 1999, Plaintiff Gutstein was required to bring his slander claim before November 9, 2000. He waited, however, until December 19, 2000, before bringing the instant cause of action. [Doc. 1]. Therefore, Plaintiff Gutstein's slander claim is time-barred.

Plaintiff argues that the "slanderous statement was memorialized in a newsletter which remained posted on LIFE's campus outside the Academic Affairs office until January 2001. Thus, the publication continued and Plaintiff was entitled to file this claim at any time until January 2002." [Doc. 50 at 47]. Plaintiff is incorrect. First, Plaintiff Gutstein has brought a slander claim based on the

---

[12]Libel, on the other hand, is a "false and malicious defamation of another, expressed in print [or] writing . . . tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule" and published to another. O.C.G.A. § 51-5-1.

61

AO 72A
(Rev.8/82)

statements made by Kim Williams. He has not brought a libel claim based on the

newsletter published by a group of students. [Doc. 1]. Moreover, Georgia law is

clear that "actions for injuries to the reputation, such as those asserted by the

plaintiff in the instant case, must be brought within one year from the date of the

alleged defamatory acts. . . ." Brewer v. Schacht, 235 Ga. App. 313, 317, 509

S.E.2d 378 (1998) (quoting Cunningham v. John J. Harte Assoc., 158 Ga. App.

774, 775, 282 S.E.2d 219 (1981)).[13] The only evidence before the court is that Kim

Williams' statement regarding Gutstein's teaching qualifications occurred on

November 9, 1999. [Gutstein Dep. at 56-57, 105-06; Def. Ex. 5]. Because Plaintiff

Gutstein does not dispute this fact, his slander claim brought more than a year

afterwards is untimely. The undersigned, therefore, **RECOMMENDS** that

Defendant's summary judgment motion [Doc. 21] be **GRANTED** on this claim.

### F.    Plaintiff Ralin's State Law Claims

Plaintiff Dennis Ralin asserted claims for breach of contract and tortious

interference with business relations in the complaint. Defendant Life moved for

summary judgment on both of these claims, and Plaintiff Ralin has not responded.

Defendant's motion is therefore considered unopposed, pursuant to Local Rule

---

[13]This is the true even if the plaintiff did not have knowledge of the
defamatory act at the time of its occurrence. Id.

62

7.1B, N.D. Ga, with respect to these two (2) claims.[14] See Magluta v. Samples, 162 F.3d 662, 664-65 (11th Cir. 1998) (granting a motion for failure to respond is within the discretion of the district judge); Southern Electronics Distributors, Inc. v. Air Express Intern. Corp. (USA), Inc., 994 F. Supp. 1472, 1475 (N.D. Ga. 1998) (granting motion as unopposed in accordance with local rule); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) ("Plaintiff's failure to respond to Defendant's argument alone entitles Defendant to summary judgment on these claims."). Thus, summary judgment is appropriate on these claims.

In the alternative, the court finds that Plaintiff Ralin has abandoned these claims because Defendant sought summary judgment on them and Plaintiff did not oppose this relief in his response to the summary judgment motion. See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325-26 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp, 10 F.3d 1563, 1568 (11th Cir. 1994) (plaintiff's failure to either move for summary judgment on claim raised in complaint or to respond to defendant's summary judgment motion on same claim, allowed district court to properly treat

---

[14]This rule provides, in pertinent part, "Failure to file a response shall indicate that there is no opposition to the motion." L. R. 7.1B, N.D. Ga.

63

claim as abandoned); <u>accord</u> <u>Federal Savings and Loan Insurance Corporation v.</u> <u>Haralson</u>, 813 F.2d 370, 373 (11th Cir. 1987) (issues not properly briefed and argued before the court will be treated as abandoned).

The undersigned, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on Plaintiff Ralin's claims for breach of contract and tortious interference with business relations.

## G.    Damages

Defendant Life moves for summary judgment on the issue of compensatory damages with respect to the termination claims asserted by Plaintiffs Harman, Silverman and Ralin. [Doc. 21 at 40-43]. One of Defendant's arguments is that Plaintiffs Harman and Silverman should not recover front and back pay or should at least be limited in the amount they recover, because they failed to mitigate damages.

Defendant is correct in noting that a plaintiff has a duty to mitigate damages. <u>See</u> <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 417-23, 95 S. Ct. 2362, 2371-74, 45 L. Ed. 2d 280 (1975). Title VII provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). "This is appropriate because the purpose of Title VII is to 'make whole' a victim of discrimination, not to provide a windfall." <u>Sowers v. Kemira, Inc.</u>, 701 F.

64

AO 72A
(Rev.8/82)

Supp. 809, 826 (S.D. Ga. 1988). The Supreme Court has stated that a Title VII claimant must "use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to back pay if he refuses a job substantially equivalent to the one he was denied." Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32, 102 S. Ct. 3057, 3065-66, 73 L. Ed. 2d 721 (1982).

With respect to Plaintiff Harman, the court has already recommended that summary judgment be granted on his termination claims. Therefore, it is **RECOMMENDED** that Defendant's summary judgment motion [Doc. 21] on Harman's claims for damages resulting from his termination be **DENIED AS MOOT**.

With respect to Plaintiff Silverman, Defendant Life contends that summary judgment should be granted on his claim for back and front pay because he failed to make a sufficient effort to find comparable employment. [Doc. 21 at 40]. Defendant argues, "The only job search Silverman has conducted since his termination is to review newspaper and internet advertisements for biochemistry teaching positions at Atlanta metropolitan colleges and universities. He has made no calls, written no letters, and made no applications, other than to the Fulton

65

Scanned Image - 1:00CV1371 Document 93 page 87 Thu Dec 05 00:00:00 2002

County School system, the Cottage school, and a company called Cryolife." [Id.]. This is the extent of Defendant's argument.

Based on the lack of evidence presented Defendant, the court finds that there are genuine issues of material fact yet to be resolved on the challenge to Silverman's damages recovery if Defendant is found liable.     Defendant acknowledges that Silverman made some effort to find comparable employment, and a reasonable jury may conclude that Silverman satisfied his duty to mitigate his damages. Accordingly, the court **RECOMMENDS** that Defendant's motion for summary judgment be **DENIED** on Plaintiff Silverman's claim for front and back pay.

Defendant Life next argues that summary judgment should be awarded on Plaintiff Ralin's claim for front pay and back pay after he found employment which paid him more than his job with Life University. [Doc. 21 at 43]. The Eleventh Circuit has stated that any "monetary award of front pay [should be] calculated to terminate on the date a victim of discrimination attains an opportunity to move to his 'rightful place.'" Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1529 (11th Cir. 1991) (citations omitted). Defendant writes, "When Ralin's employment with Life terminated on January 14, 2000, he was making $42,000.00 a year. Ralin went to work full-time for Gilmer County Schools in August 2000, at a salary of $57,000.00 a year." [Id.]. Defendant's argument is correct, and Plaintiff Ralin has

66

AO 72A
(Rev.8/82)

not responded to this argument. <u>See</u> <u>Coalition for the Abolition of Marijuana Prohibition</u>, 219 F.3d at 1325-26; <u>Magluta</u>, 162 F.3d at 664-65. Therefore, the undersigned **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED** on Plaintiff Ralin's claim of back and front pay after August of 2000, when he began working in a higher paying position.

**IV.  Conclusion**

In summary, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **GRANTED** on: (1) Plaintiff Harman's Title VII claim of religious discrimination in his termination; (2) Plaintiff Harman's ADA claim that he was terminated on the basis of a disability; (3) Plaintiff Gutstein's state law claim of slander; (4) Plaintiff Ralin's state law claims for breach of contract and tortious interference with business relations; and (5) Plaintiff Ralin's claim of back and front pay after August of 2000.

Because summary judgment is appropriate on Plaintiff Harman's termination claims, the undersigned also **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED AS MOOT** on Plaintiff Harman's claims for damages resulting from his termination.

The undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 21] be **DENIED** on: (1) the Title VII claims of a religiously hostile work environment asserted by all four (4) Plaintiffs; (2) Plaintiff Silverman's Title VII

AO 72A
(Rev.8/82)

claim of religious discrimination in his termination; (3) Plaintiff Ralin's Title VII

claim of religious discrimination in his termination; (4) Plaintiff Gutstein's Title VII

claim of religious discrimination with respect to the reduction of his hours and his

eventual termination; (5) the ADEA claims asserted by Plaintiffs Ralin and Gutstein

that they were terminated on the basis of their age; and (6) Plaintiff Silverman's

claim for front and back pay.

**SO RECOMMENDED**, this 3rd day of DECEMBER, 2002.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

68



# EXHIBIT / ATTACHMENT

**(To be scanned in place of tab)**



**A Time Warner Company**

## MEMO

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 31, 1999

---

The following is a synopsis of the Talent Contract Changes for March 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added two (2) new talent:                              $895,000
(David Abbott, Brian Yandrisovitz)

We negotiated increased contracts for two (2) talent:    $115,000
(Glenn Gilbertti, Ron Reis)

Impact to WCW Total Talent Commitment (increase):        $1,010,000

With this increase and our variables, we are currently $1,858,000 under budget for 1999.



PLAINTIFF'S
EXHIBIT
15



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348 5366

**MEMO**

TO:        Dr. Harvey Schiller

CC:        Eric Bischoff
           David Payne
           Matt Stroer
           Bill Busch

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      May 28, 1999

---

The following is a synopsis of the Talent Contract Changes for May 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added thirteen (13) new talent:                        $457,600
(David Fliehr, Emory Hail, and eleven trainees)

We negotiated increased contracts for three (3) talent:   $51,714
(Jacobus Strauss, and two(2) former non-contract
talent Scott James and Steve James)

We terminated two (2) contracts:                          $450,000
(Steve McMichael, Kevin Wacholz)

With this increase and our variables, we are currently $100,000 under budget for 1999.

PLAINTIFF'S
EXHIBIT
7 6

A Time Warner Company

**WCW 019227
CONFIDENTIAL**



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



TO:        Eric Bischoff
           Bill Busch

FROM:      Diana Myers

DATE:      June 9, 1999

RE:        New ICAs and Trainees

| Name | Salary (1st year) |
|---|---|
| Cornell, Richard (trainee-referred by Kanyon) | $ 26,000 |
| Davis, Marcial (trainee) | $ 31,200 |
| Durham, Michael (Public Enemy) | $170,000 |
| Fliehr, David (David Flair) | $ 45,000 |
| Forrester, Ryan (trainee-referred by Kanyon) | $ 20,800 |
| Funk, Allen Eric (trainee) | $ 31,200 |
| Gruner, Pete (Billy Kidman) | $300,000 (increase from $125,000) |
| Hail, Emory (Emory Hale) | $ 85,000 |
| Helms, Gregory Shane (referred by Kanyon) | $ 45,000 |
| Hugger, Jon (trainee) | $ 15,600 |
| James, Scott (Scott Armstrong) | $ 52,143 (increase from $31,286) |
| James, Steve (Steve Armstrong) | $ 52,143 (increase from $31,286) |
| Jindrak, Mark Robert (trainee) | $ 39,000 |
| Jones, Allen (trainee-referred by Kanyon) | $ 20,800 |
| Massengale, Jason (trainee-referred by Kanyon) | $ 20,800 |
| Moore, Shannon (referred by Kanyon) | $ 45,000 |
| Norris, Harrison (trainee) | $ 39,000 |
| Palumbo, Charles (trainee) | $ 39,000 |
| Petty, Ted (Public Enemy) | $170,000 |
| Rodman, Dennis | $1,000,000 |
| Roman, Sammy Lee (trainee) | $ 26,000 |
| Sanders, Michael (trainee) | $ 31,200 |
| Siaki, Sonny Uaita (trainee) | $ 31,200 |
| Skipper, Elix (trainee) | $ 39,000 |
| Strauss, Jacobus (Jakes) | $ 75,000 |
| Thornton, Randy (Swoll) | $350,000 ($50k signing bonus) |
| Tilton, Kevin (trainee) | $ 15,600 |
| Wilson, Luther (referred by Kanyon) | $ 45,000 |
| Yokley, Jay Brett (trainee) | $ 15,600 |
| Yun, James (trainee-referred by Kanyon) | $ 20,800 |

PLAINTIFF'S
EXHIBIT

A Time Warner Company



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

Myers, Diana

From:                    ...idson, Georgia
Sent:                    Friday, December 03, 1999 1:57 PM
To:                      Edwards, Don ; Prince, Greg; Lipscomb, Dee ; Davidson, Amy
Cc:                      Busch, Bill ; Dillon, JJ ; Juster, Gary ; Myers, Diana
Subject:                 Talent Summary

*World Championship Wrestling*
*A Division of Turner Sports*
*One CNN Center*
*Box 105366*
*Atlanta, GA 30348-5366*

*CONFIDENTIAL*

The following is a synopsis of the Talent Contract Changes for *November 1999*:

We added **two (2) new talent**:
Vito Lograsso ($120,000 plus $12,000 signing bonus),
Stacy Keibler ($15,000 plus $250 for non-TV and $500 TV events)

We negotiated **increased contracts for two (2) talent**:
Tonga Fifita ($175,000 plus $1,500 per day over 100 and $300 per day wrestling in Japan),
David Fliehr ($125,000 and $1,000 for each PPV)

We are in the process of negotiating a **decreased contract for one (1) talent**:
Lash Huffman ($240,000 plus $2,000 for each day over 80)

We **terminated twenty-two (22) contracts**:
(Chris Adams, Brian Adams, Scott Antol, Brian Bernick, Adam Birch, Amy Crawford, James Gibson, Steve James, Rob Knapik, Ray Lloyd, Jeremy Lopez, Juan Banos, Sonny Onoo, Ron Reis, Dean Roll, Jeremiah Ross, Hector Segura, Jason Spence, Kenny Stasiowski, Dave Taylor, Barry Windham, Kendall Windham)

*Please treat this e-mail as you would any other confidential document.*

Thanks,
GA



PLAINTIFF'S
EXHIBIT
44

WCW 019238
CONFIDENTIAL



**MEMO**

TO:         Dr. Harvey Schiller

CC:         Bill Busch
            David Payne
            Matt Stroer
            JJ Dillon
            Greg Prince
            Dee Lipscomb
            Amy Davidson

FROM:      Diana Myers

RE:         Talent Budget Summary

DATE:      November 1, 1999

---

The following is a synopsis of the Talent Contract Changes for October 1999. The back
up documentation in the form of the Talent Contract Summary has been forwarded
directly to Matt Stroer.

| | |
|---|---|
| We added three (3) new talent:<br>Donald Harris (200,000), Ronald Harris (200,000),<br>Jeff Jarrett (400,000) | $800,000 (estimate) |
| We negotiated increased contracts for three (3) talent:<br>(Perry Satullo, Dale Torborg, Jerry Tuite) | $166,714 |
| We negotiated *decreased* contracts for one (1) talent:<br>(Ian Hodgkinson) | $150,000 |
| We terminated twelve (12) contracts:<br>(Bryan Clark, Barry Darsow, Ryan Forrester,<br>Chad Fortune, James Fullington, Lash Huffman,<br>Mark Johnson, Ed Leslie, Robert Smedley,<br>Kevin Tilton, Eric Watts, James Yun, Johnny Green) | $1,943,000 |

With this decrease and our variables, we are currently $4.85 million over budget for
1999.

A Time Warner Company

WCW 019226
CONFIDENTIAL



# MEMO

TO:          Dr. Harvey Schiller

CC:          Eric Bischoff
             David Payne
             Matt Stroer
             Bill Busch
             Greg Prince

FROM:        Diana Myers

RE:          Talent Budget Summary

DATE:        September 1, 1999

---

The following is a synopsis of the Talent Contract Changes for August 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added six (6) new talent:                          $830,000
Brian Bernick (45,000), James Gibson (45,000),
Jeremy Lopez (45,000), Charles Spencer III (45,000),
Ray Lloyd (150,000), Dustin Runnels (500,000)

We negotiated increased contracts for two (2) talent:    $270,000
(William Brenneman, Ian Hodgkinson)

We terminated six (6) contracts:
(Ted Petty, Michael Durham, Scott Levy,                  $796,286
Denise Riffle, John Watson, Chase Tatum)

With this increase and our variables, we are currently $6.3 million over budget for 1999.

WCW 019225
CONFIDENTIAL



World Championship Wrestling
A Division of Turner Sports
One CNN Center
Box 105366
Atlanta, GA 30348-5366

**MEMO**

TO:         Dr. Harvey Schiller

CC:         Bill Busch
            David Payne
            Matt Stroer
            JJ Dillon
            Greg Prince
            Dee Lipscomb
            Amy Davidson

FROM:       Diana Myers

RE:         Talent Budget Summary

DATE:       September 30, 1999

---

The following is a synopsis of the Talent Contract Changes for September 1999. The back up documentation in the form of the Talent Contract Summary has been forwarded directly to Matt Stroer.

We added three (3) new talent:                          $170,000
Clare Cutrufello (15,000 plus 250-500 per event),
Ann-Marie Crooks (50,000), Nora Greenwald (105,000)

We terminated twenty-two (22) contracts:               $2,213,400
(Yoshihiro Asai, Scott Bednarski, Jose Carrera-Gomez,
Marcial Davis, Art Flores, Bret Hanmer, Kirt Hankton,
Theodore Harris, Greg Hunke, Percy Miller,
James Mitchell, Manuel Ortiz-Partida,
Randy Thornton, Robert Vick, Brett Yokley,
Barry Horowitz, Harrison Norris, Joe Dorgan,
Scott Chasser, Craig Mally, Scott Norton, Mike Enos)

With this decrease and our variables, we are currently $5.6 million over budget for 1999.

WCW 019222
CONFIDENTIAL



**MEMO**

TO:      Brad Siegel

CC:      Greg Prince
         Don Edwards
         Amy Davidson
         Jennifer Carson

FROM:    Diana Myers

RE:      Talent Budget Summary

DATE:    October 31, 2000

---

The following is a synopsis of the Talent Contract Changes for October 2000.

We terminated three (3) contracts:
(Scott Hall, Anibal Gonzalez, Bret Hart)

We added three (3) contracts:
Lenita Erickson ($125,000 plus $500 per event)
Scott Oberholzer ($750 per week plus $300 per event)
Chris Harris ($750 per week plus $300 per event)

We negotiated an increase for one (1) contract:
Torrie Wilson ($1,600 for each day over 125 days per contract year)

As a result of these changes, we now estimate that our 2000 Talent Payroll is
$38.1 million ($1.935) under the forecasted amount of $40,035,000 .

WCW 019218
CONFIDENTIAL



World Championship Wrestling
A Division of Turner Sports
ONE CNN CENTER
Box 105366
Atlanta, GA 30348-5366

**MEMO**

TO:        Brad Siegel

CC:        Bill Busch
           Scott Wilkinson, Esq.
           Gary Juster
           JJ Dillon
           Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      March 1, 2000

---

The following is a synopsis of the Talent Contract Changes for February 2000.

We added one (1) new talent:   Daniel Covell ($75,000)

We negotiated increased contracts for three (3) talent:
(Evan Karagias, Shannon Moore, Shane Helms)

We terminated four (4) contracts:
(Mark Hildreth, Ann-Marie Crooks, Bobby Eaton, Troy Martin)

These changes have resulted in an increase in our current talent payroll to $40.2 million for 2000.  This is in comparison to our current forecast of $40.35 million.

A Time Warner Company

**WCW 019217
CONFIDENTIAL**



Director of Legal
and Business Affairs
diana.myers@turner.com

*World Championship Wrestling*
*A Division of Turner Sports*
ONE CNN CENTER
*Box 105366*
*Atlanta, GA 30348-5366*

**MEMO**

TO:         Brad Siegel

CC:         Greg Prince
            Don Edwards
            Felicia McDade
            Amy Davidson

FROM:       Diana Myers

RE:         Talent Budget Summary

DATE:       May 9, 2000

---

The following is a synopsis of the Talent Contract Changes for April 2000.

We added seven (7) new talent and one (1) wardrobe seamstress:
Mike Alfonso ($350,000 plus $2,000 for house shows and $3,000 for PPVs), Chris
Candito ($104,000 plus $500 per event), Troy Martin ($350,000 plus $1,750 for house
shows and $2,500 for PPVs), Shawn Stipich ($78,000 plus $500 per event), Troy Endres
(Trainee-$600 per week), Allison Pfau ($15,000 plus $250 for PR or non-TV events and
$500 for TV events), John Riker ($750 per event), Carol Pedigo (wardrobe-$1,000 per
month plus $250 per event)

We terminated two (2) contracts:
(Rob Kellum, Sione Vailahi)

We negotiated increased contracts for:
(Richard Fliehr, Kimberly Falkinburg, Ian Hodgkinson, Shannon Spruill, Sharmell
Sullivan, Vanessa Bozman)

As a result of these changes, we now estimate that our 2000 Talent Payroll is $1,100,000
($41,450,000) over the forecasted amount of $40,350,000.

WCW 019215
CONFIDENTIAL



World Championship Wrestling
*A Division of Turner Sports*
ONE CNN CENTER
Box 105366
Atlanta, GA 30348-5366

**MEMO**

TO:        Brad Siegel

CC:        Greg Prince
           Don Edwards
           Felicia McDade
           Amy Davidson

FROM:      Diana Myers

RE:        Talent Budget Summary

DATE:      June 13, 2000

---

The following is a synopsis of the *Talent Contract Changes for May 2000.*

We added one (1) new talent:
Lance Evers ($245,000 plus $750 per event)

We terminated six (6) contracts:
(Jacobus Strauss, Brad Cain, Sonny Siaki, Dionicio Castellanos, Brad James,
Clare Cutrufello)

We negotiated increased contracts for:
(Lenny Carlson, Jerry Tuite, Jeff Jarrett, Chris Ford, Norman Smiley, Vito LoGrasso,
Ron Harris, Don Harris, Chuck Palumbo).

As a result of these changes, we now estimate that our 2000 Talent Payroll is $2.65
million ($43,000,000) over the forecasted amount of $40,035,000 .

-A Time Warner Company-

WCW 019214
CONFIDENTIAL



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



How can WingspanBank.com save me ? · · · · · · ?

CLICK HERE

WCW · WWF · ECW · Indies · Int'l
## Miller Time

Home

WrestleManiacs

ScoopThis

Bombshells

Toys

Rankings

Photos

Audio

Schedules

Columns

Almanac

Forums

Chat

Store

WOW Mag

Email Us

### Federations

WCW

WWF

ECW

Indies

Int'l

# Exclusive interview with WWF's head writer Vince Russo

September 30, 1999

**By Ben Miller**
**WrestleLine/WrestleManiacs**

PLAINTIFF'S
EXHIBIT

#2

**BEN:** The people you closed the door on, I don't want to ask for names, have they ended up showing up on ECW or WCW, or do they end up staying on the fringe of the business for the same reason you didn't want them?

**RUSSO:** No, they wind up showing in ECW and WCW. I think that's why you have such chaos, especially in WCW's locker room. When there is a free agent out there, one of the first things we look at is that there is such peace and harmony and a family feeling in our locker room, if we bring this guy in, how is it going to affect that? If it's going to affect that in a negative way, we don't bring them in. These guys definitely get picked up in ECW and WCW. Like I said, I think that's part of the reason why you have so many problems in WCW.

**BEN:** Two guys that have been critical of you at various times are **Dave Meltzer** who obviously writes the *Wrestling Observer* and **Bruce**

**Mitchell**. Do you have any opinion on those guys?

**RUSSO:** Well yeah, it just really bothers me. First of all, you've got to understand something, I never in my life claimed to be a great journalist, because the way I write ... I don't try to write to impress people. I don't try to write in a style like look at me, I'm smarter than you. I try to write in a style that people ... the common guy - the wrestling fan will understand. That's how I try to write, and that's the most important thing to me - that I write in a way that our fan is going to understand. I am not above anybody, and another thing too, every one of my columns, even if it is pro-WWF, I write what I truly believe in my heart. Nobody tells me to write my column, if I write it positive, or negative, whatever the case may be, **Vince McMahon** lets it go, then I write about what I truly, truly feel. And I try to write the truth.

The thing that just bothers me, primarily about Dave Meltzer, I just feel he thinks he's better than everybody else. I think he tries to talk down on people like he knows everything, and the reality of the situation is that Dave Meltzer doesn't know shit. Because all Dave Meltzer's information is second hand information, and whoever is giving him that information is putting their little spin



Though there are some things Russo can't talk about, like the Owen Hart lawsuit, he believes in telling readers as much as possible. (WOW)

on it, and whereas you
know - me - I'm there! I
know what's going on. I'm behind the scenes. I
talk to these guys on a daily basis. I know
what's true. I know what's bullshit, and I tell the
reader as much as I possible can.

Of course there are some things I can't talk
about. I even mentioned to you like the Owen
situation - anything involving a lawsuit, I can't
talk about, you know. But it just really bothers
me when you have a guy who feels that he's
above it all, when the reality is he's getting the
information second hand, and some of it right,
and some of it is absolutely bullshit, and he
doesn't have a clue as to what's right and what's
bullshit. And that's what bothers me. They can
be as critical as they want to be, but I would
much rather have a job and be in a position
where I know what I'm talking about rather than
have to rely on gossip.

**BEN:** I see where you're coming from. Obviously
those guys have to know someone in the
company. If you ever found out that someone
was a mole for one of these newsletters or
something like that, would you get mad at
them?

**RUSSO:** I don't necessarily know if they do
know someone in the company, and the only
reason I say that is because on so many
occasions, the information is wrong. It's just flat
wrong. I remember one time Dave Meltzer had
something in there about me, a couple of years
ago, it was rumored that one of the WCW
wrestlers died in a car crash ... that black guy ...
that Pit guy ---

**BEN:** Oh yeah. **Craig "Pitbull" Pittman**.

**RUSSO:** Yeah, the next thing I know I'm reading in Meltzer's newsletter that Russo was on the phone spreading this rumor. Just stuff like that. I can't fathom that they know somebody on the inside with credibility, because as I said, yeah half of their stuff is right on the money, and the other half is totally bullshit.

**BEN:** I see where you're coming from, but wrestling is a business obviously, where in the past, more than in the present, it's tough to get the truth. In my defense, because I'm someone who reads those newsletters, you don't know where the truth is coming from. It's hard to tell sometimes.

**RUSSO:** I don't necessarily agree with you on that, because why is it tough to get the truth? If Dave Meltzer ever called me, or a **Wade Keller** ever called me, or if any of those guys ever called me, I'm going to tell them the truth, and I'm going to tell them what I know. I have nothing to hide. If they ask me a question, I'm going to tell them the answer to the question. But the difference is, if they ask you a question, and you honestly don't know the answer to it, then you're a liar. Like you asked me about the IPO. I honestly don't know anything about that, and quite frankly, I really don't care. My plate is so full with writing television, I don't know about that. But to a Meltzer or a Keller, if they ask me that same question, and I answer it the same way, well I'm lying, and they're not getting the truth from me.

**BEN:** I understand, but to the average fan, it's not like you can get the entire truth like on the some of the uglier side of the business, like with deaths and stuff like that. It's not like you can

go to WWF.com and create a detailed itinerary of what was at **Brian Pillman**'s bedside. So sometimes you have to go to outside sources to find the truth.

**RUSSO:** Right.

**BEN:** This is something I've always wanted to see in American professional wrestling, have you guys, the TV writing team, ever thought of having the title like All Japan Pro Wrestling where there's no gimmick matches, no run-ins, no count outs, it's just two guys in a wrestling match. And not every match to be like that, because I know how it can get boring and monotonous, but just one title ---

**RUSSO:** I'm going to tell you something right now that you will absolutely not agree with, but I've been a wrestling fan my whole life and I will live and die by this - it is hard enough, believe me I write this shit, it is hard enough to get somebody over. You will never ever, ever, ever, ever see the Japanese wrestler or the Mexican wrestler over in American mainstream wrestling. And the simple reason for that is, even myself, I'm an American, and I don't want to sound like a big bigot or a racist or anything like that, but I'm an American ... if I'm watching wrestling here in America, I don't give a shit about a Japanese guy. I don't give a shit about a Mexican guy. I'm from America, and that's what I want to see. Now there are the smart fans that love that type of shit, like you.

**BEN:** Yeah, I really like All Japan.

**RUSSO:** Which is cool, but the reality of it is, that's a small minority of our audience.

**BEN:** But I'm not talking so much about the fact

that you would have to use the guys from Japan, I'm just saying, two guys who I think are good wrestlers, maybe **D'Lo Brown** and **Jeff Jarrett**, who maybe don't have the interview skills or the charisma of a **Rock** or **Steve Austin**, but if you put them out there in longer matches where they could show their in ring talent ---

RUSSO: What do you call a longer match?

BEN: I don't know, maybe 12 minutes?

RUSSO: There is no way on television ---

BEN: Not on television. I mean more PPV, and on television it would 6-8 minutes. I don't think matches on television outside of the main event should go more than 8 minutes.

RUSSO: But the thing you don't understand is, and I can tell you first hand, the way television is, and how short the matches are on TV - what we've done now basically is we've basically trained the audience. It's crash TV. It's in and out. What's the finish? Let's get to the next thing.

BEN: Absolutely.

RUSSO: That's the way we've trained the fan, and I've got to tell you, I don't know how many PPVs you go to, but a couple of years ago when I wasn't writing the PPVs, and we just really started this trend with the way the business is now, we would have 15, 20, 25 minute matches, because it was the PPV, 5 minutes in, people were sitting on their hands.

BEN: That's true -

**RUSSO:** The house was silent. The reason being, we've trained these people a certain way, and now that's why I'm writing the PPVs, because basically, the PPVs need to be written the same way as television, because that's what the fans expect.

**BEN:** That is true, but you have to recognize that WCW does a lot of short matches too, but when you go on their PPV and see a really good "wrestling match" where the workrate is high, with like ... I can remember **Raven** and **Saturn** v. **Malenko** and **Benoit** on PPV, and it went like 12 or 13 minutes and the crowd was hot the entire time. You don't think that type of thing would work in the WWF?

**RUSSO:** I think that's a rarity. I watch everything that I can. I've never watched Mexican or Japan, because I don't give a shit. I live here, that's all I care about. But one thing I got to tell you, I was watching ECW last week, **Van Dam** and who--?



Stone Cold Jersey!
· WWF Attitude Tee
· NWO Bucket Cap
· Sable Attitude Bear
· Hogan Flag
· Goldberg T-Shirt

**BEN:** I won't even go into that.

**RUSSO:** No, but who's the other guy?

**BEN: Jerry Lynn.**

**RUSSO:** Ok Jerry Lynn. Now I got to tell you something, seriously, I was sitting here really enjoying the hell out of the match, but it got to the point even with me where it was like, OK end this. The thing is, you've got to understand, in this day and age, there are so many things for people to do that their attention span is so

short. Why do you think when there is a commercial people change the channel? You know what I'm saying?

**BEN:** I agree, but are you saying that something that I thought was just as incredible, I don't know if you saw the last ECW PPV, but **Mike Awesome** versus **Masato Tanaka** and they went out there for a good 13-15 minutes and they had what people would call a \*\*\*\* or a \*\*\*\* ½ match, is that going to be obsolete in the WWF? In that match where they basically stayed around the ringside area, and there's a clean finish - even though I know they used table and chairs - but there is no in the crowd brawling, is kind of thing going to become obsolete in the WWF you think?

**RUSSO:** I don't want to say obsolete, but I don't see it going back in that direction. The only reason I tell you that, I'm at every show, I'm there, you put Rock and Mick in that ring with microphones, the people will sit there for a half an hour and be entertained. You put a wrestling in that ring for over ten minutes, they want to know, let's get to the finish, and let's go on to the next thing. And you gotta understand from a writing point of view, I am not dictating to these fans. I am basically in the arena every Monday and Tuesday night, I am in the arena, I am listening to the fans. All that I am trying to do from a television-writing standpoint is give the masses what they want. Now, I'm not saying give the smart wrestling fan what they want, I'm saying give the masses, and that's my job.

**BEN:** I see that, and I don't want to beleaguer it, but some would argue that it's true, that WWF fans mainly sit on their hands for matches that go more than 10 minutes, but some would

argue that it's because the quality of the in-ring
wrestling isn't as good. Don't you think that if
you put two good wrestlers in the ring, and I
know we had talked about the Van Dam - Lynn
thing, but I don't consider Van Dam to be that
great of a wrestler, I look more to the Masato
Tanaka - Mike Awesome example. Don't you
think if you put two good wrestlers in there, who
had a match which could stir the fans emotions,
that that would ... look at what happened with
**Sting** and Benoit? I know they still got killed by
Raw when Raw opened, but they kept a much
larger percentage than they had been by
starting off their show with interviews. Do you
think there's any validity to that?

**RUSSO:** No. I think they kept a much bigger
number than they did, because that was really a
well-booked match where you couldn't call the
outcome. Benoit isn't going to beat Sting in the
middle of the ring, and Sting isn't going to beat
Benoit, so what are they gonna do? That was
the appeal to the match.

**BEN:** OK.

**RUSSO:** Don't get me wrong, I love to see a
good wrestling match, but my job is ... I get
paid to give the people what they want, and
whether I agree or disagree with them is not my
job. I'm not writing television to please Vince
Russo. I'm writing television to please the
masses, and like I say, when I go out in a
crowd, and I see the response from a Mick -
Rock promo, and response to a wrestling match,
I know what they want to see. And again, it's
not Vince Russo writing TV for Vince Russo, I'm
just trying to give the people what they want.

**Part 1 · Part 2 · Part 3**

Case 1:00-cv-01216-CC   Document 112   Filed 01/30/03   Page 266 of 379

## E-mail Ben Miller | Miller Time archive

**WCW · WWF · ECW · Indies · Int'l**



Copyright © 1999 SportsLine USA, Inc. All rights
reserved.

This website is not sponsored or endorsed by the WWF,
WCW or ECW. This is not an official site.



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

## DECLARATION OF BOBBY WALKER

STATE OF GEORGIA
COUNTY OF Clayton

    Bobby Walker gives the following declaration under penalty
of perjury and states as follows:

1.

    I chose the stage name, "hardwork" because I wanted to be a
role model to young persons, by showing them that hard work and
perseverance leads to success.

2.

    At the time I signed my 1994 agreement with WCW, I had not
even begun to develop my wrestling maneuver of "walking the
ropes."  I did not begin practicing that maneuver until later.
Indeed, I had never even heard of the concept of "walking the
ropes" at the time I signed my 1994 agreement.

3.

    After approximately eight months of training at WCW's Power
Plant, I believe I had acquired the necessary wrestling skills
to begin getting actual experience and get much more exposure
than I received at that time.

4.

    When I signed my contract dated April 25, 1995, I was aware
that WCW had many wrestlers who did not even have a contract.

5.

    When I was offered a contract, in April 1996, I was told by
Kevin Sullivan that I was talented.

6.

    I deny that I actually wrestled in over eighty events
between 1996 and 1997.  Many times, I was required to show up,
but I was not actually used in the wrestling match.

7.

During the time that Jody Hamilton was the manager at the Power Plant, Jody Hamilton told me that my maneuver of "walking the ropes" was something that "no one else could do," and that WCW needed something different.  He then told me that if he were in control, that he would "push me."

8.

Paul Orndorff told me that I had very good abilities, and told me that what I did as far as walking the ropes was "different," and that different maneuvers like walking the ropes was what wrestling fans wanted to see.

9.

I recall a Caucasian wrestler named Billy Kidman.  I recall that Mr. Kidman fell from the ropes while he was doing some of his maneuvers, including his finishing move.  I saw him slip off the ropes on WCW main events as well.  Nevertheless, he was still given many opportunities, and became an extremely successful wrestler.  Mr. Kidman is still wrestling, and is a huge success.

10.

While training at the Power Plant, I remember a Caucasian named Chris Canyon.  Mr. Canyon trained at the Power Plant and arrived after I did.  Although Mr. Canyon did acquire the basic physical skills needed to wrestle, I believe I was a much better wrestler.  I was stronger, more agile, and could bench press more weight.  Also, I could perform my maneuver of "walking the ropes," which Mr. Canyon could not do.

11.

I acknowledge that Eric Bischoff offered me a new wrestling contract, after Taylor had caused my termination.  But I did not accept it for several reasons.  The main reason is that I did not believe Bischoff was doing anything to address the real problem -- Terry Taylor and WCW's discrimination.  Also, I wanted assurance that WCW would not terminate the new contract without any reason.

12.

When I sued WCW and Terry Taylor, the main thing that I
wanted was for WCW to allow me the opportunity to demonstrate my
talents in order to become as successful as the Caucasian
wrestlers who had similar or lesser skills and abilities.

13.

At the time I signed my last contract, I agreed to spend a
few days at the Power Plant, to get back into ring shape.  I had
been working out and training on my own and did not need more
than a few days at the Power Plant.  After my few days of
training at the Power Plant ended, I did not need to go to the
Power Plant each day.  No other wrestler who was under contract,
with a similar level of experience to mine was required to
attend ongoing training at the Power Plant.  What I needed was
more television exposure to showcase my maneuver "walking the
ropes."

14.

Although I had learned to truly execute my walking the
ropes maneuver, I was only scheduled to wrestle in about five
WCW matches for the entire two year period (1999 and 2000) of my
last contract.  WCW simply did not give me any meaningful
wrestling opportunities during this time frame.  Instead, they
essentially refused to use me and waited for my contract to
expire.

15.

Although my opportunities were limited and I was under
pressure, I tried to take advantage of each and every
opportunity.  I was very successful in getting a positive crowd
reaction during my limited 1999 and 2000 appearances.

16.

I never trained with, or directly worked with Arn Anderson.
I only recall exchanging a few words with him during the entire
time I was at WCW.

17.

I was never difficult to work with.  Even though I knew
that Terry Taylor was discriminating against me, I agreed to do

anything that he wanted me to do, including stop doing my signature move of "walking the ropes."

18.

I was never in a tag team with Harold Hogue.  Although Mr. Hogue had told me that he might become my tag team partner, I told him that we would have to wait to see because WCW had always lied to me before.  I add that although Mr. Hogue came to the Power Plant about once a week, we did not specifically  work together.

19.

Although I was not Mr. Hogue's tag team partner, I did participate with him at a Dark Match for a Thunder event.  A dark match is one of the matches in front of the audience, but not aired "live" on Television.  I was very successful in this match and perfectly executed my "walking the ropes."

20.

I also recall during this time, that Kevin Sullivan wanted to work with me more, and discussed making me a "heel."

21.

Sullivan also told me that Orndorff was very impressed with my working abilities, and he told me that Orndorff was in my corner.  I also recall Paul Orndorff telling me that my "walking the ropes" was "exciting."  He also told me that I should keep doing it, which I did.  Orndorff even told me that it was okay if I fell because we would cover it up and it would provide the opponent with a good opportunity to get his limelight during the match.

22.

I had trained regularly at the Power Plant for many years.  After my successful match with Harold Hogue, and after I realized I did not have a chance to get any more opportunities from WCW, I finally gave up.

23.

At no time, however, did I ever lose interest in becoming a successful wrestler at WCW.  If WCW had scripted me for any

match, I would have done anything they would have suggested.  I would have wrestled as the "babyface" or as the "heel," whatever they asked me to do.  I only reluctantly gave up on WCW after seven years of training, and after suing them for discrimination, because they were retaliating against me for my complaints of discrimination.

24.

At all times I was ready to wrestle for WCW.  Although I did tear my ACL, it never impeded my ability to wrestle for WCW.  Also, many Caucasian wrestlers had torn their ACL, but were given opportunities nevertheless.

25.

At the time I had signed my last contract, I had mastered my finishing move of "Walking the ropes."  I had developed all of the skills that I needed, and only needed additional work with the bookers and exposure on WCW events.  I was never given the push that was provided other Caucasian wrestlers.  Nevertheless, after I had signed my last contract, every time that I was given any chance to wrestle in an WCW event, I performed my maneuver of "walking the ropes" perfectly.

26.

As a general rule, the bookers and agents decided the storylines and dictated the outcomes of the matches and the manner in which the outcome would be achieved.  While the wrestlers might have varying levels of input as to how the match was performed, the bookers always had the final say as to the result of the match.

27.

During most of the period that I had a contract with WCW, Taylor was a booker. Also, for most of the time I had a contract from 1997 through the end of WCW, Taylor was considered the "top booker." Taylor never gave me constructive criticism, but often demanded I change my name, my gimmick and my character.

I declare under penalty of perjury that the foregoing is true and correct.

_Bobby Walker_
Bobby Walker

_1/12/2003_
Executed on (Date)



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

To: ALL WCW TALENT

From: J.J. DILLON

Date: APRIL 30, 1999

CC: Eric Bischoff
    Bill Busch
    Diana Myers
    Alan Sharp

Subject: TALENT SCHEDULES, INCLUDING PERSONAL APPEARANCES

●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●●

We have had several recent situations where talent were needed on short notice for WCW business ("house show" substitution, personal appearance, etc.) only to be informed by the individual talent that they had made a previous commitment not approved by WCW (movie project, charity appearance, autograph session, etc.) that caused a conflict.    In order to avoid a reoccurrence of these situations from this point forward, please be advised that all requests for days "OFF" must be requested in advance and approved by J.J. Dillon.    If you are planning a vacation, wanting to attend the wedding of a friend or planning to attend a school reunion, etc., you must request the time off in advance. THIS INCLUDES ANY AND ALL PERSONAL APPEARANCES (INCLUDING AUTOGRAPH SESSIONS), WHETHER FOR CHARITY OR INVOLVING AN APPEARANCE FEE.

Talent Relations has been given approval on a trial basis to authorize personal appearances for talent that involve payment to talent of a fee payable from a source outside our company.    These personal appearances will only be considered "Authorized Appearances" if they are scheduled through WCW.    The talent involved and WCW will share any fee involved, with the majority of any appearance fee going to the talent that makes the appearance.    All of these non WCW related personal appearances will be voluntary (therefore not regarded as a workday if there are limitations in the WCW talent contract) and subject to the approval of the talent. Appearance fees are usually determined by the fair market value, and if approached, WCW will attempt to get a fair appearance fee, which is subject to the approval of the talent.    If you are approached concerning an appearance, please have the party contact J.J. Dillon to comply with our appearance approval process.    This usually involves a contract for the appearance, which assures the validity of the request.    All appearance fees are received in advance by WCW, which assures the talent will be paid in accordance with the agreement.    ALL APPEARANCES NOT CLEARED BY WCW WILL BE REGARDED AS "UNAUTHORIZED" AND YOUR PARTICIPATION IN AN "UNAUTHORIZED APPEARANCE" COULD BE INTERPRETED AS A BREACH OF YOUR CONTRACT.

This represents a great opportunity for an added revenue stream for WCW talent.    This should continue beyond a trial basis, if we all work within the system.    If you have any questions or comments, please call J.J. Dillon at (404) 603-3832.    Thank you.



PLAINTIFF'S
EXHIBIT

49

WCW 010262
CONFIDENTIAL



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

## AFFIDAVIT OF MOSES WILLIAMS

STATE OF GEORGIA
COUNTY OF FULTON


Personally appeared before the undersigned officer, duly
authorized to administer oaths, Moses Williams, who, upon having
been first duly sworn, deposed on oath and states:

1.

I worked for World Championship Wrestling ("WCW") in
various capacities.  I was initially hired as a stage carpenter
in October, 1991, and worked as a stage coordinator when my
employment was severed by WCW in March, 2001.

2.

In addition to the work that I did at WCW, I have extensive
experience in stage production, and have worked on many large
events.  Among other clients, I have worked with entertainment
groups such as the Rolling Stones and Michael Jackson. I was
also involved in Farm Aid.

3.

Throughout the approximate nine and one-half years of
working with WCW, I was always a very loyal and dedicated
employee.  I was extremely courteous to all personnel, and
treated everyone with respect.  I was also very respectful of
managers and officials at WCW.

4.

Even though I was always very dedicated to WCW, I observed
many actions that demonstrated a racial or ethnic bias against
anybody who was not a Caucasian.  I myself, am African-American.
Although some of the WCW officials were more overt about their
racial biases than others, I believe that there were many
actions and decisions that were made based on a racial or ethnic
bias.

5.

Over the years, I observed certain WCW officials make statements and take actions in order to protect the "good old boy" establishment. Unfortunately, the "good old boy" establishment was exclusively Caucasian. Also, in my experience, the favoritism and better treatment given to Caucasians over minorities was pervasive throughout WCW.

6.

During nine and a half years at WCW, WCW never had an African-American work in Security in any capacity. I even recommended some qualified persons for Security, but they were not hired. The decision-maker, Mr. Doug Dillinger, expressly stated that there would not be a black "security" person at WCW. True to his word, there never was an African-American hired to work in Security. As I indicate further in this affidavit, Mr. Dillinger made other statements showing his racial bias.

7.

Similarly, there was never an African-American hired to work in Lighting at WCW. The decision-maker was Frank Santoro. Mr. Santoro overlooked many qualified African-Americans. I personally recommended several qualified African-Americans directly to Mr. Santoro, but he did not hire an African-American person for Lighting.

8.

Similarly, Mr. Santoro was also responsible for hiring truck drivers for the WCW tractor-trailers. In the years I was with WCW, I only recall one African-American truck driver (female). She was involved in a minor incident, whereby she collided with a painted post (or similar fixture) and did a little damage to the truck. The truck had been leased, and I myself inspected the truck. I did not see any significant damage to the truck. The woman was crying as she told me that Frank Santoro fired her for the accident. I did not feel this was fair because I was aware of at least two Caucasian drivers who were involved in much more serious accidents, but were not fired. One Caucasian driver was involved in an accident in Nashville, Tennessee, whereby he took out a whole street light and the pole it was on. There was damage to side of truck, and the pole was destroyed. The police even came and took a report.

As to the other Caucasian driver, in Indiana, the driver lost control of the truck and it effectively destroyed the truck and the trailer. But this Caucasian driver was not fired.

9.

WCW also never hired an African-American to work in Audio. Al Smith was the decision-maker for Audio. I submitted many highly qualified African-Americans for his consideration, but he never hired an African-American for Audio.

10.

The Production Manager was William Byrd. As Production Manager, Mr. Byrd was ultimately responsible for Staging, Lighting, Audio, and Trucking. He was the supervisor of Mr. Smith and Mr. Santoro. I am aware that Mr. Byrd often asked if a prospective employee was Jewish. If a prospective employee was Jewish, Mr. Byrd said to hire the individual. I felt that this bias was unfair because many minorities were not Jewish. I also recall a statement Mr. Byrd made about the child of another WCW employee, Steve Small, who married an African-American woman. Mr. Byrd stated, "Steve's kids will have problems in life because they are half black."

11.

Vince Russo often made statements demonstrating that he preferred Caucasian persons, especially Caucasian males, over other persons for WCW management and control. I heard Vince Russo often refer to people as "blacks," "Japs," "spics" or "wetbacks."

12.

I heard Vince Russo make statements suggesting that "whites" were in control at WCW. For example, I heard him say, "whites rule wrestling." I also heard him say that it was a white man's sport and that "is why we don't have many black wrestlers." I also heard him say I am running things the way that I want and we are going to have a "white champion" because that's the way I want it. Vince Russo made it clear that he did not want oriental persons, African-Americans, or Hispanics succeeding at WCW, much less gaining any position of management or control.

13.

Similarly, I heard Terry Taylor make statements demonstrating his racial and ethnic bias against persons who were not Caucasian. Although he was somewhat careful around me, I have heard from other persons that he routinely used words such as "nigger." I did, however, hear Terry Taylor express his desire to promote Caucasian wrestlers. For example, I witnessed Mr. Taylor overtly "push" Caucasian wrestlers, but not "push" African-Americans.

14.

I also heard Terry Taylor make statements about his opinions of African-American fans. I heard him say, "blacks don't buy wrestling tickets."

15.

In my experience, WCW officials such as Taylor and Russo treated Caucasians better than African-Americans, Hispanics, and Asian-Americans. Based on my observation, non-Caucasians received a "B" treatment. I use the term "B" treatment to indicate that minorities were not treated as favorably as Caucasians.

16.

I have personally observed WCW, through its employees and managers, treat minority wrestlers differently than Caucasian wrestlers. For example, on numerous occasions, I observed WCW officials "push" a Caucasian wrestler over a non-Caucasian wrestler. In wrestling terms, a wrestler is "pushed" when that wrestler is provided television exposure and/or is scripted to prevail in a particular match. As it is well known in the industry, the WCW officials would write scripts as to which wrestler would prevail. On numerous occasions, I believe that the Caucasian wrestler was unnecessarily scripted to prevail over the African-American wrestler.

17.

For example, I recall a wrestling match between a wrestler named Stevie Ray (African-American), who was one of two members of the very successful Harlem Heat duo. On that particular match, the Caucasian wrestler, David Flair, was scripted to prevail over Stevie Ray. Although Stevie Ray had been extremely

successful in his participation with the Harlem Heat duo, and although Stevie Ray was considered by myself and others a much better athlete and performer than David Flair, David Flair was scripted to prevail over Stevie Ray, nonetheless.  It is my belief that this decision is one of the many times that wrestling victories were scripted based on a racial bias.

18.

Similarly, David Flair was routinely scripted to prevail over Ice Train (African-American) even though Ice Train was a very strong and solidly built wrestler who was much bigger than David Flair.  And on the one occasion when David was not scripted to prevail, Ice Train effectively destroyed (and even injured) David Flair.

19.

I also observed the treatment of an African-American wrestler named "Hard Body" Norris.  I was told Hard Body was referred to as a "dumb nigger."  I note that Hard Body was never given any meaningful chance, and was never pushed.  Hard Body was really badly treated.  A fan indicated that it seemed puzzling that Hard Body was getting beaten so easily at WCW even though he was winning the "Tough Man" Competition.  Another "Tough Man" competitor, Tank Abbott (Caucasian) was pushed very hard, and had great exposure.

20.

I recall another interesting event when a wrestler by the name of Booker T was scheduled to wrestle Scott Steiner.  I believe this was in the summer of 2000, and was a very big WCW event.  Because it was a big event, I was very involved in the stage production for that particular fight.

21.

I specifically recall everybody talking about the match, and everyone stated that Scott Steiner (Caucasian) had been scripted to win that match over Booker T (African-American).  Indeed, even during some of the stage preparations, it was a known fact that Scott Steiner would be the world champion for WCW by the end of the night.

22.

Even though Scott Steiner had been designated the world champion, I was informed before the match that there had been a change. I was informed that Booker T would become the champion instead of Scott Steiner. During my production work, I had my headsets on and I heard various conversations. During these conversations, I heard Vince Russo and Terry Taylor calling the shots. These two individuals made it known to the WCW workers that Booker T would be the champion that night, and not Scott Steiner.

23.

I was extremely surprised and taken back. In my experience, I had never witnessed a change of the designated winner so close before the match. Myself and many people all wondered what the reason was for the abrupt change in the scripted winner. We thought it was quite unusual, if not bizarre, to change the designated world champion on the day of the match. Even after the show, people were shocked at the abrupt change.

24.

I heard several WCW employees state that the reason for the abrupt change was a response to the racial allegations raised by wrestlers against WCW. These employees, recognizing that Booker T. was African-American, concluded that WCW officials such as Russo and Taylor made this move to conceal their racially discriminatory practices and to provide a defense to the lawsuits involving racial discrimination.

25.

Although I witnessed many discriminatory acts and statements, I did not personally raise any formal complaints. I am aware that another African-American, Pez Whatley, did vocalize his opposition to racially discriminatory practices that he perceived. I believe that Pez Whatley suffered retaliation for raising his concerns of racial issues and discrimination. For example, Pez Whatley was no longer pushed, was no longer involved in training as he had done before, and was essentially removed from wrestling and demoted to menial labor such as setting up the ring.

26.

In addition to discrimination against African-American wrestlers, I also believe that WCW has favored Caucasian wrestlers over Asian-American and Hispanic wrestlers. I recall a particular group of Asian-American wrestlers known as the Young Dragons. Although I felt that they had much to contribute to the wrestling entertainment, these individuals were never "pushed" or given any meaningful exposure. I recall one match whereby the fans were overwhelmingly in favor of the Young Dragons over Three Count (all of whom were Caucasian). Nevertheless, the Young Dragons were not pushed after this event, but WCW did continue to push Three Count.

27.

As to another individual Sonny Onoo, I believe that he was treated differently because he was not part of the "good old boys" network as I described earlier. Sonny, an Asian-American, was never accepted and brought into the inner circle even though he was extremely knowledgeable about the wrestling industry, and was a very capable and hard working person.

28.

As to Sonny Onoo, I am now aware that Sonny Onoo was not a full time employee of WCW. This surprises me because Sonny had an office, was listed on the extension list of WCW personnel, and contributed greatly to WCW. In addition to serving in numerous capacities such as agent, entertainer, coordinator of talent, Sonny also translated for Hispanic and Asian wrestlers.

29.

Jimmy Hart's work was very similar to the work done by Sonny Onoo. Similar to Sonny, he was responsible for recruiting and developing talent. Although Jimmy didn't work as a translator, they essentially performed similar work. Although I am not taking anything away from Jimmy Hart, I believe that Sonny was just as qualified (or even more so given his language skills) as Jimmy Hart.

30.

As to Asian-Americans, I also recall seeing a "Chinese menu," on the bulletin board at WCW. This "Chinese menu" portrayed Chinese in a very negative manner. This is one

example of the atmosphere at WCW, which tolerated and perpetuated racial stereotypes and racial prejudices.

31.

As for me, I also believe that I was personally treated differently because of my race when WCW hired Caucasians, and paid them more compensation than I was receiving.

32.

As I indicated earlier, I have much experience in stage production and am capable of performing every aspect of preparing a stage event.  At one point, I was working as the prop master, carpenter, stage manager, and performing any and all other work for WCW.  Although I felt that I was being overworked, and spread too thin, I did not complain and did what was asked of me.

33.

I did become quite upset, however, when WCW hired Caucasians to perform my tasks, but paid them even more than I was making.  For example, WCW hired Trevor George, Art Shipley, and Scott Stevens (all of whom are Caucasian) to work on the props.  I believe that WCW paid each of these Caucasian individuals more than what I was making even though they were only doing one part of the job that I had done, and even though they did not have nearly the extensive experience in stage management and production. Similarly, WCW hired Ellis Edwards to do the stunts and the props, and also paid him more than I was making.  Again, I was much more qualified for the type of work than Mr. Edwards, but I believe WCW paid him more than I was paid.

34.

I believe that the manner in which WCW handled this situation, and paid the Caucasian workers more money than I was making was racially biased.

35.

As I indicated earlier, I did not confront the WCW officials with my complaints about discrimination.  I heard from several individuals that I was known as the "good nigger."  I was basically told that because I did not make any waves, called

the Caucasian officials "Sir" and "Mr.," and because I did everything that I was told, that I was considered "a good nigger."

36.

In addition to the racial discrimination against WCW wrestlers and employees, I also believe that WCW officials discriminated against wrestling fans based on race.

37.

I previously addressed Doug Dillinger.  I also add that, on numerous occasions, I observed Doug Dilinger, the chief of security, provide promotional gifts and souvenirs to Caucasian children, but did not treat African-American children the same.

38.

I was offended by Mr. Dillinger's flagrant favoritism towards Caucasian kids.  I made my best effort to treat all of the children the same, regardless of their race (although I did go out of my way to take care of any children with apparent handicaps).  As to Mr. Dillinger, I recall, during the O.J. Simpson trial stating that "yes I used the "N word," and I will use it again."  He then stated that it would not effect the way he would act in the work place, but I believe that his actions speak louder than his words.

39.

I recall Terry Taylor stating that they did not need to "worry about spies or brothers; they just need to get to the back of the line."  I believe that he was referring to African-Americans, and any person who would raise complaints about the treatment of African-Americans. He was indicating that they would be put at the back of other persons seeking advancement at WCW.

40.

As to Terry Taylor, I was told by another person that when WCW signed Hulk Hogan, that Terry Taylor stated that WCW was bringing in Hogan, and he didn't want any blacks on the show to take away from Hogan coming back into the limelight.  From my understanding, Taylor didn't want any black wrestlers to take away from his intended effect in bringing in Hogan.

I have read the above.  It is true and correct.

FURTHER THE AFFIANT SAYETH NOT.

Moses Williams

Sworn to and Subscribed
Before me this __18th__ day of
__February__, 2002.

NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 13, 2002



# EXHIBIT / ATTACHMENT

(To be scanned in place of tab)

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION

 3
     PEZAVAN WHATLEY,                  )
 4                                     )
               Plaintiff,             )
 5                                     )
          vs.                         ) CIVIL ACTION FILE
 6                                     ) NO. 1:01-CV-0916-CC
     WORLD CHAMPIONSHIP WRESTLING,    )
 7   INC.,                             )
                                       )
 8             Defendant.             )

 9

10

11     _____

12             DEPOSITION OF PEZAVAN WHATLEY
                   NOVEMBER 14, 2001
13                    10:09 A.M.

14     _____

15

16

17

18

19

20

21

22

23

24

25
```

*Premier Reporting*

CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia 30326 • www.premierrptg.com

404-237-1990

1   conversation, that he would confer with JJ Dillon.

2      Q      What was Mr. Bush's race?

3      A      White.

4      Q      And what was Mr. Goodley's race?

5      A      Black.

6      Q      Do you know what happened after that meeting

7   with Mr. Bush?

8      A      Yes -- only guesswork, but -- what

9   happened, but --

10     Q      What do you believe happened?

11     A      We talked to Mr. JJ Dillon, who stopped all

12  of the black people from being  -- moving up in

13  positions, and I was stuck.

14     Q      Why do you believe that?

15     A      Because Mr. JJ Dillon is as racist as they

16  come.

17     Q      Why do you believe that?

18     A      Because I've known Mr. Dillon for the

19  longest time.

20     Q      What has he done to make you believe he's

21  racist?

22     A      Well, I worked with him at a time when we

23  were in a bathroom listening to country and western

24  music, and the country and western music involved a

25  song and the word "nigger."  He thought that was

Page 63

1    great.

2         Q    Anything other than that?

3         A    Mr. JJ Dillon worked with me at times, with

4    Mr. James Crockett, and we were also given positions

5    to move up, but every time that I had to participate

6    in -- me, myself had to participate in any activity in

7    which I was under Mr. Dillon's hand -- it was always

8    racist, nigger.

9         Q    Let me back up for a minute.  When was this

10   incident with you and Mr. Dillon and country western

11   music in the bathroom?  Do you recall when that was?

12        A    That was in the '80s.

13        Q    In the '80s?

14        A    Yes.

15        Q    And you just said as far as working in

16   positions involving Mr. Dillon, it was always racist?

17        A    With me.

18        Q    What did he do?  Did he say anything racist?

19        A    He just stopped your opportunity to go

20   forward on your position.

21        Q    What evidence, Mr. Whatley, do you have that

22   JJ Dillon was responsible for stopping you from going

23   to any position?

24        A    I think he gave the talk to him.  He got --

25        Q    I don't want to know, Mr. Whatley  -- I want

Page 74

1    assisting with Keith on editing and passing out

2    papers.

3        Q        Do you know who made the decision to let

4    them do this work as assistant booker?

5        A        No, I don't.  I don't know.  I could only

6    speculate.  I don't know for sure.

7        Q        Now, you talked about earlier who you talked

8    with in terms of wanting to be a booker?

9        A        Yes.

10       Q        You mentioned Mr. Hamilton.  We talked about

11   that.

12       A        Yes.

13       Q        You mentioned Tim Goodley --

14       A        Yes.

15       Q        -- and a meeting that you had with Tim.  Was

16   that the only time you talked with Mr. Goodley about

17   being a booker?

18       A        No.

19       Q        Were there other times?

20       A        Yes.

21       Q        What did you say to Mr. Goodley?  Those --

22       A        Same thing I told him at the beginning.

23       Q        Which --

24       A        That we have --  we have and --  we have not

25   had any black bookers in the main events of the major

Page 95

1    Mr. Bruce were assigned trips in which that he could

2    make it back in time for his family or just one or two

3    days at different times.  But because of the fact that

4    my availability of being able to drive, after my

5    first-proven shot that I could drive a truck -- look

6    how this case is going --  that I could drive --  that

7    I could go then to be trusted to drive their truck and

8    their equipment from one designated point to another.

9         Q      Anything beyond what you've just told me as

10   far as the assignments of trucks that you believe was

11   discriminatory, or is that everything?

12        A      Yes.

13        Q      That's everything, or there's more?

14        A      No.  I mean, there's more.

15        Q      What else is there?  Please tell me.

16        A      In our --  Mr. Hamilton, part of his job was

17   to go at the television --  with the television, when

18   the television went out and --  at the beginning, and

19   our assignment was to take the people that applied to

20   --  that wanted to be wrestlers, into the training

21   facility both at Jonesboro and at Carroll Drive, and

22   at this time there was a man employed also with us,

23   because of Mr. Hamilton's absence sometimes, was

24   Blackjack Mulligan, and during the time we accepted as

25   trainers the people that applied into our jobs, and

1   when Mr. Hamilton arrived back and he first saw the

2   new recruits, his first comment was, oh, a different

3   color.

4        Q    All right.  When was this?

5        A    When we were in the training facility in

6   Jonesboro.

7        Q    So this is before you moved to Carroll

8   Drive?

9        A    Before we moved to Carroll Drive.

10       Q    Do you know what he was referring to?

11       A    Yes.

12       Q    What was he referring to?

13       A    Before there was never any --  maybe one,

14  two Afro-Americans or nonCaucasian people there.  The

15  applications that we received when he was there,

16  happened to include more than that, and which we

17  accepted, and they were in the facility when he came

18  and turned the corner.  This was not something that he

19  expected.

20       Q    Did he do anything about it other than to

21  say the comment that you just said?

22       A    What was done a little later is that they

23  were trimming the fat, multimillions of dollars.  They

24  were trimming the fat by cutting four of the black

25  guys that were down there and let two of the white

guys go, because the white guys were not talented. The black guys were very, very, very talented, and they said we had too many down there. Too many, I mean too many people of different color.

Q Did someone say that to you?

A We knew it, and they said it.

Q Who said that?

A Mr. Mulligan told us as a repeat of what Mr. Hamilton had said.

Q So in other words, Mr. Mulligan told you that Mr. Hamilton had said something about the color of the trainees?

A Mr. Hamilton had spoken about the color of the trainees before that period of time, but this particular instance, what we're speaking of, that's the way it went.

Q Do you remember who it was who was cut?

A Troy Hamilton. I can't remember his tag team partner. Very, very highly talented young man. Mr. -- I can't remember his name. I can't remember his name. Very well built, muscular bodybuilding phenomena that was in town that wanted to become a wrestler. And other individuals, I can't remember their names, but they made it very difficult for them to stay at the facility and still wrestle.

Page 101

1       A       It was as -- it was true for us to train

2    everybody really hard, but the emphasis was exactly on

3    the -- on the black individuals that they knew that

4    they could really pound on at the same time as you

5    would be -- white individuals would be given a

6    routine, whereas the black was to be given the

7    routine.

8              Now, if a white individual doing the

9    routine faltered, slumbered, could not get it done, he

10   was given extra opportunity to get hisself together so

11   that he could be able to -- to keep going on.  If a

12   black individual stumbled, faltered, or -- he didn't

13   want to be there; he had a bad attitude; they couldn't

14   teach him; he couldn't learn it.

15      Q       Who was in control of this?  Wasn't it the

16   trainers who were in control of this, including

17   yourself?

18      A       Including myself.

19      Q       So you took part in the process of what

20   you're claiming?

21      A       My process was that you were wrong.  He can

22   do this.  They're great talents sitting right here.

23      Q       Mr. Whatley, let me interrupt you, because I

24   want you to try to make yourself clear.  I'll let you

25   finish, but I don't understand what it is you're

Page 132

1    wrestle, which would provide me with more money.

2        Q     Who told you that?

3        A     From Mr. Sullivan himself.

4        Q     He came to you and told you that?

5        A     Yes.

6        Q     Did he tell Mr. Bruce and Mr. Wenner that

7    too?

8        A     No.   Mr. Sullivan told me.

9        Q     Just you?

10       A     Whether he told Mr. Bruce and Mr. Wenner, I

11   can't remember, but I know what he told me.

12       Q     So he came to you and said, I'm going to

13   give you more chances to wrestle?

14       A     Now you're going to get chances to wrestle.

15   He and Mr. Mike Graham both, who were in the booking

16   position and assisted booking.

17       Q     Why is that discriminatory discipline?

18       A     Well, because of the fact that they --  that

19   Mr. Bischoff -- during this period of time we wrestled

20   in a place called Atlanta, Georgia, the Omni, and Mr.

21   Bischoff showed expressively his desire about

22   discrimination, because he took not only myself but

23   every black off the card, and he was quoted as saying,

24   this is white night.

25       Q     When was this?

1    A      In the Omni, when Mr. Shuler was in charge

2    and at our first big Omni show.

3    Q      Who else did he take off the card, according

4    to you, besides you?  Who else?

5    A      Jacqueline --  the female, Jacqueline, who

6    was Mr. Sullivan's walk-in.

7    Q      His valet?

8    A      His valet.  The Harlem Heat, Harold Hogue.

9    That was all, because that --  that wasn't any other

10   blacks on the card.  Any other blacks on the card that

11   had been wrestling previously.

12   Q      Did Mr. Bischoff make this comment to you?

13   A      Mr. Bischoff made that comment to Mr.

14   Sullivan.

15   Q      Were you there when he made that comment?

16   A      No.

17   Q      How did you hear about that comment?

18   A      Mr. Sullivan came out and told us why we

19   weren't going to be able to work.

20   Q      What did he say?

21   A      He said that this is going to be --  he took

22   off Jacqueline.  He took off the Heat.  He took off

23   Harold Hogue.  He took off any other persons except

24   for the --  what he wanted, and he told us, just

25   before he left, told us, turned around and say, Eric,

1    said this is white night.  In Atlanta, Georgia.

2        Q      Any other discipline beyond that, Mr.

3    Whatley?

4        A      That's all of them that I can remember right

5    now, sir.

6        Q      Is there anything you think that would help

7    you remember other instances?

8        A      I'm trying to, but that's all I can

9    remember.

10       Q      Why don't you take a minute and see if you

11   can remember anything more?

12       A      I spoke up to Mr. -- Mr. Randy Savage, who

13   was one of the prominent wrestlers at the time, about

14   having the opportunity to wrestle and to book, to be

15   the booker at that time, who was Kevin Sullivan.  I

16   mean, Kevin Nash.  Who at that time, Mr. Savage was

17   one of the few people that knew the --  about

18   qualifications of being the booker and that --  and

19   that I had them.

20              He spoke to him about him -- about doing

21   it, and at that time Mr. Nash could have done it if he

22   wanted to.  And he did not do it, and when Mr. Savage

23   came back to tell me the reason why he did not do it,

24   he included the fact that they were making some

25   changes.  But also he said, but the real changes, you

Page 135

1    know.  And we both pointed, and we parted.

2        Q      This was what Mr. Savage said to you?

3        A      Mr. Randy Savage.  When we discussed

4    wrestling and booking as one of the things that I

5    could continue doing on that job.  Oftentimes headline

6    wrestlers go to the booker and the --  and express,

7    this guy can do it.  This guy can do it.  Randy Savage

8    was a guy highly respected.  His opinion was highly

9    noted.  He done a lot in the business, and so -- even

10   more so than the guy that held the position in the

11   job.

12              And so when Mr. Savage came back, it was

13   told to me because they're going to make some changes,

14   but also in the conversation, we knew that changes

15   that were being made had nothing to do with my

16   request.  Changes was that they didn't want me in

17   there and that I was black.

18       Q      He didn't say that, but that's what you

19   understood him to be saying?

20       A      Well, he pointed to skin.

21       Q      Did he say that's what Mr. Nash said, or did

22   he say that's what he believed was going on?

23       A      He told me what Mr. Nash said about the

24   changes and that there were going to be those changes

25   made.  I can't remember verbatim, word for word.

Page 139

1      A      Right now.

2             MR. PONTZ:  Well, I'm going to reserve

3      the right to reopen this deposition when Mr. Whatley

4      decides he can remember some other stuff, but I'm

5      taking him at his word that that's everything he knows

6      about.

7      BY MR. PONTZ:

8      Q      Mr. Whatley, you also indicated in your

9      complaint that you believe you were subjected to a

10     racially hostile work environment?

11     A      Yes.

12     Q      What do you think made your work environment

13     racially hostile?  What things happened at the

14     workplace that you think made it racially hostile?

15     Other than what we've talked about?  You don't need to

16     repeat the things we've talked about, although you can

17     point them out to me if you want.

18     A      I found it necessary to try to advance

19     knowledge or equip young black wrestlers on some of

20     the things that they were going to be facing when they

21     got into the business.  Not only was that

22     objectionable from Mr. Hamilton's point of view, but

23     it was objectionable to the assistant booker's point

24     of view, objectionable to the booker's point of view,

25     and objectionable to Mr. Bischoff's point of view.



1    Q       Well, what was racially harassing about

2    that?

3    A       Well, they would rather for those kids not

4    to know those things than to be told those things.

5    They would not -- they would rather for them not to

6    know that they weren't going to get an equal

7    opportunity and that they were going to be twice as

8    good as the white boys even to be able to look at, and

9    they didn't want them to know that even though they

10    could be twice as good as the white boys and wrestle

11    and have talent, charisma, talking and everything,

12    they still weren't going to be given the chance, even

13    though they colored it like you were going to be --

14    like they was going to give an equal opportunity to

15    them all.  Me being in that business and knowing that

16    before, knew that they were lying.

17    Q    Mr. Whatley, what I'm really asking you is,

18    what happened in your workplace --  what happened to

19    you in your efforts to do your work and provide your

20    services that you believe was racially hostile and  --

21    A       Okay.

22    Q       -- affected your ability to perform your

23    job?

24    A       During the time the four --  when they made

25    the cutbacks, when they made the cutbacks on the four

Page 142

1    A      Well, being a man of the experience that I

2    had, Mr. Hamilton first of all, who was in full

3    knowledge that I was a fully capable and able person

4    to be able to do not only my job but the job that he

5    was doing and to be booker.  Well, Mr. Hamilton made

6    no effort whatsoever to promote the fact that he had

7    an individual that could help with the company

8    overall.  Mr. Hamilton rather kept his mouth shut so

9    that no fur is fluffing.

10   Q      Anything else that Mr. Hamilton did that you

11   believe made a hostile work environment for you?

12   A      The fact that when we were in Carroll Drive

13   and wrestling, we would point out the different

14   individuals who working with them day by day, that

15   were really coming along real fine.  Well, Mr.

16   Hamilton came out there, and he would look under the

17   surmise of whatever period of time he was out there;

18   an hour, two hours, or whatever, and then come back

19   and make a decision on which ones he thought that was

20   good or bad, you know.

21          And oftentimes -- oftentimes nonCaucasian

22   or off-white or African people were -- were given

23   positions of -- he could stay down there and train

24   more, but it's always a little this that was wrong or

25   a little that, that was wrong.  Everybody had

1.   something wrong.  You know, so it should not be just

2    one group that should have been -- that should have

3    been identified as having something wrong.

4              They just whenever the administration

5    didn't want an extra black in there, they make up a

6    reason.  He don't come on time.  Some didn't come at

7    all, you know, and still were welcome back.  Also,

8    which was -- this is -- the terrible thing is that

9    they would bring down Keith and that young lady that I

10   can't remember her name to look at the talent, who had

11   no idea what's going on.

12             And myself, especially myself, who were

13   capable of doing a lot of things for the young men,

14   our opinions were swept under the rug.  I mean, when I

15   mean our opinions, I mean my opinion on who could be

16   doing --  like you could have a black man down there,

17   six-eight, 325 pounds, undeniably, undeniably money

18   walking, and because they would bring individuals down

19   there that had no idea about what was going on or what

20   the training, all they do is looked and thought he was

21   cute or had the hair long enough or they dyed their

22   hair blond.  They had enough steroids stuck in their

23   ass that they was the ones that would be chosen over

24   individuals with talent.

25       Q    Anything --  I'm sorry.  Go ahead.

1      A      No.  Go ahead.

2      Q      No.  Finish what you're saying, please.

3      A      That was it.  That was it.

4      Q      Anything else that you think was done that

5  made your work environment a racially hostile work

6  environment?  Besides what you've already told me?

7      A      When I chose an individual that was --  that

8  was talented enough to go around and --  and

9  especially, you know, when I chose a black individual

10  that was good enough to be talented, useful, could

11  draw money, that was like a mark against him.

12      Q      Did you ever choose any white individuals

13  that you thought were good?

14      A      I tried to be fair.

15      Q      And what happened to the white guys that you

16  chose that were --

17      A      Quite a lot of them were chosen.

18      Q      And none of the black guys you pushed were

19  chosen?

20      A      No black guy that I endorsed was ever used

21  on a WCW main event on the assistant basis.

22      Q      Who were some of the African-American

23  trainees you endorsed?

24      A      Like, Mr. Bobby Walker is an individual I --

25  now, Mr. Bobby Walker had a talent that no other

Page 161

1    hold you on the sideline, especially me, because they

2    didn't want you to -- to display the guy giving

3    talent that you could do what was actually being

4    required of you to do.

5        Q       Anything else that you believe supports your

6    claim for a hostile work environment on the basis of

7    race?

8        A       Okay.

9        Q       What else?

10       A       Because of the fact that you -- I wrestled

11   in several -- I mean, I participated in several

12   different jobs in the WCW organization, it was not

13   unusual for you to hear amongst the work place, you

14   know, the N-word, or darky, or if you went and was

15   sitting down beside another employee that was an

16   individual that was there and the employee happened to

17   be a white female, better make sure that you were not

18   sitting down there for enticement of the white female.

19   Other white males who were always looking at that,

20   would come over and sit beside you.

21              If I was in a conversation with another

22   black individual, or another couple other black

23   individuals, it was not unusual for Terry Taylor,

24   Diamond Dallas Page to come over with a joke.  Hey,

25   not more than two or three black guys in a -- at one

Page 167

1    incidents with some lighting employees, is there

2    anything else?

3        A    Well, also in security, Doug Dellenger, who

4    was head of security from start to beginning, came up

5    and told one black individual they were playing the

6    music over the loudspeaker and turned it off and said,

7    we don't want to hear no more of that nigger music.

8    And when the individual turned around and got mad, he

9    said, I don't know what you got mad; we could say that

10   to Pez and it'll be all right.

11       Q    Were you there when that happened, Mr.

12   Whatley?

13       A    No.  I was just told about that after it

14   happened.

15       Q    Who told you about that?

16       A    The people that it was told to.

17       Q    Who?  Who?  Names?

18       A    The wrestle --  was Mr. William Boulware was

19   told, and he reported it to the human resources

20   department.

21       Q    How do you know he reported it to the human

22   resources department?

23       A    Because we went down there when he went down

24   there and told.

25       Q    Were you there when he went and told them?

Page 174

1    Q    Did they ever say that to you?  Did you ever

2  hear them say that?

3    A    No.  Only time that I heard them say it is

4  when they thought I wasn't there.

5    Q    That's what I'm asking you, Mr. Whatley.

6  Were there times that you heard Diamond Dallas Page or

7  Chris Kanyon use the N-word about you?

8    A    When they was in dressing rooms and were

9  leaving the dressing room or coming out of the

10  dressing room and you're making suggestions about,

11  well, what can be happening in the ring, you would

12  hear them when you left saying, what that nigger

13  talking about?

14    Q    Who would you hear say that?  Chris Kanyon

15  and Diamond Dallas Page?

16    A    Different ones like that.

17    Q    Anybody else you can think of?

18    A    Not right off the bat.

19    Q    When did that happen?

20    A    During the  '98-'99 --  it continued to

21  happen all the way through, but most --  most of the

22  time, '98 and '99 sessions during the wrestling.

23    Q    And these were wrestlers who were making

24  these statements?

25    A    They were wrestlers, yes.

1    or come get security and say, hey, there's a guy in

2    the ladies' room?

3        A    Not to my knowledge.

4        Q    That's fine.  Any instance that we haven't

5    talked about -- Mr. Whatley, any instance we haven't

6    talked about involving the use of the word "nigger?

7        A    Only things that I could say is what I was

8    told after somebody said that it was said.  The

9    earshot of hearing it or up in front of your face,

10   hearing it, had been limited to just several

11   occasions.

12       Q    The ones we talked about?

13       A    Yes.

14       Q    Did anyone ever call you darky?  That was a

15   word you used a few minutes ago.

16       A    I heard the word "darky," but that was, you

17   know -- the word darky on the crew, with the people

18   that you worked with, and that because of the fact

19   that -- like I said before, that I wouldn't take

20   second citizenship to, like, for instance, a guy that

21   was -- I can't remember his name.  He was one of the

22   ones in charge of lighting.  Used in reference.  Used

23   it in reference to me, because of the fact that we

24   were all moving out our stuff at the same time.

25                   He wanted us to stop doing our job so that

1    he can complete the --  completely let the --  the

2    lights down.  But because of the fact that we were on

3    the move and they wanted economically to use the

4    locals to do all the things, they were trying to get

5    us out first, so therefore he was disgusted in the

6    fact that he had to wait, and now it's --  I had to

7    wait behind a darky too.

8        Q     Do you remember his name?

9        A     I can't remember --  I tried not to remember

10   his name, but I knew that he was one of the men that

11   was in charge of when the lights went up and went

12   down, and  --

13       Q     Did he work for the arena, or did he work

14   for WCW?

15       A     WCW.

16       Q     So he was a lighting employee of WCW?

17       A     WCW.

18       Q     Did you complain about that?

19       A     Oh, yes.

20       Q     Who did you complain to?  Do you recall?

21       A     Oh, yes.  Every instance that we did, that

22   we called, you know, I knew exactly that the person

23   that you can go to in the instance was human resources

24   department.

25       Q     Do you know if human resources department



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

## INTERVIEW OF OLIE ANDERSON



AUG 12 1992

        This is the interview of Olie Anderson taken at the law
offices of Bentley & Bentley by Randall Bentley and Ronald J.
Freeman at 9:55 a.m. on January 23, 1992.

Q:   For the record, could you please state your full name.

A:   Olie Anderson.

Q:   Could you please give your name that you were given at
     birth.

A:   Allen Robert Rogalsky.

Q:   What are you commonly known as in the Atlanta area?

A:   Olie Anderson.

Q.   Can you please give us your business address and your
     residential address.

A:   The residential address is 1660 Rock Springs Lane,
     Woodstock, Georgia.

Q:   Zip code?

A:   30188

Q:   And your residential address?

A:   That is the residential address.

Q:   For the record, could you please tell us a little bit about
     your educational background?

A:   High school, four years of college, no degree.

Q:   Where did you attend high school?  City and State.

A:   St. Paul, Minnesota.

Q:   And where did you attend college?

A:   University of Colorado, University of Minnesota and St.
     Cloud State University.

Q:   After you left college, what did you do then?

A:   Served in the Army.

Q:   How many years were you in the Army?

A:    Two years, nine months, 1 day.

Q:    Were you recruited for the Army or did you volunteer?

A:    Drafted and then volunteered, September, 1964.

Q:    Did you serve during any war time?

A:    During Viet Nam.  Viet Nam started then.

Q:    Did you in fact serve in Viet Nam?

A:    No, I did not.  I was in Germany.

Q:    What is the highest rank that you attained while in the service?

A:    E-4.

Q:    What branch of the service were you in?

A:    Army.

Q:    Which level was it, infantry, quartermaster?

A:    I was a clerk personnel specialist.

Q:    Now upon leaving the Army, what did you do?

A:    I went into professional wrestling.

Q:    How did you first become involved with professional wrestling?

A:    I was approached by a couple of people involved in professional wrestling in Chicago, where I was later stationed while I was still serving in the Army and was told that they would consider making an offer for me to get into professional wrestling. One was Vern Gagne, the other was Dick the Bruiser.

Q:    Did you eventually become involved in professional wrestling?

A:    In September of 1967 I started professional wrestling in Minneapolis.

Q:    Now, kind of chronologically walk us through your history of professional wrestling up in Minneapolis up until the time you arrived in Atlanta, Georgia.

A:    I wrestled in Minneapolis for approximately 6 months.  In April of 1968 I went to Canada for a very short time.  In

June of 1968 I went to North Carolina - my first NWA.  NWA
at that time was recognized as being the largest sanctioned
body of wrestling.  I wrestled in North Carolina until
September of 1970.  I was injured and was out of wrestling
for approximately a year.  I came back into wrestling in the
summer of 1971 by wrestling for the NWA again in Florida.  I
stayed there until January of 1972 and was asked to come
back to the Carolinas.  I stayed in the Carolinas until
1974.  I went to Florida and then came back to...or went to
Georgia in about April of 1974.  I wrestled again off and on
in Georgia and Florida, or Georgia and Carolina I should
say, and then came to the Carolinas...I mean Georgia, in
1976 in September or October of that year as a wrestler and
for the first time in a management position as a booker and
stayed like that through December of 1979.  I got out of
wrestling for approximately 5 or 6 months and was asked to
come back in the manager and wrestling capacity in May of
1980, again in Georgia, and then became a booker in the
Carolinas in 1981.....I think around March of 1981....and a
few months after that became the booker for both Georgia and
Carolina until approximately June of 1982, when I became the
booker of Georgia exclusively until 1985, when I sold out my
position in wrestling and essentially retired.

Q:   Since being the exclusive booker here in Georgia in 1985,
     have you maintained any other managerial or wrestling
     positions with the WCW or the NWA?

A:   In 1989 I was hired by WCW at that time to be a road agent
     and later in 1990....May of 1990.....I was asked to be
     placed in the position of being the booker until November of
     1990.

Q:   Now while at the times when you were in a booker or manager
     position with the NWA or the WCW, were there any other black
     managers employed with the NWA or the WCW?

A:   No.  By managers again, you mean by administrative?

Q:   Administrative.

A:   No.

Q:   Throughout your entire tenure here in Georgia....or
     throughout your entire tenure with the NWA, have you ever
     known them to employ a black booker?

A:

Q:   You were telling me about Ernie Ladd, can you give me  the
     dates and what position you understood Mr. Ladd to hold.

A:   Well, Ernie was, I think, helping Bill Watts in booking the areas of Mississippi, Louisiana, Arkansas.  I believe it was probably in the early '80's......'81, '82, something like that.

Q:   Do you know what Ernie Ladd's title was at that time?

A:   I couldn't honestly say that he had a title, and I wouldn't say that he.....I don't know that he necessarily received any compensation for that job either.

Q:   Was he wrestling during that time period?

A:   Yeah, I think so.

Q:   Now Bill Watts, was he a white male?

A:   Yeah.

Q:   Is he a white male?

A:   Yes.........still is.

Q:   With the exception of Ernie Ladd, have you ever known any black to hold a booker or any other administrative position in the NWA or WCW?

A:   No, I don't think there has any time where a black has held a particular position as booker where he received any compensation for that particular situation.

Q:   Was it your understanding that white males that held those positions were paid salaries or other types of benefits?

A:   Yes.

Q:   Now, during the time that you were a booker exclusively here in Georgia, can you tell me approximately how many black wrestlers that you had either under a written contract or an oral contract to wrestle?

A:   Personally had?

Q:   That you personally had.

A:   When I was doing the booking and when I owned a portion of Georgia Championship Wrestling I used, I think, every black wrestler that existed.  What are we looking for at this point....names?

Q:   No....just.

A:   Everybody that was there.

Q:  Okay.  Were you ever questioned by your superiors concerning your frequent use of black wrestlers?

A:  Prior to my coming to WCW I would say probably not.

Q:  And when you came to WCW.....tell me about the people that took over at WCW and what type of questions they raised concerning your hiring practices of black wrestlers.

A:  When I got to the WCW I was working for a man by the name of Jim Heard.  Jim Heard at one point I think just made a comment as to why or what favors I might have owed wrestlers that I had.  At that time I was trying to bring in Thunderbolt Patterson.  I had brought in Junkyard Dog, Ranger Ross........there were conversations I think about Abdullah the Butcher and several other people, and I think....the best I can remember is that Heard asked me what allegiance or what favors or whatever that I owed these people.  I tried to work out things for instance with Thunderbolt Patterson because I thought he would be a way to encourage people to come to wrestling matches, particularly blacks, because we went to a lot of cities that had black populations....and had some things set up for Thunderbolt Patterson too which would have been economically sound....and the WCW wouldn't do it.

Q:  Had you ever experienced those types of problems prior to your coming on board with the WCW?

A:  No.

Q:  Okay, Olie, start describing to me the time when Ted Turner bought out the NWA.....and what your understanding of the name change...and what your position was with the WCW.

A:  My understanding is that Turner bought out Jim Crockett Promotions.  Jim Crockett Promotions at the time was a member of the NWA....and I didn't have any association to do with that until a year later....September of 1989.....in the capacity of a road agent, which was basically nothing.....going to the towns and watching over the matches and the wrestlers.  During that time there was....

Q:  What was your understanding of your duty as a road agent.....as it relates to the wrestlers?

A:  Well, primarily to see that they were there....to watch the matches.  That would be basically it.

Q:  So you just watched the matches.....made sure the wrestlers showed up?

A:  Yeah, there were some things going to the televisions and things like that.  I also sat in on different meetings that

they had.....talking about what they were going to do, programs they were going to have and talent that they were using, that type of thing.

Q:   As a road agent, did you have anything to do with who would be wrestling that night?

A:   At that point, no.

Q:   Did you have anything to do with who....could you enter into a contract with a wrestler to come to work for the WCW?

A:   No.

Q:   Okay, what position held that responsibility?

A:   Well, that would have been up to the booker and primarily to the guy that was the vice president of WCW working for Turner, and that would have been Jim Heard.

Q:   Who was the booker when you came on board as the road agent?

A:   They had several...they had a booking committee.....I was a part of that committee, supposedly.....and then there were several of the wrestlers as well.....as well as at least one announcer.  There were maybe 8 or 9 people who were in this so called booking committee who decided what they were going to do.

Q:   Were there any black wrestlers or black people on that booking committee that you knew about?

A:   No.

Q:   Were there any blacks in management with the WCW during that time period?

A:   Administratively, no.

Q:   Do you recall how many black wrestlers were involved with the WCW during the time that you came on board as a road agent?

A:   I think there were four.  Ranger Ross, Teddy Long, Butch Reed and Ron Simmons come to mind as the only ones that were there.

Q:   Now out of the four that you just named, do you know how many had contracts with WCW?

A:   I think that they all did, although I'm not sure.  I thought they might have all had contracts.  I never saw them.

Q:   Now, you were a road agent for how long?

WCW 102070

A:   Until May of '91.

Q:   And what happened in May of '91?

A:   In May of '91 they apparently thought they....being Heard
     and the organization.....Turner decided that they weren't
     doing well enough for....things needed to be
     changed......and I was asked by Jim Heard if he and I could
     get along and that he would recommend me and like to have me
     take over the job as booker.

Q:   Now tell me from your own personal observation what was
     going on as far as the revenue that WCW was able to generate
     based on the attendance at the matches?

A:   Well, things hadn't hit the bottom yet, although they felt
     that they were at the bottom, and because of the fact that
     they weren't doing the money that they wanted to do, they
     decided that there had to be a change.  The houses were
     probably....well significantly less than they had been in
     the '70's and the early '80's, and they were concerned about
     it and they thought that a change was needed, and that was
     when I was asked to become the booker.

Q:   Now, what cities were you'all servicing around May of '91?

A:   Everywhere in the country.

Q:   Did a lot of these cities have a majority black population?

A:   Yes.

Q:   Can you tell me in your opinion what was the percentage of
     attendance at the matches?

A:   Blacks to whites?

Q:   Blacks to whites.

A:   Well, I think in cities like Atlanta, Chicago, Baltimore,
     Philadelphia were....I personally have wrestled before and
     have booked before and have seen the crowds well enough to
     have an idea.  I would say that while I was with WCW there
     were virtually no blacks that came to the wrestling matches.
     The Atlanta area used to be...I would guess 30 to 40% blacks
     ten years ago in attendance.  Columbus, Georgia would easily
     have been 40% blacks.  Augusta auditorium would have had
     that same type of figure.  WCW might have lost total
     attendance in terms of the total number of people that were
     going, but the black attendance dropped off to a point where
     I think I would hazard a guess as to percentage.  It would
     be easier to say there just were no blacks that were coming
     to the wrestling matches.

Q:   By this time, how many years of experience had you had in
     the wrestling industry?

A:   Starting in 1967 and this was in 1989, 1990.

Q:   Now during the time that there were a lot of blacks in
     attendance at wrestling matches, were there also a lot of
     black wrestlers?

A:   Yes, more so than there are now or that where were when I
     came to WCW.

Q:   Did you attribute the decrease of black attendance to any
     particular fact that was going on in '90 or '91 when you
     were a road agent and booker with WCW?

A:   Yeah, I thought definitely that....

Q:   What did you attribute it to?

A:   The fact that we didn't have the blacks that were wrestling.

Q:   Did you present that idea to anyone?

A:   Yes I did.  I presented it to the committee at various
     times, and when I became the booker, that idea was presented
     to my boss at that time, Jim Heard.

Q:   When you presented it to the committee, what type of
     response did you get?

A:   The committee, I think, was basically ruled by Jim Heard, so
     I was kind of......nobody had an opinion.....unless it was
     voiced by Jim Heard.....and then they would mimic that
     opinion, I think.

Q:   Did you eventually go to Jim Heard and get his opinion?

A:   Yeah, I think his comment as I mentioned was something like
     "what favors do you owe that would make you want to have
     these people or have this guy or that guy wrestle."  My
     answer was "I don't owe this person anything, and I don't
     owe anybody any favors.  I'm just looking at it from the
     standpoint of trying to be able to draw a crowd and bring
     spectators into the buildings; and I think for that we need
     to have blacks as well as the whites in order to do that."

Q:   Once you assumed the role of booker, did you begin to sign
     more blacks?

A:   Yeah, the first guys I tried to get were.....the first one I
     brought in was Junkyard Dog.

Q:   Okay, did you enter into a contract with Junkyard Dog?

A:   I can't say that we've made a contract.  There was a verbal agreement with Junkyard Dog for sure.  Whether there was a contract, I don't know.

Q:   Do you remember what the salary was?

A:   I believe it was around $400 or $450 per event, and of that sum I think it was $100 that was to be withheld until the end of the month, at which time he would then be paid that sum.

Q:   Was there a certain number of events that he was to participate in per month?

A:   No.  That was pretty much up to me, but I booked him regularly.....I booked him as much as I could.

Q:   So in '91 the first person you remember...

A:   May of '90.

Q:   May of '90, the first person you remember entering into a contract with was Junkyard Dog, and it was based on the events........he was being paid a certain salary based on the number of events that he participated in.

A:   Yeah.......based on a per event situation.

Q:   Per event situation.  Were there any other black wrestlers that you entered into that same type of agreement with.

A:   No.  I ran into a lot of flack when I brought in Junkyard Dog.

Q:   What kind of flack did you run into?

A:   Well, as I've said, what favors did I owe?  What past deals might there be between he and I?  There was just a lot of heat, as I would call it, to have Junkyard Dog, because nobody seemed to want to have him there.  The reasons were because he was overweight, because he was fat, because he was undependable.  They didn't know if he was going to show up and that type of thing.

Q:   Were there any overweight white wrestlers that were on contract?

A:   I don't know.

Q:   Can you think of anyone that was proportionately the same size as Junkyard Dog that happened to be a white wrestler that was wrestling during this time period?

Patterson is in the same situation, having drawn sell-out
crowds in all parts of the country, particularly here in the
southeast. A guy like Tony Abbus....the same exact
situation....sell-out crowds. A guy like Abdullah the
Butcher....the same type of situation....sell-out crowds.
Ernie Ladd.....sell-out crowds. I've seen these people sell
the buildings out because I either was with them or worked
with them or I was booking them. Conversely, if I look at
Sid Vicious....I don't believe there has been one sell-
out....well, in fact there hasn't been a sell-out crowd in
years.....so I guess he couldn't have been responsible for a
sell-out crowd, because there hasn't been any. Lex Luger is
the same way. Lex Luger is paid a high salary, but there is
never any evidence anywhere to show that he's ever drawn any
money.

Q:    Now, during the time that you were the booker, was the
      policy of WCW to pay black wrestlers a lower salary than
      what they were paying white wrestlers?

A:    Yeah, I don't think there is any question. I think that I
      offered, for instance in JYD's case....I offered him several
      hundred dollars per event less than I would have offered a
      white person, and did do that. In the case of JYD I think
      offered him $450 an event, $100 to be withheld to be paid
      later on at the end of the month, and approximately a month
      later or so I hired a guy by the name of Stan Hanson, who
      was white, and paid him $600, because I knew it was going to
      be difficult for the black man to argue about it...for JYD
      to argue about it. He was kind of between a rock and a hard
      spot and pretty much had to take what we'd offered, where
      Stan Hanson was in a better position to argue about his
      wages and said I'll go for $600. If I would have suggested
      $450 he would have just thrown it back in my face. In fact,
      now I'm remembering Paul _____ I think offered him
      something like $400/$450. He wouldn't take it.....he said
      no.....and I think we upped his to $600. Thunderbolt
      Patterson, when I started him I paid him $100 because I felt
      that there was so much heat and so much·flack from hiring
      anybody who was black. When I suggested Tony Atlas
      everybody just kind of farted at it and decided that they
      didn't want Tony Atlas, and I don't know whether they
      thought I was gonna flood the place with blacks or what, but
      my intention was simply to be able to draw money, that's
      all, and business. I didn't care about it. I wasn't pro
      black, white, green....I just wanted to try to draw money,
      and the only way I knew how to do it was the way that it had
      been successful for years and year and years and years, and
      that is to have blacks on the card to draw not only blacks,
      because that wasn't the idea exclusively to draw blacks, it
      was a black that could perform to the point where he would
      draw blacks as well as whites.

Q:    Now how long did you say in a booker position with WCW?

A:

Q:   You were talking about...they had raised some concerns
     concerning JYD's dependability....do you have an opinion as
     to Junkyard Dog's dependability?

A:   Well, the time that he worked for me off and on during the
     years prior to my being with WCW there was never a problem.
     He always was on time, and he always showed up.  I had no
     reason to question whether or not he would make it.

Q:   Did he work with you while you were with the WCW?

A:   Well, I hired him.  That's when he first came to work for
     WCW.

Q:   Were there any wrestlers that you were having problems with
     concerning their dependability?

A:   Yeah, a lot of them.

Q:   Can you tell me....can you give me the names of a couple of
     them and the types of problems that you had with them?

A:   We had two wrestlers that were chronically a problem....one
     in particular by the name of Lex Luger, who was making....my
     understanding was he was making $500,000 a year....and he
     was always a problem.  He was always late.  I talked to him
     several different times about his being tardy because it
     raised problems in the buildings and required that in some
     cases we give money back.  We had to inform the spectators
     that he wasn't there, and I told him that unless he showed
     up we had no way of knowing if he intended to be there later
     or if something had happened where he couldn't be
     there....so he needed to be there on time.  At the very
     least, on occasion, he needed to give us a phone call.  If
     he couldn't be there on time he needed to give us a phone
     call and say he was running a little bit late.  Well, he
     never thought that that was important, and I thought that
     was kind of funny.....well, difficult to deal with because I
     wouldn't do business that way.  They were so concerned about
     JYD, and I never had a problem with JYD, and for the period
     of time that I was there, to my knowledge there was never a
     problem with JYD.  And yet the guys that they had problems
     with, Lex Luger, Sid Vicious and a few others.....nothing
     was done...except in most cases they gave them a raise.

Q:   Now isn't it your professional opinion that a JYD or a
     Thunderbolt Patterson could draw a larger crowd that a Lex
     Luger or a Sid Vicious.

A:   Well, I can only say that the past tells me that JYD has
     drawn large crowds....sell outs.....in various parts of the
     country.  Personally I know that.  A guy like Thunderbolt

A:  From May '91 until November of '91....November 22 or 23, something like that.

Q:  Now prior to your becoming a booker with WCW, can you tell me how many blacks you understood were on contract with WCW, prior to May of 1991?

A:  I think four would be about it.  There might have been one two more.  I'm thinking Teddy Long, Butch Reed, Ron Simmons and Ranger Ross I think at that time might have been under contract, or he had been prior to that.

Q:  Now once you became booker you said that you signed Junkyard Dog.  Were there any other blacks that you signed?

A:  Well no, I said that I don't know about a contract, because I didn't personally negotiate any contract.  I negotiated a verbal commitment on my part.  Whether that translated to a written contract later on or even at that time, I don't know.  But I brought in JYD.  I tried to bring in Tony Atlas.

Q:  What happened when you tried to bring in Tony Atlas?

A:  Everybody just nixed the idea.  He had been in a lot of trouble.  He was another unpredictable commodity, and I think again the comment against was something like "What do you owe these people, anyway?"

Q:  Had you ever wrestled with or signed Tony Atlas prior to your association with the WCW?

A:  I started Tony Atlas.  My brother Gene and myself...we started Tony Atlas.  He's from Roanoke, Virginia.....one of the toughest kids that I've ever run into.  In all the years that I wrestled we only started about three people.  We only introduced two that I can think of....one being Tony Atlas....that we introduced to wrestling, so we were rather selective over a period of 20 years.  Tony Atlas, in my estimation, was probably one of the.....he was a draw very much like Thunderbolt Patterson.....very much like Junkyard Dog.  He had the ability to talk.  He looked good.  He fit the mold that WCW seemed to want....that is the Superman type of mold.....the body builder.  Tony Atlas was a body builder before Lex Luger knew how to put his pants on.  Tony Atlas was a legitimately strong individual as well.  He did demonstrations where he would bench press 500 pounds and so forth and so on.....and he was a legitimate guy.  He was also the kind of guy that I could work with.  I took him to the Children's Hospital and did community service type things that I thought were important to help wrestling and to help Tony Atlas become popular in wrestling, and he was willing to do it.  He was just....he was, I thought, an

outstanding individual, and he would have contributed an awful lot to wrestling.  At that point the argument couldn't be made, like Junkyard Dog, that he was heavy, because he wasn't.  They couldn't make the argument that he was old, because he wasn't.  They couldn't make any argument that would go against him, so I could only draw my own conclusion, and that was they just didn't want Tony Atlas; and I guess I can go further to say that I would assume that it had to be because he was black.  If there was another reason, I don't know what it would be.  But in any event, we never got Tony Atlas.

Q:   Were there any other blacks that you attempted to introduce?

A:   Thunderbolt Patterson.

Q:   What happened with Thunderbolt Patterson.

A:   I just ran into a lot of crap all the time.  I had Thunderbolt show up every week I think for three months.  I hope he'll remember better than I do.  I'm not quite certain the length of time.  For somewhere in the neighborhood of like three, maybe four months, I had Thunderbolt Patterson come to the TV tapings.  I had him on occasion do an interview or two.  Every time I did that the word got back to the office...Jim Heard...in such a way that it was brought to me the next day or whatever....wanting to know what in the world I intended to do with the guy and so forth and so on, and I just made it very low key then for Thunderbolt, and I explained to him many times that it's real tough.  I said just take it easy and maybe we can work this doggone thing out and maybe I can finally get you into a position where we can try to draw some money with you, either by having you in the ring or by having you manage somebody in the ring, which was the choice, or by putting you in a position, which I suggested several times, where you would be involved directly in our management in a way where we could help to promote wrestling through the black community, and let Thunderbolt Patterson, who was well known in the black community in cities all over the country, work in that capacity to encourage black participation.  We had a deal set up for him to go to the.....or I should say I had an idea set up for Thunderbolt to attend the black tenants association, which was taking place in Washington, D.C., and it would have cost WCW say a thousand dollars.  That would have been way more than was necessary for the plane ticket, hotel, the whole works, to attend this meeting, which I think lasted two or three days, which I thought could have done a lot of elbow rubbing, etc. with the intention of following that up by going to black mayors all around the country and black officials, politicians or whatever and try to put wrestling back on the map and try to get communities and those people interested in wrestling again through black participation, by bringing blacks in, not only to wrestle,

WCW 102077

but by having blacks in management and to show that things
had changed, that Turner, who is the humanitarian as we now
know....the man of the decade....was trying to change things
that had happened in the past....to include
segregation.....to include the Ku Klux Klan and all that
crap.  Thunderbolt Patterson used to say it's a new day,
it's a new day, and we tried to expound on that to show that
this was in fact a new day, and that was our idea....that
was our theory....that we would be able to go to the
officials at WCW.....Jim Heard let's say in this
case.....and convince him that would be something that would
on paper sell and would in fact could become reality.  It
could make a significant change.  Whether Heard actually
felt that way or anybody else felt that way, or for that
matter, whether I felt that way in terms of making some kind
of a sociable economic change.....I'm not trying to be that
damn goody goody....but I could see where a person could
make money out of it.  I could see where business could be
improved, and I was all for it.  So when that idea was
presented, the same thing.  What do you owe the guy?  Just
comments that indicated that I was treading on thin ice.

Q:     Who made those comments?

A:     Well it was kind of general feeling, but primarily it would
be Jim Heard.

Q:     Were there any other black wrestlers besides Junkyard Dog,
Tony Atlas and Thunderbolt Patterson, that you tried to
introduce during that time period of May '91 through
November of '91?

A:     Yeah, there were quite a few, and I'm sure that I could just
about name them.  I can think of Abdullah the Butcher, Pez
Whatley, Ranger Ross, who was, I think, out at that time,
and I would see him frequently looking for employment.
Something had happened in there, and I didn't even know what
it was.  I was really busy so I can't......I'm not quite
sure.  But I just had an overall view of the situation,
which was to promote and utilize black wrestlers because we
weren't doing business, because we didn't have the black
wrestlers and the population in terms of the wrestling body
that I thought was necessary in order to bring business back
to a comfortable level.

Q:     Now during the time that you served as the booker, what was
the average salary of a white wrestler?

A:     I couldn't tell you what the average salary was.  I can tell
you what I thought some of the salaries were.....Lex Luger
at $500,000 and Sting I think at $350,000 and Rick Flair at
probably $700,000 or $750,000.  They were white.  I think
the Steiners were probably promoted later on at about
$250,000 a piece.  Sid Vicious was in the range of $180,000

I think I told you, and then he was raised to $250,000.  I
think the Freebirds and Brian Pillman and those people were
probably making around $104,000.  To my knowledge all the
white wrestlers, save one, made in excess of $100,000.  The
once exception would have been Tommy Rich, and my
understanding there was he was making $1,500.00 a week.  The
black wrestlers, I don't know what they were making.  I
thought Ranger Ross was making like at $100,000 or $104,000.
Simmons and Reed I thought were making somewhere between
$104,000 and $150,000.  Teddy Long I thought was like at
$104,000, and that takes care of all the black wrestlers.

Q:   Now Butch Reed and Ron Simmons at one point were the heavy
     weight champions.

A:   Tag champions.

Q:   Tag champions.  Do you know the average salary for two white
     males when they held the heavy weight tag team championship
     with the WCW?

A:   Well I don't know who had the tag.....I guess the Steiners
     did.  At one time I think there were probably some _____
     there in terms of salaries....if, in fact, Simmons and Reed
     were making $150,000.  The Steiners, I think, also held
     those titles, and I think they were making $150,000.  But
     I'm quite certain as of now that the Steiners are making
     $100,000 more.  Arn Anderson was there, and he started at
     about $150,000, but if I'm not mistaken I think his salary
     has provision for a wage increase for something like
     $200,000 after the first year and $250,000 in the final
     year.  I don't know that those provisions existed for Ron
     Simmons or Butch Reed, and of course, Butch Reed is no
     longer there.  I know they wrestled Sting.  I know they
     wrestled Luger.  I know they wrestled Flair and Arn, and I
     know they wrestled a lot of other white people who without
     question were making more money than Ron Simmons and Butch
     Reed.

Q:   Now as a booker, how were you paid?

A:   I was an employee.  I had no contract.  I was paid $250,000
     a year.

Q:   Were you paid a straight base salary at $250,000 a year?

A:   Yeah.

Q:   Were you to receive any commissions based on the gross
     revenue at the event?

A:   The deal with Heard was in his office.  Prior to my becoming
     a booker I was given an appearance fee or talent fee I think
     they called it....one or the other.....interchangeably

probably....for any participation in any matches, and we did the one thing with the Black Scorpion where I was the whole thing, and they agreed to pay me then for all appearances and they agreed to pay me for all pay-per-view events. Since I was the once that booked it, since I was the once that put the talent in the thing, and I was responsible for making it work, it was only right in my opinion, and they agreed, that I would get a percentage, because later on I found out that they had offered something like $50,000 for each show that Sid Vicious might appear in or that Rick Flair might appear in.  They were just going to give him fifty grand.  Now that's what I was told by Heard.  It kind of let it slip when we were arguing about my deal.  So since I was the one that would orchestrate what Rick Flair would do and provide everything that would enable him to be in that show, and the same thing as far as Sid Vicious was concerned, and they could pick up fifty by just doing what I told them to do, I didn't find it too difficult to imagine that my compensation might be a little bit more, as it always had been in years past, because a booker was considered to be the glue that put everything together.... well, more than the glue.  He was the glue and he was the parts and he was the man that wrote, directed, produced....everything....and that was the way it used to be.  He used to have the ability to hire, fire, and so forth and so on, and I was told that I would have one year to turn this thing around.

Q:   Who told you that you had one year?

A:   Jim Heard.

Q:   And that year commenced in May of '91?

A:   It commenced in May of '91 and ended in November of '91.

Q:   It was your understanding that it was to run until April of '92?

A:   It should have run until May 1 of '92.

Q:   And in fact you remained the booker until...

A:   I was actually there....the first two months....May....it was nothing to do with me or anything.....I started out as a booker, but things had already been in the works by the previous people.  So there was discussion at that point because the business was still horrible, and there was discussion at that point....I said well, you know, I need a grace period here because certainly this May thing isn't mine, and part of June wasn't mine.  I was making up the TV's for May and June, but they weren't going to be played until the latter part of June, because we were like four to six weeks ahead.  So I said we won't be able to see what I'm

able to do until six weeks down the road. All I'm doing is just cleaning up all the crap that's been thrown my way. So when we got to July, August, September, October and November, I booked such things as the Clash in September, the July Bash, and the Halloween Havoc in October. The Clash turned out to be the best numbers they had. It was a classic example of how things should be. August revenues....my understanding was the August revenues were in excess of $1,000,000. Revenues now on a monthly basis are probably $250,000 - $300,000. The numbers went as high as a seven two if I remember right on the Clash in September. The Halloween Havoc....Heard badmouthed me and told everybody before....the personal crap. He told me when I talked about getting my money for pay-per-view, he said that was the worst show they ever had so I should just hide my head in shame and walk out the damn door. It turns out that that was the best pay-per-view they ever had, but still there was no money forthcoming. Anyway....that period of time was the best that they've had as far as numbers as concerned, as far as revenues are concerned, as far as pay-per-view things are concerned. When the five months got over, because I think I argued vociferously, if that's the word I can use, for different things that I thought should be done to a make it right. I think he just got tired of listening to me and just decided that they didn't need me, and then after that we can draw our own conclusions as to why.

Q:  Now for the pay-per-view, did you have any idea how much money you thought you were entitled to?

A:  I'm from the old school, and in the old school there were no set figures, you know. If a person treated you right, you worked for them. If a person didn't treat you right, you walked away. A lot of things were done on handshakes. In fact, there were no contracts back then. You walked in and you say, well, I'm gonna work blah, blah, blah, and once again you had an idea what the house was....they wouldn't have to tell you....the house was $20,000. If I was_____, I could expect that I would make somewhere between 6, maybe 7, 8 percent of that figure. When I'd get my pay check and I could compute what 6% of $20,000.....1,200 bucks.....if I'd get 1,200 bucks I was happy. If I got 1,300 bucks I was happy. If I got 1,100 bucks, I wasn't going to argue about it. If I got 800 bucks I'd go in and argue. I'd say something. To hell with this thing....hold it....what's going on here. Then they might tell me their story, whatever it might be. If it sounded plausible, like there were extra guys on the doggone card, or if we had unusual expenses, you might just swallow it and say okay, live and let live, and we all got to get along. So when you say did I anticipate anything out of the pay-per-view. All I could do was say that I would anticipate that whatever they had offered completely to somebody, that

WCW 102081

I had to be entitled to at least to that.  And if they
offered that to several people, well then it kind of gets
screwed up because if there were ten people and they were
all offered $50,000, I wouldn't reasonably say I should get
$500, but I'll tell you when I first took the job I didn't
know what some of the other wrestlers were making, and when
I found out and found out that Flair was making $700 or $750
and Luger $500, I seriously, based on the old days, said
well, the booker always makes more, because the booker was
responsible for putting that guy in that position to make
that money, and so I was going to go with the argument and
say, I'll settle for the same as Luger's got - $500.  Well
shoot, they'd have laughed me right out of the deal.  So I
said okay, $250, and they went for $250.  But there again
the $250 was to be sliced with the pay-per-view, which in my
estimation could have brought it up to something
significantly better that $250.

Q:  During your six months as a booker did they pay you based
on an annual salary of a quarter of a million dollars a
year?

A:  Yes.

Q:  Mr. Anderson, let me just ask you some housekeeping
questions now.  Have you given this statement based on your
own personal knowledge?

A:  Yes, I have.

Q:  Has anyone promised or induced you in any way to give this
information.

A:  No.

Q:  Are you presently under the influence of any drugs or
alcohol?

A:  No.

Q:  Have you given this statement on what you believe to be the
truth as it relates to your employment with the NWA and the
WCW?

A:  Yes, I have.

Q:  That concludes the statement of Olie Anderson.

Q:  This is a continuation of the statement of Olie Anderson.
Could you please give us your opinion as it relates to who's
really behind taking a wrestler and helping him to ascend to
the ranks of Heavyweight Champion or Television Champion?

A:  Going back, it used to always be the booker or the owner of
    the territory as such that would be able to determine who
    was going to be what.  With the acquisition by Turner it
    became even more pronounced that the ability to make a star
    was with the position of either the booker or whoever it was
    that was running the organization.  In this case it would
    have been like Jim Heard.  You just took a body and did
    whatever you wanted to do.

Q:  Can you tell us about the facts or circumstances that led up
    to Ron Simmons and Butch Reed becoming the Tag Team
    Heavyweight Champions.

A:  Well, I think there was a period there in the summer or so
    of '91 where there was some concern.  Some of the black
    wrestlers.....Rocky King was rumored to being
    upset...unhappy with his situation in the wrestling
    world....not making money or whatever.  The rumor was
    pretty much that he may be attempting to make some kind of a
    legal problem as a result of racial discrimination or
    whatever, and we then made black tag team of Ron Simmons and
    Butch Reed.  Somewhere in that time period we made them the
    World Tag Team Champions, and as Heard said, this should
    prove that we're not discriminatory.  This should prove that
    we've taken a black team and we've made them champion so
    that they wouldn't have any bitch from a racial point of
    view.....not using blacks and not making them champion.

Q:  So it's your opinion that that was done to pacify the black
    community such that they would believe that the WCW did not
    discriminate against black wrestlers?

A:  Yeah, I would say so.

TURNER

TURNER BROADCASTING SYSTEM, INC.
ONE CNN CENTER, Box 105366, Atlanta, GA 30348-5366

GINGER S. McRAE
Assistant General Counsel
(404) 827-3113
Telecopy (404) 827-1995

April 8, 1992


Ms. Lois S. Madison
Investigator
Equal Employment Opportunity Commission
Citizens Trust Building, Suite 1100
75 Piedmont Avenue, N.E.
Atlanta, GA  30335

        Re:   Robert L. Ross v. World Championship Wrestling, Inc.
              EEOC Charge No. 110920735

Dear Ms. Madison:

     This letter is in response to your request for a position
statement and certain other information with respect to the
referenced Charge.  This response is provided with the
understanding that all information and documents will be kept
confidential.

I. Position Statement

     World Championship Wrestling, Inc. ("WCW") is a company which
promotes matches between professional wrestlers for viewing by
live and television audiences.  WCW associates professional
wrestlers under various arrangements to perform in its matches.
None of these wrestlers is employed by Respondent.  Some of them
are associated by the event and others are associated over a
longer term for a larger number of events.

     Charging Party is a professional wrestler who performed
services for Respondent at various times.  He first worked for
Respondent from February 1989 to April 1990.  He performed
services pursuant to a verbal agreement for $2,000.00 bi-weekly.
The decision to associate Charging Party for this period was made
by Jim Herd, Respondent's Executive Vice President at the time.
Of course, Mr. Herd was aware Charging Party is black.  Charging
Party made no complaints of race discrimination at the end of
this initial association with Respondent.

     In late 1990 or early 1991, Charging Party approached
Respondent about again using him as a wrestler.  He had adopted

WCW 102084

the professional name "Ranger Ross", and portrayed himself as
loosely connected with the military to take advantage of the
Persian Gulf War and the current popularity of people and things
associated with the military. Mr. Herd was interested in this
idea and thought it might play well to Respondent's audience. He
therefore agreed to a contract to use Respondent's services for a
six-month term, to expire July 14, 1991. The agreement entered
into by Charging Party and Respondent is attached as Exhibit A.
It is entitled "WCW Freelance Wrestler/Independent Contractor
Agreement" and clearly sets forth that Charging Party is an
independent contractor. Charging Party explicitly acknowledged
this fact in signing the contract. He agreed that the commitment
was for a definite term of six months. He agreed that he, not
Respondent, was fully responsible for all taxes owed by him on
compensation for his services and that he was not entitled to the
benefits provided by WCW to its employees.

    The agreement signed by Charging Party did not limit his
ability to work elsewhere. He provided his own costumes and
makeup in performing as "Ranger Ross". Charging Party performed
and was paid through July 14, 1991. Respondent fully performed
its contractual obligations to him. At the end of his term, he
was told by Mr. Herd, who had associated Charging Party on both
occasions, that "Ranger Ross" had not achieved a satisfactory
level of success with WCW's audiences and WCW was not interested
in signing him to a new contract. Charging Party and a number of
white wrestlers whose achievement of success with audiences also
had been unsatisfactory ceased services for Respondent in the
summer of 1991.[1]

    It is clear that Charging Party was not an employee covered
by Title VII of the Civil Rights Act of 1964. 42 U.S.C. §
2000e(f); Mathis v. Standard Brands Chemical Industries, 10 FEP
cases 295 (N.D. Ga. 1975). Although, as is customary in the
industry, Respondent gave Charging Party direction as to the
ultimate outcome of his matches, the details of his performance
were left to him. He supplied his own professional name and
persona, and accompanying costumes and makeup. The agreement
between the parties clearly specified that Charging Party was an
independent contractor and Charging Party freely acknowledged
that fact in signing the agreement. The agreement allowed
Charging Party the freedom to work elsewhere. He did not receive
the benefits provided by Respondent to its employees. The
industry has consistently treated professional wrestlers such as
Charging Party as independent contractors. All these facts are
indicative of an independent contractor situation. Cobb v. Sun
Papers, Inc., 673 F.2d 337 (11th Cir.), cert. denied, 459 U.S.
874 (1982).

---

[1]Charging Party was asked to and agreed to perform for one
event on September 5, 1991.

-2-

Assuming for purposes of argument only that Charging Party was an employee, it is clear he was not discriminated against in any way. Mr. Herd made the decision to use Charging Party's services on both occasions. Mr. Herd also made the decision not to offer a new contract when Charging Party's contract expired in July 1991. When such a short time passes between such actions, and the same manager is involved in both decisions, a claim of racial animus in the discharge, but not in the hire, is irrational and does not support any finding of intentional discriminations. Proud v. Stone, 945 F.2d 796 (4th Cir. 1991).

Moreover, as stated above, a number of white wrestlers were released in the summer of 1991. A list of those individuals is attached as Exhibit B. A number of black wrestlers and other performers worked for WCW at this time and were retained. They are Curtis Hughes, Teddy Long, Sylvester Ritter and Ronald Simmons. All these individuals still perform for WCW. Obviously, race was not a criteria for the releases in the summer of 1991. Rather, it was based on purely business reasons.

Further, it is clear that race was not a factor in Charging Party's compensation. There are no scales or ranges of compensation for wrestlers. The compensation a wrestler or other performer receives in each case is wholly dependent on negotiation between the parties. Obviously, Respondent strives to negotiate as low an amount as possible and the wrestler seeks to get as much money as possible. The resulting amount depends on the wrestler's stature in the industry, his bargaining skills, Respondent's economic capacity at the time, Respondent's bargaining skills and many other factors. White wrestlers similar to Charging Party made comparable amounts. Thus, Rick Jones was paid $250.00 per event and worked about five times every week, a total of $1,250.00, an amount less than Charging Party. Richard Slater earned $300.00 per event for about five events per week, or about the same as Charging Party. Matt Osburne made $3,000.00 every two weeks, the same as Charging Party, who made $1,500.00 per week. Charging Party's wage claim is without merit.

II. **Response to Charge**

1. As explained and supported in Section I, Charging Party performed as an independent contractor from January 15, 1991 through July 14, 1991 pursuant to a written agreement. As set forth above, compensation of wrestlers is individually negotiated and is the result of many factors, and therefore comparisons to other wrestlers have little value. However, as shown above, Charging Party's earnings were about the same as or more than several white wrestlers.

2. Charging Party was told WCW was not interested in signing a new contract with him due to his lack of success during the

-3-

WCW 102086

term of his agreement, as explained above.  Respondent cannot
admit or deny the second sentence of this paragraph; however, as
also explained above, each wrestler's compensation is
individually negotiated and comparisons are not especially
meaningful.

    3.  Respondent denies that it discriminated against Charging
Party in any way.

## III. Response to Request for Information

    1.  Information shown on the Charge is correct.

    2.  See Section I above.

    3.  Charging Party was an independent contractor, as
explained in Section I, and written rules, policies and
procedures for employees did not apply to him.  With respect to
independent contractors such as Charging Party, it is up to the
manager to decide whether and when to use their services.

## Discharge

    1.  As explained fully in Section I, Charging Party was not
"discharged".  Respondent complied in every way with its
agreement with Charging Party, set forth in Exhibit A.
Respondent opted not to enter a new agreement with Charging
Party, as it had every right to do.  The agreement did not
contemplate any extension and Respondent was under no obligation
to offer one.  Jim Herd, then Respondent's Executive Vice
President, white, made the decision not to enter a new agreement
with Charging Party in conjunction with discussions with his
assistants.  Charging Party had no personnel file.  The
independent contractor agreement is attached as Exhibit A and
documents regarding Charging Party's compensation are attached as
Exhibit C.

    2.  Because Charging Party was an independent contractor, not
an employee, and was not "discharged", Respondent objects to this
request.

    3.  See response to 2 above.

    4.  See response to 2 above.

    5.  See response to 2 above.  But see Exhibit B for a list of
white wrestlers released in the summer of 1991.

## Additional Questions

    1.  a.  See Exhibit A.

-4-

WCW 102087

b.  See Exhibit C.  Charging Party was paid in accordance with Respondent's and the industry practice for paying performers.  Thus, he received a "draw" of $100.00 at the time of the event and a "talent event fee", or an allocation of the gross revenues of an event to an individual based on his position on the "card", according to industry practice.  The balance between these amounts and Charging Party's contractual compensation was paid on a bi-weekly basis.  This system of payment is not typical of payments to employees who are generally paid the same amount on a regular schedule.

c.  See Exhibit A.

d.  See Exhibit C.  Such taxes were not withheld.

e.  No benefits were provided.

f.  Charging Party was covered under a separate policy applicable only to wrestlers.

g.  Charging Party was told his contract was expiring and that WCW was not interested in a new agreement.

h.  The agreement did not restrict Charging Party's freedom to work elsewhere.

i.  Charging Party could not delegate his wrestling duties.

j.  Respondent does not understand this question; however, Charging Party supplied his own costumes and makeup.

## IV. Conclusion

As fully set forth above, Charging Party's Charge is completely without merit for two reasons.  First, he was an independent contractor not covered by Title VII.  Charging Party assented to and never challenged this arrangement, which is followed throughout the professional wrestling industry.  He should not be able to claim now that he was an employee.

Second, even assuming for purposes of argument only that Charging Party was an employee, Respondent chose not to enter a new contract with Charging Party due to business reasons having to do with his failure to achieve a satisfactory level of success as a wrestler and not at all with race.  A number of white wrestlers met the same fate during the summer of 1991.  Other black wrestlers have continued to perform for WCW.  While working for Respondent, Charging Party suffered no discrimination in compensation.  Compensation was a subject of individual negotiation and depended on a number of factors, none of them related to race.

-5-

WCW 102088

Charging Party's Charge is without merit.  Respondent requests that the Commission promptly issue a finding of no reasonable cause.

Sincerely,

*Ginger S. McRae*

Ginger S. McRae
Assistant General Counsel

GSM:lwt

\mcrae\letters\madison.rsp/lwt

-6-

WCW 102089

EXHIBIT A


**World Championship Wrestling, Inc. Freelance**
**Wrestler/Independent Contractor Agreement**


1.  I, <u>Robert Ross, Jr.</u>            (<u>Ranger Ross</u>),
         **Name**                    Ring Name

agree to perform services for World Championship Wrestling, Inc.
("WCW") as requested by WCW at the rate of $1,500.00 per week
for the period of January 15, 1991 through July 14, 1991. I
understand that I shall be entitled to such compensation only if
I appear and complete the services requested by WCW for such
event and in the manner requested by WCW.

    2.  I understand and agree that I perform such services as
an independent contractor and not as an employee of WCW. I
agree that I shall be fully responsible for taxation of the
amounts paid to me by WCW as compensation for my services and
that WCW shall bear no responsibility for such taxation. I
agree that I am not entitled to the benefits provided by WCW to
its employees. I understand that WCW makes no commitment to use
my services and makes no guarantee of any number of events or
amount of compensation.

    3.  I understand that if I am injured inside the ring and
within the crowd barriers at an event while performing services
for WCW pursuant hereto, as determined by the schedule of
physicians provided by WCW, WCW shall assume responsibility for
medical expenses directly related to such injury through and
according to its respective insurance program. I understand
that I will be paid only for events for which I was scheduled at
the time I was injured and only if WCW's doctor certifies that
the injury prevents me from wrestling and I appear at the event
for interviews and other tasks as requested by WCW (unless I am
unable to appear as certified by WCW's doctor); provided,
however, that such payment shall be reduced by payments other
than those for medical treatment to which I may be entitled
under WCW's insurance or otherwise. I understand I will not be
paid for events for which I might have been scheduled while I am
injured.

    4.  I agree that all programs, recordings and work product
in connection with which I perform services and my contributions
thereto (the "Works") shall belong solely and exclusively to
WCW. To the extent that such Works are considered contributions
to collective works and/or parts or components of audio-visual
works, I agree that the Works shall be considered "works made
for hire" under the U.S. Copyright Act of 1976, as amended. To
the extent that such Works are deemed otherwise, I assign to WCW
all rights, title and interest in and to the copyright of such
Works.

WCW 102090

5.  I release WCW and its agents from and waive any and all claims arising out of my independent contractor relationship with WCW, except as set forth specifically above in paragraph 3.  I have read this Agreement and understand its terms.  I agree that my relationship with WCW is covered by this Agreement for all purposes and at all times unless and until it is superseded by a subsequent written agreement, and that this Agreement shall be governed by the laws of the state of Georgia, whose courts shall have jurisdiction with respect to any dispute arising under this Agreement or my relationship with WCW.


World Championship Wrestling, Inc.          Independent Contractor

By: _____                _____
          Signature                              Signature

    ___1_-__9__-__91___                       ___9 Jan 1991___
          Date                                     Date


-2-

WCW 102091

EXHIBIT B

| NAME | RING NAME | DATE RELEASED | RACE |
|---|---|---|---|
| Carline, Gary | Rip Morgan | August 1991 | White |
| Colley, Randy | Moon Dog | August 1991 | White |
| Gibson, Robert | Reuben Cain | August 1991 | White |
| Gray, George | One Man Gang | September 1991 | White |
| Haynes, William | Black Blood Bill Jack Haynes | August 1991 | White |
| Humperdink, Oliver | John Sutton | August 1991 | White |
| Jones, Rick | Black Bart | August 1991 | White |
| Keown, Wayne | Dutch Mantell | August 1991 | White |
| Murdock, Richard | Dick Murdock | August 1991 | White |
| Reininghaus, Kenny | Jack Victory Russian Assassin | August 1991 | White |
| Ross, Robert | Ranger Ross | July 1991 | Black |
| Slater, Richard | Dick Slater | August 1991 | White |
| Smith, Mike | Sam Houston | August 1991 | White |
| Spivey, Danny | Danny Spivey | June 1991 | White |

WCW 103093

**EXHIBIT C**

WORLD CHAMPIONSHIP WRESTLING, INC.
TALENT PAY SUMMARY
1991

NAME: ROSS.JR.        , ROBERT

| EVENT DATE | CITY | STATE | DESCRIPTION | AMOUNT |
|------------|------|-------|-------------|--------|
| 1/30/91 | GAINESVILLE | GA | DRAW | (100.00) |
| 1/30/91 | GAINESVILLE | GA | TALENT EVENT FEE | 200.00 |
| 2/10/91 | ATLANTA | GA | AS PER CONTRACT | 2,800.00 |
| 2/24/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 2/26/91 | ATLANTA | GA | AS PER CONTRACT | 2,775.00 |
| 2/26/91 | ATLANTA | GA | TALENT EVENT FEE | 225.00 |
| 3/12/91 | ATLANTA | GA | AS PER CONTRACT | 2,850.00 |
| 3/12/91 | ATLANTA | GA | TALENT EVENT FEE | 150.00 |
| 4/07/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 4/21/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 4/24/91 | DOTHAN | AL | AS PER CONTRACT | 450.00 |
| 4/24/91 | DOTHAN | AL | DRAW | 0.00 |
| 4/24/91 | DOTHAN | AL | TALENT EVENT FEE | 150.00 |
| 4/25/91 | PANAMA CITY | FL | AS PER CONTRACT | 450.00 |
| 4/25/91 | PANAMA CITY | FL | DRAW | 0.00 |
| 4/25/91 | PANAMA CITY | FL | TALENT EVENT FEE | 150.00 |
| 4/26/91 | VALDOSTA | GA | DRAW | (100.00) |
| 4/26/91 | VALDOSTA | GA | TALENT EVENT FEE | 150.00 |
| 4/27/91 | JEKYLL ISLAND | GA | AS PER CONTRACT | 900.00 |
| 4/27/91 | JEKYLL ISLAND | GA | DRAW | 0.00 |
| 4/27/91 | JEKYLL ISLAND | GA | TALENT EVENT FEE | 150.00 |
| 4/28/91 | COLUMBIA | SC | AS PER CONTRACT | 450.00 |
| 4/28/91 | COLUMBIA | SC | TALENT EVENT FEE | 150.00 |
| 5/16/91 | RICHMOND | VA | AS PER CONTRACT | 1,350.00 |
| 5/16/91 | RICHMOND | VA | DRAW | (100.00) |
| 5/16/91 | RICHMOND | VA | TALENT EVENT FEE | 150.00 |
| 5/17/91 | WASHINGTON | DC | AS PER CONTRACT | 1,350.00 |
| 5/17/91 | WASHINGTON | DC | LICENSE FEE | (20.00) |
| 5/17/91 | WASHINGTON | DC | TALENT EVENT FEE | 150.00 |
| 6/02/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/16/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 6/30/91 | ATLANTA | GA | AS PER CONTRACT | 3,000.00 |
| 7/14/91 | ATLANTA | GA | AS PER AGREEMENT | 3,000.00 |
| 9/05/91 | AUGUSTA | GA | DRAW | (100.00) |
| 9/05/91 | AUGUSTA | GA | TALENT EVENT FEE | 250.00 |

TOTAL PAY 1991    35,830.00

Add Back Draws    420.00

0•%

35•830•00+
420•00+
36•250•00%

36,250.00
9-5-91 Payment    250.00

36,000.00

9-5-91
36•250•00+
> 250•00-

Vic 7/.

WCW 102003

WORLD CHAMPIONSHIP WRESTLING
ROBERT ROSS, JR.
EARNINGS FOR 1990

| | | REFLEX AMOUNT | EVENTS WORKED |
|---|---|---|---|
| 18–Dec–89 | 31–Dec–89 | 2,000.00 | 7 |
| 01–Jan–90 | 14–Jan–90 | 2,000.00 | 9 |
| 15–Jan–90 | 28–Jan–90 | 2,275.00 | 11 |
| 29–Jan–90 | 11–Feb–90 | 2,000.00 | 3 |
| 12–Feb–90 | 25–Feb–90 | 2,000.00 | 9 |
| 26–Feb–90 | 11–Mar–90 | 2,000.00 | 9 |
| 12–Mar–90 | 25–Mar–90 | 2,000.00 | 4 |
| 26–Mar–90 | 08–Apr–90 | 2,000.00 | 7 |
| 09–Apr–90 | 22–Apr–90 | 2,000.00 | 2 |
| | | 3.63  WRESTLERS RIGHTS | |
| | | 0.54  WRESTLERS RIGHTS | |
| | | $18,275.00 | 61 |

```
                                    0 • *
              1990    18.275.00+
              1989    43.003.46+
                      61.278.46*
```

WCW 102094

**WORLD CHAMPIONSHIP WRESTLING**
**ROBERT ROSS, JR.**
**EARNINGS FOR 1989**

| | | REFLEX AMOUNT | | EVENTS WORKED |
|---|---|---|---|---|
| 27–Feb–89 | 12–Mar–89 | 450.00 | | 3 |
| 13–Mar–89 | 26–Mar–89 | 1,850.00 | | 13 |
| 27–Mar–89 | 09–Apr–89 | 2,000.00 | | 12 |
| 10–Apr–89 | 23–Apr–89 | 2,000.00 | | 2 |
| 24–Apr–89 | 07–May–89 | 2,000.00 | | 5 |
| 08–May–89 | 21–May–89 | 2,000.00 | | 3 |
| 22–May–89 | 04–Jun–89 | 2,775.00 | | 14 |
| 05–Jun–89 | 18–Jun–89 | 2,752.00 | | 5 |
| 19–Jun–89 | 02–Jul–89 | 2,000.00 | | 3 |
| 03–Jul–89 | 16–Jul–89 | 2,400.00 | | 11 |
| | | 6.46 | MDSE SALES | |
| 17–Jul–89 | 30–Jul–89 | 2,000.00 | | 6 |
| 31–Jul–89 | 13–Aug–89 | 2,000.00 | | 6 |
| 14–Aug–89 | 27–Aug–89 | 2,000.00 | | 5 |
| | | 1.00 | MDSE SALES | |
| 28–Aug–89 | 10–Sep–89 | 2,000.00 | | 7 |
| 11–Sep–89 | 24–Sep–89 | 2,000.00 | | 3 |
| 25–Sep–89 | 08–Oct–89 | 2,000.00 | | 2 |
| 09–Oct–89 | 22–Oct–89 | 2,000.00 | | 1 |
| 23–Oct–89 | 05–Nov–89 | 2,000.00 | | 5 |
| 06–Nov–89 | 19–Nov–89 | 2,000.00 | | 4 |
| 20–Nov–89 | 03–Dec–89 | 2,775.00 | | 14 |
| 04–Dec–89 | 17–Dec–89 | 2,000.00 | | 7 |
| | | $43,003.46 | | 131 |



# EXHIBIT / ATTACHMENT

# AA

**(To be scanned in place of tab)**

## DECLARATION OF PAMELA COLLINS

STATE OF GEORGIA
COUNTY OF _COBB_

    Pamela Collins gives the following declaration under penalty of perjury and states as follows:

1.

    I worked for World Championship Wrestling Organization ("WCW") in the call center.  My official position was the call center coordinator.

2.

    I recall WCW submitting a written request for each employee to write a job description.  This description was later to be used for WCW's Employee Job Profiles.

3.

    In filling out the questionnaire, I correctly indicated that I "supervised" four to six customer service representatives. Although I was actually supervising four to six customer service representatives, I was never made a supervisor at WCW.

4.

    Until the time that WCW ceased operating, I continued to work as the call center coordinator.  I was never paid as a supervisor, and was only paid for being the "call center coordinator."

5.

    Throughout my employment with WCW, I often heard various rumors about discrimination.  I could not help but notice that Caucasians dominated WCW, and we had few minorities.  I became aware that there were specific complaints of discrimination filed by some of the wrestlers at WCW.  I am certain that I was aware of these claims of discrimination before July 9, 2000.

6.

On July 9, 2000, Booker T was made the world champion. Because I routinely watched various videotapes of WCW's events, I watched the videotape of Booker T. I am confident that I was aware of the claims regarding discrimination prior to the time in which Booker T became champion.

7.

As I watched the numerous videotapes of the WCW wrestlers, I often wondered why there was not more diversity among the wrestlers. The successful wrestlers were predominately Caucasian. With the exception of Booker T and a few other wrestlers, WCW was dominated by successful Caucasian wrestlers.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Pamela Collins

_____
Executed on (Date)



# EXHIBIT / ATTACHMENT

# BB

**(To be scanned in place of tab)**

*Revised March 28, 2000*



## IV. Employee Job Profiles



CONFIDENTIAL

*Revised March 28, 2000*

Names: **Avery-Neal, Catherine** (3-5239)
   **Clifton, Robert** (3-1070)
   **Nichols, William** (3-5239)
   **Jensen, Ralph** (3-1070)
Title: <u>Warehouse Clerk</u>
Department: <u>Merchandise</u>

Warehouse Clerks are responsible for fulfilling catalog merchandise orders: shipping, receiving, and pulling. They can process office comp orders and merchandise returns. They can also Fed Ex domestic, international, and Priority mail orders; and they order the supplies for Catalog use (boxes and Paks for Fed Ex and Priority mail).   People can come to Warehouse Clerks if they need help with anything regarding Catalog merchandising and orders.

CONFIDENTIAL

*Revised March 28, 2000*

# CALL CENTER

Name: **Cameron, Leslie**
Title: Senior Catalog Operations Fulfillment Manager
Department: Merchandise and Catalog
Extension: 3-5219
I oversee the catalog operation; which includes Call Center, Warehouse for arena and catalog, and MACS software maintenance. I am responsible for all catalog and arena merchandise in and out of the warehouse. People can come to me for help with MACS software, catalog promotions or questions, merchandise shipments, lottery fulfillment, catalog system data extracts, and catalog reports.

Name: **Collins, Pamela**
Title: Call Center Coordinator
Department: Merchandising
Extension: 3-1026
I supervise four to six customer service representatives. This includes motivating, developing their skills and encouraging them to achieve their highest potential through effective communication, assigning job responsibilities, controlling employee conflict and treating employees fairly and consistently. Additional responsibilities include ensuring production jobs are run in a timely manner for our catalog business, responding to customer calls, running and analyzing the call center phone and production reports, offering suggestions on improving productivity, quality and morale for the call center operation- plus any additional assigned duties as needed. People can come to for help with placing personal merchandise orders, or if a fed-ex catalog order is returned undeliverable- any misdirected customer service orders or complaints.

Names: **Bonhomme, Kadija** (3-1026)
          **McAdoo, Frank** (3-1026)
          **Hester, Frankesha** (3-1093)
Titles: Call Center Rep
Department: Call Center
The call center reps are responsible for calls pertaining to WCW merchandise orders. They deal with customer service questions concerning previously made orders.

CONFIDENTIAL



# EXHIBIT / ATTACHMENT

# CC

**(To be scanned in place of tab)**



# BOBBY   HARDWORK   WALKER
BOBBY Walker
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:      ERIC BISHOFF
SUB.     Racial Discrimination
FROM:    Bobby Walker

MARCH 01,1998

DEAR SIR:

 In the past Terry Taylor has made statements to me and others how he felt about blacks. Since he has had the top booking job, I have had nothing but problems. Ever since I talked to Terry in Orlando Fl., about my future in WCW, the problem has gotten worse. I feel like I lost my job because of Terry Taylor deep dislike for Blacks. I have alwas tried to talk to you about any problems. I want to know from you why I lost my job? Please contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in advance for your assistance in this matter.


Bobby Walker.



CC: ERIC BISHOFF



WCW 009452
CONFIDENTIAL



# BOBBY HARDWORK WALKER

**BOBBY Walker**
Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

———

Telephone 770-716-6830

TO:      DR. HAVEY SCHILLER
SUB.     Racial Discrimination
FROM:    Bobby Walker

MARCH 01,1998

DEAR SIR:

I know that you are a very busy man. Could you Please arrange a meeting with
me, to talk about this problem. In the past Terry Taylor has made statements to me
and others how he felt about blacks. Since he has had the top booking job, I have
had nothing but problems. Every since I talked to Terry in Orlando Fl., about my
future in WCW, the problem has gotten wrost. I feel like I lost my job because of
Terry Taylor deep dislike for Blacks. I want to know why I lost my job? Please
contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in
advance for your assistance in this matter.


Bobby Walker.



CC: DR. HAVEY SCHILLER



PLAINTIFF'S
EXHIBIT
15

P00593



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**



# BOBBY HARDWORK WALKER
### BOBBY Walker
### Professional Wrestler

59 Gleneagles Dr.
Fayetteville, GA.

Telephone 770-716-6830

TO:    DR. HAVEY SCHILLER
SUB.    Racial Discrimination
FROM:    Bobby Walker

MARCH 01,1998

DEAR SIR:

I know that you are a very busy man. Could you Please arrange a meeting with me, to talk about this problem. In the past Terry Taylor has made statements to me *and others how he felt about blacks.* Since he has had the top booking job, I have had nothing but problems. Every since I talked to Terry in Orlando Fl., about my future in WCW, the problem has gotten wrost. I feel like I lost my job because of Terry Taylor deep dislike for Blacks. I want to know why I lost my job? Please contact me at 770-716-6830. I look forward to hearing from you soon. Thanks in advance for your assistance in this matter.

Bobby Walker.

CC: DR. HAVEY SCHILLER



P00593



# EXHIBIT / ATTACHMENT



**(To be scanned in place of tab)**

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC

DEFENDANT UNIVERSAL WRESTLING CORPORATION'S
SUPPLEMENTAL RESPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANTS
WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS, INC.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure,

Defendant Universal Wrestling Corporation ("UWC") (formerly known

as World Championship Wrestling, Inc. ("WCW")) supplements its

objections and responses to Plaintiffs' Consolidated First

Interrogatories And First Request For Production Of Documents To

DEFENDANT'S
EXHIBIT

# 11

Defendants World Championship Wrestling, Inc. and Turner Sports, Inc. ("Plaintiffs' First Interrogatories") as follows:

### GENERAL TERMS AND CONDITIONS FOR RESPONSES

#### 1.

The following supplemental responses are provided by UWC based upon documents and information currently available to UWC. UWC reserves the right to modify any of such responses at a later date if further factual development or analysis warrants such modifications.

#### 2.

In responding to any of the interrogatories and document requests contained in Plaintiffs' First Interrogatories and Document Requests, UWC explicitly reserves the right to object to the admissibility at trial of any information produced in connection with such responses.

### SUPPLEMENTAL RESPONSES AND OBJECTIONS TO SPECIFIC INTERROGATORIES

**INTERROGATORY NO. 3.**     Please identify (following the requirements set forth in Instruction No. 8) the total number of wrestlers with whom Defendant WCW and/or Defendant Turner Sport *[sic]* have entered into wrestling contracts of any kind from January 1995 until the present.  For each such wrestler, please provide the following information:

     (a)   His or her legal and professional name;

     (b)   His or her racial background, (i.e. African or African-American, Hispanic/Latino or Hispanic/Latino American, Asian or Asian-American, Caucasian or Caucasian-American, or Other (please provide additional information regarding the racial background of any individual categorized as "Other"));

     (c)   The number of matches in which he or she performed on live television;

     (d)   The outcome (e.g. win, lose or other) of each WCW Monday Nitro, Thunder and/or Pay-Per View match in

which he or she performed from January 1995 through the
present;
(e)   His or her annual compensation for each year from
January 1995 until the present;
(f)   The merchandising revenues he or she received for each
quarter from January 1995 until the present; and
(g)   Whether or not he or she was terminated and/or released
during 1999.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3.

UWC hereby adopts and incorporates by reference its general

and specific objections to Interrogatory No. 3 as set forth in

UWC's Objections and Responses to Plaintiff's First

Interrogatories.   Subject to and without waiving its objections,

and in accordance with the Discovery and Scheduling Order entered

in the above-referenced actions, UWC supplements its response to

Interrogatory No. 3 as follows:

Attached hereto as Exhibit A is a chart identifying each

male wrestler who entered into a wrestling contract with WCW for

the period 1996 through 2000, and providing compensation

information regarding salary, merchandising revenue and licensing

revenue for each wrestler by year, as determined from documents

and information currently available to UWC.

**INTERROGATORY NO. 7.**   Please identify (following the
requirements set forth in Instruction No. 8) each and every
individual who attended a "try out" at the Power Plant (or its
predecessor) from January 1995 until the present.   For each such
individual, please provide the dates of his or her "try-out" and
his or her racial background, (i.e., African or African-American,
Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-
American, Caucasian or Caucasian-American or Other (please
provide additional information regarding the racial background of
any individual categorized as "Other")).

3

**RESPONSE TO INTERROGATORY NO. 7.**

UWC hereby adopts and incorporates by reference its general

and specific objections to Interrogatory No. 7 as set forth in

UWC's Objections and Responses to Plaintiff's First

Interrogatories.  Subject to and without waiving its objections,

UWC supplements its response to Interrogatory No. 7 as follows:

After diligent investigation and review of information and

documents reasonably available to UWC, UWC states that it does

not have information or documents in its possession reflecting

all of the individuals who attended a "try out" at the Power

Plant from 1996 through 2000.  Based upon review of documents

currently available to UWC, UWC is aware of the following

individuals who attended a "try out" at the Power Plant:

Matthew B. Baum, Cameron Beach, Nikola Bobic, Paulie Bykow,

Joseph Bradley Cain, Tony Byron Carr, Rick Cornell, Twanta

Maurice Craig, Jason Matthew Daniel, Marcial R. Davis, Joseph

Fredrick Denson III, Rico Dixon, William C. Dreer, Phap Minh

Duong, Darron Devon Easterling, Sean Charles Evans, Chris

Ferrell, Allan Eric Funk, Edward Gatzky, Todd Griffith, Charles

I. Groegler, Mark Guthrie, Bret Hamner, Theodore Harris, Jonathan

Martin Hugger, Gregory John Hunke, Mark Jindrak, Trae Keller,

Brian Klinge, Paul Lewis Knox, Charles M. Lee, Wondell Le Flore,

J. Mark LeRoux, David Libich, Roberts S. Loewen, Michael W. Long,

Jeremy Lopez, Ken Moore, Michael Brady Nimmons, Paul Neu, Stephen

Oliviera, Charles R. Palumbo, Stan Patron, Craig Phillips, Cecil

Riley, Sam Roman, Bounthan Saengsiphan, Mike Sanders, Frank Sepe, Sonny Siaki, Elix Skipper, Kenneth M. Stasiowski, Matthew T. Sletvold, Mark Stevens, W. Chase Tatum, Courtright Thurber, James Thurber, Mark Tipton, Michael Tolbert, Michael Jerry Tuite, Scott Vick, Charles Franklin Walker, J. Bradley Walker, Sr., Chris West, Curtis L. White, Wesley Wright, and Brett Yokley.

UWC further states that, upon information and belief, most or all of the individuals who were "trainees" at the Power Plant during the period 1996 through 2000 had also previously attended a "try out." Attached hereto as Exhibit B is a chart identifying each individual who was a "trainee" at the Power Plant for the period 1996 through 2000, as determined from documents and information currently available to UWC.

**INTERROGATORY NO. 8.**      Please identify (following the requirements set forth in Instruction No. 8) each and every individual who trained at the Power Plant (or its predecessor) from January 1995 until the present. For each such individual, please provide the dates he or she trained at the Power Plant, his or her racial background, (i.e. African or African-American, Hispanic/Latino or Hispanic/Latino-American, Asian or Asian-American, Caucasian or Caucasian-American or Other (please provide additional information regarding the racial background of any individual categorized as "Other")), and whether Defendant WCW and/or Defendant Turner Sports offered a wrestling contract (whether classified as an "employment," "contractor," or "independent contractor agreement") to him or her.

**RESPONSE TO INTERROGATORY NO. 8.**

UWC hereby adopts and incorporates by reference its general and specific objections to Interrogatory No. 8 as set forth in UWC's Objections and Responses to Plaintiff's First

Interrogatories.  Subject to and without waiving its objections, UWC supplements its response to Interrogatory No. 8 as follows:

Attached hereto as Exhibit B is a chart identifying each individual who was a "trainee" at the Power Plant for the period 1996 through 2000, as determined from documents and information currently available to UWC.

This 10th day of October, 2002.

John J. Dalton
Georgia Bar No. 203700
James A. Lamberth
Georgia Bar No. 431851
Eric A. Richardson
Georgia Bar No. 233873
Evan H. Pontz
Georgia Bar No. 583577

Counsel for Defendant
Universal Wrestling Corporation
(formerly known as World
Championship Wrestling, Inc.)

TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308-2216
(404) 885-3000

EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| , David Lee | Flash Abbott | | | | | $0.00 | | | $0.00 | $0.00 | $86,134.98 | $0.00 | $0.00 | $624,228.31 | $0.00 | $0.00 |
| , ... | Chris Adams | | | $20,339.99 | | $0.00 | | $76,147.72 | $0.00 | $0.00 | $107,820.55 | $0.00 | $0.00 | $4,598.00 | $0.00 | $0.00 |
| , Brian (Brian ... te, Inc.) | Kensuke | | | | | $0.00 | | $213,613.70 | $0.00 | $19,786.85 | $240,593.51 | $0.00 | $213,346.56 | $224,638.83 | | |
| | | | | | | | | | | | | | | | | $1,883.90 |
| ..., Michael | Mike Awesome | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $279,551.40 | $15.95 | |
| , Arthur | Steve Sharpe | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $37.25 | $0.00 |
| ..., Frank | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $32,413.45 | $6.00 | $0.00 |
| , Samuel | Samoan Swat | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | | $0.00 |
| , Scott | Team Scott Steel Scott Riggs | $11,135.72 | | | $116,482.54 | $0.00 | | $190,543.14 | $0.00 | $16,330.00 | $176,360.75 | $0.00 | $29,575.27 | $7,671.35 | $0.00 | $184.90 |
| ..., David (Kids Red, Inc.) | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.36 | |
| Yoshihiro | Ultimo Dragon | | | | $110,011.77 | $0.00 | $116,876.18 | $120,305.01 | $0.00 | $21,318.86 | $104,100.42 | $0.00 | $28,467.01 | | $0.00 | $0.00 |
| ..., Charles (... Internediane,) | Konnan | $92,757.10 | | | $353,791.14 | $0.00 | | $391,970.19 | $40.14 | $20,970.77 | $464,675.66 | $4,999.55 | $40,379.80 | $411,946.09 | $32.38 | $37,653.65 |
| ..., Marcus Scott, Inc. | Buff Bagwell | $134,960.13 | | | $150,099.76 | $0.00 | | $284,140.19 | $40.14 | $20,476.60 | $319,811.76 | $1,279.25 | $28,993.07 | $361,643.37 | $3,074.65 | $45,448.93 |
| ..., Arthur | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $500.00 | $0.00 | $0.00 |
| ..., Eric Randolph | Randy Barnes | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Arthur | The Joker | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Cedar | Silver King | | | | $29,637.54 | $0.00 | | $67,344.36 | $0.00 | $0.00 | $84,380.35 | $0.00 | $0.00 | $67,870.29 | $0.00 | $0.00 |
| ..., Scott | Scott Putski | | | | | $0.00 | | $54,341.30 | $0.00 | $0.00 | $49,472.14 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ghan, Tom | Disorderly Conduct | | | | $9,400.00 | $0.00 | | $11,630.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Chris ...wyer (Storm,) | | $105,966.00 | | | $189,412.59 | $33.90 | $10,679.41 | $187,348.40 | $45.46 | $24,660.15 | $317,760.57 | $49.51 | $35,608.04 | | $16.77 | $29,712.12 |
| ..., Brian | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $3,338.74 | $0.00 | $0.00 |
| ..., Marius | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1866009_5.XLS - Active

EXHIBIT

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

[CONFI]DENTIAL

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...on, Lenny | Lenny Lane, Standards and Practices | | | | $11,333.14 | | | $37,485.22 | $0.00 | $0.00 | $45,300.23 | $0.00 | $0.00 | $133,382.03 | | $0.00 |
| ...lanta, Dominic | Psychosis | $7,270.59 | | | $43,382.42 | $0.00 | | $107,591.54 | $0.00 | $16,330.00 | $149,551.97 | $0.00 | $27,698.47 | $70,044.71 | $0.00 | $1,213.97 |
| ...er, Scott | | | | | $16,128.17 | $0.00 | | $51,462.17 | $0.00 | $0.00 | $27,462.16 | $0.00 | $0.00 | | $9.39 | $0.00 |
| ...o, Max | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.01 | $0.00 | | $0.00 | $0.00 |
| ...L. E. Bryce ...da, Inc.) | Kronic/Wrath | $101,713.32 | | | $166,175.41 | $0.00 | | $173,235.43 | $27.41 | $4,997.18 | $214,587.52 | $30.39 | $12,461.24 | $230,402.34 | | $4,490.63 |
| ...Keith James | Garth Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $14.899 | $0.00 |
| ...Kent Darrell | Kent Cole The Cole Twins | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ell, Richard | Rick Cornell Fame | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $39,650.59 | $0.00 | $0.00 |
| ...e, Daniel | Chris Daniels | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $44,472.58 | $0.00 | $0.00 |
| ...rydzik, John | Max Muscle | $31,075.00 | | | $21,514.20 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...her, William | Bill Sullivan | $37,347.14 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ny Blasy | Blazing Billy | | | | $40,775.94 | $0.00 | | $134,243.92 | $0.00 | $0.00 | $133,194.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...i, Mirza | Elvira Lancaster | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...i, Mensi | | | | | | $0.00 | | $325.95 | $0.00 | $0.00 | $17,440.20 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ia, Patrick | Apollo | | | | | $0.00 | | $6,011.45 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...m, William C. | General Election, Hugh Morris | $100,210.52 | | | $163,564.15 | $0.00 | | $164,203.34 | $0.00 | $0.00 | $196,618.00 | $0.00 | $609.30 | $345,931.43 | | $44.12 |
| ...Mendoza, ...tesi | Villano V | | | | $14,911.44 | $0.00 | | $36,977.62 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Mendoza, ...a | Villano IV | $2,371.77 | | | $43,838.64 | $0.00 | | $44,454.47 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...a, Alfred | Roger The Wrestling Crew | | | | | $0.00 | | $2,600.00 | $0.00 | $0.00 | $19,936.66 | $0.00 | $0.00 | $14,465.00 | $0.00 | $0.00 |

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...Joseph ...get (Enterprise | Johnny Swinger | $1,425.00 | | | $22,091.14 | $0.00 | | $37,479.99 | $0.00 | $0.00 | $35,410.96 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...ce, James | Hacksaw Jim Duggan | $164,377.44 | $28.40 | | $210,301.39 | | | $111,643.81 | $0.00 | $0.00 | $180,731.44 | $0.00 | $0.00 | $173,900.95 | $0.00 | $0.00 |
| ...m, Bobby | Bobby Duncum, Jr. | | | | | $0.00 | | $46,908.00 | $0.00 | $0.00 | $156,291.00 | $0.00 | $0.00 | $16,290.41 | $0.00 | $59.20 |
| ...n, Michael | Public Enemy (Johnny Grunge) | $81,110.85 | $23.90 | | $109,943.16 | $201.77 | | $71,513.16 | $13.41 | $907.49 | $54,969.82 | $0.00 | $17,901.00 | | ($1.06) | $2,518.00 |
| ...Bobby | Beautiful Bobby | $88,709.17 | | | $76,378.24 | $0.00 | | $81,249.89 | $0.00 | $0.00 | $94,113.82 | $0.00 | $0.00 | $56,394.41 | $0.00 | $0.00 |
| ...Tony | Rough & Ready; Mike Enos | $77,724.17 | | | $80,567.00 | | | $106,970.16 | $0.00 | $0.00 | $212,016.36 | $0.00 | $0.00 | | ($1.06) | $2,518.00 |
| ...Mike | | | | | | $0.00 | | | $0.00 | $7815.35 | $101,659.04 | $0.00 | $108,615.57 | | $0.00 | $0.00 |
| Sidney B. | Sid Vicious | | | | | $0.00 | | | $0.00 | $0.00 | $633,531.36 | $0.00 | $0.00 | $883,552.98 | $445.97 | $8,439.50 |
| ...Lawn Timothy | Lawn Storm | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $182,473.51 | | |
| ...berg, Page Page (manson) | Diamond Dallas Page (DDP) | $149,444.93 | | | | $12,093.87 | | $300,315.88 | $15,975.86 | $49,054.05 | $1,076,554.81 | $1,138.67 | $247,708.97 | $1,176,677.77 | $191.11 | $0.00 |
| ...Harold Daniel | | | | | | $0.00 | | | $0.00 | $0.00 | $332,990.27 | $0.00 | $0.00 | $370,821.31 | $419.35 | $344,731.23 |
| ...n, Ed | The Cash | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...Jeff | NWO Sting | | | | $83,698.65 | $0.00 | | $190,102.20 | $0.00 | $4,148.00 | $143,009.41 | $0.00 | $1,031.62 | $103,729.36 | $0.00 | $0.00 |
| ...Tonga | King | $153,290.69 | | | $164,508.21 | $0.16 | | $178,692.11 | $0.00 | $19,330.00 | $177,809.00 | $0.00 | $19,334.40 | $171,993.56 | $0.00 | $44.17 |
| ...David | Fit Finlay | $17,000.00 | | | $20,000.00 | $0.00 | | $116,084.95 | $0.00 | $16,320.00 | $135,424.42 | $0.00 | $272,942.22 | $166,191.81 | $0.00 | $44.17 |
| David | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Richard (Phil | Rik Flair | $313,844.24 | | | $466,412.03 | $0.00 | | $742,204.92 | $413.29 | $273,411.06 | | $14.31 | $320,350.24 | $1137,170.64 | | $14,056.26 |
| ...Amato | Spyder | | | | | $0.00 | | $1,276.16 | $0.00 | $0.00 | $346,109.39 | $0.00 | $0.00 | | $81.45 | $0.00 |
| Michael | Cruise Jack | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Christopher (Joe Storm) | Greenisc | $900.00 | | | $1,750.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $123,335.31 | $0.31 | $0.00 |
| ...er, Ryan | | | | | | $0.00 | | | $0.00 | $0.00 | $4,718.88 | $0.00 | $0.00 | | $0.00 | $0.00 |

1044406_5XL3 - Active

Supplemental Response to Plaintiffs' *Consolidated First Interrogatories*, Interrogatory No. 3

EXHIBIT

CONFIDENTIAL

| Real Name | Ring Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| m, Chad Guerrero, no | El Los Fabulosos /el Dandy | | | | $54,000.00 $177,021.52 | $0.00 | | $55,913.37 $50,332.15 | $0.00 $0.00 | $0.00 | $79,040.24 $846,093.54 | $0.00 $0.00 | $0.00 $0.00 | $54,555.29 | $0.00 | $0.00 |
| , Rick | Rick Fuller | | | | $22,307.14 | $0.00 | | $16,583.95 $87,383.56 | $0.00 $0.00 | $951.33 | $64,408.21 $215,603.83 $16,823.95 | $0.00 $0.00 $0.00 | $10,635.17 $0.00 $0.00 | $60,285.07 $68,202.81 $287,738.78 | $0.00 $4.44 $0.00 | $11,331.74 $0.00 $0.00 |
| , Allen Eric | Kwee-Wee | | | | $31,200.00 | $0.00 | | $32,408.64 | $0.00 $0.00 | $0.00 | $22,697.83 | $0.00 $0.00 | $0.00 $0.00 | $9,190.00 $62,041.71 | $0.00 $0.00 | $0.00 $0.00 |
| , Terry | Terry Funk | $32,390.00 | | | | $0.00 | | | $0.00 | $0.00 | $19,376.19 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Jeff | The Gambler | | | | | $0.00 | | | | | | | | | | |
| , Alan | | | | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, James Knoble | James Knoble | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| rd | Jung Dragons | | | | | $0.00 | | | | | | | | | | |
| s, Robert Cain | Reuben Cain | $84,641.35 | | | $42,395.96 | $0.00 | | $87,563.43 | $16,277.77 | $20,970.77 | $199,351.34 | $0.00 | $30,482.99 | $186,888.07 | ($0.94) | $8,051.10 |
| n, Thomas Gilbert | Eddie Gilbert | $20,143.90 | | | $116,820.44 | $0.00 | | $462,084.77 | | $32,783.77 | $4,680,801.77 | $10,002.94 | $551,120.65 | $2,376,247.44 | $15,593.46 | $668,375.46 |
| m, Glenn (Inc.) | Boogie Knights - Disco Inferno | $26,321.34 | | | $11,000.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| org, Bill ght, Inc.) | | | | | | | | | | | | | | | | |
| m, Jimmy | | $80,617.03 | | | $67,501.31 | $0.00 | | $63,702.58 | $0.00 $0.00 | $0.00 | $11,500.00 | $0.00 $0.00 | $0.00 $0.00 | | $0.00 | $0.00 |
| s, Lee | Bunkhouse Buck | $34,147.43 | | | $46,016.63 | $0.00 | | | | | | | | | | |
| z, Juan Carrera | Damien | $4,330.87 | | | $41,044.09 | $0.00 | | $111,083.11 | $0.00 | $16,570.00 | $132,468.41 | $3.31 | $27,088.47 | $99,748.74 | $0.00 | $15,092.00 |
| tin, Hernandez, do Anibal | Juventud Guerrera | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.13 | $144.34 |
| dez, Jorge | El Gigante | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| m, Terry | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| m, Robert George | Bobby Graham | $10,000.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $84,635.04 | $0.00 | $0.00 |
| , Sam Gang | One Man Gang | $10,000.00 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Jimmy | | | | | $16,024.57 | $0.00 | | $51,120.57 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Kevin | | $116,000.00 | | | $430,000.00 | $0.00 | | $520,000.00 | $0.00 | $0.00 | $169,810.52 | $100.65 | $26,043.16 | $1,304,336.39 | $66.67 | $32,206.76 |
| , Peter | | $119,483.36 | | | $35,740.56 | $0.00 | | $114,112.76 | $0.00 | $16,330.00 | $472,614.71 | $0.31 | $15,938.34 | $18,349.86 | $36.60 | $4,331.70 |
| rro, Eduardo | Billy Kidman / Eddie Guerrera | $111,823.39 | | | $366,419.43 | $1.11 | $10,676.18 | $257,198.77 | $28.16 | $35,094.31 | | | | | | |

1044666_3.XLS - Active

EXHIBIT

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Role Name | 1996 Payroll | 1996 Licensing | 1996 March | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| rrro, Salvador | Lihuanraal Loco/ Chaco Guerra Jr. | $44,073.06 | | | $84,766.96 | $0.00 | | $136,404.13 | $0.00 | $16,520.00 | $175,316.67 | $0.00 | $27,941.13 | $205,470.52 | ($1.06) | $3,544.12 |
| rrro, Oscar rrrio Inc.) | Rey Mysterio, Jr. | $37,042.11 | | | $154,453.77 | $243.93 | | $205,845.82 | $263.88 | $24,157.44 | $355,337.70 | $903.71 | $31,733.48 | $356,120.49 | $1,318.63 | $7,930.78 |
| Emory rmactric, Inc.) | | | | | | $0.00 | | $2,500.00 | $0.00 | $0.00 | $32,376.80 | $0.00 | $0.00 | $167,504.25 | | $0.00 |
| r, Sean | Sean Oliver | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $74,994.59 | $0.00 | $0.00 |
| Scott (Stern Hall) rrprian) | Scott Hall/ Lars Call Hall/ The Outsider | $379,291.49 | | | $665,947.71 | $3,511.13 | $1,207.51 | $1,373,726.73 | $4,490.76 | $44,946.04 | $771,737.94 | $19.39 | $76,349.91 | $815,334.45 | $1,285.07 | $41,724.15 |
| ron, Troy | Abs | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| rrry, Bret | | | | | | $0.00 | | $51,575.36 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| rrco, Kirt | | | | | | $0.00 | | | $0.00 | $0.00 | $108,493.16 | $0.00 | $0.00 | | $0.00 | $0.00 |
| rrn, Stan | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| n, Donald | Harris Boys Creative Control | | | | | $0.00 | | | $0.00 | $0.00 | $13,990.54 | $0.00 | $0.00 | $200,401.47 | | $0.00 |
| n, Ronald | Harris Boys Creative Control | | | | | $0.00 | | | $0.00 | $0.00 | $13,990.54 | $0.00 | $0.00 | $200,476.87 | $5.70 | $0.00 |
| , Theodore | 4X4 | | | | | $0.00 | | | $0.00 | $0.00 | $50,410.94 | $0.00 | $0.00 | $13,991.00 | $5.70 | $0.00 |
| , Bret | | | | | $345,945.20 | $0.00 | | $1,666,353.51 | $178.92 | $31,477.04 | $2,560,888.06 | $19.31 | $39,206.76 | $1,311,345.80 | $2,289.50 | $101,771.19 |
| rrron, Shaiju rrolo, Kanadare | King Dragon X4 | | | | | $0.00 | | $40,017.79 | $0.00 | $955.31 | $91,494.21 | $0.00 | $11,444.75 | $100,196.98 | $0.00 | $0.00 |
| rrr, Michael | Prince Iaukea/ The Artist | $8,360.00 | | | $44,708.66 | $0.00 | | $53,321.50 | $0.00 | $0.00 | $205,552.80 | $0.00 | $7,099.62 | $81,560.06 | ($1.06) | $3,544.12 |
| , David | Road Warrior Hawk | $72,093.22 | | | $7,200.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.06) | $3,118.00 |
| rrack, Michael | Road Warrior Hawk | | | $99.19 | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| rrg, Jim | Diprota Warrior | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |

1044444_3.XLS - Andrew

EXHIBIT

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

CONFIDENTIAL

| Real Name | Ring Name | 1998 Payroll | 1998 March | 1998 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| m, Gregory Shane | J Coast Shane | | | | | $0.00 | | | $0.00 | | $28,109.64 | $0.00 | $0.00 | $37,728.94 | $3.33 | $0.00 |
| g, Curt | | | | | $200,497.03 | $0.00 | | $417,964.00 | $40.14 | $13,866.99 | $437,654.00 | $0.00 | $27,941.23 | $176,901.11 | ($8.03) | $3,836.05 |
| rth, Mark (Van mar Inc.) | Van Hammer | | | | $9,006.88 | $0.00 | | $151,224.02 | $0.00 | $0.00 | $119,322.66 | $0.00 | $27,132.03 | $990,462.99 | | $0.00 |
| ghmont, Richard | Vampiro | | | | | $0.00 | | $41,556.28 | $0.00 | $0.00 | $131,210.33 | $0.00 | $0.00 | $240,632.92 | $11,270.21 | $0.00 |
| m, Harold | M. T. Smooth Ice Train | $73,516.52 | | | $93,408.97 | $0.00 | | $55,259.39 | $0.00 | $0.00 | $211,165.52 | $0.00 | $0.00 | $3,480.00 | $0.00 | $0.00 |
| wright, Barry | | | | | $15,956.14 | $0.00 | $33.00 | $240,881.62 | $33.57 | $4,814.59 | $609,550.08 | $98.17 | $30,653.70 | $712,127.49 | $0.00 | $0.00 |
| rien, Booker T (ker T. Inc.) | Harlem Heat Booker T | $151,403.90 | $2,668.12 | | $234,360.30 | $19.24 | | $261,223.67 | $22.59 | $2,973.19 | $609,550.08 | $98.16 | $32,015.77 | $304,304.60 | $27.22 | $31,191.93 |
| rien, Lash | Harlem Heat Stevie Ray | $151,703.24 | $2,668.27 | | $238,880.45 | $63.40 | $33.00 | | $0.00 | $0.00 | | $0.00 | $0.00 | | $7.94 | $4,317.71 |
| ngr Jonathan (Bull Balls) | Johnny "The Bull" | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $41,555.67 | $0.00 | $0.00 |
| my Jonathan | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ws, Curtis | Big Cat | | | | | $0.00 | | $1,150.00 | $0.00 | $0.00 | $16,240.95 | $0.00 | $0.00 | | $0.00 | $0.00 |
| in, Gregory | Chris | $50,389.62 | | | $144,495.18 | $0.00 | | $134,208.11 | $27.41 | $4,021.64 | $143,439.54 | $323.32 | $31,648.22 | $79,975.24 | $9.80 | $30,206.31 |
| , Chris | Chris Jericho | $34,348.73 | | | $85,507.48 | $0.00 | | $103,816.55 | $0.00 | $0.00 | $128,015.40 | $0.00 | $0.00 | | $0.00 | $0.00 |
| a, Robert Brad | Brad/Brad/Brad Armstrong | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| nt, Scott | Scott | $12,440.00 | | | $83,379.37 | $0.00 | | $32,720.27 | $0.00 | $0.00 | $43,523.13 | $0.00 | $0.00 | $55,719.02 | $0.00 | $0.00 |
| ng, Steve | Steve Armstrong | $12,740.00 | | | $22,628.57 | $0.00 | | $33,603.27 | $0.00 | $0.00 | $9,944.07 | $0.00 | $0.00 | $535,421.17 | $0.00 | $0.00 |
| strp, Frederick | Marty Jannetty The Chosen One | $62,783.24 | | | $10,576.18 | $0.00 | $10,674.14 | $117,253.34 | $0.00 | $0.00 | $314,302.05 | $0.00 | $0.00 | $77,205.39 | $4,330.64 | $0.00 |
| ist, Jeff (J.J. Inc.) | | | | | $177,717.42 | $0.00 | | | $0.00 | $0.00 | $23,290.09 | $0.00 | $0.00 | | $0.00 | $0.03 |
| ad, Mark Robert | Mark Hebick | | | | | $0.00 | | $120.00 | $0.00 | | $79,281.10 | $0.00 | $0.00 | $97,348.72 | $0.00 | $0.00 |
| rson, Mark | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $1,300.00 | $0.00 | $0.03 |
| , Alan | AJ Styles | | | | | $0.00 | | $5,060.27 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.03 |
| , Michael | Vincent | $27,010.56 | | | $109,453.71 | $0.00 | | $112,514.58 | $40.14 | $0.00 | $129,780.04 | $0.00 | $25,205.28 | $115,840.35 | $0.00 | $48.13 |

EXHIBIT

CONFIDENTIAL

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ia, Even | J Crane | | | | $250.00 | $0.00 | | $33,327.12 | $0.00 | | $71,865.21 | $0.00 | $0.00 | 179,197.42 | $3.55 | $0.00 |
| Steve | | | | | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Rob | A Levine | | | | | $0.00 | | $47,439.13 | $0.00 | $0.00 | $67,104.45 | $0.00 | $0.00 | $19,042.29 | $0.00 | $0.00 |
| inia, Chris | Kalyani/String | $45,381.77 | | | $26,221.17 | $0.00 | | $309,911.95 | $37.41 | $0.00 | $246,397.73 | $0.00 | $27,841.21 | $146,397.49 | $0.00 | 15,646.35 |
| , Rob | Robby Rage/ High Voltage/ Kaos | $17,115.54 | | | $109,733.02 | $0.00 | | $7,209.14 | $0.00 | $0.00 | $148,611.55 | $0.00 | $101.89 | $31,595.88 | $91.04 | |
| | | | | | $37,080.00 | | | | | | | | | | | |
| Caleb | Greele Giant | | | | | $0.00 | | | $0.00 | | | | | $0.00 | $0.00 | $0.00 |
| ing | Gary Valentine | $5,980.00 | | | $71,465.18 | $0.00 | | $10,542.37 | $0.00 | | $51,007.95 | $0.00 | $0.00 | | $0.00 | $0.00 |
| nt, Mark | Conquest/ Cajun/Lash Lerout | | | | | $0.00 | | $4,344.00 | $0.00 | | | $0.00 | $0.00 | $66,656.77 | | |
| Ed | Disciple/Booty Man/ Zodiac | $149,919.65 | | | $183,338.06 | $0.00 | | | $0.00 | | $194,629.05 | $0.00 | $11,444.77 | | ($1.06) | $2,518.00 |
| ew, Paul | Terror Rysinki/ Paul Levesque | | | | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $44.12 |
| Scott | Raven | | | | $105,541.60 | $0.00 | | $247,127.01 | $3,218.45 | $30,011.49 | $189,826.57 | $119.17 | $35,411.42 | | $6.00 | $0.00 |
| Raymond | Glacier | $66,693.33 | | | $150,443.97 | $0.00 | | $164,418.41 | $37.41 | $7,269.02 | $160,544.57 | $0.00 | $27,555.41 | $25,479.44 | $13.55 | $36,413.45 |
| | Booty Buster | | | | | | $10,674.18 | | | | | | | | | $451.18 |
| ae, Van | Big Van | | | | | $0.00 | | | $0.00 | $0.00 | $21,861.07 | $0.00 | $0.00 | 1243,641.28 | $0.00 | $0.00 |
| Jeremy David | Jeremy Lopez | | | | | $0.00 | | | $0.00 | $0.00 | $19,334.19 | $0.00 | $0.00 | $3,100.76 | $0.00 | |
| uan Carlos | Lizmark, Jr. | | | | $34,304.37 | $0.00 | | $44,393.03 | $0.00 | $0.00 | $85,997.72 | $0.00 | $0.00 | $6,594.94 | $0.00 | $0.00 |
| Arturo | Arn Anderson | $700,399.96 | | | $211,493.92 | $0.00 | | $236,578.90 | $0.00 | $0.00 | $15,434.47 | $0.00 | $11,495.16 | | ($1.06) | $2,518.53 |
| en, Jerry | Joey Maggs | $3,000.00 | | | $19,228.57 | $0.00 | | $7,200.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | ($1.06) | $2,718.00 |
| , Karl | The Mailman | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| James | | $14,377.22 | | | $30,000.00 | $0.00 | | $31,210.00 | $0.00 | $0.00 | $23,980.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Michael | Barrie Richards | | | | $29,562.44 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Troy | The Franchise | | | | | $0.00 | | | $0.00 | $0.00 | $172,057.49 | $0.00 | $0.00 | $334,485.51 | | |
| | Shane Douglas | | | | | | | | | | | | | | $41.04 | $0.00 |
| ngle, Jason | | | | | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 |
| as, Daren | Steve Regal | $149,539.99 | | | $216,234.47 | $0.00 | $10,674.18 | $184,109.54 | $0.00 | $10,709.72 | $197,189.71 | $0.00 | $17,314.64 | 336,416.35 | $0.00 | $4,484.22 |
| ual, Steve | | $302,417.97 | | | $370,408.72 | $0.00 | | $258,245.46 | $37.41 | $33,551.18 | $109,496.02 | $0.00 | $16,281.64 | | ($1.06) | |

1046666_3.XLS ; Active

**EXHIBIT**

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Last Name | Ring Name | 1996 Payroll | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mark | Johny B. Badd | $68,929.14 | $356.62 | $164.59 | $0.00 | $2,389.78 | $47,319.93 | $0.00 | $0.00 | $308,311.66 | $0.03 | $0.00 | $1,500.00 | $0.00 | $0.00 |
| Ernest | The Cat | $35,142.84 | | $17,062.47 | $0.00 | | $47,336.87 | $27.41 | $0.00 | $293,080.00 | $0.00 | $10,061.40 | $341,440.36 | ($1.06) | $3,184.17 |
| Percy | Mister P. | | | $40,228.37 | $0.00 | | $46,214.32 | $0.00 | $0.00 | $35,231.10 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Don | Onyx | $31,290.00 | | | $0.00 | | | $0.00 | $0.00 | $40,344.43 | $0.00 | $0.00 | | $0.00 | $0.00 |
| James | Vandenberg | | | $38,310.24 | $0.00 | | $54,606.43 | $0.00 | $0.00 | $46,280.11 | $0.00 | $43,311.39 | $46,473.13 | $0.00 | $0.00 |
| John | Disorderly Conduct | | | $6,700.00 | $0.00 | | $18,630.00 | $0.00 | $0.00 | $38,140.97 | $0.00 | $0.00 | | $0.00 | $0.00 |
| Rocky | | $10,480.00 | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Louie Spicolli | | | | $17,432.00 | $0.00 | | $39,847.61 | $0.00 | $0.00 | | $0.00 | $0.00 | $47,843.47 | $0.00 | $0.00 |
| Kelji Great Muta | The Outsiders/Big | $356,301.31 | | $792,575.77 | $3,510.75 | | $1,471,728.15 | $4,994.97 | $39,356.12 | $1,357,044.40 | $1,804.07 | $246,549.89 | $1,195,131.40 | $3,547.10 | $265,893.77 |
| | Vegas | | | | | | | | | | | | | | $44.13 |
| | | | | | | | | | $5,438.63 | | $0.00 | $30,344.51 | $0.00 | $0.00 |
| Jim Helms | The Artist | | | $40,273.95 | $0.00 | | $315,953.46 | $0.00 | $0.00 | $16,411.25 | $0.00 | $0.00 | | $0.00 | $0.00 |
| H. Harrison | Hardbody Harrison | $1,514.74 | | $12,475.00 | $0.00 | | $132,300.39 | $0.00 | $0.00 | $22,895.21 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | | | | $1,400.00 | $0.00 | | $5,823.00 | $40.14 | $4,899.67 | $355,499.40 | $0.00 | $38,574.15 | $39,733.45 | ($1.05) | $3,504.72 |
| Kevin Nash | | $195,328.02 | | $223,147.14 | $0.00 | | $390,140.33 | $0.00 | $0.00 | | $0.00 | $0.00 | $315,343.47 | $0.00 | $0.00 |
| Scott Hall | Scott | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $316,765.76 | $0.00 | $0.00 |
| Michael | | | | | $0.00 | | | $0.00 | $2,107.94 | $118,449.24 | $0.00 | $16,781.49 | $113,150.69 | $0.00 | $2,514.00 |
| Kazuo (Super K) | Sonny | $99,310.58 | | $163,313.49 | $0.00 | | $319,533.96 | $0.00 | $0.00 | | $0.00 | $0.00 | | ($1.06) | $0.00 |
| Jeff | Buzz | $5,733.42 | | $36,411.48 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $1,500.00 | $0.00 | $0.00 |
| J.H. Paul Carl | | $45,977.26 | | $91,955.03 | $0.00 | | | $0.00 | $0.00 | $36,150.49 | $0.00 | $0.00 | $111,623.84 | $0.00 | $0.00 |
| Charlie | The Event Check | | | | $0.00 | | $2,338.35 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Thomas C. | | | | | $0.00 | | | $0.00 | $0.00 | $58,159.41 | $0.00 | $0.00 | $10,564.40 | $0.00 | $11,092.00 |
| Juan Manuel | Cyclope | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Adam J. | | | | | | | | | | | | | | | |

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

EXHIBIT

| Real Name | Ring Name | 1996 Payroll | 1996 Merch | 1996 Licensing | 1997 Payroll | 1997 Merch | 1997 Licensing | 1998 Payroll | 1998 Merch | 1998 Licensing | 1999 Payroll | 1999 Merch | 1999 Licensing | 2000 Payroll | 2000 Merch | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Theodore J. | Tyheny Banno Rocky/ Public Enemy | $81,454.91 | $33.56 | | $189,402.21 | $201.73 | | $170,559.16 | $13.42 | $807.09 | $39,118.56 | $0.00 | $7,901.04 | | | $0.00 |
| Lawrence | The Total Package/Lex Luger | $443,992.79 | | | $761,373.31 | $3,111.56 | $11,501.46 | $791,299.39 | $575.46 | $39,909.32 | $1,321,704.74 | $12.45 | $50,181.77 | $1,336,086.87 | $0.00 | $34,037.24 |
| m. Brian | First Brian Pillman/ California Brian | $70,880.49 | | $969.55 | | $0.00 | | | $0.00 | | | $0.00 | $0.00 | | $44.84 | |
| M. Craig Alan | Sgt. Craig Pittman | $99,681.14 | $1.31 | | $70,411.06 | $29.54 | $17.92 | $1.50 | $0.91 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Lenny | Lenny Priffo | | | | | $0.00 | | $4,521.27 | $0.00 | $0.00 | | $0.00 | $0.00 | | ($0.17) | $0.00 |
| Randy | Randy Savage Macho King Macho Man | $723,412.19 | $10,379.17 | | $1,290,170.23 | $1,079.43 | $6,462.20 | $1,543,679.78 | $4,074.72 | $23,937.73 | $1,414,463.66 | $557.31 | $219,406.76 | $110,317.67 | | $0.00 |
| Steve | Rick Steiner (Varsity Club) | $156,217.06 | | | $119,774.11 | $0.00 | | $335,578.59 | $0.00 | $0.00 | $144,202.00 | $0.00 | $0.00 | $997,410.21 | $65.43 | $180,535.13 |
| striner, Scott t Brothers) | Big Poppa Pump | $154,312.34 | | | $309,962.79 | $1.59 | $10,676.18 | $311,230.25 | $27.94 | $13,476.19 | $460,448.94 | $579.17 | $34,982.57 | $732,060.14 | ($1.04) | $23,453.51 |
| Joseph | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $15,498.39 | $115,993.76 |
| Ken | Ken Tuda | $24,150.94 | | | $37,634.99 | $0.00 | | $87,379.18 | $0.00 | $0.00 | | $0.00 | $16,300.00 | $0.00 | $0.00 |
| John | Ralphus | | | | | $0.00 | | $1,750.00 | $0.00 | $0.00 | $4,900.00 | $0.00 | $0.00 | $26,239.94 | $0.00 |
| on, Mark | | | | | | $0.00 | | | $0.00 | $0.00 | $1,176,413.56 | $0.00 | $0.00 | $0.00 |
| el, Dennis | The Worm | | | | | $0.00 | | $500,000.00 | $0.00 | $0.00 | $8,143.81 | $0.00 | $0.00 | $453.89 |
| A. Sammy Lee | Sunny Boy | | | | | $0.00 | | | $0.00 | $0.00 | $22,420.31 | $0.00 | $0.00 | $34,351.50 |
| Richard | Kid Rudos | | | | | $0.00 | | $296,477.28 | $0.00 | $0.00 | $12,129.42 | $0.00 | $21,299.19 | $297,254.92 | $0.00 |
| Jeremiah | Blue Dog | | | | | $0.00 | | $400.00 | $0.00 | $0.00 | $63,768.10 | $0.00 | $3,831.74 | $0.00 |
| Michael | Wildwind | $119,302.16 | | | $149,564.99 | $0.00 | | $137,401.88 | $0.00 | $0.00 | $162,305.04 | $0.00 | $0.00 | $131,133.44 | $0.00 |
| na Andrea | | $46,007.36 | | | $972,513.32 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 |

1044494_S.XLS - Andrea

10

CONFIDENTIAL

EXHIBIT

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3



| Last Name | Reg Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| s, Dustin | Dustin Rhodes | $164,602.42 | | $949.85 | $165,683.24 | $0.00 | | $103,379.50 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| s, Virgil | Dusty Rhodes | $234,514.00 | $47.33 | $3,024.84 | $154,374.56 | $0.00 | | | $0.59 | $0.00 | | $0.00 | $14,495.46 | | $0.00 | $0.00 |
| ...th, Jerry | Jerry Sags/Nasty Boys | | | | $12.06 | | $481.44 | | | $0.00 | | | $0.00 | | | |
| m, Brain | Bam Bam | $8,000.00 | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| x, Rain Canna | Super Club | | | | | $0.00 | | | $0.00 | | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Michael E. | Alabama Average | | | | | $0.00 | | $3,399.00 | $0.00 | | $0.00 | $20,398.59 | $0.00 | $0.00 | $70,641.00 | $0.00 | $0.00 |
| r, Robert | | | | | | $0.00 | | | $0.00 | $0.00 | | $1,709.59 | $0.00 | $0.00 | $65,543.83 | $0.00 | $0.00 |
| Kanula | | | | | | $0.00 | | | $0.00 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Perry (Saturn Inc) | Saturn | | | | $11,760.81 | $0.00 | | $163,315.63 | $0.00 | $1,814.97 | $273,349.21 | $149.44 | $29,364.23 | $29,108.54 | | $4,832.27 |
| Charles | 2 Cold Scorpio | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | | $44.08 | $0.00 |
| Hector | | | | | $24,388.94 | $0.00 | | $46,995.51 | $0.00 | $0.00 | $163,944.26 | $0.00 | $0.00 | $54,233.17 | $0.00 | $0.00 |
| David | | | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...enny, Eddie | Benny Stud | | | | | $0.00 | | | $0.00 | $0.00 | | $119,402.81 | $0.00 | $0.00 | $24,392.44 | $0.00 | $0.00 |
| Shelby Dean | Dean Malenko | $125,541.66 | | | $240,310.09 | $2.11 | $10,674.18 | $248,493.85 | $29.41 | $13,273.14 | $234,162.22 | $314.43 | $35,271.09 | $49,706.03 | $0.00 | $0.00 |
| (Malenko Inc.) | | | | | | | | | | | | | | | | |
| Eric | Primetime Elix | | | | | $0.00 | | $1,548.00 | $0.00 | $0.00 | $229,187.54 | $0.00 | $0.00 | $74,406.26 | $34.72 | $17,037.55 |
| Richard | Chris Slater | $39,254.48 | | | | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| , Robert | Bobby Blaze | | | | $17,453.06 | $0.00 | | $46,476.72 | $0.00 | $0.00 | $65,530.16 | $0.00 | $0.00 | $17,315.61 | ($17.00) | $0.00 |
| Norman | Norman/Black Magic | | | | | $0.00 | | | $0.00 | $0.00 | | $100,649.42 | $0.00 | $0.00 | $172,631.49 | | |
| Mark | | | | | $31,298.94 | $0.00 | | | $0.00 | $0.00 | | | $0.00 | $0.00 | | $48.26 | $2,518.00 |
| and (Davis boy) | Davis Boy Smith/Bulldog | | | | | $0.00 | | $281,597.72 | $0.00 | $1,709.33 | $65,993.30 | $0.00 | $29,789.19 | | $0.00 | $0.00 |
| ...ness | Christian York | | | | | $0.00 | | | $0.00 | $0.00 | | $17,247.15 | $0.00 | $0.00 | $32,095.99 | $0.00 | $109.88 |
| III., Charles | C.J. Spoone | | | | | $0.00 | | | $0.00 | $0.00 | | $119,354.16 | $0.00 | $0.00 | $17,788.57 | $0.00 | $0.00 |

{00446_332_Active}

CONFIDENTIAL

EXHIBIT

## Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Band Name | 1996 Payroll | 1996 March | 1996 Licensing | 1997 Payroll | 1997 March | 1997 Licensing | 1998 Payroll | 1998 March | 1998 Licensing | 1999 Payroll | 1999 March | 1999 Licensing | 2000 Payroll | 2000 March | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| , Daniel E. | Dangerous Dwadgery | | | | | | | | | | | $0.00 | | | $0.00 | $0.00 |
| with, Kenneth | | $16,842.40 | | | $77,880.00 | | | $88,448.04 | | $1,943.44 | $196,943.95 | $0.00 | $161.89 | $19,995.88 | ($1.00) | $2,518.00 |
| , High / Yoshagi/Kenny/Ken | High Voltage/Kenny/Ken | | | | | | | | | | | | | $31,500.00 | | $0.00 |
| g, Herman | Perfectisham | | | | | | | | | | $34,127.36 | | | $11,534.74 | | $0.00 |
| , Dawn | | | | | | | | | | | | | | $16,531.76 | | $0.00 |
| , Jacobus | Akan | | | | | | | | | | | | | | | $0.00 |
| , Oraj | | | | | | | | | | | | | | $500.00 | | $0.00 |
| , Dan | El Gato | $45,136.00 | | | $41,978.07 | | | $67,469.59 | | | $111,879.75 | | $22,556.81 | $103,547.35 | | $2,518.70 |
| Barra, Adolfo | LaPyria | $3,947.29 | | | $45,836.60 | | | | | | | | | | ($1.00) | |
| , William Chase | | | | | $0.00 | | | $5,600.00 | | | $24,598.05 | | $0.00 | | | $0.00 |
| , Dave | | $43,910.79 | | | $65,662.47 | | | $36,633.16 | | | $116,134.33 | | $0.00 | $11,201.37 | | $0.00 |
| , Paul W. | Terry Taylor | $146,299.10 | | | $124,061.79 | | | | | | | | $0.00 | | | $0.00 |
| , John | Avalanche | $236,448.96 | | | $130,134.97 | | | | | | | | $0.00 | | | $0.00 |
| , Wayne | Thunderbolt | | | | | | | | | | $50,990.41 | | $0.00 | | | $0.00 |
| , Randy | Dwell | | | | | | | | | | $113,862.26 | | $0.00 | | | $0.00 |
| , Kevin | | | | | | | | | | $1,721.36 | $686,571.10 | | $31,624.56 | $432,994.12 | | $0.00 |
| , Roderick (Hoolian, Inc.) | Randy Roddy Pope | $185,203.55 | | | $641,578.12 | $0.00 | | $688,078.90 | | | | | | | | $2,745.45 |
| , Dale | The Demon | | | | $18,542.86 | $0.00 | | $45,180.49 | $0.00 | | $59,941.67 | | $0.00 | $19,216.63 | $0.00 | $0.00 |
| , Ray | Big Rubba Rogers | $105,931.23 | | | $390,396.16 | $20.28 | $10.74 | $334,042.81 | $3.07 | | $27,794.91 | | $0.00 | $125,031.12 | $0.00 | $0.00 |
| hichael Terry | Sgt. A-Wall / The Wall | | | | | $0.00 | | | $0.00 | | $57,252.87 | | $0.00 | $44,990.68 | | $0.00 |
| , Joseph | Ioana Chirea Passa | | | | | | | $165,409.16 | | | $169,044.32 | | $27,173.03 | | | $0.00 |
| , Bono | Barberdos | $71,568.47 | | | $149,548.93 | $0.15 | | $111,437.10 | $0.00 | | $115,697.11 | | $0.00 | | | $49.12 |
| , Kheruro | Iron Sheik | | | | $54,602.05 | $0.00 | | $110,087.27 | $0.00 | | | | $23,961.13 | | | $0.00 |
| , John | Sick Boy | | | | $43,323.90 | $0.00 | | $144,160.35 | $0.00 | | $100,393.43 | | $0.00 | | | $0.00 |
| , Richard | Re Morel | | | | | | | | | | | | | | | |
| , Kevin | Kevin Kelly | | | | | | | | | | | | | | | |

12

EXHIBIT

Supplemental Response to Plaintiffs' Consolidated First Interrogatories, Interrogatory No. 3

| Real Name | Ring Name | 1996 Payroll | 1996 Merch. | 1996 Licensing | 1997 Payroll | 1997 Merch. | 1997 Licensing | 1998 Payroll | 1998 Merch. | 1998 Licensing | 1999 Payroll | 1999 Merch. | 1999 Licensing | 2000 Payroll | 2000 Merch. | 2000 Licensing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ...r, Bobby | Hardwork Bobby Walker | $70,013.32 | | | $94,571.49 | $0.00 | | $53,342.43 | $0.00 | $0.00 | $99,380.00 | $0.00 | $0.00 | $95,870.42 | $0.00 | $0.00 |
| ...ma, Sam | Sox | $44,600.44 | | | $244,820.02 | $3,543.41 | $13,289.09 | $52,054.79 | $2,121.61 | $3,163.21 | $74,996.49 | $0.00 | $3,176.12 | | $1.01 | $0.00 |
| ...n, John H. | Mikey Whipwreck | | | | $0.00 | $0.00 | | $48,310.86 | $0.00 | $0.00 | $44,047.56 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...i, Erik Johnson | Erik Watts | | | | | $0.00 | | $900.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ... Robert | Colonel Parker | $77,214.41 | | | $55,156.07 | $0.00 | | $13,416.05 | $0.00 | $0.00 | $28,899.91 | $0.00 | $0.00 | | $0.00 | $0.00 |
| ...er, Michael | Michael Wallstreet | $57,466.30 | | | $27,377.56 | $0.00 | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Anthony | Tony Atlas | | $563.81 | | $0.00 | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Don | Vader or Big Van Vader | | | $10,183.56 | $4,701.55 | $0.00 | | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Reggie | | | | | $209,000.00 | $0.00 | | $1,176.71 | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Matthew | Horshu | | | | $54,752.01 | $1,107.92 | $11,280.63 | $399,920.79 | $383.43 | $46,422.61 | $55,733.75 | $0.39 | $82,758.10 | | ($0.51) | $40,748.75 |
| ..., Paul (Plus Or | Glaci | $234,401.16 | | | $313,564.78 | | | | $0.00 | $0.00 | | $0.00 | $0.00 | $29,600.00 | | $0.00 |
| ...rm, Steve | Steve Austin Stunning Renegade | | | | | $0.00 | | | $0.00 | $0.00 | $10,418.41 | $0.00 | | $10,109.40 | | $0.00 |
| ...t, Rick | Renegade | | | | | | | | | | $33,794.55 | | $0.00 | | | |
| ...t, Stephen | Luther | $11,700.00 | | | | $0.00 | | $64,394.12 | $0.00 | $0.00 | $318,054.31 | $0.00 | $0.00 | $39,235.07 | ($3.06) | $2,518.00 |
| ... | Barry Windham | $849.85 | | | | $0.00 | | $77,155.46 | $0.00 | $0.00 | $375,411.06 | $0.00 | $0.00 | $391,211.09 | $0.00 | $0.00 |
| ...turn, Kenaldji | Boogie Knight/Alex Wright | $154,393.51 | | | $20,156.97 | $0.00 | | $234,446.35 | $29.99 | $3,307.44 | | $0.00 | $11,299.34 | | ($0.37) | $2,563.11 |
| ...t, Alex | | | | | $160,450.38 | $44.89 | | | | | | $0.00 | $0.00 | | $0.00 | $0.00 |
| ..., Chad | | $230,317.21 | $47.56 | $11,905.55 | $159,622.75 | $0.00 | | | $0.14 | $0.00 | $187,602.15 | $0.00 | $0.00 | $180,776.94 | | $0.00 |
| ...tkavia, Brian (etc.) | Brian Knobs | | | | | $12.00 | | | $0.00 | $0.00 | $48,377.04 | $0.00 | $0.00 | $27,510.62 | | $0.00 |
| ...y, Brett | | | | | $0.00 | | | $0.00 | $0.00 | $4,711.88 | $0.00 | $0.00 | | $0.00 | |
| James Dragons | | | | | $0.00 | | | | $0.00 | $0.00 | | $0.00 | $0.00 | | $0.00 | |

13

1044604_3.XLS - Active

## Exhibit B

# POWER PLANT TRAINEES

| REAL NAME | RING NAME |
|---|---|
| Allen, Steve | |
| Baum, Matthew B. | |
| Beach, Cameron | |
| Bernick, Brian Michael | Jet Jaguar |
| Bobic, Nikola | |
| Cain, Joseph Bradley | |
| Carr, Tony Byron | Corporal Cruel |
| Cornell, Rick | Nino, Reno |
| Craig, Twanta Maurice | |
| Daniel, Jason Matthew | J-Sin, New-sensation Jason |
| Davis, Marcial R. | Mercenary |
| Denson, Joseph (Joey) Frederick III | |
| Dixon, Rico | |
| Dorgan, Joe | Johnny Swinger |
| Dreer, William C. (Billy) | |
| Duong, Phap Minh | |
| Easterling, Darron Devon | |
| Endres, Troy | |
| Evans, Sean Charles | Shocker |
| Faqir, Rachid Daniel (Danny) | |
| Fliehr, David | David Flair |
| Forrester, Ryan | The Hearthrob |
| Fortune, Chad | |
| Funk, Allan Eric | Vytor, Triple A |
| James Gibson | |
| Greco, Sam | |
| Greene, John | Johnny Attitude |
| Groegler, Charles I. | |
| Guthrie, Mark | |
| Haire, Sean | Sean O'Haire |
| Hamner, Bret | |
| Hildreth, Mark | |
| Hogue, Harold | Ice Train |
| Hugger, Jonathan Martin | Johnny Blaze or Johnny Blade |
| Hunke, Gregory John | J T Greed |
| Jindrak, Mark | Mark Millenium |
| Jones, Allen | |
| Karagias, Evan | |
| Kellum, Rob | Artiste |
| Knapik, Robert J. | |
| Knox, Paul Lewis | Pierce Kage |
| Lee, Charles M. | |

**Exhibit B**

| | |
|---|---|
| Le Flore, Wondell | The Judge |
| LeRoux, J. Mark | Lash LeRoux |
| Loewen, Robert S. | |
| Mally (O'Malley), Craig | Irish Invasion |
| Maria, David | Apache |
| Massengale, Jason | |
| Moore, Ken | |
| Nimmons, Michael Brady | Mike Nova |
| Norris, Harrison, Jr. | Hardbody Harrison |
| Northcutt, Kevin | |
| Oliveira, Stephen | |
| Palumbo, Charles (Chuck) R. | |
| Reis, Ron | |
| Roll, Dean | Shark Boy |
| Roman, Sam | Rick Romeo, Kid Romeo |
| Saengsiphan, Bounthan | |
| Sanders, Mike | |
| Sapp, Bob | |
| Siaki, Sonny | Hawaiian GQ |
| Skipper, Elix | T-Lock, Venom |
| Speight, Lester | Mighty Rasta |
| Strauss, Jacobus | Jakes |
| Tatum, W. Chase | |
| Thurber, Courtright | |
| Thurber, James | |
| Tilton, Kevin | The Engima |
| Tipton, Mark | |
| Torborg, Dale | |
| Tuite, Michael Jerry | |
| Walker, Charles Franklin | |
| Walker, J. Bradley, Sr. | |
| Watkins, Joe | Vic Violent |
| White, Curtis L. | Toad |
| Wiese, Matthew | |
| Wilson, Luther | |
| Worthen, William | William Worthy |
| Wright, Chris | C.W. |
| Wright, Wesley "Shane" | |
| Yokley, Brett | |
| Yun, James | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Walker v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0367-CC
Onoo v. World Championship Wrestling, Inc., Turner Sports, Inc.
    and Turner Broadcasting System, Inc., Civ. File No. 1:00-
    CV-0368-CC
Norris v. World Championship Wrestling, Inc., Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-0369-CC
Easterling v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1715-CC
Davis v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1716-CC
Worthen v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1717-CC
Speight v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1718-CC
Saengsiphan v. World Championship Wrestling, Inc. and Turner
    Sports, Inc. and Turner Broadcasting System, Inc., Civ.
    File No. 1:00-CV-1719-CC
Reeves v. World Championship Wrestling, Inc. and Turner Sports,
    Inc. and Turner Broadcasting System, Inc., Civ. File No.
    1:00-CV-1720-CC
Patterson v. World Championship Wrestling, Inc., Turner Sports,
    Inc., Turner Entertainment Group, Inc. and Turner
    Broadcasting System, Inc., Civ. File No. 1:01-CV-1152-CC


CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of

*DEFENDANT UNIVERSAL WRESTLING CORPORATION'S SUPPLEMENTAL*

*RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST INTERROGATORIES TO*

*DEFENDANTS WORLD CHAMPIONSHIP WRESTLING, INC. AND TURNER SPORTS,*

*INC.* upon the interested parties by hand delivery, properly

addressed to:

1059482_1.DOC

Cary Ichter
Kelly Jean Beard
Charles Gernazian
Michelle M. Rothenberg-Williams
MEADOWS, ICHTER AND BOWERS, P.C.
Eight Piedmont Center, Suite 300
3525 Piedmont Road
Atlanta, GA 30305

This 10th day of October, 2002.

Eric A. Richardson

1059482_1.DOC